# EXHIBIT E

1                  UNITED STATES BANKRUPTCY COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                             -oOo-

4    In Re:                    ) Case No. 19-30088
                               ) Chapter 11
5    PG&E CORPORATION AND PACIFIC )
     GAS AND ELECTRIC COMPANY   ) San Francisco, California
6                              ) Tuesday, August 27, 2019
                      Debtors.  ) 10:08 AM
7    _____  )
                                 APPLICATION OF THE OFFICIAL
8                                COMMITTEE OF TORT CLAIMANTS,
                                 PURSUANT TO 11 U.S.C. SECTION
9                                1103 AND FED. R. BANKR. P.
                                 2014 AND 5002, TO RETAIN AND
10                               EMPLOY TRIDENT DMG LLC AS
                                 COMMUNICATIONS CONSULTANT
11                               EFFECTIVE AS OF JULY 18, 2019
                                 [3324]

12
                                 MOTION OF THE OFFICIAL
13                               COMMITTEE OF TORT CLAIMANTS
                                 TO COMPEL PROCEDURES OF
14                               THIRD-PARTY CONTRACTOR
                                 DOCUMENTS [3205]

15
                                 MOTION OF DEBTORS FOR ENTRY
16                               OF ORDER PURSUANT TO 11
                                 U.S.C. SECTION 365(D)(4) AND
17                               B.L.R. 6006-1 FURTHER
                                 EXTENDING TIME TO ASSUME OR
18                               REJECT UNEXPIRED LEASES OF
                                 NONRESIDENTIAL REAL PROPERTY
19                               ("SECOND LEASE EXTENSION
                                 MOTION") [3396]

20
                                 STATUS CONFERENCE RE:
21                               DEBTORS' MOTION PURSUANT TO
                                 11 U.S.C. SECTIONS 105(A) AND
22                               502(C) FOR THE ESTABLISHMENT
                                 OF WILDFIRE CLAIMS ESTIMATION
23                               PROCEDURES [3091]

24                  TRANSCRIPT OF PROCEEDINGS
                  BEFORE HONORABLE DENNIS MONTALI
25                UNITED STATES BANKRUPTCY JUDGE



```
1   APPEARANCES:
    For the Debtors:              STEPHEN KAROTKIN, ESQ.
2                                 JESSICA LIOU, ESQ.
                                  Weil, Gotshal & Manges LLP
3                                 767 Fifth Avenue
                                  New York, NY 10153
4                                 (212) 310-8000

5                                 KEVIN J. ORSINI, ESQ.
                                  Cravath, Swaine & Moore LLP
6                                 825 Eighth Avenue
                                  New York, NY 10019
7                                 (212) 474-1000

8   For the Official Committee    DENNIS F. DUNNE, ESQ.
    of Unsecured Creditors:       Milbank LLP
9                                 55 Hudson Yards
                                  New York, NY 10001
10                                (212) 530-5770

11  For the Official Committee    ROBERT A. JULIAN, ESQ.
    of Tort Claimants:            Baker & Hostetler LLP
12                                11601 Wilshire Boulevard
                                  Suite 1400
13                                Los Angeles, CA 90025
                                  (310) 442-8887
14
                                  CECILY A. DUMAS, ESQ.
15                                KIMBERLY S. MORRIS, ESQ.
                                  Baker & Hostetler LLP
16                                11601 Wilshire Boulevard
                                  Suite 1400
17                                Los Angeles, CA 90025
                                  (310) 820-8800
18
    For the Ad Hoc Committee      ABID QURESHI, ESQ.
19  of Bondholders:               Akin Gump Strauss Hauer & Feld LLP
                                  1999 Avenue of the Stars
20                                Suite 600
                                  Los Angeles, CA 90067
21                                (310) 229-1000

22  For the Ad Hoc Group of       BENJAMIN P. MCCALLEN, ESQ.
    Subrogation Claim Holders:    Willkie Farr & Gallagher LLP
23                                787 Seventh Avenue
                                  New York, NY 10019
24                                (212) 728-8651

25
```



| | |
|---|---|
| 1  For California Department<br>of Toxic Control: | PAUL J. PASCUZZI, ESQ.<br>Felderstein Fitzgerald Willoughby<br> Pascuzzi & Rios LLP<br>500 Capitol Mall<br>Suite 2250<br>Sacramento, CA 95814<br>(916) 329-7400 |
| 5  For California Public<br>Utilities Commission: | ALAN W. KORNBERG, ESQ.<br>SEAN MITCHELL, ESQ.<br>Paul, Weiss, Rifkind, Wharton &<br> Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>(212) 373-3000 |
| 9  For the Indenture Trustee,<br>BOKF, NA: | BETH M. BROWNSTEIN, ESQ.<br>Arent Fox LLP<br>1301 Avenue of the Americas<br>42nd Floor<br>New York, NY 10019<br>(212) 484-3900 |
| 12  For Lisa Delaine Allain,<br>Thomas Atkinson, Chippewa<br>Pest Control, Inc., Lara<br>Balas, Adam Balogh, Brian<br>Bolton, Sharon Britt, and<br>Heather Blowers: | STEVEN M. CAMPORA, ESQ.<br>Dreyer Babich Buccola Wood<br> Campora, LLP<br>20 Bicentennial Circle<br>Sacramento, CA 95826<br>(916) 379-3500 |
| 16  For North Bay Cases: | FRANK M. PITRE, ESQ.<br>Cotchett, Pitre & McCarthy, LLP<br>840 Malcolm Road<br>Suite 200<br>Burlingame, CA 94010<br>(650) 697-6000 |
| 19  For PGE Shareholders: | JAMES O. JOHNSTON, ESQ.<br>Jones Day<br>555 South Flower Street<br>Los Angeles, CA 90071<br>(213) 489-3939 |
| 22  For SLF Fire Victim<br>Claimants: | RICHARD A. MARSHACK, ESQ.<br>Marshack Hays LLP<br>870 Roosevelt<br>Irvine, CA 92620<br>(949) 333-7777 |

25



```
 1   For Various Insurance        CRAIG S. SIMON, ESQ.
     Companies:                   Berger Kahn
 2                                1 Park Plaza
                                  Suite 340
 3                                Irvine, CA 92614
                                  (949) 748-4444
 4
     For Wildfire Victims:        AMANDA L. RIDDLE, ESQ.
 5                                Corey, Luzaich, de Ghetaldi &
                                   Riddle LLP
 6                                700 El Camino Real
                                  Millbrae, CA 94030
 7                                (650) 871-5666

 8

 9

10

11

12

13

14

15

16

17

18

19

20   Court Recorder:             LORENA PARADA

21   Transcriber:                CLARA RUBIN
                                  eScribers, LLC
22                                7227 N. 16th Street
                                  Suite #207
23                                Phoenix, AZ 85020
                                  (973) 406-2250
24
     Proceedings recorded by electronic sound recording;
25   transcript provided by transcription service.
```

PG&E Corp., Pacific Gas and Electric Co.

1    SAN FRANCISCO, CALIFORNIA, TUESDAY, AUGUST 27, 2019, 10:08 AM

2                                -oOo-

3              THE COURT:  Okay, who's up?  Mr. Karotkin, are you

4    with us today?  I hope?

5              I got two matters other than status conference, so

6    where do you want me to start?  I mean, I'd like -- the status

7    conference, I presume, will take a lot of various counsel, and

8    we only have a couple of matters that are short.  Well, maybe

9    not.

10             MS. LIOU:  Good morning, Your Honor.

11             THE COURT:  Oh.

12             MS. LIOU:  Jessica Liou from --

13             THE COURT:  Oh, Ms. Liou --

14             MS. LIOU:  -- Weil, Gotshal & Manges --

15             THE COURT:  Okay.

16             MS. LIOU:  -- on behalf of the debtors.

17             THE COURT:  Good morning.

18             MS. LIOU:  I'm here to address the second item on the

19   agenda; it's the uncontested matter going forward today on the

20   debtors' second lease extension motion.

21             THE COURT:  Oh, yeah, that's -- no problem.  That's --

22             MS. LIOU:  Yeah.

23             THE COURT:  I've reviewed that.

24             MS. LIOU:  So I have --

25             THE COURT:  That's fine.



6

PG&E Corp., Pacific Gas and Electric Co.

1     MS. LIOU:  -- a revised proposed order here for you,

2  Your Honor --

3     THE COURT:  Okay.

4     MS. LIOU:  -- if you would like to view it.

5     THE COURT:  No, just go ahead and upload it.

6     MS. LIOU:  Great.

7     THE COURT:  I've --

8     MS. LIOU:  Okay.

9     THE COURT:  I've reviewed the motion and seems fine to

10  me, too, so --

11     MS. LIOU:  Sure.  The only change would be reflecting

12  the supplemental declarations --

13     THE COURT:  Right.

14     MS. LIOU:  -- filed, which include the additional

15  stipulations --

16     THE COURT:  Okay.

17     MS. LIOU:  -- for extension.

18     THE COURT:  Thank you, Ms. Liou.

19     MS. LIOU:  Thank you.

20     THE COURT:  Are you taking the Trident Bank (sic)

21  motion also?

22     MS. LIOU:  No, that's going to be handled by Mr.

23  Karotkin.

24     THE COURT:  Mr. Karotkin.  Okay, thank you, Ms. Liou.

25     Oh, there you are.  Good morning, Mr. Karotkin.

PG&E Corp., Pacific Gas and Electric Co.

1          MR. KAROTKIN:  Good morning, Your Honor.

2          THE COURT:  So is the only issue you've -- and the

3     only issue with the debtor, I guess, is you don't believe that

4     the TCC needs the services of Trident?

5          MR. KAROTKIN:  No.  And we're prepared to rest on our

6     papers.

7          THE COURT:  Ms. Dumas, are you -- Mr. Julian?  I have

8     a very minor question.  The engagement (sic) suggests that the

9     TCC on its own can continue Trident's engagement past November

10    if it chooses to.  What would be the circumstance?  I mean, as

11    I understand from the papers, the theory behind this request is

12    to help the victims and get the kind of assistance that you

13    think they're entitled to.  Is that something that would

14    continue after the claims deadline?  Likely to be the case?

15         MR. JULIAN:  Yes.

16         THE COURT:  Do you know -- can you just tell me what

17    might be an example of what would happen?

18         MR. JULIAN:  Yes, Your Honor.  The committee, as you

19    know, under 1103, has a statutory duty to advise the

20    constituency of what's going on with respect to plan --

21         THE COURT:  Right.

22         MR. JULIAN:  -- negotiations and the like, in this

23    case.  There are always issues coming up where the members and

24    the lawyers are getting calls.  And so we communicate through

25    the website and other methods.  And what we anticipate doing is

PG&E Corp., Pacific Gas and Electric Co.

1   answering questions through frequently asked questions on the

2   website or press releases and the like --

3           THE COURT:  Um-hum.

4           MR. JULIAN:  -- dealing with the estimation process,

5   pendency of claims, plan negotiations, and the like.

6           So we anticipate this going forward.  And we have

7   found that it's simply cheaper for a specialist to charge us

8   way lower rates than a lawyer at the Baker firm to help the --

9           THE COURT:  Or any other firm.

10          MR. JULIAN:  Yeah -- help the members of the --

11          THE COURT:  But what if --

12          MR. JULIAN:  -- of the committee.

13          THE COURT:  -- one of the victims calls one of the

14  Trident people who's not law-trained and it ends up getting

15  bounced over to one of your lawyers anyway?  I mean, I grant

16  you that Trident may be performing a very critical service, but

17  they also may be fielding -- they may be just intermediaries to

18  some of these questions that are so uniquely bankruptcy -- or

19  the bankruptcy procedure that I would assume many of the

20  victims don't have knowledge about.  Why would Trident have any

21  knowledge about that?

22          MR. JULIAN:  Well, we've -- here's what we did.  So we

23  operated without them for a while, and there was heavy draw on

24  the lawyers.  Now, since they've been on board for a month

25  helping out, the lawyer time still was involved but it's much

PG&E Corp., Pacific Gas and Electric Co.

1    farther reduced.  Basically what I'm looking at is insider

2    information, securities issues like that.

3            It's really been truncated now.  They've been a great

4    help and they're much cheaper for us.  So I think it's working

5    out this way.

6            THE COURT:  Okay, I'm willing to overrule the

7    objection by the debtor.  I don't -- I'll take your word for it

8    and the word of the victims.  I guess I would make one minor --

9    first of all, I think your opposition pointed out -- or your

10   response, rather, pointed out that much like other

11   professionals, the engagement here has similar language.  It

12   wasn't true in the employment application or the engagement,

13   because the negligence issue was not added on.  But it's in the

14   order.  So it's just my -- it's a personal thing about making

15   sure you don't get indemnified for your own negligence.

16           The only other thought, then, would be, if the

17   committee chooses to extend, by a month or two or three or

18   whatever period of time, Trident's engagement beyond the mid-

19   November, I think it would be appropriate at least to give the

20   official creditors' committee and the debtor just a quick

21   heads-up on it, maybe a ten-day notice on a scream-or-die

22   basis.  So I would propose -- I don't know, sitting here, what

23   our November dates are.  But I would say, as you get near the

24   end of October when -- if your client decides to extend Trident

25   or Trident convinces you that's the right thing to do, we don't

10

PG&E Corp., Pacific Gas and Electric Co.

1    have to turn this into a big deal; it can be just ten days to

2    give both the OCC and the debtors -- and I guess we include the

3    U.S. Trustee; they should be included -- an opportunity just to

4    be heard and, if there's no response, you could just submit an

5    order.  You shouldn't have any problem with that; would you?

6            MR. JULIAN:  That's fine, Your Honor.

7            THE COURT:  Okay.

8            MR. JULIAN:  We'll add that to the order and upload

9    it.

10           THE COURT:  Okay.  So ten-day to extend.  And I

11   believe now -- you've persuaded me that it seems like a good

12   thing to do to -- not only to ease the burden on you and your

13   colleagues in the firm but also perhaps nonlawyers being able

14   to communicate on a less lawyerly-like manner to the people

15   that need the information.

16           Okay.  Thanks very much.

17           MR. JULIAN:  Thank you, Your Honor.

18           THE COURT:  So are we going to go forward on the

19   third-party contractor document?  Is that still viable for

20   today, or not?

21           MS. MORRIS:  Good morning, Your Honor.

22           THE COURT:  Good morning.

23           MS. MORRIS:  Kimberly Morris from BakerHostetler, for

24   the official committee of tort claimants.

25           THE COURT:  And --



PG&E Corp., Pacific Gas and Electric Co.

1        MS. MORRIS:  Your Honor --

2        THE COURT:  Yes?

3        MS. MORRIS:  Do you have a question?

4        THE COURT:  Well, no.  Who -- someone started to

5   speak; I don't know who.

6        MS. MORRIS:  Oh, on the phone?

7        THE COURT:  Well, Mr. Orsini, you're not on this one

8   today?

9        MR. ORSINI:  I am, Your Honor.  I'll be responding for

10  the debtors.

11        THE COURT:  Well, my question is, is it something that

12  should be taken separately today or part of the -- sort of the

13  whole question of discovery generally?  What do you think?

14        MR. ORSINI:  Well, candidly, Your Honor, from our

15  perspective, the motion is an example of further meet-and-

16  confer by motion.  There are a whole series of issues that they

17  raise for the first time with us in the reply brief, at which

18  point they've abandoned all their initial ones.  I propose we

19  meet and confer on those, because, candidly, we're willing to

20  look into most, if not all, of that, to see if we can get them

21  the documents they're looking for.  We never heard of these

22  issues until the reply.

23        THE COURT:  Is there any reason why we can't just

24  defer this, Ms. Morris?

25        MS. MORRIS:  Your Honor, this request has been



PG&E Corp., Pacific Gas and Electric Co.

1    outstanding since April.

2            THE COURT:  No, I know.

3            MS. MORRIS:  And these documents are critical to our

4    ability to analyze many of the issues that relate to the Camp

5    fire, which is the most --

6            THE COURT:  Well, but are they critical to the

7    estimation process?  In other words, we are now moving up the

8    ladder of intensity:  different judges, different focus.  And

9    investigation or discovery of third-party contractors seems a

10   bit of a stretch beyond the immediacy of the importance of the

11   estimation process.

12           MS. MORRIS:  They are related to the estimation

13   process, Your Honor, but these are not minor third-party

14   contractors.

15           THE COURT:  No, I know.

16           MS. MORRIS:  PG&E used a number of significant third-

17   party contractors to perform essential services on the Caribou-

18   Palermo line, and one of the reasons why we asked for this

19   discovery back in April is because the Camp fire is the one

20   fire that was not subject of any litigation prior to this --

21           THE COURT:  No --

22           MS. MORRIS:  -- bankruptcy proceeding.

23           THE COURT:  -- I'm aware of that.  I'm aware of that.

24           MS. MORRIS:  Many of the documents are still being

25   held up by criminal investigations.  And this information is

PG&E Corp., Pacific Gas and Electric Co.

1    essential for us to start to understand even how PG&E operated

2    the line that contained the parts that failed and caused

3    the Camp fire.

4           THE COURT:  But we're going to talk later today, and

5    Judge Donato and others -- somebody -- other people will be

6    talking about the kind of discovery that's appropriate for the

7    estimation, the timing of it, and so on.  It seems to me that,

8    to the extent that there's a third-party contractor document or

9    issue that somehow is part of what has to be framed as the

10   ground rules for the estimation, should be considered in that

11   context.

12          Again, I'm not saying no.  I'm saying it's kind of an

13   isolated thing that isn't the same as -- from my point of view,

14   as it was in April.  So if you were frustrated that you didn't

15   get it in April, that's unfortunate.  But isn't it, sort of, of

16   lesser importance, relative (sic) speaking, to the question of

17   the estimation?  I mean, Mr. Orsini and people on your side

18   have focused on these issues that are critical to the

19   estimation.  And I'm having trouble knowing that third-party

20   contractor issues are sort of front and center on the

21   estimation; estimation are what are PGE's defenses and what are

22   the damages, not who else might be liable.

23          MS. MORRIS:  Your Honor, we're not looking at these

24   documents just for who else may be liable.

25          THE COURT:  Well, I think that's what's said in the

14

PG&E Corp., Pacific Gas and Electric Co.

1   motion.  I mean, there's something about that in the motion,

2   so --

3          MS. MORRIS:  It is.  And at the time, Your Honor,

4   PG&E's arguments as to the fact that they are not accepting

5   legal responsibility for all of these fires wasn't entirely

6   clear to the tort claimants' committee at that time.

7          THE COURT:  Okay.

8          MS. MORRIS:  However, we were seeking the documents at

9   the time we filed, but we were seeking these documents not only

10  because these contractors could have liability and they have

11  significant pools of insurance, given the size and nature of

12  these contractors --

13         THE COURT:  Right.

14         MS. MORRIS:  -- but also because they were essential

15  for the tort claimants' committee to start to understand the

16  work that was performed.

17         Just so Your Honor understands, the work performed by

18  some of these contractors goes to the heart of --

19         THE COURT:  Oh, I know that.

20         MS. MORRIS:  -- the negligence cases here.

21         THE COURT:  I know that.  I know that.  If third-party

22  contractor did some careless, negligent work, maybe that person

23  should be held accountable, but so should the debtor, unless

24  the debtor has an absolute defense that the contractor

25  wouldn't.  My point is that the estimation process is designed

PG&E Corp., Pacific Gas and Electric Co.

1    to get the right amount of money -- an appropriate, right

2    amount of money, consistent with AB1054 and the concepts of

3    what the plan is supposed to deal with.  And if there's an

4    adequate resolution there -- I don't want to say the third-

5    party contractors are off the hook.  Maybe they are on the

6    hook.  But the point is it's not the front priority.  The

7    company itself might have claims against those third-party

8    contractors.

9           MS. MORRIS:  It's not only about the claims against

10   the third-party contractors; it's the product that was provided

11   to the company from those third-party contractors.  They

12   performed services like assessing the life expectancy of the

13   parts, the very part that failed in connection with the Camp

14   fire.  And PG&E used those reports; they used information to

15   determine how often to inspect the line, to determine how

16   often -- whether they were going to let the part run to

17   failure, as they called it, and let it fail before they

18   replaced it.

19          THE COURT:  Right.

20          MS. MORRIS:  All of that information is critical to

21   the estimation process, and it's a specific pool of documents

22   that relate just to the third-party contractors that I believe

23   that Your Honor should order that they produce now.  It's been

24   outstanding for four months.  And PG&E trying to push it off

25   into the estimation discovery when they've known about it for

PG&E Corp., Pacific Gas and Electric Co.

1    four months, Your Honor --

2        THE COURT:  Well, again, I'm not trying to talk you

3    out of it, because you're being a lawyer who's advocating your

4    cause.  But what I'm telling you is it seems like it's part of

5    the big nut that has to be cracked here --

6        MS. MORRIS:  Um-hum.

7        THE COURT:  -- sooner rather than later.  And so

8    whatever happened in April or May or June doesn't count.  It's

9    now the end of August, and the clock is ticking, and another

10   court is getting ready to be involved in estimation, and we're

11   all focusing on that.  So it seems like this is one of those

12   things that is part of the bigger whole.

13       One other question before I call on Mr. Orsini.  If

14   you came across, in your discovery, culpability by a third-

15   party contractor, the TCC wouldn't have any claim against the

16   contractor, would it, any direct claim?  So it'd be a claim

17   that would belong to the debtor anyway, wouldn't it?

18       MS. MORRIS:  It could be, Your Honor, but it's --

19       THE COURT:  Well --

20       MS. MORRIS:  -- something that could be assigned as

21   part of the resolution of the whole bankruptcy case.

22       THE COURT:  I agree, it could be.  But the point is,

23   if you found something critical, if you opened up the file and

24   said, my God, I got this third-party contractor big-time, I

25   don't think the TCC would be in a position to do anything about

PG&E Corp., Pacific Gas and Electric Co.

1   it today.  It would go into the mix of part of the negotiation

2   of the result.  But at the end of the day, it's still the

3   debtors who owe the victims.  And if the debtors make good --

4   do the right thing for the victims, proper result, maybe this

5   problem goes away, right?  Right?

6          MS. MORRIS:  That's part of it, Your Honor, but part

7   of it also relates to PG&E's own conduct and what PG&E knew,

8   itself, and how --

9          THE COURT:  I agree.

10          MS. MORRIS:  -- PG&E operated the lines themselves.

11          THE COURT:  I agree.

12          MS. MORRIS:  Just by way of one example, Your Honor;

13   PG&E -- this request called for -- would have called for all

14   documents that were used by third parties to risk score the

15   line.  We have emails that were produced in other forums, in

16   other courts, that show that McKinsey Consulting (sic), one of

17   their third-party contractors, for which they produced not one

18   single document in response to our request -- that that

19   contractor was part of a "team", as it's described on an email,

20   that determined that, on the Caribou-Palermo line -- and I'm

21   taking this quote directly from the email -- that "although the

22   likelihood of failed structures happening is high, the affected

23   customers are less than 1,000.  And it's not likely a public-

24   safety issue with live wires down because it was in a remote

25   area."  This goes to the heart of the negligence case.

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Yeah.  I understand.

2    MS. MORRIS:  PG&E employees as well as McKinsey

3  consultants were on that email, yet they're taking the

4  hairsplitting position that it wasn't called for because they

5  actually didn't go out and look at the lines while they're

6  scoring -- they're evaluating the lines and working with PG&E

7  to do that.  And it created the entire risk model upon which

8  PG&E based their scoring system.

9    So it goes to the heart of this negligence case

10  against PG&E and not just the third-party contractors; that

11  could be part of it, but it goes to the heart of PG&E's

12  negligence case against the third-party contractors.  And

13  there's no reason to wait when we know and can identify at

14  least some of those third-party contractors now, based upon

15  what they've already provided to us, that they shouldn't be

16  obligated to produce emails and invoices, of which we've

17  received none as part of their production and were specifically

18  called for by our request.  There's no reason to delay that and

19  push that off into the estimation discovery, when it should be

20  easily identifiable now.

21    THE COURT:  Okay.  Let me hear what Mr. Orsini says

22  about that.

23    Oh, okay, counsel in the other courtroom, go ahead and

24  speak up.

25    Yes.



PG&E Corp., Pacific Gas and Electric Co.

1          MS. RIDDLE:  Yes, Your Honor.  Can you hear me?

2          THE COURT:  Yes.

3          MS. RIDDLE:  Amanda Riddle for the wildfire

4    plaintiffs.  I just wanted to add something to what Ms. Morris

5    said.  It's not about the third-party contractors' liability.

6    PG&E has a nondelegable duty to maintain their lines, to

7    maintain their infrastructure, and to deliver electricity

8    through Northern California safely.  So regardless of whether

9    or not it was a contractor who did the work or whether it was a

10   PG&E employee with a PG&E uniform and a PG&E truck, PG&E is

11   liable for the negligence.

12          The documents that Ms. Morris is speaking of, as she

13   said, not only relate to contractor negligence, but they

14   relate, more important and very specifically for this

15   proceeding, to PG&E's negligence because even if it's done by a

16   contractor, PG&E is responsible for those actions.

17          THE COURT:  Okay.  Thank you very much.

18          MS. RIDDLE:  Thank you.

19          THE COURT:  Mr. Orsini.  Yeah, I don't want to get

20   hung up on the literal words of a 2004 exam request.  You

21   know --

22          MR. ORSINI:  Well, I --

23          THE COURT:  You know the deal:  you got to give them

24   the information.

25          MR. ORSINI:  I do, Your Honor.



PG&E Corp., Pacific Gas and Electric Co.

1      Kevin Orsini on behalf of the debtors, for the record.

2      So there's the question of what discovery they're

3  ultimately going to get as part of the estimation, and there's

4  the fact that they filed a motion to compel for documents they

5  didn't even ask for and didn't raise with us as being documents

6  that they actually wanted.  Right?  The request here that's at

7  issue -- and this is just the context because they're talking

8  about it's been months.  The requests they served were for

9  documents for each third-party contractor who performed work on

10 any portion of the line --

11      THE COURT:  No, I know, and I --

12      MR. ORSINI:  -- at issue.

13      THE COURT:  Again, I'm --

14      MR. ORSINI:  And --

15      THE COURT:  I read literally -- as a literal

16 constructionist, you were right; they didn't ask for it the

17 right way.  But --

18      MR. ORSINI:  Right.  And so I've said -- I've said,

19 Your Honor, today, I've said in repeated correspondence with

20 the TCC -- that we're willing to engage on other documents they

21 want, including documents about McKinsey, about the risk

22 assessment, about all of that.  We're willing to engage and

23 produce those documents.  There've been four categories of

24 documents that they raise in their opening brief they had never

25 asked for before that we've since said we'll give to you -- a

PG&E Corp., Pacific Gas and Electric Co.

1   number of them that we've already given to them.  Right?

2              So this is just a waste of the Court's time and the

3   debtors' time, for them to be filing a motion to compel on

4   things they never raised with us, that are not responsive to

5   their request, and that ought to be dealt with, as Your Honor

6   said, as part of the broader discussion we're having about

7   discovery.

8              THE COURT:  Well, but doesn't that mean that, if there

9   are some documents in the file, in the folder -- whether it's

10  McKinsey or somebody else; I don't care who it is -- the TCC

11  should be getting it as part of the information that's going to

12  be part of your "show my why you're not liable".  Your

13  letter -- your second -- your August 24th letter and the

14  response sort of said, okay, I mean, I know that I got to tell

15  you what my legal facts and theories are to say the company

16  isn't liable.

17             MR. ORSINI:  So --

18             THE COURT:  Right?

19             MR. ORSINI:  So stated differently, Your Honor, do I

20  agree that there's going to have to be discovery on these types

21  of documents?  Absolutely.  Absolutely.

22             THE COURT:  Right.

23             MR. ORSINI:  Right?  What we're here on is a motion to

24  compel on requests that don't cover these.  So my point is,

25  very simply, there's no relief warranted on the motion.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Right.

2          MR. ORSINI:  Your Honor is absolutely right that we

3     ought to address what -- the broader issue of the discovery on

4     the other documents that they didn't ask for in these requests

5     but that they want in the conversation about how we're getting

6     to estimation.  That's my point.

7          THE COURT:  Okay, well, I'm going to -- I'm going to

8     take your counsel on that subject.

9          And Ms. Morris or Ms. Little (sic), I'm not denying

10    your request.  I'm really sticking with what I just said a few

11    minutes ago.  This has all got to be part of a big inquiry, and

12    we start with the kind of positions that are set forth in two

13    important documents, to me:  one is the request that

14    accompanies the -- let me keep my dates straight -- the

15    response to Mr. Orsini's August 22nd letter from the TCC, and

16    then his August 24th response, and then some of the arguments

17    that have been made by others who've weighed in on the whole

18    subject of what kind of discovery needs to go forward as part

19    of the estimation.

20          So I'm just going to defer it and not act on this

21    motion.  I'm neither going to grant or deny it.  I'm going to

22    fold it into the bigger discussion.  Okay?

23          MR. ORSINI:  Thank you.

24          THE COURT:  So let me come back now -- Mr. Karotkin,

25    are you going to be more involved in responding to the kind of

23

PG&E Corp., Pacific Gas and Electric Co.

1    items that I asked to talk about on the status conference, or

2    Mr. Orsini'll get into that?

3            MR. KAROTKIN:  I think both of us will be tag-teaming

4    on that.

5            THE COURT:  Okay, well, I -- when I did my order for

6    today's proceeding, I wasn't -- I mean, a lot was going on -- a

7    lot's been going on for all of you and your clients, but a

8    lot's been going on our end of it also, with decisions that I

9    made about the Camp fire, and -- of course unrelated

10   specifically but still a lot going on -- exclusivity, then the

11   question of withdrawal of the reference, and the district

12   court's response to that, and so on.

13           So when I prepared the order that I issued on the 20th

14   of August, it was really to get a -- to get a conversation

15   going about a number of things.  And I'm not even wedded to the

16   sequence that I put in there, but let's do that.  I'll stick

17   with that for the moment.

18           So, Mr. Karotkin, I'll really ask you, are you on

19   track for September 9th filing?  Is that still on schedule?

20           MR. KAROTKIN:  Very much so, sir.  We intend to file

21   the plan --

22           THE COURT:  And is --

23           MR. KAROTKIN:  -- by that date.

24           THE COURT:  And is it -- I mean, leaving aside all the

25   things that have to go with any plan that any debtor files, is

PG&E Corp., Pacific Gas and Electric Co.

1    it a plan that, in your sense -- your mind, is the plan the

2    debtors are going to try to seek to get confirmed in some way,

3    even if there's some loose ends?  Clearly, the estimation is a

4    critical fact but, I mean, it's not going to be one of these

5    plans that says "more later"?  I mean, it's going to do the

6    classification and set forth who's going to get impaired and

7    who isn't?

8                MR. KAROTKIN:  Yes, sir.

9                THE COURT:  And is there enough of a -- meat on the

10   bones for the financial end of it, that --

11               MR. KAROTKIN:  Well, I believe so, Your Honor.  And

12   again, as you know, there is some uncertainty here because of

13   the upcoming estimation process --

14               THE COURT:  Um-hum.

15               MR. KAROTKIN:  -- and how that pans out in terms of

16   exactly what the fire claimants and the insurance companies

17   would be entitled to, under a plan.  So I think that, as time

18   moves forward, there'll be more clarity on those issues, and

19   the plan may have to be adjusted to address some of those

20   issues.  But again, we'll have to see how that plays out both

21   in this court and in the district court.

22               THE COURT:  Well, tell me if I've got this basic

23   concept right:  that -- and I think I mentioned in my order for

24   today that I looked at the competing plans that did not get

25   passed the last time around.  But should I -- may I assume

PG&E Corp., Pacific Gas and Electric Co.

1    that, for the most part, the impaired classes are those same

2    two classes and that everybody else is going to be unimpaired?

3    Is that a fair presumption?

4          MR. KAROTKIN:  That's a fair presumption in addition

5    to we believe that the public entities are impaired as well.

6          THE COURT:  Okay.  So therefore -- again, I'll risk an

7    oversimplification.  You'll recall, when we had the discussion

8    about the motions for redetermining exclusivity, that the

9    senior bondholders and the ad hoc subrogation group, they both

10   had a fund; they had the amount of money, a target.  There was

11   some range.  But I seem to recall one of their lawyers -- I

12   think it was -- well, I don't remember which of the lawyers it

13   was, but it was one of the lawyers representing the subrogation

14   group -- sort of said that maybe the numbers change depending

15   on the estimation.

16         So is that still a safe assumption?  If the estimation

17   is fixed at X, the plan will read, well, we're going to deal

18   with a pot of X -- a fund of X; if it's 2X, you just have to --

19   it sounds simple, you just have to change the number.  Then how

20   you get the money is a different story.

21         MR. KAROTKIN:  Well --

22         THE COURT:  Right?

23         MR. KAROTKIN:  -- again, Your Honor, if there's a

24   finding that with respect to the subrogation claims we have to

25   address X and with respect to the individual claims we have to

PG&E Corp., Pacific Gas and Electric Co.

1   address Y --

2           THE COURT:  Correct.

3           MR. KAROTKIN:  -- the plan, in order to comply with

4   AB1054, will have to be modified to address that.

5           THE COURT:  Correct.

6           MR. KAROTKIN:  And then the funding --

7           THE COURT:  Yeah, but what I'm --

8           MR. KAROTKIN:  -- sources as well --

9           THE COURT:  The funding sources.

10          MR. KAROTKIN:  -- will have to be there to address

11  that, as well.

12          THE COURT:  But that's what I'm driving at.  I just

13  wanted to see if you and I are on the same page, and I think we

14  are.  So --

15          MR. KAROTKIN:  Think we are.

16          THE COURT:  So if we go back to sort of basic Chapter

17  11 101, one of the things you learn in 101 school is you got to

18  say what the treatment is and then you got to say the means of

19  execution.

20          MR. KAROTKIN:  Correct.

21          THE COURT:  It seems to me there are two deltas here,

22  big ones.  One is, how much; that's the estimation:  Tubbs,

23  district court, bankruptcy court, negotiation.  But all those

24  forces come to bear on how much dollars goes to the two

25  different classes of victims.  And then the means of execution



PG&E Corp., Pacific Gas and Electric Co.

1    vary on how much you have to pay is how much you have to put

2    in, whether it's public offering or new legislation or equity,

3    or any number of other things.  Am I right?

4           MR. KAROTKIN:  You're right.  And just --

5           THE COURT:  Okay.

6           MR. KAROTKIN:  -- obviously, to keep in mind, Your

7    Honor, and I think I'm not telling you anything you don't know,

8    funding sources are not going to say, I'm going to provide

9    unlimited funding.

10           THE COURT:  Correct.

11           MR. KAROTKIN:  So that may be a fluid concept, moving

12    forward.

13           THE COURT:  No, but the point is, in terms of -- at

14    some point the managers and the lawyers representing the

15    debtors and the managers and the representatives representing

16    the funding sources are going to have to come to an agreement

17    that, based upon either what we're negotiating with the victims

18    or the subrogation or what the courts are fixing, we know what

19    has to be the amount; therefore, we have to negotiate how we're

20    going to do it.

21           And to me, that gets back to my point.  There're

22    really two halves of this plan process.  And one side says, as

23    I said in my papers, I don't think you need a fancy disclosure

24    statement to tell the victims how much they're going to get and

25    when.  But you do need, I -- and I'm going to ask Mr. Kornberg

PG&E Corp., Pacific Gas and Electric Co.

1   or others from the Commission to tell me -- you need to get a

2   much more expansive explanation of how you're going to do it.

3   And AB1054 itself lays out, for the CPUC and the bankruptcy

4   court, what kind of considerations have to be taken into

5   account.  But they all seem to relate, for the most part, to

6   that second half of the problem:  how're you going to do it,

7   not what are you going to do.  Again, are we on the same page?

8           MR. KAROTKIN:  I think we are.  And all --

9           THE COURT:  Okay.

10          MR. KAROTKIN:  -- I think I'm saying, Your Honor, is

11  that there are sources today who we have who are willing to

12  provide funding --

13          THE COURT:  Right.

14          MR. KAROTKIN:  -- based on certain numbers and certain

15  assumptions.  And if the estimation comes in at something

16  different, then those issues are going to have to be,

17  obviously, revisited, and people are going to have to address

18  those issues.

19          THE COURT:  And then it goes both ways.  I mean, if

20  the Tubbs fire comes in for the debtor, that might --

21          MR. KAROTKIN:  Exactly right.

22          THE COURT:  -- not drive it a different way.  And --

23          MR. KAROTKIN:  All I'm saying, Your Honor, is we can't

24  get --

25          THE COURT:  Yeah.



PG&E Corp., Pacific Gas and Electric Co.

1    MR. KAROTKIN:  People are not going to come in on

2  September 9th and say I'm going to give you unlimited amounts

3  of money.

4    THE COURT:  I got it.

5    MR. KAROTKIN:  Okay.  That's all I'm saying.

6    THE COURT:  I got it.

7    MR. KAROTKIN:  So as we move forward, that will be

8  adjusted to address what happens in the estimation process,

9  because under 1054 we are required to do certain things with

10  respect to the wildfire claims, both the victims and the

11  insurance companies.

12    THE COURT:  Well, right, but the way I read 1054 --

13  and again, I can't read it all, it's so long, but I read the

14  critical sections, and it says that you've got to either reach

15  a resolution or a determination by the court -- a court.

16    MR. KAROTKIN:  Correct.

17    THE COURT:  And then that's really all that I think it

18  says for the victims.  And again, I'm using "victims" and

19  "subrogation" --

20    MR. KAROTKIN:  Um-hum.

21    THE COURT:  -- "victims" -- on the one hand.  The

22  flipside of that is what I, again, want Mr. Kornberg or others

23  to help me on, is what are the requirements to fill in the

24  blanks on the how you're going to do it, not what are you going

25  to do.  So it looks to me like the Commission has to decide is

PG&E Corp., Pacific Gas and Electric Co.

1    the funding source adequate, does it impact rates, is it

2    feasible, is it in the best interest; all the magic words.

3             But what I read from 1054 was there's very little as

4    to what goes into that pot for the victims, as long as it's the

5    right amount that the Court has determined or the parties have

6    agreed to.

7             MR. KAROTKIN:  Correct.

8             THE COURT:  Right?

9             MR. KAROTKIN:  I agree with that.

10            THE COURT:  So this gets back to my point about

11   wanting to do the sequencing.  I want to break the -- and I

12   want to hear from you and the other lawyers, obviously -- break

13   the traditional linear process of plan and disclosure

14   statement, lots of time on disclosure statement and then go to

15   plan issues.  I'd like to put them on parallel tracks.  And to

16   me, the track for the disclosure statement is the track that

17   stops at the estimation station until that is done.  Meanwhile,

18   I would think that some portion of the "how you're going to do

19   it" process could go forward with the Commission.  Now, if I'm

20   wrong about that, I --

21            MR. KAROTKIN:  No, I think --

22            THE COURT:  -- I need to be --

23            MR. KAROTKIN:  -- I think you're right.  And Mr.

24   Kornberg, I think, will address some of those things.  We --

25            THE COURT:  So when I went to your time line -- see,

PG&E Corp., Pacific Gas and Electric Co.

1    that goes back to the time line that you filed when -- back on

2    the 12th when you said plan, September 9th, and then switching

3    over to deadline for hearing on disclosure statement, October

4    14.  That's what seems completely unnecessary, for me.  To me,

5    the disclosure statement ought to be over on the side.  And

6    maybe it's too soon to know what the amount of funding will be,

7    but I would hope that some of the -- some of the concepts of

8    the plan could be fleshed out and vetted by the CPUC.

9            MR. KAROTKIN:  I think that -- I think that's right.

10   I think what Mr. -- I don't want to speak for Mr. Kornberg but

11   I'll try anyway.  I think what Mr. Kornberg will say is that

12   for the CPUC to get started, they will need to see the plan.

13           THE COURT:  Um-hum.

14           MR. KAROTKIN:  It not necessarily will need to see the

15   disclosure statement.

16           THE COURT:  Right.

17           MR. KAROTKIN:  And --

18           THE COURT:  That's fine.

19           MR. KAROTKIN:  And --

20           THE COURT:  That's what I want him to say.

21           MR. KAROTKIN:  Yeah.  Well, I think that's what he's

22   going to -- I hope that's what he's going to say.

23           And I noticed in your order, Your Honor, where you

24   were -- you referenced Bankruptcy Rules 3016 and 3017.  And

25   3016, obviously, gives Your Honor the right to defer the filing

PG&E Corp., Pacific Gas and Electric Co.

1      of a disclosure statement.

2              THE COURT:  Right.  Right.

3              MR. KAROTKIN:  And reflecting on that, and in view of

4      the circumstances we're faced with here with the estimation

5      hearing coming up and the details of that not even been set

6      yet, and then with Judge Donato involved --

7              THE COURT:  Right.

8              MR. KAROTKIN:  -- it seems to us -- again, subject to,

9      obviously, what you have to say -- that the filing of the

10     actual disclosure statement should be deferred for some period

11     of time until we get more clarity on some of these issues.  But

12     we would --

13             THE COURT:  Yes.

14             MR. KAROTKIN:  -- we would leave that to you.  It

15     seems --

16             THE COURT:  Well, I would like -- "meet and confer" is

17     becoming a common term here.  But to me, you and the debtors'

18     representatives and the two affected committees' counsel ought

19     to sit around and come up with what is an adequate disclosure

20     statement.  And I said in here, I don't want it to look like a

21     phone book.  You should have seen what the earlier drafts

22     called it.

23             MR. KAROTKIN:  Well --

24             THE COURT:  And I didn't -- it doesn't need to be much

25     of anything.  I'm not --

PG&E Corp., Pacific Gas and Electric Co.

1    MR. KAROTKIN:  We got a good phone book in the works,

2    Your Honor --

3    THE COURT:  Yeah.

4    MR. KAROTKIN:  -- let me tell you.

5    THE COURT:  Well, I don't want a big one.

6    MR. KAROTKIN:  No, I understand.

7    THE COURT:  I want a little one.  And you've learned

8    from me and my views on exclusivity, and surprised you were on

9    my result.  But the same about the disclosure statement.  I

10   think that more time is wasted on disclosure statements than --

11   and then I just don't want it to be the thing here.

12   If Ms. Dumas and Mr. Julian have different views, they

13   can explain it.  But I don't think we want to burden the

14   victims of these fires, with the Manhattan --

15   MR. KAROTKIN:  No.

16   THE COURT:  -- phone book.

17   MR. KAROTKIN:  No.  And I --

18   THE COURT:  Okay?

19   MR. KAROTKIN:  -- think that -- again, we will file

20   the plan on or before September 9th.  And I think that your --

21   what I think was your suggestion, that we defer filing a

22   disclosure statement at the same time and we consult with the

23   parties as to what's appropriate and, as we get -- as things

24   move forward, we'll have more information as to what's relevant

25   financing, treatment of claims, that type of thing.  So --

PG&E Corp., Pacific Gas and Electric Co.

1        THE COURT:  Yeah, I mean, I --

2        MR. KAROTKIN:  -- I think it makes sense.

3        THE COURT:  -- I realize that Mr. Orsini would like to

4   have the estimation done before Halloween, but it just isn't

5   going to happen.  And one of the questions on the Tubbs fire

6   timing is one thing.  I personally don't have as much control

7   as I might have under other circumstances to control the

8   estimation process.  But the point is, everybody understands

9   what we're up against.  And that'll be the subject of some

10  further discussion.

11        What I thought about doing is giving you a date on our

12  next calendar, and it might be too soon right after the 9th --

13  is to -- so we'll figure that out at the end of the hearing

14  today -- is to have a status conference that will have whatever

15  other matters we have to talk about, but it's when everybody

16  will see what the debtors' plan is and perhaps then have a

17  discussion about what needs to be discussed and scheduled and

18  thought about.  Again, I'm not making any rules yet.  I want to

19  hear from the committees -- both committees and the CPUC and

20  other parties.

21        So let's see what other people want to say about my

22  thinking on that aspect.  So to --

23        MR. KAROTKIN:  Sure.

24        THE COURT:  -- to make, in simple terms -- and, Mr.

25  Karotkin, I don't know how much you know about what we've done

PG&E Corp., Pacific Gas and Electric Co.

1   here.  We're kind of the innovators here in the small cases, in

2   this district, with the simplified plan and disclosure

3   statement which, by the way, the President signed into law last

4   week on the -- simplified for little Chapter 11s.  But this

5   notion of just treating the disclosure as part of the plan

6   and a simple thing; it's very -- part of the culture of easy

7   cases.  I want to make it part of the culture for this very

8   difficult case.

9         All right, so, Ms. Dumas, are you going to speak to

10  this issue?  Would you like to?

11        Good morning.

12        MS. DUMAS:  Good morning, Your Honor.  Cecily Dumas,

13  BakerHostetler, appearing on behalf of the official committee

14  of tort claimants.  I would appreciate the opportunity to

15  address this issue in a way that I'm hoping will be neutral and

16  explanatory.  And I hope everyone will agree that I'm

17  expressing, sort of, the points of view fairly.

18        There's a major difference of opinion between the

19  debtors and the TCC, with respect to, kind of, a big

20  overarching question, and that is whether or not in the

21  aggregate the tort claims, subrogation claims, individual

22  plaintiff claims, and PE claims -- public entity claims --

23  whether those collectively are in an amount that can be proven

24  to be higher than the net distributable value of the debtor, in

25  other words, at a discount.

PG&E Corp., Pacific Gas and Electric Co.

1     So let me explain what I mean by that.  PG&E at

2   confirmation will have a total enterprise value, and that

3   enterprise value will be something that we learned from the

4   debtor based on its business plans and projections.  And you

5   saw that we're anxiously ahead of the Court in wanting to see

6   those, and we apologize.  But we see the -- sort of the

7   enterprise value as a number, an analysis that will inform

8   everyone.

9     So what do I mean by the "distributable value"?  We're

10   all assuming optimistically and, I think, maybe realistically

11   that these debtors are solvent, that the plan that is proposed

12   by any of the three current plan proponents or someone else

13   will provide for the payment in full of the bank debt, the bond

14   debt, the trade debt, employee claims, and have the either

15   agreed or estimated amounts for tort claims.  So we're on the

16   same page as what Mr. Karotkin described in terms of the only

17   impaired class will be tort claims.

18     So if you take into account the money that would be

19   necessary to pay the DIP loans back and treat the other claims,

20   there is some net amount that the value of the debtors at

21   confirmation dictate.  There's not general agreement; there's

22   only guesses, as to what that number may be.  But between the

23   roughly eighteen billion in insurance payments that the

24   insurers have told us they will pay out when all is said and

25   done, the one billion of PE claims and then --

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Well, that's only one category of PE

2     claims, right?

3          MS. DUMAS:  That's only -- and that's only -- thank

4     you for reminding me of that.  FEMA stepped in with claims that

5     we understand may be in the multibillion -- but -- and then the

6     victim claims --

7          THE COURT:  But, excuse me, that one billion is a

8     finite agreed number between one county and the debtors, right?

9          MS. DUMAS:  No, it's --

10         THE COURT:  It's more than that?

11         MS. DUMAS:  -- more than one county, but it's --

12     you're right, it doesn't include all public entities.

13         THE COURT:  Okay.

14         MS. DUMAS:  So --

15         THE COURT:  That's what I thought.

16         MS. DUMAS:  So whatever that aggregate amount is -- so

17     we've got -- let's just say, for purposes of my hypothetical,

18     you've got nineteen billion right there, and then you've got

19     some other amount for individual victims.  Now, if you're -- in

20     Mr. Orsini's analysis, that number may be another ten billion

21     and that in the aggregate sense all those claims -- eighteen

22     plus one plus ten -- twenty-nine billion -- would be amounts

23     that the debtor can satisfy within its ability to pay claims,

24     in other words, less than the distributable value of the

25     company.  The tort claimants believe that under any

PG&E Corp., Pacific Gas and Electric Co.

1    circumstance -- and we may be wrong, but we believe that under

2    any circumstance, the individual victim number is going to be

3    higher than that net after the claims that you can calculate

4    from insurance payments or the settlement and that, even

5    accounting for losing Tubbs -- and it's because of the

6    magnitude of the -- what we've described before, the higher-

7    than-calculated property damages, the emotional-distress claims

8    and the like.  So --

9              THE COURT:  No.  No, no, you --

10             MS. DUMAS:  -- we can agree or disagree on that.  But

11   one fundamental thing that sort of needs to be figured out is

12   are we talking about eighteen plus one plus another eight or

13   ten, or are we talking about eighteen plus one plus forty?

14             THE COURT:  But that's the whole estimation process --

15             MS. DUMAS:  Exactly, but --

16             THE COURT:  -- right?

17             MS. DUMAS:  -- but that needs to get reduced down to

18   the distributable value.  And that's the estimation process,

19   that under any circumstance the company can't pay more than its

20   value.

21             So that brings me to -- and again, I'm not trying to

22   take sides; I'm trying to help the Court in understanding the

23   current dynamics in which the plan process is being evaluated.

24   So then you get to the types of plans that can be proposed.

25   And with respect to that distributable value that's available,

PG&E Corp., Pacific Gas and Electric Co.

1    the insurance companies have the ability to say, hey, we'll

2    take fourteen, eighteen, whatever our debt is, and we'll

3    convert it to some sort of equity instrument.  Big beneficial

4    effect on a reorganization.  The bondholders have said, we can

5    do certain things with the bonds that the debtor has issued to

6    us, and we've raised other cash.

7         The debtor is constrained, I mean constrained by

8    financing sources that may come from securitization if allowed

9    by the State of California, additional equity issued by its

10   current stockholders.  So all of those pieces of the puzzle on

11   your Part B, the sort of the second half, we kind of don't have

12   clarity yet, until we know are we dealing with the

13   distributable value and how would that get financed, in a way;

14   how does that get treated; or are we dealing with some smaller

15   number, in which case the debtors' path is very clear.

16        And again, not trying to characterize, but I think

17   that's the nut we need to crack before --

18        THE COURT:  Well, you're kind of looking at it from

19   distributable value and going backwards.  What if we turn it

20   around the other way and say -- imagine you're drafting the

21   plan, and you know what the round number of nontort claims are

22   because there's a whole -- it's out there; I mean, we all know

23   what that is.

24        MS. DUMAS:  Exactly.

25        THE COURT:  And we then go to what is likely to be



PG&E Corp., Pacific Gas and Electric Co.

1    either a discounted amount or an agreed amount of the

2    subrogation claimants.  And then we take something like the

3    settlement of a billion.  And then what's missing for your

4    constituency is the product of the estimation process.  And if

5    it's a lower number, it's an easier process.  If it's a higher

6    number, then the company has to deal with the shortfall, if you

7    will.  And "shortfall" is the wrong word.  To use your

8    mathematics, eighteen plus one plus ten is a much different

9    analysis than eighteen plus one plus forty.

10             MS. DUMAS:  Exactly right.  And --

11             THE COURT:  But therefore what?  I mean, and that's

12   all the more reason why two things have to happen that can't

13   happen in this room today:  the estimation has to happen, and

14   Mr. Karotkin and his clients and the advisors and the money

15   sources have to figure out a way to meet that minimum threshold

16   of those three components.  Right?  So --

17             MS. DUMAS:  Absolutely.  And --

18             THE COURT:  -- it's the same thing.  And if they are

19   able to get a number that is within the enterprise value as you

20   see it, then the problem is solved --

21             MS. DUMAS:  Well --

22             THE COURT:  -- if your clients -- particularly if they

23   consent to it.

24             MS. DUMAS:  Absolutely.  And --

25             THE COURT:  Okay.

PG&E Corp., Pacific Gas and Electric Co.

1    MS. DUMAS:  -- I'm also saying that that is -- I think

2    everybody in the room realizes that PG&E doesn't have more

3    value than it has.  Right?  So there's not an intention, on the

4    part of tort claimants, to say, our number is forty billion or

5    eighty billion and deal with it.  We're working within the

6    parameters of the distributable value and an insolvent company.

7    THE COURT:  Yeah, but I'm --

8    MS. DUMAS:  So --

9    THE COURT:  -- appreciate your comments; I'm not sure

10   what you want me to do with them today.  I'm trying to talk

11   about how to deal with problems that we can deal with.  And one

12   thing that we can deal with is be innovative, like, toss the

13   rule book out on "have to do a disclosure statement first".  Do

14   it separately.  We've got a different set of rules because the

15   debtors have to deal with CPUC processes.

16   MS. DUMAS:  Um-hum.

17   THE COURT:  I mean, those are things that I thought we

18   were going to focus on today, and then --

19   MS. DUMAS:  And it is.  It is.

20   THE COURT:  -- plus the issue of how to get the

21   estimation trial --

22   MS. DUMAS:  Yeah.

23   THE COURT:  -- up and running.

24   MS. DUMAS:  Your Honor, you're right.  And I jumped a

25   little bit ahead; I didn't intend to.



PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  That's all right.

2    MS. DUMAS:  The Court gave the debtors the first crack

3  by continuing the exclusive period.

4    THE COURT:  Um-hum.

5    MS. DUMAS:  And I guess what I'm suggesting is that,

6  until it becomes evident, some of these financial breakdowns

7  and whether my clients are right that their aggregate claims

8  are in excess of the distributable value and therefore we have

9  to cut back, the TCC is really unable to determine whether it

10  is going to continue to work with the debtor along the lines of

11  a debtor plan or whether the TCC will conclude that one of the

12  other proposals that had been put out there as maybe improved,

13  is a way that the TCC wants to then come back to the Court and

14  say --

15    THE COURT:  No, I understand.

16    MS. DUMAS:  -- we're going down a different path.

17    THE COURT:  But where we are today is I made a

18  decision, right or wrong, to give the debtor a chance, and -- a

19  loan.  And the debtor, through counsel just today, reiterated

20  they're on track to file a plan.  Now -- and we're not going to

21  worry about the disclosure statement, for the moment.  If that

22  plan is bogus and anybody can tell it's bogus, I probably would

23  be very receptive to terminating exclusivity very quickly.  I

24  think Mr. Karotkin even conceded the point; he'd be -- he would

25  concede that it would probably be what'd happen next.

PG&E Corp., Pacific Gas and Electric Co.

1          If the plan is credible, to use my -- one of my terms,

2    but your clients don't like it and don't think it's legally

3    permissible or couldn't be confirmed without your consent, then

4    you can renew your argument to terminate exclusivity.

5          But I think the premise on this, from my point of

6    view, and partly why I made the decision not to terminate

7    exclusivity, was I was persuaded that, given the looming June

8    30th, 2020, plus the CPUC requirements, plus the complexity of

9    estimation, regardless of how it's done and how many judges you

10   need -- because there are different opinions about that, but

11   now we're told we know at least two who are involved; one

12   doesn't -- I don't know the name of that judge, but he's down

13   the street at the superior court.

14          MS. DUMAS:  McAllister.

15          THE COURT:  And whether there's two federal judges or

16   one is not something I need to -- we need to worry about

17   today.  That's what we're doing.

18          So it seems to me that, until I'm presented with

19   something that suggests that the debtors' plan is not worth

20   giving the next round to --

21          MS. DUMAS:  Yeah, and I'm certainly not suggesting --

22          THE COURT:  -- that's what we're going with.

23          MS. DUMAS:  -- that's the case --

24          THE COURT:  Okay.

25          MS. DUMAS:  -- because nobody has seen it.



PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Yeah, and that's --

2          MS. DUMAS:  And --

3          THE COURT:  And therefore, that's the product of

4   negotiation.  That's why the debtor and the committee better --

5   hopefully will continue to --

6          MS. DUMAS:  Yes.  And perhaps my --

7          THE COURT:  -- have conversations.

8          MS. DUMAS:  -- perhaps my opening comments were

9   intended to be a segue to how we, therefore, see the estimation

10  proceeding going forward, because when we have such a big, sort

11  of, difference of views, how to --

12         THE COURT:  Um-hum.

13         MS. DUMAS:  -- how to get to that difference of views

14  in the most expedient way because ten billion and forty

15  billion -- somebody's wrong.  And given the time frame in which

16  we're dealing, the TCC has put a lot of work into a targeted

17  program, which Mr. Julian is going to describe, because under

18  the circumstances -- again, the ten versus forty -- or fifty --

19  we just can't see how the debtors, all out, "we're going to

20  fight every issue on every fire," is going to work in the

21  context.  And maybe they have a plan for eventually providing

22  discovery and eventually making concessions of what issues

23  they're really contesting fire by fire.  But I'm just trying to

24  say, look, we all need to figure something out between ten and

25  forty or fifty in a pretty compressed time frame.

PG&E Corp., Pacific Gas and Electric Co.

1      So I'll leave it at that.  I know that --

2      THE COURT:  Well, but I want -- do you have --

3      MS. DUMAS:  Yes, sir.

4      THE COURT:  -- you have no quarrel with my desire to,

5  kind of, simplify the disclosure statement side of it, do you?

6      MS. DUMAS:  Absolutely not.  The extent to which that

7  the -- I guess, the disclosure statement is usually the

8  document in which the plan assumptions and projections are

9  included.  And as long as we have that financial information,

10  we don't need the Manhattan or even the San Francisco phone

11  book.

12      THE COURT:  No, you don't.  You need about three

13  pages.

14      MS. DUMAS:  Exactly.

15      THE COURT:  Right?

16      MS. DUMAS:  We need financial information, Your Honor,

17  which is why we've been pressing that.

18      THE COURT:  Okay, but this goes back to the same

19  subject, as Mr. Karotkin said.  He can't put in the number

20  until there is either consensual agreement, which is great if

21  it happens, or there is a determination by the superior court

22  plus the district court.  Right?

23      MS. DUMAS:  True.

24      THE COURT:  Okay.

25      MS. DUMAS:  And fortunately for myself and Mr.



46

PG&E Corp., Pacific Gas and Electric Co.

1   Karotkin, that issue is Mr. Orsini's and Mr. Julian's to deal

2   with.

3           Thank you, Your Honor.

4           THE COURT:  And Mr. Dunne's going to come to the

5   rescue.

6           MR. DUNNE:  Your Honor -- we'll see about that, Your

7   Honor.  For the record, Dennis Dunne from Milbank LLP, on

8   behalf of the official committee of unsecured creditors.

9           I have a couple comments, but let me start with the

10  question you asked, Your Honor.  We're perfectly fine with

11  proceeding in the manner Your Honor suggested.  There's no

12  reason why we have to stick to the normal conventions in this

13  case.  There's very little that's, kind of, normal in this

14  case.  And so to the extent we can build a better mousetrap on

15  the disclosure statement, let's try.

16          THE COURT:  Okay.

17          MR. DUNNE:  Let me just address one point, and it's

18  under -- it has to do with the scalability of the plan as we

19  land at different levels for the tort victims.  And we

20  certainly hope and expect that we're dealing with a solvent

21  estate.  I was pleased to hear Ms. Dumas' comments about how

22  the tort committees see it kind of the same way, that they're

23  kind of reverse-engineering from distributable value to try to

24  get to the same place.  But on the numbers that Ms. Dumas was

25  proposing -- eighteen billion for a subrogation claim, a

PG&E Corp., Pacific Gas and Electric Co.

1    billion for the public-entity group that settled to date, and

2    maybe forty billion for the individual plaintiffs, plus the

3    debt for borrowed money and the other liquidated -- that

4    exceeds the enterprise value of the company under any kind of

5    reasonable scenario.

6            THE COURT:  Well, I suspect she probably understands

7    that.

8            MR. DUNNE:  And I think -- I hope so.  I think so,

9    too.

10           THE COURT:  Yeah.

11           MR. DUNNE:  And so that brings me to the other point,

12   which is, whatever gets filed on September 9th is going to have

13   some amount of committed capital.  And if Your Honor kind of

14   lands on the estimated tort size near that amount of committed

15   value, I think we all kind of know that that works.  As you --

16   but I -- the point I'm making is it's not linear as you scale

17   that up.  And what I mean by that is, as Your Honor was saying,

18   if you land, like, 2X or 3X on that number, a number of things

19   may happen; they may not:  The committed capital might not be

20   there.  The vehicle for raising the capital in the plan, the

21   original structure for doing so, might not be workable at

22   particular levels.  You might have to combine a number of, kind

23   of, funding sources to make the plan work.  And you may have to

24   ask other classes of creditors to be impaired.  You may not be

25   able to raise --

48

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Right.

2          MR. DUNNE:  -- the cash to unimpair them.  You may ask

3     them to take equity.  And that raises a whole bunch of issues

4     that you still could have a solvent estate but you're going to

5     be dealing with those types of plan issues --

6          THE COURT:  Right.

7          MR. DUNNE:  -- which is why it leads us all to --

8     there's only so much we can do today, Your Honor.  We're going

9     to have to be in a mode of, kind of, constant reassessment and

10    reevaluation --

11         THE COURT:  Right.  Well, that's my sense too.

12         MR. DUNNE:  -- as we go down and pivot.  But for

13    today, Your Honor, that's how we're seeing it.  And we support

14    the efforts to kind of streamline the disclosure statement and

15    to move forward.

16         THE COURT:  Well, obviously my goal of streamlining

17    the disclosure statement is to get a distraction out of the

18    way.  Unfortunately, if the numbers or the dynamics are such

19    that you have to impair, then you have to disclose.  And

20    that's --

21         MR. DUNNE:  The disclosure statement --

22         THE COURT:  -- that's --

23         MR. DUNNE:  -- will look different in that world.

24         THE COURT:  Yeah, the process will be different.  The

25    timing and the cost and the confusion -- it's just one of those

PG&E Corp., Pacific Gas and Electric Co.

1    things it'd be great if we can avoid.  But you're making a good

2    pitch for your two colleagues on both sides of you to get their

3    clients and get a resolution.

4            MR. DUNNE:  Exactly.  We'd like to be helpful with

5    that involvement, because we care very deeply about whether we

6    are -- that we will have a solvent estate with unimpaired

7    creditors, exactly like everybody was suggesting.  But we need

8    to cut some deals and reach some resolution in order to do it.

9    Thank you.

10           THE COURT:  So are we going to hear from Mr. Kornberg

11   after all this?  Is he going to help me out?

12           MR. QURESHI:  Your Honor, if I could just --

13           THE COURT:  Oh, yes, sir.

14           MR. QURESHI:  -- before Mr. Kornberg.  For the record,

15   Abid Qureshi, Akin Gump Strauss Hauer & Feld --

16           THE COURT:  Mr. Qureshi.  Yes.

17           MR. QURESHI:  -- on behalf of the --

18           THE COURT:  Good to see you again.

19           MR. QURESHI:  -- ad hoc noteholder group.

20           Your Honor, two things I wanted to raise.  First of

21   all, we, too, have no opposition to a streamlined process with

22   something other than the normal disclosure statement.  It is,

23   however, important, vis-a-vis the bondholders, that we

24   understand -- to the extent the debtors are purporting to

25   unimpair the bondholders in their plan, that we understand,

PG&E Corp., Pacific Gas and Electric Co.

1   through whatever it is that they file on or before September

2   the 9th, whether they intend to fully recognize the contractual

3   rights of the bondholders because if they don't but they are

4   otherwise seeking to unimpair us, that will of course be a

5   litigable issue.

6           THE COURT:  And listen, we're all in this together --

7           MR. QURESHI:  Yeah.

8           THE COURT:  -- trying to make things happen.  And by

9   saying I want to simplify the disclosure statement, I don't

10  want Mr. Karotkin and his side to think that's an invitation to

11  hide the ball on what their proposal is.  So I'm almost tempted

12  to use one of my favorite terms:  let's have a term sheet for

13  the disclosure statement, or an outline of the disclosure

14  statement, or if nothing else, at least a statement as to -- I

15  mean -- let me rephrase that.  I don't know what he's going to

16  present by a plan, but I know that a well-drafted plan has the

17  classes right in it.  And if you say Class 1 is the bondholders

18  and Class 2 are the subordinated something and Class 3 are the

19  victims, you can also add -- certainly for these purposes, you

20  could say whether they are impaired or not, which is not

21  uncommon in any simple drafting plan, right?

22          So if he puts your client in Class 1 and says

23  "unimpaired", that to me is a concession that perhaps -- maybe

24  not but, if you're unimpaired, you got -- you don't get to

25  vote; you get to object if there's some legal -- you know these

PG&E Corp., Pacific Gas and Electric Co.

1    rules.  I'm not telling you what you don't know.  But it

2    simplifies the process, right?

3              MR. QURESHI:  And we assume whatever does get filed,

4    Your Honor, will be sufficiently clear with respect to those

5    issues.

6              THE COURT:  And --

7              MR. QURESHI:  The second thing I wanted to --

8              THE COURT:  Yeah.

9              MR. QURESHI:  -- raise, Your Honor, goes to the

10   financing.  Your Honor, we, of course, read very carefully Your

11   Honor's ruling on our motion to terminate exclusivity.  We

12   think it is very important that, although Mr. Dunne, of course,

13   is correct that we will not know until we're done with

14   estimation exactly what that universe looks like, we need to

15   understand what financing commitments the debtors have or do

16   not have with respect to whatever plan is going to be filed by

17   September the 9th.

18             And so we think it is important, Your Honor, that the

19   financing commitments that do exist with respect to that

20   plan -- that the underlying commitment letters get shared at

21   least with the parties, if not filed with the court.  And the

22   reason for that, Your Honor, is if that financing is not there,

23   if it is subject to contingencies, whether those contingencies

24   may be legislative contingencies or other contingencies, or if

25   the aggregate amount of that financing is not deemed by the

PG&E Corp., Pacific Gas and Electric Co.

1    parties, by the bondholders, to be sufficient, Your Honor, we

2    are standing by and ready to renew the motion to terminate if

3    the circumstances are appropriate.  And --

4            THE COURT:  Well, this goes back to my statement

5    about -- first of all, Mr. Karotkin said they're on track to

6    file by the deadline they said they would.  My intention is to

7    set a hearing promptly, not necessarily the next morning but

8    soon after, this kind of conference.  So --

9            MR. QURESHI:  Yeah.

10           THE COURT:  -- if people like you stand up and say, we

11   can't make any sense out of it; we don't know how it's possibly

12   feasible, Mr. Karotkin's going to have to do some explaining

13   why you have to ask that question.

14           So the burden is on him to be disclosing, at least

15   privately or one-on-one with the constituency -- everybody

16   likes to use "the stakeholders"; that's not my term -- but the

17   stakeholders, he's got to do it.  He doesn't have to file a

18   disclosure statement.  He's got to make sure you know what the

19   deal is.

20           MR. QURESHI:  And, Your Honor, we --

21           THE COURT:  Okay?

22           MR. QURESHI:  -- we think that type of a conference

23   should be scheduled sooner rather than later.  Again, because

24   of the legislative deadline, this is not a situation where we

25   have the luxury of time --

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Right.

2          MR. QURESHI:  -- so that we can see whether the

3   financing is there and, if it's not, somebody else can come

4   forward.  We need to know now.

5          THE COURT:  No, I understand.  Let me just check.

6          Mr. Karotkin, am I right; the regular PG&E schedule we

7   have is for the 10th and 11th, right?

8          Yeah, see, that would be -- that seems to be a little

9   bit tight.  I would want to -- I wouldn't particularly want to

10  have a hearing on the morning after, when I expect you'll

11  haven't had a chance to decide.  Let's defer that for --

12         MR. QURESHI:  Sure.

13         THE COURT:  -- the time being.  The intention --

14  relying on Mr. Karotkin's statement -- he can rely on my

15  statement that we will have a prompt hearing right after that,

16  not to have formal objections or to have anything more than,

17  okay, what's the reaction.  And if the TCC or the senior

18  bondholders or the subrogation group say, we're good to go, we

19  have enough information, that's helpful.  If they say, no, we

20  don't, then we'll figure out what to do next.  Okay?

21         MR. QURESHI:  Thank you, Your Honor.

22         THE COURT:  Okay.

23         Mr. --

24         MR. MARSHACK:  Good morning, Your Honor.  Richard

25  Marshack, Marshack Hays --



PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Mr. Marshack.

2          MR. MARSHACK:  -- on behalf of the --

3          THE COURT:  Yeah.

4          MR. MARSHACK:  -- SLF --

5          THE COURT:  Right.  Mr. Marshack --

6          MR. MARSHACK:  -- fire victims.

7          THE COURT:  -- good to see you.  What --

8          MR. MARSHACK:  Your Honor, would the Court -- I think

9   it'd be -- it'd provide a great benefit to everybody if the

10  Court would elaborate a little bit on what the Court means by a

11  streamlined disclosure statement.  I have a --

12         THE COURT:  Well, I think the bankruptcy lawyers

13  probably know what I'm talking about.

14         MR. MARSHACK:  I am a --

15         THE COURT:  And I don't want to --

16         MR. MARSHACK:  I am a bankruptcy lawyer --

17         THE COURT:  Well --

18         MR. MARSHACK:  -- Your Honor.  So --

19         THE COURT:  Well, okay.  Are you familiar with --

20         MR. MARSHACK:  I mean, I'm thirty-seven years --

21  thirty-five as a bankruptcy trustee.

22         THE COURT:  I don't -- I just don't know you.  That's

23  all.

24         MR. MARSHACK:  Okay.

25         THE COURT:  Are you familiar with the Northern

PG&E Corp., Pacific Gas and Electric Co.

1    District simplified combined plan and disclosure statement?

2              MR. MARSHACK:  I am not, Your Honor.  And that's why

3    I'm -- that's typically done in a small case.

4              THE COURT:  Oh, yeah.

5              MR. MARSHACK:  And here's what I'm saying --

6              THE COURT:  I'm not going to use that form for this

7    case.

8              MR. MARSHACK:  -- what I'm trying to say to this Court

9    is, I think everybody's on board.  But we don't want to

10   disappoint you.  So we want to know what your expectations are

11   for a simplified disclosure statement.  And I did --

12             THE COURT:  So quoted the statute in my order, right?

13   Adequate information for a hypothetical -- and then I put in

14   with a question mark -- investor -- that's what the statute

15   says -- of the relevant class, to make an informed judgment.

16             What will your constituents, your fire victims, need

17   to know how to vote up or down on this plan?  To me, it

18   couldn't be more simple than:  when am I going to get paid and

19   how much am I going to get -- or at least, if not, how much in

20   terms of dollars to a particular victim, at least in the

21   aggregate what's it going to mean for my fellow victims and me,

22   what are we likely to get?

23             To me, I don't know that you need much more than that.

24   But so I envision a very simple disclosure statement.  And that

25   doesn't mean that all the things you've heard the other lawyers

PG&E Corp., Pacific Gas and Electric Co.

1    representing the different financial institutions are being

2    told you don't get any information.  You get all the

3    information you need to know what your treatment is.  You're

4    just not a voter, therefore we don't have a disclosure

5    statement for you.  We have what you need to make sure you are

6    not going to be challenging or objecting to this plan.

7             MR. MARSHACK:  Okay, so --

8             THE COURT:  Okay?

9             MR. MARSHACK:  -- I understand how the Court gets to

10   what's your treatment, but previous speakers at this podium

11   talked about enterprise value and things --

12            THE COURT:  I think Ms. Dumas was talking about it in

13   a big-picture sense.  She also acknowledged that for today's

14   purposes, I think I'll speak -- she can clarify it -- she was

15   talking big terms but not things that are plan-and-disclosure-

16   statement issues.

17            In other words, she and the torts committee believe

18   that -- come on, let's not kid ourselves -- that the aggregate

19   claims from the Tubbs fire and all the other fires that haven't

20   been quantified, are far greater in amount than what were

21   scheduled or at least proposed in the two competing plans that

22   did not get approved for consideration.  And if the debtor has

23   a plan that it files on the 9th -- they file on the 9th, that

24   says we're going to have a fund, a capped trust of eighteen or

25   twenty billion, I suspect that the TCC is not going to be very

PG&E Corp., Pacific Gas and Electric Co.

1    supportive of that and probably would not vote for it.

2           So --

3           MR. MARSHACK:  Your Honor --

4           THE COURT:  Okay?

5           MR. MARSHACK:  -- my motives are not to delay the

6    process.  To the contrary.  My motives are to get an early

7    approval of a plan and disclosure statement.  And I come to

8    this Court and simply say please give us clarity on what your

9    expectations are, because you have to approve the disclosure

10   statement.  And that's the --

11          THE COURT:  No, to me --

12          MR. MARSHACK:  -- only reason I'm here.

13          THE COURT:  -- the disclosure statement is the easiest

14   task in the world.  The question is:  what is going to be

15   disclosed -- or apart from that, just pretend that your class

16   of victims say fine, if I'm going to be paid in full by a year

17   from now or six months from now, I'll vote for it.

18          The question is, do we -- is it a confirmable plan?

19   What are the confirmation standards?  The confirmation

20   standards are a variety of things that are -- start with

21   Section 1129, disclosure is just one item for the voters.

22          So if the senior bondholders say, wait, you can't cram

23   down on me; or you can't -- you're actually impairing me even

24   though you say you're not; or I object to confirmation because

25   it violates the absolute-priority rule; or something --

PG&E Corp., Pacific Gas and Electric Co.

1    something that bankruptcy lawyers will have an argument about;

2    or most importantly, it's not feasible; or it's not acceptable

3    to the CPUC.  Those are confirmation issue that aren't

4    disclosure-statement voting issues.

5            I'm really just focusing on the -- and simplifying

6    that prospect.

7            So you say you clearly want an early plan and

8    disclosure statement.  Well, so does everybody.  But --

9            MR. MARSHACK:  No, no.  We share your objectives.  We

10   just --

11           THE COURT:  But that's the estimation.  That's the

12   hang-up, right?

13           MR. MARSHACK:  Correct.  We share your objective.  We

14   just want to make sure -- at least I want to make sure we're on

15   the same page as you with regard to your definition of a

16   simplified disclosure statement.

17           I've taken up enough time of this Court.

18           THE COURT:  No, no.  You're take -- and I -- you've

19   been here several times, but I didn't know you had the

20   bankruptcy background.

21           MR. MARSHACK:  Yes.

22           THE COURT:  And I don't mean to act snobby to lawyers

23   that I don't know, who I don't know what they know about

24   bankruptcy.

25           So you tell me.  If I said to you, what is the easiest

PG&E Corp., Pacific Gas and Electric Co.

1    thing you could possibly do in a disclosure statement, if you

2    were doing it, what would you put?  Why do you need the

3    Manhattan phone book?  Wouldn't three pages be enough?

4             MR. MARSHACK:  I don't.  I don't.  And frankly, you

5    know that ninety percent of the people aren't going to read it.

6    But no, I applaud this Court's direction.

7             THE COURT:  That's --

8             MR. MARSHACK:  What do you need?  You need the amount

9    of the -- you need what the value of the entity is, what the

10   debts are, the funding, summary of the plan --

11            THE COURT:  Again, I'm not even sure you need all

12   those things.  But that's for easy discussion.

13            I don't care if it's acceptable to the victims that

14   it's a little more elaborate, but I don't think we need to

15   burden them with all kinds of things that go into a more

16   traditional disclosure statement, like a public -- a 10-Q or a

17   10-K.  I mean, imagine how -- talk about what percentage of

18   people read those, right?  The securities plaintiffs' lawyers,

19   they probably do.  That's about it.

20            MR. MARSHACK:  The only thing we need, I think, Your

21   Honor, is if you're -- if the victims are going -- if their

22   claims are going to be impaired -- if they're not going to paid

23   in full, we need to understand --

24            THE COURT:  Well, they're going to be impaired no

25   matter what, because they're not going to be paid on the

PG&E Corp., Pacific Gas and Electric Co.

1     effective date.  Right?

2          MR. MARSHACK:  If the victims are not going to be paid

3     in full, the disclosure statement has to explain why.

4          THE COURT:  Yeah, I agree.

5          MR. MARSHACK:  Thank you.

6          THE COURT:  So your input will be welcome on the

7     disclosure statement.

8          MR. MARSHACK:  Thank you, Your Honor.

9          THE COURT:  Okay.  We have -- someone wants to speak?

10    Yes.

11         Come on in.  It's still morning.

12         MS. BROWNSTEIN:  Good morning, Your Honor.  Beth

13    Brownstein from Arent Fox on behalf of BOKF as indenture

14    trustee for the senior notes in the outstanding amount of

15    seventeen-and-a-half billion dollars.

16         THE COURT:  Right, I got your papers.  Um-hum.

17         MS. BROWNSTEIN:  Your Honor, we are -- or the

18    noteholders are a significant stakeholder in the cases and have

19    an interest, of course, that the debtors emerge a viable,

20    reliable, financially sound company.  And I think Your Honor

21    had identified some of the concerns that noteholders may have:

22    whether or not holders are going to be unimpaired under the

23    plan; what does "unimpaired" mean; is the plan feasible?  And

24    the indenture trustee intends to be part of that process in

25    analyzing the plan, and we'll be back before Your Honor, as you

PG&E Corp., Pacific Gas and Electric Co.

1    said, after -- once the plan is filed and once we have seen the

2    details of how the noteholders are going to be treated.

3              THE COURT:  Okay.  Great.  Thank you.

4              MS. BROWNSTEIN:  Thank you.

5              MR. JOHNSTON:  We keep Mr. Kornberg waiting.  Your

6    Honor, Jim Johnston of Jones Day on behalf of certain

7    shareholders.  Just three quick points.

8              One, there are going to be more than two impaired

9    classes in this case, because the class of shareholders will be

10   impaired no matter how you look at valuation.

11             The means of execution, whether it's new equity, new

12   debt, some combination of both will dilute the shareholders.

13             THE COURT:  Okay.  Okay.

14             MR. JOHNSTON:  Two --

15             THE COURT:  Then we might have to have different

16   disclosure statements.

17             MR. JOHNSTON:  Perhaps.  Although I certainly think

18   that streamlined is the way to go.

19             THE COURT:  Okay.

20             MR. JOHNSTON:  And we are in extreme agreement with

21   Your Honor that less is more in this context and that we should

22   be thinking outside-the-box.

23             THE COURT:  Okay.

24             MR. JOHNSTON:  We fall on the side of the debtors

25   that, call it, total distributable value vastly exceeds the

PG&E Corp., Pacific Gas and Electric Co.

1   amount of claims that will be allowed in the case.  We think

2   this is a solvent debtor.

3          And so we disagree with the suggestion of Ms. Dumas

4   and the TCC that we are going to get anywhere close to that

5   line.  And I just want to react very briefly to one set of

6   numbers that she threw out, which is the eighteen billion

7   dollars in alleged insurance subrogation claims.  She said the

8   insurers have already made those payments and so the debtors

9   start with a baseline of eighteen billion dollars.

10         As we understand it, they haven't made eighteen

11  billion yet.  But even if you assume that they ultimately will

12  make those payments, a very large proportion of those relates

13  to Tubbs, eight billion dollars or so.

14         So we can't start with the baseline that we're talking

15  about eighteen billion dollars in subrogation claims.  The San

16  Francisco Superior Court will have a lot to say about that, I

17  think.  And Your Honor ultimately will in the estimation

18  context.

19         THE COURT:  But I think -- but I think she conceded

20  that the number is subject to these other things that are

21  taking place, and Tubbs is a huge swing.  That's why it's

22  going.

23         MR. JOHNSTON:  Exactly.  And estimation will give us

24  some clarity on the point.  I just didn't want that to go

25  unremarked upon.



PG&E Corp., Pacific Gas and Electric Co.

1        THE COURT:  Okay.  Okay.

2        MR. JOHNSTON:  My third point relates to what you

3   called the meat on the bones, what Mr. Karotkin called the

4   means of execution.  As you heard last hearing and in the

5   papers, my clients and other shareholders have stepped up with

6   a very large commitment --

7        THE COURT:  Um-hum.

8        MR. JOHNSTON:  -- for equity financing.  The debtors

9   and we are confident that adequate financing will be available

10  from many sources:  equity, debt, Oldco, utility.  But Mr.

11  Karotkin and Mr. Dunne are correct in that this is a very fluid

12  concept.  And the how much is completely interrelated with the

13  means of execution.  You can't have unlimited commitments for

14  financing up to the sky, and you can't have unlimited

15  commitments on the time period.  So I --

16       THE COURT:  Right.

17       MR. JOHNSTON:  -- completely agree that this is going

18  to be a fluid situation, and I think that also counsel's in

19  favor of Your Honor's outside-the-box procedure for plan and

20  disclosure statement.

21       THE COURT:  Okay, thank you, Mr. Johnston.

22       MR. JOHNSTON:  Thank you.

23       THE COURT:  Where is he?  Mr. Kornberg, where are you?

24  Maybe we should take a break for lunch.  No, come on.  Nice to

25  see you.



PG&E Corp., Pacific Gas and Electric Co.

1          MR. KORNBERG:  Good morning, Your Honor.

2          THE COURT:  You're not really going to talk today, are

3   you?

4          MR. KORNBERG:  Alan Kornberg from Paul, Weiss,

5   Rifkind, Wharton & Garrison for the California Public Utilities

6   Commission.  Your Honor, before I address the specific

7   questions that you raised in your August 20 order, I thought

8   maybe just a few words about the work the Commission has to do

9   might be helpful --

10          THE COURT:  Sure.

11          MR. KORNBERG:  -- not only for the Court, but frankly,

12   for many parties-in-interest, because there has been, I think,

13   some confusion or misunderstanding about our process.

14          THE COURT:  Please do.

15          MR. KORNBERG:  So the Commission expects to enter that

16   is called an order instituting investigation -- and I'll refer

17   to that as the "bankruptcy OII" -- relating to these bankruptcy

18   cases in late September following PG&E's filing of its plan.

19          THE COURT:  That's the triggering event?  You got to

20   have something --

21          MR. KORNBERG:  Correct.

22          THE COURT:  -- to trigger it?  Okay.

23          MR. KORNBERG:  Correct, Your Honor.  The filing of the

24   plan will permit the Commission to begin the bankruptcy OII.

25   That is a significant event, because the initiation of the



PG&E Corp., Pacific Gas and Electric Co.

1    bankruptcy OII is the beginning of the Commission's required

2    processes related to these cases.

3            That is a multistep process that will begin, and the

4    ultimate goals of that multistep process are the formulation

5    and approval of a global settlement between the Commission and

6    PG&E relating to a variety of outstanding issues of concern to

7    the Commission, not only in the Chapter 11 cases, but in

8    certain ongoing regulatory proceedings that I'll refer to in a

9    minute.

10           THE COURT:  But pending settlement of things that are

11   already in the pipeline that -- where there are differences.

12           MR. KORNBERG:  Correct, some that are in the pipeline,

13   some that may be in the pipeline.  And then also, the other

14   goal, of course, is the Commission approval of the Chapter 11

15   plan that will resolve these cases.  And of course, approval of

16   that plan necessarily involves ratemaking --

17           THE COURT:  Right.

18           MR. KORNBERG:  -- and other questions that are within

19   the Commission's jurisdiction.

20           So as PG&E and others well know, accomplishment of

21   these two goals -- the global settlement, hopefully that will

22   be reached, and a formal Commission approval of the plan -- are

23   conditions to the effectiveness of any Chapter 11 plan.  And

24   I'm sure as Your Honor will recall, that was the case also in

25   the first PG&E.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Well, and it's clear right on the face of
2     AB1054.
3          MR. KORNBERG:  And that's correct.
4          THE COURT:  I mean, that's where I got the clue of
5     what you have to deal with, and you said it before at the prior
6     hearing, yeah.
7          MR. KORNBERG:  And as Your Honor just mentioned, these
8     goals have to be achieved before June 30, 2020, if PG&E is to
9     participate in the Wildfire fund created by AB1054.
10          So the issues that -- in very broad-brush terms, the
11     issues requiring resolution -- I think this is important for
12     people to understand -- will be negotiated by PG&E, on the one
13     hand, presumably as plan proponent, and Commission advisory
14     staff, in the context of confidential settlement discussions.
15     Indeed, the parties have met to frame and discuss the issues
16     that require resolution.
17          Once the bankruptcy OII is commenced, Commission
18     advisory staff and PG&E will begin the settlement discussions
19     in earnest.  So the important takeaway here, Your Honor, is
20     that that process is going to begin promptly after the plan is
21     filed.  There are no preliminary approvals or interim
22     adjudications along the way, and I'll explain why that is the
23     case.
24          When these discussions hopefully bear fruit in the
25     form of the global settlement agreement tied to PG&E's plan of

PG&E Corp., Pacific Gas and Electric Co.

1   reorganization, that agreement -- this global settlement

2   agreement will be submitted for consideration by the

3   commissioners following evidentiary hearings before the

4   Commission in the bankruptcy OII.  So again, first, there is a

5   process where Commission advisory staff will negotiate with

6   PG&E.  When those discussions have reached their conclusion,

7   then it will be presented to the commissioners.  In that phase

8   of the bankruptcy OII, many parties will have an opportunity to

9   be heard, most notably ratepayer representatives and advocates

10  and safety advocates.

11          In the bankruptcy OII, the Commission will have to

12  evaluate and make certain findings concerning the plan and the

13  related transactions.  And Your Honor has already referred to

14  AB1054.  Of critical importance for PG&E to be eligible to

15  participate in the Wildfire fund under that statute, when the

16  Commission approves PG&E's Chapter 11 plan, it must make

17  findings relating to corporate governance and safety culture,

18  consistency with the state's climate goals, rate neutrality,

19  and proper recognition of contributions by ratepayers, if any.

20          THE COURT:  Yeah, let me interrupt you.  Those are the

21  four -- or three paragraphs that I read right from the bill.

22  And you're reading the same place.

23          MR. KORNBERG:  Correct.  But let me go on from that,

24  Your Honor.

25          THE COURT:  Okay.



PG&E Corp., Pacific Gas and Electric Co.

1      MR. KORNBERG:  Because the Commission's work is not

2  limited to the findings required by that provision of AB1054.

3  Under the Commission's existing ratemaking authority, the

4  Commission must do some other things as well.  The Commission

5  has to evaluate the reasonableness of the rates that will be in

6  effect upon PG&E's exit from bankruptcy.  We're all aware of

7  that, I think.  But the Commission also has to approve the

8  respective percentages of debt and equity for the reorganized

9  company's capital structure.  The Commission --

10      THE COURT:  Again, interrupt you.  That's their

11  version of the feasibility determination that the bankruptcy

12  court has to make, right?

13      MR. KORNBERG:  Well, but it's also taken from a

14  different perspective --

15      THE COURT:  I understand.

16      MR. KORNBERG:  -- as one can imagine.

17      THE COURT:  I understand, but I mean, they have to

18  determine the company can do what it says it's going to do.

19  The bankruptcy court has to make the same determination.

20      MR. KORNBERG:  Well, actually, it's a little

21  different --

22      THE COURT:  Okay.

23      MR. KORNBERG:  -- because the Commission also has

24  to -- well, the bankruptcy court does this as well, but the

25  Commission has to also authorize the issuance of the debt and

PG&E Corp., Pacific Gas and Electric Co.

1    the issuance of the equity financing contemplated by the plan.

2            THE COURT:  No, I understand.  I understand.  I mean,

3    those are the -- those are the kinds of things that -- it's a

4    parallel track.  I'm not suggesting that the Commission's doing

5    the bankruptcy court's work or vice versa.  It's doing its own

6    work, but it's consistent with what, in a nonregulated entity,

7    you have to make sure other certain things are complied with.

8            MR. KORNBERG:  Correct, Your Honor.

9            THE COURT:  Okay.

10           MR. KORNBERG:  And it also has to set the reorganized

11   company's rate of return on its equity.  That's another

12   responsibility.

13           The global -- then I mentioned there's a global

14   settlement of a variety of matters that are pending before the

15   Commission.  So for example, we would imagine that the global

16   settlement between the Commission and PG&E must also determine

17   PG&E's liability, if any, for fines and penalties relating to

18   its pre-petition conduct with respect to the 2017 and 2018

19   wildfires.

20           There is a pending OII concerning PG&E's violation of

21   locate-and-mark rules relating to its natural gas and electric

22   infrastructure.  That involves pre-petition conduct.  That also

23   requires resolution.

24           And finally, there is the so-called safety culture OII

25   in which issues relating to potential changes in PG&E's

PG&E Corp., Pacific Gas and Electric Co.

1   corporate structure have to be addressed.

2          Your Honor asked -- well, before I address that

3   question, let me also say a word about what these processes

4   look like.  The statutes governing the Commission proceedings

5   require the Commission to exercise a quasi-judicial function

6   involving separate evidentiary hearings and factual findings.

7   And accordingly, it can't prejudge the issues that will come

8   before it.

9          In the bankruptcy OII, for example, the Commission

10  will have to develop a factual record and resolve all material

11  issues raised by the parties in a detailed decision that

12  contains separately stated findings of fact and conclusions of

13  law.

14         Given the myriad issues before it, Commission advisory

15  staff can and will, as I mentioned before, begin its formal

16  work immediately upon opening of the bankruptcy OII.  Indeed,

17  the preliminary work it has already done sets the stage for

18  that to happen.  Ultimately, however -- and this I think is of

19  concern to Your Honor and is relevant to questions you've asked

20  today -- the Commission will require a definitive, confirmable

21  plan to facilitate the deliberations and make the required

22  rulings concerning the plan.

23         Now, to answer the specific question raised by the

24  Court in its order last week, the Commission doesn't require

25  anything from Your Honor to begin the process that I've

                    PG&E Corp., Pacific Gas and Electric Co.

1    described.  But we would anticipate -- and this relates to

2    conversations about the disclosure statement -- clearly, any

3    disclosure statement in this case will describe that successful

4    conclusion of the Commission process is a condition precedent

5    to the effectiveness of any Chapter 11 plan.

6            THE COURT:  But that's just a statement.  I mean,

7    that --

8            MR. KORNBERG:  Correct.

9            THE COURT:  -- that's just a statement of the law.

10           MR. KORNBERG:  Correct.

11           THE COURT:  It's like approval of some other agency.

12   I mean, it doesn't have to explain the process, just the end

13   result.

14           MR. KORNBERG:  Correct.  It's a significant condition.

15           THE COURT:  Right.

16           MR. KORNBERG:  I would assume that the disclosure

17   statement, no matter how brief -- and we certainly support the

18   idea of a slim disclosure statement -- will have significant

19   conditions to effectiveness described.

20           THE COURT:  Right, but again, I think I'm stating the

21   obvious.  In one sentence, it could say the plan is not

22   effective unless the Commission approves.  It doesn't have to

23   have a --

24           MR. KORNBERG:  Right, an exegesis on it.

25           THE COURT:  -- a long discussion on what the -- okay.

PG&E Corp., Pacific Gas and Electric Co.

1    Where to begin.

2         MR. KORNBERG:  Okay, so how does this all relate to

3    the estimation proceedings?  I know that's an issue of concern

4    to the Court.  As Your Honor has repeatedly observed, the

5    overarching purpose of these cases is the quantification and

6    resolution of payment of the wildfire victims' claims and those

7    of their insurers.  Completion of the estimation proceedings

8    here and elsewhere, or hopefully a settlement of those

9    liabilities, is also critical to the Commission's work, and let

10   me explain why.  Quantification of the wildfire-related

11   liabilities, as you've already heard this morning, is likely to

12   have a substantial effect on the amount and form of financing

13   necessary to fund a plan.

14        THE COURT:  Right.

15        MR. KORNBERG:  Because the plan financing ultimately

16   shapes the company's post-reorganization capital structure and,

17   therefore, has a direct impact on rates, the prompt and speedy

18   resolution of the estimation proceedings will facilitate the

19   Commission's essential ratemaking functions.  We cannot do that

20   in a vacuum.

21        So as I've described, there's a lot of work we can do

22   to narrow the issues between PG&E and the Commission through

23   the work of Commission's advisory staff.  But the essential

24   ratemaking will have to be in the context of understanding the

25   reorganized company's capital structure and the debt and equity

PG&E Corp., Pacific Gas and Electric Co.

1   financing that is a part of it.

2   THE COURT:  Okay, but what that means to me is that

3   the Commission can't go through the final or whatever processes

4   it goes through until it knows the amount that the company is

5   committing to pay its disputed unliquidated claims, and how

6   it's going to raise the money to pay that.  And those are two

7   critical questions.  And one question is answered by the

8   estimation process.  The other is by the kind of things we

9   heard from the debtor and so on.

10   So if we could have a magic best case/worst case, the

11   sources that are going to provide the funding can tell us

12   whether they can fund it at the lower number or the higher

13   number or anywhere in between.  The Commission doesn't need to

14   have the final answer to all those questions, does it, as long

15   as it knows the range.

16   MR. KORNBERG:  I'm not sure if a range would work,

17   Your Honor.

18   THE COURT:  Okay, the high number.

19   MR. KORNBERG:  A high number, I suppose if the company

20   came in with a high number, and the number turned out to be

21   less, and they needed less financing, and there was less impact

22   on ratepayers, I'm sure that would be a good thing, and it

23   would happen.

24   THE COURT:  Well, stated differently, if the parties

25   agreed today on an amount to fund the plan for the impaired

PG&E Corp., Pacific Gas and Electric Co.

1   victim classes, you still have to go through all these

2   processes.  Everything you've described has to happen.  The

3   question that I want some more help on is can't a lot of those

4   things take place before that number gets plugged in and how

5   you support or pay that number gets determined?

6                MR. KORNBERG:  Yes, Your Honor.

7                THE COURT:  Okay.

8                MR. KORNBERG:  I think the answer to that question is

9   that a lot of the work will be done in advance, and as I said,

10  we'll start work in the bankruptcy OII after the plan is filed.

11  However, the actual hearings to approve and get a Commission

12  vote will require substantial testimony about -- and evidence,

13  relating to the actual ratemaking.  And I think that --

14               THE COURT:  Okay.

15               MR. KORNBERG:  -- requires a definitive financing plan

16  and capital structure plan.

17               THE COURT:  Okay.

18               MR. KORNBERG:  So I guess, Your Honor, I would echo

19  what everyone has said this morning, which is the sooner we

20  have the results of the estimation proceeding the better.  The

21  Commission's committed to doing its job before the June

22  deadline but, as everyone has noted, this is a fluid situation.

23  And the estimation results or, hopefully, a negotiated

24  settlement are a very, very important condition to getting that

25  work completed.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Okay.  I understand, but the point is --

2     well, look at what the debtor filed on the 20th or the 12th.

3     It had a time line.  That had a confirmation order on April

4     15th.  And the question I have for you is, in your experience,

5     if the OII had been initiated when the debtor filed the plan,

6     same day to Mr. Karotkin's outline -- which is obviously not

7     going to be the outline, but it doesn't mean it can't be an

8     outline of an outline -- would that work?  I mean, in your

9     experience, if the debtors were able to follow that time

10    line -- remember the document?  Have you seen it?  Do you

11    remember it?

12          MR. KORNBERG:  Yes, Your Honor.

13          THE COURT:  Yeah, it was what they filed on the 20th,

14    and it started with a September 9th filing.  And it ended with

15    a confirmation order on April 15th.

16          MR. KORNBERG:  Your Honor, I think the issue from our

17    perspective will be as follows:  We imagine that the plan that

18    gets filed on September 9th will have to be amended to take

19    into account the results of the estimation proceeding.  And so

20    I think the key issue is when will the company be in a position

21    to file that amended plan that has the benefit of the results

22    of the estimation proceeding and the finalization of the

23    financing package.

24          THE COURT:  Well, but again, what can the Commission

25    do before that amount is plugged into the blank on the draft?

PG&E Corp., Pacific Gas and Electric Co.

1          MR. KORNBERG:  The Commission could go about

2     negotiating a global settlement of the myriad --

3          THE COURT:  Right.

4          MR. KORNBERG:  -- other issues.

5          THE COURT:  All those other things.

6          MR. KORNBERG:  But the actual vote on the plan --

7          THE COURT:  No, I understand the vote.

8          MR. KORNBERG:  -- will be at the end of the process.

9          THE COURT:  No, how could I -- of course, I understand

10    the commissioners cannot be expected to vote on something that

11    has a blank in it.

12          MR. KORNBERG:  Right.

13          THE COURT:  My question is -- and I think you're

14    telling me this is doable -- much like my sense of we could --

15    we ought to be able to flesh out some of the bankruptcy

16    challenges to a plan, even though we haven't plugged in the

17    amount that needs to be disclosed as far as the funding for the

18    victims.  But you could go -- we could go on a track towards

19    that goal.  You even made the comment earlier I think, at the

20    prior hearing, that maybe the bankruptcy court could have this

21    kind of tentative confirmation target.  So you're not ruling

22    out that possibility, are you, something like that?

23          MR. KORNBERG:  I'm sorry, what kind of --

24          THE COURT:  Well, at the prior hearing -- I think at

25    the hearing on exclusivity or maybe it was the last hearing; I

PG&E Corp., Pacific Gas and Electric Co.

1   forget which -- but you made the point that maybe the

2   bankruptcy court could provide something in the form of a

3   tentative plan or a plan that would be confirmable.  In other

4   words, let me try it this way for you.

5        You heard Mr. Johnston talk about maybe there'll be an

6   impaired equity class.  You heard a number of the speakers say

7   we don't know what the plan's going to look like.  But come

8   September 9th, there will be a pretty good idea of what the

9   plan looks like in terms of its structure, classification, what

10  have you.  I will concede that I can't hope for the amount to

11  go to the trust for the victims -- whether it's Ms. Dumas'

12  forty billion, or Mr. Orsini and Karotkin's ten billion; I

13  don't know what it will be -- and I can't expect the kind of

14  financial interests that are going to step up and capitalize

15  the reorganized company to commit to a blank.  But as

16  bankruptcy professionals and judges, we know how to make -- we

17  know the kinds of stuff that have to go into the plan.

18        MR. KORNBERG:  Um-hum.

19        THE COURT:  You have to flesh out who's going to

20  object, are there other issues that would have to be resolved,

21  even if those numbers are not filled in yet.

22        Are there -- can we have a similar track taking place

23  at the CPUC so that maybe it is at the end of the estimation

24  period.  Maybe it's February.  Maybe it's January.  Maybe

25  it's -- again, using the debtors' outline, the outline said

PG&E Corp., Pacific Gas and Electric Co.

1    final order regarding estimation January 17th.  Well, what if

2    it's February 17th?  Is it still impossible or not impossible

3    to assume the Commission can follow a similar track?

4           MR. KORNBERG:  It's not impossible.  And let me be

5    very clear, because I apparently haven't been.

6           THE COURT:  No.

7           MR. KORNBERG:  There are many, many issues that will

8    be addressed in the settlement discussions between advisory

9    staff and PG&E.  And we're going to start working on those

10   immediately.  And as I listed them, these are significant,

11   important matters that require resolution.

12          THE COURT:  Right.  No, I understand that.

13          MR. KORNBERG:  What we will not be able to do -- and

14   if this is what Your Honor is getting to -- we will not be

15   giving preliminary rulings or conclusions in advance because

16   that has to await the adjudicative process before the

17   Commission.  But that doesn't mean that we won't be addressing

18   all of these very significant issues starting as soon as the

19   bankruptcy OII is launched.

20          THE COURT:  Okay.  No, that's all I could hope for.  I

21   mean, it sounds like a very tight schedule and a difficult

22   path -- two paths.  I mean, it's a -- I don't want -- no more

23   metaphors, whether it's Cal-L (ph.) or not.  The Commission has

24   to do its thing.  The bankruptcy court has to do its thing.

25   And at the moment, it sounds like nobody is saying it can't be

PG&E Corp., Pacific Gas and Electric Co.

1    done.  It's just a challenge, right?

2              MR. KORNBERG:  Exactly.

3              THE COURT:  Stating the obvious.

4              MR. KORNBERG:  We will get it done.  We hope it won't

5    become more complicated, however, than it already is.

6              THE COURT:  Well, I'm sure you or your colleagues will

7    be at the table with the other players on the bankruptcy side;

8    whether you invite them to the CPUC is none of my business.

9    But you or someone from your side has to be participant in this

10   discussion to make it work.  Okay, I'm okay with it.  I got it.

11             MR. KORNBERG:  Thank you, Your Honor.

12             THE COURT:  Does anyone else want to be heard on this

13   topic?  Whether we take a break or try to conclude the other

14   matters, I don't know, but let's see.  Anybody want to talk

15   about the -- what we'll call the plan-disclosure-statement

16   track and the CPUC interplay?  Okay.

17             So I had suggested as a separate matter to deal with

18   the inverse condemnation issue.  And I offered a proposed time

19   line.  I think the ad hoc committee proposed a slight

20   adjustment to that.

21             I need to make this statement.  In the prior

22   discussions we had during the estimation -- the original

23   estimation hearing, I might have misunderstood.  I thought the

24   inverse condemnation issue was a simple yes or no.  I mean, it

25   either is or isn't a viable doctrine.  And although it might be



PG&E Corp., Pacific Gas and Electric Co.

1   a simple question to state, it's certainly a question that

2   needs to be fully vetted.

3           But in reading the papers, I believe from Mr.

4   Orsini -- your letter, it looks like there's some maybe not

5   factual disputes, but facts that drive the outcome, right.  So

6   you made the point about some of the lines that are dedicated

7   for public work versus private work.  How do I resolve that as

8   part of the step?

9           MR. ORSINI:  So two separate issues, Your Honor.

10          THE COURT:  Yeah, okay.

11          MR. ORSINI:  So from our perspective -- and before I

12  do that, I just want to clarify one thing on the record --

13          THE COURT:  Okay.

14          MR. ORSINI:  -- because it's very significant and

15  needs to be clarified.  Ms. Dumas was suggesting, and Your

16  Honor just picked up on the idea that the spread between the

17  parties on the value of the individual claims is ten to forty.

18  She said take Mr. Orsini's ten.  Mr. Orsini doesn't have a ten.

19  Our position that the value of their claims are significantly

20  below that number.  I just need that to be clear on the record.

21          THE COURT:  Okay.

22          MR. ORSINI:  With respect to inverse condemnation, so,

23  Your Honor, the issue that we have proposed to brief in an

24  earlier phase of the case, you are absolutely right, is a

25  yes/no, up/down question.  And the question is as follows:  is

81

                    PG&E Corp., Pacific Gas and Electric Co.

1    inverse condemnation as a doctrine under California state law

2    applicable to an investor-owned utility such as PG&E.

3            THE COURT:  Right, that's how I understood the

4    question.

5            MR. ORSINI:  And if it is, is it unconstitutional

6    under the federal Constitution?  That is a simple up/down

7    question.  Doesn't require facts.

8            THE COURT:  Well --

9            MR. ORSINI:  It's something that can be dealt with --

10           THE COURT:  -- can the bankruptcy court or even a

11   district court make -- even rule on it, versus is there a

12   controlling precedent that we cannot?

13           MR. ORSINI:  Well, that's on the merits, right.

14           THE COURT:  But that's still a legal question.

15           MR. ORSINI:  Exactly, Your Honor.

16           THE COURT:  Okay.

17           MR. ORSINI:  Exactly, Your Honor.  I think what you're

18   referring to in my letter with respect to some fact issues is

19   let's assume for a second that Your Honor disappoints me, and

20   you rule against me on whether or not inverse condemnation

21   applies to PG&E.  Okay?  At that point, so we've lost our

22   threshold challenge as to whether it even applies to the

23   debtors.  Then there will still be, at least for some fires, a

24   factual question as to whether or not inverse condemnation

25   applies to that fire.



PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  But is it a factual question or is it just

2    a question that the facts are not in dispute; we just have to

3    apply the rules?

4    MR. ORSINI:  Well, actually, that's a fair

5    clarification.  I think ultimately, Your Honor, on this

6    question, it's going to be something that could be resolved on

7    something akin to summary judgment.

8    THE COURT:  Well, that's -- see that's --

9    MR. ORSINI:  Because the underlying --

10    THE COURT:  -- that's what I was -- go on.

11    MR. ORSINI:  Let me just -- if I can just explain the

12    argument.

13    THE COURT:  Yeah, go ahead.

14    MR. ORSINI:  Just very briefly, the argument is based

15    upon a doctrine under California law known as Cantu.  Very

16    simply stated --

17    THE COURT:  Yeah.

18    MR. ORSINI:  -- inverse is about damage caused by

19    something built for the public good.

20    THE COURT:  No, I got that.

21    MR. ORSINI:  And in Cantu, the argument was -- that

22    was adopted by the intermediate court in California where a

23    line had been extended for a handful of people.  That was a

24    private good, not a public good.  So for some of the fires at

25    issue, particularly in 2017, there will be this question as to

PG&E Corp., Pacific Gas and Electric Co.

1   given the circumstances under which a particular line where a

2   fire may have started was constructed, does that fall into the

3   Cantu doctrine or not.

4          The facts as to how many people were served, when it

5   was built, why it was built, those I think will all be

6   undisputed.  But that is sort of what we propose to deal with

7   in the second phase, because it still does require some

8   discovery and assessment of facts.

9          THE COURT:  Well, you're saying -- well, are you sure?

10  I mean, I guess my gut -- what I was getting at as I thought

11  about a briefing schedule, it was -- and whether it was my

12  dates or your dates are not a big deal, but it was the point

13  that you made in your letter that, well, there are some facts

14  that will drive the outcome in part.  You said it before I did.

15  It sounds like a perfect example of a summary judgment or

16  partial summary judgment.

17         MR. ORSINI:  We would be --

18         THE COURT:  But it depends on if your opponents

19  disagree with the underlying facts as to a particular fire at a

20  particular location.  I mean, excuse me -- whether it was

21  private or public use.

22         MR. ORSINI:  To the extent my friends on the other

23  side would agree that it's something the Court could resolve on

24  summary judgment -- effectively summary judgment on the papers,

25  we'd be happy to fold that issue into our threshold legal

PG&E Corp., Pacific Gas and Electric Co.

1  challenge as to whether or not inverse applies to investor-

2  owned utility.

3       I suspect they're not going to agree with me on that,

4  in which case, we're back to what we are proposing, which is

5  let's take the piece we know the Court can deal with quickly

6  and that is a pure legal issue, which is that threshold

7  challenge.  Let's get that briefed sooner rather than later.

8  And then to the extent we need to deal with these factual

9  issues, we can deal with them as we get into the meat of the

10  estimation process going forward.

11       With respect to the briefing schedule, Your Honor, we

12  continue to believe we can and should brief inverse earlier,

13  but I think we've got a lot bigger fish to fry than to argue

14  about that briefing schedule.  I do think that there was some

15  suggestion by some of the objectors that they wanted a little

16  bit more time.

17       THE COURT:  Just another week I think, yeah.

18       MR. ORSINI:  Yeah, which what I would propose, Your

19  Honor, is I'm happy to give them another week.  But let's not

20  use that to delay the ultimate resolution.  Have my motion go

21  in a week sooner.  So it's still coming in after the bar date.

22  It still gives the same adequate time that Your Honor had

23  identified after the bar date for the opposition, but it gives

24  the parties who are all already in this courtroom already

25  thinking about those issues that extra week they've asked for

PG&E Corp., Pacific Gas and Electric Co.

1   rather than shift everything back.

2         THE COURT:  So debtor motion -- okay, I had suggested

3   that you file on November 1.  You're suggesting an earlier

4   date?

5         MR. ORSINI:  I'm suggesting if they really do want

6   their extra week for the opposition --

7         THE COURT:  Well --

8         MR. ORSINI:  -- just back me up a week.  Keep the rest

9   of the schedule the same.

10        THE COURT:  -- so what's -- so for you, that would be

11  October 25th?

12        MR. ORSINI:  Yes, Your Honor.

13        THE COURT:  And then your proposal would be the

14  opponents, whether it be TCC or anyone else -- I had suggested

15  November 15th.

16        MR. ORSINI:  My proposal is that date sticks.  Your

17  Honor had -- I think as Your Honor suggested by setting that

18  schedule, it's more than enough time after the bar date.  And

19  by moving my brief up, you give them the extra week they're

20  asking for.

21        THE COURT:  Okay, I'll hear the others speak about

22  that.  My recommendation to the district court, as you will

23  recall, was that this was a matter that I did not believe was

24  implicated by the issue.  My recommendation was adopted by the

25  court, and so I'm -- and no one has raised a contrary view, so

PG&E Corp., Pacific Gas and Electric Co.

1    I'm going to suggest that that be the process.  And I'll let

2    the TCC or other plaintiffs' lawyers respond to that.

3              MR. ORSINI:  Thank you, Your Honor.

4              THE COURT:  Any response?  Is that -- Mr. McCallen,

5    are you going to come on up?  That's -- I recognized you;

6    didn't I?

7              MR. MCCALLEN:  Good morning, Your Honor.  Good to see

8    you again.  Just briefly, I'll just deal first with just the

9    logistics on the scheduling.  We're fine with the amendment to

10   the schedule proposed by Mr. Orsini, in other words, moving the

11   date forward by one week rather than moving our opposition date

12   back.  So I think that's the most critical issue in terms of

13   just setting forth the schedule.  And that's that.

14             I would like to introduce, though, another counsel

15   for -- Craig Simon, who's lead counsel in the North Bay fire

16   litigation.

17             THE COURT:  Okay.

18             MR. MCCALLEN:  He just wants to address some of the

19   issues that Mr. Orsini addressed earlier about Cantu and some

20   of his statements he made about the factual issues.

21             THE COURT:  Okay.  I'll be happy to hear what Mr.

22   Simon has to say, but I'm not going to resolve it today,

23   unless --

24             MR. MCCALLEN:  Understood, Your Honor.

25             THE COURT:  -- we proceed.

PG&E Corp., Pacific Gas and Electric Co.

1        So all right, Mr. Simon, good morning.

2        MR. SIMON:  Thank you, Your Honor.  Craig Simon, one

3   of the lead counsel in the state court action.  And Mr.

4   Orsini's comment about Cantu and the inverse condemnation is

5   not exactly accurate and not exactly clear.

6        The one thing I wanted to point out to you is it's not

7   a clear up-and-down summary judgment motion without a fact on

8   the issue of whether a privately owned public utility is

9   subject to inverse condemnation.

10       The arguments that come from those, and I just argued

11  this yesterday in front of Judge Buckley in the Thomas fire

12  down in Southern California.  And the issues that come up in

13  these cases, the defense says we can't risk spread unless we

14  get the permission to do so.  And unless we have permission to

15  risk spread in the future known now, we are different as a

16  privately owned utility from a public utility.

17       And we have factual issues that go to the issue of

18  risk spreading.  It has to do with whether or not, for example,

19  when a utility seeks a certain -- an increased level of

20  investor return, whether that acts as cost-shifting.  And

21  there'll be some discovery on that.  So I just wanted to set

22  the record clear that in the very "up-or-down" issue, there are

23  facts embedded in that.

24       THE COURT:  Well, how do you -- then you don't like

25  this time schedule, do you?  I mean, how do I deal with this?

88

PG&E Corp., Pacific Gas and Electric Co.

1    What facts?  I mean, I thought this was going to be easy.  It's

2    not easy.  What do you need to do by way of getting discovery?

3          MR. SIMON:  Probably a deposition of one of their

4    people with regard to rate issues, and if that needs to be

5    disclosed or discussed on our side, we have people who will be

6    prepared to discuss those issues as well.

7          THE COURT:  Well, one thing that will not be helpful

8    to me, at least, to try to do this is to get equivalent of a

9    motion for summary judgment with an opposition saying there are

10   material facts in dispute, in which case, I have no choice but

11   to deny it, assuming -- and I'm assuming that even if there

12   were facts to dispute, that's not something that I couldn't

13   decide.  The question is how about doing it.  I'm not going to

14   be able to have a mini trial on this issue.  So, Mr. Simon,

15   could you envision that this matter could be done in this kind

16   of a procedural setting?

17         MR. SIMON:  It depends on what the motion is, Your

18   Honor.  Obviously, I've seen motions brought like this before

19   from other privately owned utilities.  And they do embed a

20   certain fact issue that comes in.  If they are doing something

21   purely of law that we would be able to respond to purely of

22   law, then obviously --

23         THE COURT:  Well, sure.

24         MR. SIMON:  -- we can do it.

25         THE COURT:  Of course.



PG&E Corp., Pacific Gas and Electric Co.

1          MR. SIMON:  So I think -- I think we need to see the

2    motion, and then address it at that point.

3          Also, Your Honor, with regard to Cantu that was

4    mentioned, Cantu was a trench that PG&E built for a number of

5    homes, and the trench delivered water to a land -- caused a

6    landslide.  Had nothing to do with counting poles or counting

7    customers in the same way that Mr. Orsini said.  So we're going

8    to be factually discussing Cantu in light of the various fires.

9          But I guess the question that I would ask Mr. Orsini

10   or anyone on his side is which fires specifically are they

11   bringing any inverse motions regarding?

12         THE COURT:  I think he's -- didn't he identify the

13   fires in his letter?  Did you read his letter?

14         MR. SIMON:  Yes, I did.

15         THE COURT:  Those are -- aren't those the fires --

16         MR. SIMON:  But --

17         THE COURT:  -- Mr. Orsini?  That you listed about ten

18   fires.  Aren't they the ones?

19         MR. ORSINI:  Those are the ones I'm aware of as I sit

20   here right now, Your Honor.

21         THE COURT:  So for all the other fires, it's the pure

22   legal question.

23         MR. ORSINI:  That's correct, Your Honor.

24         THE COURT:  Right?

25         So, Mr. Simon, is that --



PG&E Corp., Pacific Gas and Electric Co.

1    MR. SIMON:  Yes, thank you, Your Honor.  So in those

2    fires, there will be factual issues with regard to, for

3    example, any Cantu-type motion brought, whether or not it's on

4    public use or private use.

5    THE COURT:  I have to simplify this because, for

6    reasons that many of you are quite familiar with, so I'm not

7    going to repeat it, we're splitting this estimation process

8    into various parts:  part of it down the street, part of it up

9    on the 19th floor, part of it here.  And the argument on

10   inverse condemnation, until a couple of days ago, was a pure

11   legal question.  And that seemed like an easy thing to fit into

12   this schedule.  If suddenly it becomes a factual question, then

13   the question is well, how can it possibly work.  I mean, I

14   certainly can do my best to consider the law and apply it, but

15   if there are facts in dispute, and I have no choice but to deny

16   the motion, then everybody's lost all the effort to try to get

17   this piece out of it.  So whether I go up or down, whether I

18   rule for or against the debtor, it's a component to the

19   estimation equation or formula.  But it's no contribution to

20   the problem if the answer is motion denied because of facts in

21   dispute.

22   MR. SIMON:  Your Honor, the way --

23   THE COURT:  So what do I do?

24   MR. SIMON:  Again, I'll only throw out one situation.

25   Judge Buckley --



PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Yeah.

2          MR. SIMON:  -- in complex --

3          THE COURT:  That's what you said.

4          MR. SIMON:  -- in Los Angeles Superior Court,

5   Department 10, the way he handled it with Edison is he asked

6   Edison to file their brief.  Then he asked the plaintiffs in

7   that case to respond whether they thought there were factual

8   issues --

9          THE COURT:  Right.

10          MR. SIMON:  -- or whether they thought they could do

11   it legally.

12          THE COURT:  Okay.

13          MR. SIMON:  And then he had a hearing on that issue.

14          THE COURT:  Okay.

15          MR. SIMON:  So to me, I think that's the way --

16          THE COURT:  Did he rule?

17          MR. SIMON:  -- to get it.  Yeah, he ruled yesterday

18   that he thought there were factual issues.

19          THE COURT:  So he --

20          MR. SIMON:  In that particular case.

21          THE COURT:  Great.

22          MR. SIMON:  Yeah.

23          THE COURT:  I'll just adopt the decision of the

24   Supreme Court.

25          MR. SIMON:  I'll send you the ruling, Your Honor.

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  No, I don't want the ruling.

2      MR. SIMON:  I'm teasing.  But my point was that I

3  believe that we need to see what the motion is.

4      THE COURT:  Mr. Orsini, you don't have to get up.  Are

5  you -- is this motion for summary judgment doomed to be denied

6  for this reason?  I mean, can you figure out a way to get

7  around it so we can do this efficiently?

8      MR. ORSINI:  Your Honor, I fundamentally do not

9  believe that there are any fact issues that will be in dispute

10  or relevant to the motion that we proposed to file and the

11  schedule we just described.  We've done this twice in the state

12  court.  I was disappointed with the outcome of those, but I'm

13  hoping third time's a charm.

14      THE COURT:  Going for the hat trick.

15      MR. ORSINI:  They were done on the state law

16  equivalent of a motion to dismiss.  There were not disputed

17  fact issues that precluded the resolution of these arguments.

18  There's a single fact that matters here, Your Honor.  That

19  single fact -- and I'm not asking you to agree with me right

20  now because we're not arguing the merits, but there's one fact

21  that matters that's not going to be disputed.

22      Mr. Kornberg's client holds the purse strings.

23  They're the ones who are able to decide whether or not we raise

24  rates in order to cover losses associated with wildfires.  And

25  our argument is very simply that fact distinguishes us from

PG&E Corp., Pacific Gas and Electric Co.

1   public utilities.  And when you apply the law of the Supreme

2   Court of California, including as it confirmed in its most

3   recent decision on inverse about a week and a half ago, that

4   means it can't apply to PG&E.

5          But look, I have no doubt that they're going to make

6   some argument that there's a disputed fact in there.  They

7   don't want the issue decided quickly.

8          THE COURT:  Mr. Simon, how much did -- Mr. Simon, what

9   was Judge Buckley's page requirement?  How long were the

10  motions?  How many pages?

11         MR. SIMON:  I believe that they filed it in twenty

12  pages.

13         THE COURT:  Okay.

14         MR. SIMON:  And we did it in less than ten.

15         THE COURT:  Mr. Orsini, I'll let --

16         MR. ORSINI:  I'll take it, Your Honor.

17         THE COURT:  I'll let you file your motion.  We'll call

18  it a motion for summary judgment.  It's in the context the

19  estimation and the process called claims estimation is a

20  little -- in bankruptcy terminology, as many of you know, it's

21  called a contested matter.  Contested matters do lend

22  themselves to summary judgment or a partial summary judgment

23  motion.

24         You file your motion and support it.  We'll stick with

25  the normal rules for our court.  So it's twenty-five pages.

PG&E Corp., Pacific Gas and Electric Co.

1  And if you have facts -- you can make your argument without the

2  facts -- I mean, without any facts in dispute, so be it.  If

3  your opponent raises facts in dispute, we'll deal with it that

4  way.

5       Mr. Julian, do you want to be heard, because you're

6  going to -- one of you will -- one of the people on your side

7  is going to be responding on this argument, so either you work

8  that out --

9       MR. JULIAN:  I'm going to bring it back to your August

10  20 order.  It sets a briefing schedule on a pure legal issue

11  that does not deal with this Cantu stuff.  The pure legal issue

12  that you ordered briefing on, which is fine as modified today,

13  is whether the bankruptcy court can determine that the

14  California Supreme Court would overrule the California Court of

15  Appeal decisions on whether inverse condemnation applies to

16  investor-owned utilities.  That's the only thing we're

17  briefing, Your Honor, and Mr. Orsini, I believe, agrees it's a

18  legal issue.  His brief is going to be due October 22.

19       THE COURT:  25.

20       MR. JULIAN:  Ours is --

21       THE COURT:  I thought we said 25.  Didn't we say 25?

22       UNIDENTIFIED SPEAKER:  Yes, 25.

23       THE COURT:  25.

24       MR. ORSINI:  25th.

25       MR. JULIAN:  Oh, 25th?



PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  Yeah, 25.

2      MR. JULIAN:  Our brief is due November 15 and their

3  reply brief --

4      THE COURT:  Yeah.

5      MR. JULIAN:  -- due thereafter as set forth.  It

6  doesn't have to do with this Cantu issue.

7      THE COURT:  Well, I don't know if it does or doesn't.

8  Again, I don't know the law.  But we'll stick with that

9  schedule, and if there are facts in dispute that make me deny

10  the motion, I'll deny the motion if I have to --

11      MR. JULIAN:  Thank you, Your Honor.

12      THE COURT:  -- and without getting into the merits.

13  Okay, we'll put that to bed.

14      Let me see if it's -- well, we're here to talk

15  about --

16      MR. MARSHACK:  Excuse me, Your Honor.

17      THE COURT:  Yeah.  Yes.  Yes, Mr. Marshack.

18      MR. MARSHACK:  You -- just to be clear, I believe your

19  order provided that Mr. Orsini will file his brief, and then

20  TCC will file their brief.

21      THE COURT:  Mr. Julian has to coordinate with other

22  counsel.  You and Mr. Tredinnick for the City wants to weigh

23  in, and any other group, you just have to coordinate, so I get

24  one brief.

25      MR. MARSHACK:  That is exactly my point.  So subro,



PG&E Corp., Pacific Gas and Electric Co.

1    us, and TCC.

2         THE COURT:  Well, it's anybody who wants to oppose it.

3    I mean, it's a -- you're all experienced capable lawyers; you

4    can do it that way.

5         MR. MARSHACK:  And are we --

6         THE COURT:  But the CCSF, through Mr. Tredinnick.  I

7    don't even know if -- seen him or if he's here.  I mean --

8         MR. MARSHACK:  And we're held to the page limit,

9    correct?  And --

10         THE COURT:  I'm going to modify the page limit, if

11    necessary.  I just want to get to the issue.  Okay.

12         So, Mr. Julian, are you or whoever works with you on

13    this subject -- I'll ask you to coordinate with other counsel,

14    so that there can be a joinder on the brief.

15         MR. JULIAN:  Yes, Your Honor.

16         THE COURT:  Okay.  I did ask for comments and

17    discussions from many of the litigation counsel.

18         If Mr. Pitre or Mr. Kelly are here particularly, I

19    don't -- Mr. Pitre, can you help me on this?  You were partly

20    persuasive to get me to grant the relief you asked for.  Now

21    tell me how to make it work.

22         So the first question is, have you filed anything with

23    the superior court yet?

24         MR. PITRE:  Yes, Your Honor.

25         THE COURT:  Okay.



PG&E Corp., Pacific Gas and Electric Co.

1          MR. PITRE:  And I'm pleased to report that Ms. Cordova

2   yesterday went down to the San Francisco superior court.  With

3   cooperation of PG&E, there was a stipulation that the hearing

4   that we asked for on preference, will be set for September

5   16th --

6          THE COURT:  Oh, okay.

7          MR. PITRE:  -- in conjunction with a C&C in front of

8   Judge Jackson.  So that has been taken care of, Your Honor.

9          THE COURT:  One of the questions that I thought about

10  after I went home and made my decision, and thought about what

11  comes next, including drafting this order for today, was what

12  if your side gets cold feet and decides not to stick with the

13  preference?  I mean, I presume a preference plaintiff can waive

14  the entitlement, but I got to make sure that that doesn't

15  happen.  I mean, obviously if there were personal reasons why

16  you or any of the principal lawyers need to get some

17  adjustments, that's a different story.

18          I would not be favorably impressed if you persuaded me

19  to let this go for reasons that you said, only to have it

20  sidetracked.  So what can you do to assure me that that's not

21  going to happen?

22          MR. PITRE:  What I can say is that all the lawyers on

23  the personal injury side have red-hot feet.  There is no cold

24  feet.  We want that case to go forward.  It's statutorily

25  mandated.



PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  Yeah, but it's only --

2      MR. PITRE:  And you --

3      THE COURT:  -- statutorily mandated if the person who

4  claims it, claims it, right?  Because --

5      MR. PITRE:  Nobody is going to ask for an extension,

6  and the only issue, Judge -- it's very simple.  Will PG&E

7  cooperate with the discovery that is necessary to have that

8  case tried?  And my suggestion, if I have an opportunity to

9  speak to the superior court judge, is that if there is a delay,

10  that there be a finding and a sanction and an evidentiary

11  sanction, but that case will not be continued.

12      THE COURT:  Well, I don't want to get into the subject

13  of -- I don't like sanctioning lawyers, and particularly

14  telling other courts to do it.  My point is that Mr. Orsini and

15  Mr. Karotkin and everybody on the debtor's side know that the

16  way they can get in trouble with me is to hold up something

17  because the way to pay the price is to slow it down here.

18          In other words, they've been pushing for the

19  estimation to go forward.  I'm perhaps lesser involved in that

20  than at the last hearing, but that's not the point.  And I

21  don't speak for Judge Donato, he will decide for himself what

22  he wants to do.  But my guess is he will get the message loud

23  and clear, as the entire populace of northern California has,

24  about the urgency of making all these things come together.

25          So I'll take your word for it that that's going to



PG&E Corp., Pacific Gas and Electric Co.

1    happen.  The question then -- the second question is, I think,

2    you were the one that said -- or maybe it was Mr. Kelly, I

3    forget -- about why don't I pick up the phone and call the

4    superior court judge.  And I'm not inclined to do that, but

5    what can or should I do, if anything, and if you say do

6    nothing, that's fine, I'll take it.  Any words of wisdom on

7    that subject?

8         MR. PITRE:  Well, Your Honor, I don't think there is

9    anything different than Mr. Kelly had offered to the Court,

10   which is, from time to time, if appropriate, walking across the

11   street, and sitting in conjunction with Judge Jackson at a case

12   management conference, suggestion only.  Two, regular status

13   reports by Mr. Kelly or I to this Court as to what is going on,

14   so this Court knows exactly what is happening.  You also have

15   Mr. Orsini who can report, so the Court is kept abreast.

16        If the telephone doesn't work, sometimes what has been

17   done by Judge Breyer and also by Judge Walker in the past, is

18   to have a telephonic conference, where the judge phones in and

19   listens to what's going on, so that the Court can be apprised

20   of exactly what's happened.  Those are the only suggestions I

21   have.

22        THE COURT:  Yeah, well, I, of course, feel strongly

23   and appreciate those two judges, but we just have different

24   styles.  And I don't particularly enjoy or feel comfortable

25   interfering with another judge's court, whether it be federal

PG&E Corp., Pacific Gas and Electric Co.

1  or down the street at superior court.  So I'm not going to do

2  that unless there's a reason.  But the notion of getting up to

3  date, as you know, we have enough ongoing regular hearings

4  here, status conference, motions, and I don't mind getting a

5  status report from Mr. Orsini or Mr. Karotkin, or your side.

6  Mr. Julian's not bashful either.  He knows how to tell me what

7  I need to know, so --

8        MR. PITRE:  Yeah, the first status conference would be

9  September 16th, and I will be pleased to provide a report as to

10 what happened, as well as Mr. Orsini or anybody else.

11       THE COURT:  Well, is it your view that the judge at

12 that hearing will set the trial, or assign it out to the trial

13 judge --

14       MR. PITRE:  That is my expectation, Your Honor.

15       THE COURT:  Okay.  Okay, well, that's -- then that's

16 fine.  You had made this point before about contacting the

17 judge, and the flip side is true.  I mean, if a superior court

18 judge on a matter wants to communicate with this court, again,

19 that's fine.  It gets more complicated when we have yet another

20 federal court involved, because the critical thing is the

21 resolution of the estimation procedure and -- proceeding, and

22 how that goes about remains to be seen.

23       Okay, I'm --

24       MR. PITRE:  Yes, Your Honor.

25       THE COURT:  -- happy with that explanation.  Thank you



PG&E Corp., Pacific Gas and Electric Co.

1   for coming --

2        MR. PITRE:  Very well.

3        THE COURT:  -- and telling me.

4        MR. PITRE:  Thank you, Your Honor.

5        THE COURT:  All right, let's have --

6        MR. KORNBERG:  May I just comment briefly --

7        THE COURT:  Yes, sir.

8        MR. KORNBERG:  -- on this issue?  So I obviously read

9   your decision on the lift stay very carefully, and in

10  particular, footnote 4, which I read as the Mr. Orsini

11  cooperative footnote.  So just to update the Court, as Mr.

12  Pitre said, there was -- there were two ex parte hearings

13  yesterday.

14        Effectively what happened is, the parties agreed to

15  shorten the time for the briefing on whether or not they're

16  entitled to statutory preference and also the briefing on where

17  the trial actually should be held.  Your Honor may recall, our

18  position is that it should be held in Sonoma, the county that

19  was actually affected by the fire.  Their position is, it

20  should be held in San Francisco.  We don't want that to delay

21  things.  So that too will be taken up at the September 16th

22  conference.

23        In terms of --

24        THE COURT:  But is it -- is your experience that the

25  conference will be definitive on the motions?



(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1              MR. KORNBERG:  I would --

2              THE COURT:  The judge will be asked to rule on the

3    motions.

4              MR. KORNBERG:  I would expect so, Your Honor.

5              THE COURT:  Whether she does or --

6              MR. KORNBERG:  I never liked to, particularly on the

7    record in another court, presume to say what a different

8    court's going to do, but I think the court understands below

9    the significance of the timing here.  Certainly we had very

10   good experiences with Judge Karnow, the pervious judge, who was

11   overseeing these litigations to make quick decisions on these

12   types of issues, so I agree with Mr. Pitre.  I would expect

13   that we'll know up/down on both of those issues come the 16th.

14             And just so the Court understands, what that means if

15   I count my days right, is the latest the trial could be set to

16   begin is January 14th.

17             THE COURT:  But what about earlier?

18             MR. KORNBERG:  It could be set earlier.

19             THE COURT:  But could you be persuaded to cooperate in

20   making it earlier if the plaintiffs want to do that?

21             MR. KORNBERG:  I am willing to cooperate to set it as

22   early as the plaintiffs are willing to.  Of course, there's the

23   question of what discovery needs to be taken --

24             THE COURT:  Right.

25             MR. KORNBERG:  -- and the physics of how quickly that



PG&E Corp., Pacific Gas and Electric Co.

1    can be taken.

2              THE COURT:  No, I understand that.  Understand that.

3              MR. KORNBERG:  Okay.  The only other point, Your

4    Honor, on the question of communication and I've heard you loud

5    and clear as to what Your Honor's preferences are on that

6    front.  The one area where I think there could be some utility

7    in the Court communicating its views, is on what is most

8    important to this Court in terms of the outcome of that trial.

9              And by that, I mean, when we were here roughly a week

10   and a half ago, there was a discussion about how long the trial

11   would last.  There was the discussion about -- and the

12   suggestion by the tort claimants, that potentially we could

13   bifurcate the trial, so that we deal with the issue of

14   causation, get the verdict on that, so you could plug it into

15   the estimation process.  That obviously would shorten the

16   trial.

17             It may also allow us to get to that stage a little

18   faster, because we don't have to go through the full-blown

19   discovery on damages.  We had proposed that stipulation to the

20   trial lawyers, that we engage in the bifurcation, and in

21   return, that we wouldn't even object to preferential trial

22   setting.  They've not been willing to agree to that, and

23   instead have said that we need to work into the initial

24   session, if we are bifurcating, some testimony from their

25   clients on their specific damages.

PG&E Corp., Pacific Gas and Electric Co.

1    That obviously complicates matters.  It's going to

2  delay issues.  I don't think it gets to the sixty-four-million-

3  dollar question, as Your Honor said, which is what really

4  should be tried first, which is what caused the Tubbs fire.

5  Was it PG&E, and it was PG&E, was PG&E negligent?  So I think

6  Your Honor's views on that will be useful.

7    THE COURT:  Well, I mean, we raised them before.  That

8  was the original proposal from your side, that I decide that

9  before we ever even got to the Article III issue.  And had I

10  denied the motion for relief from stay, maybe I would've taken

11  you up on it, but to me, it was once I was persuaded to grant

12  relief from stay, that that problem switches venue.

13    MR. KORNBERG:  It's someone else's --

14    THE COURT:  Yeah, and --

15    MR. KORNBERG:  Okay.

16    THE COURT:  -- and similarly, the decision of

17  involving the Article III judge is so critical now too, so I

18  may have virtually no role in some of these things going

19  forward.  That's something that you all, principal lawyers,

20  need to be prepared to discuss with Judge Donato the sooner the

21  better, and maybe by now, he's issued his order.  I don't know.

22  I can't -- don't make it a habit of telling him what to do

23  either.  But he does know that -- he informed me that he will

24  be doing a status conference shortly.  So I encourage you to

25  discuss with him the timing of the estimation process, and

PG&E Corp., Pacific Gas and Electric Co.

1    what's going on in the superior court as well, so.

2         MR. KORNBERG:  And would that include Your Honor -- I

3    just want to make sure I have a clear understanding as to what

4    we're covering today versus at that conference.  Is Your

5    Honor's anticipation that we would be covering with Judge

6    Donato the question of not only when the estimation will occur,

7    but what it looks like, whether it's our proposal or --

8         THE COURT:  I think so.  I mean, I think -- look, I

9    mean, one of the things that's so awkward about this, is

10   there's not a playbook on how to do this, and so then -- and

11   for reasons I've tried to explain in my recommendation for a

12   withdrawal that the court accepted, is that I didn't wish to

13   take on the responsibility of making the call on such things as

14   I deferred on emotional distress as part of personal injury or

15   not, was that the trier of fact has to make that call.  It's

16   the same with the burden of proof question in this.

17        MR. KORNBERG:  Right.

18        THE COURT:  And the same with who goes forward.  The

19   same with how to conduct it.  Is it an evidentiary hearing?  I

20   mean, is it a -- which side goes first.  Is it -- how can the

21   trial judge not be in charge of that process?  So --

22        MR. KORNBERG:  And to be clear, Your Honor, we don't

23   disagree with that.  My experience is if a trial judge is going

24   to preside over a trial, they want to have a voice in what that

25   trial looks like.



PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  That's right.  And --

2          MR. KORNBERG:  So I just wanted to clarify.

3          THE COURT:  And that includes the suggestion that came

4    up in the prior hearing on whether we bifurcate the subrogation

5    claims from the victims' claims, because insurance companies

6    don't suffer personal injury or emotional distress, but that

7    doesn't mean that there isn't one fire and one set of facts.

8          MR. KORNBERG:  Understood.

9          THE COURT:  So I think Judge Donato's going to make

10   the call on that, and he'll take all the advice you can give

11   him, I think.

12         MR. KORNBERG:  Thank you, Your Honor.

13         THE COURT:  Okay, so on one of the items that I had,

14   I'll defer the question of discovery for a moment.  I put on my

15   list, role of the Article III judge.  I've just given you the

16   role.  I've told Judge Donato a little bit of background.  I'm

17   not going to tell him what to do.  It's not appropriate for a

18   variety of reasons.  And I'm sure he wouldn't listen to me

19   anyway, but he has to make the decisions -- all these critical

20   decisions -- because if he were a -- or I were a ventriloquist,

21   and I had him as a puppet, that would be a strange procedure.

22   That's not the procedure.

23         So I'll take out of order the question of mediation.

24   Some of the people who have filed papers have suggested that

25   there's something to be done.  I am not bashful in other cases

PG&E Corp., Pacific Gas and Electric Co.

1   to ask parties if they've talked about mediation.  Here I don't

2   even want to invite or pin anyone down.  I suspect that

3   there -- if there's mediation being considered, you don't need

4   me to tell you to do it.  And if it's not being considered,

5   maybe my telling you wouldn't be helpful anyway.

6        But certainly nothing comes out as a big what-about as

7   that, and so I simply leave open either for me, or for Judge

8   Donato, or both of us, or neither of us, to -- for someone to

9   raise the question and tell me how either or both of us can be

10  helpful in the process.  And I don't even need a response now,

11  unless somebody wants to respond to me.

12        Mr. Julian?

13        MR. JULIAN:  Your Honor, I'd like to address what we

14  had briefed in our estimation brief on core versus noncore, and

15  then address where we are today.

16        So in our August 7th estimation brief, we sent a clear

17  signal that we believed that it would be most expeditious and

18  economical to stay in this court as far as we could on property

19  damage claims, and put off the personal injury to the future,

20  and maybe it would not be necessary.  Our intent in saying that

21  was to maximize this Court's adjudication under core

22  jurisdiction.

23        And in the last paragraph -- second to last paragraph

24  of our brief, we stated we preserve the argument or the

25  position on noncore jurisdiction, and we used the word preserve

PG&E Corp., Pacific Gas and Electric Co.

1    for a reason, which was that we were not objecting at that time

2    to core proceeding on everything, but we were preserving it,

3    because as we stated on pages, I think, 2 and 15 of the brief,

4    we simply have to have an identification of the legal and

5    factual basis from PG&E, as to why they're denying liability,

6    in order to address scope of the proceeding, discovery, and

7    core versus noncore.

8            And let me address the third point now.  That's

9    because when you raise the issue of whether or not the parties

10   would consent to core jurisdiction, we had to go to our eleven-

11   person layman's --

12           THE COURT:  Yeah, I don't -- I didn't ask for

13   anybody --

14           MR. JULIAN:  No, but --

15           THE COURT:  -- to explain why it was done.  It was

16   done.

17           MR. JULIAN:  We preserve the argument, and I want you

18   to know the position, because we still believe it's better to

19   maximize this court if it can be done.

20           And so when the question was asked of the TCC, can you

21   consent to core, I have to explain to them the legal and

22   factual issues that are going to be subject to core.  And at

23   that point, I couldn't do it.  So the way I interpret your

24   order, is you are going to issue a -- we are going to have a

25   pre-trial conference, and you're going to essentially manage

PG&E Corp., Pacific Gas and Electric Co.

1    this case under case management procedures, and get it up to

2    the pre-trial conference, and then at that time ship it over to

3    the federal court or not.

4         The reason why I raise this is because we -- TCC, and

5    especially me -- view the pre-trial conference as much like a

6    pre-trial conference in the district court, where someone has

7    requested a jury trial.  The district -- at the pre-trial

8    conference, the district judge says, are we going for a jury

9    trial or not?  Similarly, if you're still of a mind, we would

10   make a decision later of whether or not this case has been pre-

11   tried or narrowed by various rulings, such that it makes sense

12   not to bifurcate proceedings and have everything here.

13        So we still anticipate doing that.  That's what I

14   intended to do in our estimation brief, to say we need

15   identification of the issues first, to determine core versus

16   noncore, and consents.  If you've already made the decision,

17   though, no matter what --

18        THE COURT:  Well, look, the train left the station.

19        MR. JULIAN:  Okay, that's fine.

20        THE COURT:  I raised the question, and my recollection

21   is, I raised it without anybody even discussing it.  And I

22   don't recall anybody offered it as an option, but I raised it

23   on my own, not because I was looking for the work, or because I

24   have a particular outcome in mind, but because it seemed to be

25   most efficient.  And so I took it upon myself to ask the

PG&E Corp., Pacific Gas and Electric Co.

1    question.  Is there consent?  And I don't -- I didn't know want

2    to know then, and I still don't want to know why I didn't get

3    consent.  I didn't get consent, and I felt no choice but to

4    toss the ball to the district court in the way I did.

5            And the fact of the matter is that the law is

6    unsettled on what does the statute mean for purposes of

7    confirmation versus purposes of distribution.  What does the

8    law say about personal injury tort and wrongful death, about

9    emotional distress, and all the things that go with it?

10           MR. JULIAN:  I understand.

11           THE COURT:  And I was not prepared to take the risk

12   for the victims frankly, or the insurance companies to a lesser

13   degree, of deciding upon myself that I should do that only to

14   be wrong, when it's so easy to have an Article III judge do it.

15   Easy in the sense that I don't get to that question, because of

16   that.  So that's why I felt I had no choice.  If it -- what

17   does that mean to me?  Nothing, it means to me.  It means that

18   I have less work to do.  But I mean, if all the parties want to

19   persuade Judge Donato to send it back, he can do it.

20           MR. JULIAN:  Is your --

21           THE COURT:  But I don't really want to discuss that.

22   I'll just do it when I'm asked to do.

23           MR. JULIAN:  Is your intent to send the inverse claim,

24   if it stays in the case, which deals only with property damage

25   to Judge Donato along with the other claims?

PG&E Corp., Pacific Gas and Electric Co.

1      THE COURT:  The inverse condemnation is just a legal

2  question.

3      MR. JULIAN:  No, the inverse -- the calculation of

4  damages on the inverse claim.  Did you intend to keep the

5  calculation --

6      THE COURT:  I haven't even thought about it.  I mean,

7  if I --

8      MR. JULIAN:  I see.

9      THE COURT:  -- I mean, what -- where should it be?

10  You tell me.  Suppose I announce that Mr. Orsini is wrong, and

11  the law is what your side says it is.  What's the marching

12  order for the estimation judge?

13      MR. JULIAN:  As I read your withdrawal of reference

14  order, as I read it, the estimation of damages on the inverse

15  claim is in this court, and the estimation of damages on the

16  negligence combined personal injury would be in front of Judge

17  Donato.

18      THE COURT:  I don't think I meant it that way.  I

19  mean, I --

20      MR. JULIAN:  Oh.

21      THE COURT:  I mean --

22      MR. JULIAN:  If it's all in front of Judge Donato,

23  then I understand.

24      THE COURT:  I mean, to me it makes no sense to

25  bifurcate.  It's not efficient.  In other words, I didn't think

PG&E Corp., Pacific Gas and Electric Co.

1   of it in terms of the inverse claim.  I think of it in terms of

2   the property damage claim.  So if there had been no personal

3   injuries in this case, or -- by personal injury, I mean all the

4   horrible things that go with it from trauma to emotional

5   distress to death, and this had only been about people's houses

6   or their cars or their trees burning, I don't think we ever

7   would have -- we never would have had a discussion about core

8   and noncore, would we?

9        MR. JULIAN:  No.

10       THE COURT:  We wouldn't have.  That's right.  By the

11  way, a little on the side, you probably know this.  I learned

12  from Judge Carlson who was involved in some of the drafting of

13  this bill in 1984.  The add-on for the district judge came from

14  the asbestos plaintiffs' bar out of nowhere.  It wasn't

15  something that was even discussed at the staffing level when

16  they were putting together this whole concept of core and

17  noncore, which I might add began in San Francisco around a

18  table in the bankruptcy court here, the whole concept of core

19  and noncore.

20       And so I asked him a little background, where did this

21  come from?  Well, it came from certain groups that wanted to

22  have an Article III judge.  So I had no option in my mind to

23  gamble on the rights of the parties, and if lawyers want to

24  persuade Judge Donato to bifurcate it, so that I -- I'm only

25  dealing with personal property and property damage losses, I

PG&E Corp., Pacific Gas and Electric Co.

1    guess that's the right thing to do, but it seems the wrong

2    thing to do, because it's one fire, and one set of damages,

3    that caused all kinds of -- well, times twenty-two, maybe

4    there's some that didn't have personal injury components, but

5    that's not the point.

6          So that was the point.  I had no -- I didn't feel a

7    choice to do it, so.

8          MR. JULIAN:  Thank you, Your Honor.

9          THE COURT:  I'll leave it at that.

10         Anybody else want to be heard on any subject?

11         MR. PASCUZZI:  Yes, Your Honor.

12         THE COURT:  Mr. Pascuzzi?

13         MR. PASCUZZI:  Your Honor, I don't know if we're in or

14   at your other concerns part of your order, but I do have one

15   that I raised.  Paul Pascuzzi, we're co-counsel with the

16   California Attorney General's Office for the state agencies on

17   our pleading at docket 3421, like CAL FIRE, Office of Emergency

18   Services, Department of Toxic Substances Control, Department of

19   Veteran's Affairs, California State University, and State

20   Parks.   Your Honor, I raised the issue before that certain

21   state agency claims are not fire victim claims.

22         THE COURT:  Right.

23         MR. PASCUZZI:  They are --

24         THE COURT:  You did.

25         MR. PASCUZZI:  -- cost recovery -- while they could be

PG&E Corp., Pacific Gas and Electric Co.

1    called fire related and the motion, debtor's estimation motion,

2    is very broad in talking about fire-related claims, our claims

3    are not property-damage/personal-injury claims.  To be clear,

4    there may be a handful of state agencies that have property

5    damage claims, but when we're talking about CAL FIRE,

6    Department of Toxic Substances Control, and the Office of

7    Emergency Services, these are different types of claims.  And

8    we don't think they should be part of the estimation procedure.

9         The -- for one reason, if I use CAL FIRE as an

10   example, those claims are liquidated --

11        THE COURT:  Well, yeah, you said before, they're

12   liquidated.  So they're --

13        MR. PASCUZZI:  They're liquidated.

14        THE COURT:  -- by definition they're not estimated.

15        MR. PASCUZZI:  But we need to be clear, and I need to

16   know that, before we go off into discovery land and into

17   proceedings for the district court, and I think there needs to

18   be some clarity, because recall the debtor's motion or reply

19   said that they dispute our claim, so therefore they're

20   unliquidated and subject to estimation, so.

21        THE COURT:  Well, disputing doesn't mean unliquidated.

22        MR. PASCUZZI:  I agree with you on that.

23        THE COURT:  It means disputed.

24        MR. PASCUZZI:  I agree with you, Your Honor.

25        THE COURT:  Well, ask Mr. Orsini, do you have -- can

PG&E Corp., Pacific Gas and Electric Co.

1   you shed light on this?  What's your take on California

2   agencies cost recovery claims?

3          MR. ORSINI:  That they are unliquidated and therefore

4   need to be part of the estimation motion.

5          THE COURT:  Why are they unliquidated if --

6          MR. ORSINI:  Because we --

7          THE COURT:  -- they paid -- if they had a certain

8   fixed amount to fix the problem?

9          MR. ORSINI:  Well, there's some piece of it that is

10  fixed amount to fix the problem, but the same is true frankly

11  with respect to the subros, paying out whatever they paid out.

12  There's a fundamental question as to whether or not they're

13  entitled to those claims.  They're only --

14         THE COURT:  That means they're disputed, not

15  unliquidated.

16         MR. ORSINI:  No, I understand that, but we would also

17  challenge how much was actually spent.  We do not accept that

18  whatever they've spent is --

19         THE COURT:  That's disputed.

20         MR. ORSINI:  -- is what in --

21         THE COURT:  That's not unliquidated.  That's disputed.

22  That's what the case law says.

23         MR. ORSINI:  Your Honor, I think --

24         THE COURT:  You can have any number of disputes.  You

25  can say you owe them nothing.  But it's liquidated, because the

PG&E Corp., Pacific Gas and Electric Co.

1    claimant says, this is what I'm owed to the penny.  And if you

2    dispute it, you dispute it.  I mean, I think -- isn't that your

3    point?

4         MR. PASCUZZI:  Yes, Your Honor.

5         THE COURT:  That's what the Ninth Circuit has said on

6    cases.  It comes up in Chapter 13 eligibility.  It comes up in

7    a number of other questions.  I can't remember that it's come

8    up here before.

9         MR. ORSINI:  Well, the other point I'll make, Your

10   Honor, is it's the exact same factual issues that are going to

11   have to be dealt with --

12        THE COURT:  Well, I understand that.

13        MR. ORSINI:  -- and legal issues.  And so from our

14   perspective, whether you want to characterize the resolution of

15   those claims as an objection to those claims, in which case,

16   we'd be happy to object to those claims, or as part of the

17   estimation process.  What really fundamentally does not make

18   sense --

19        THE COURT:  Well, but, Mr. Orsini --

20        MR. ORSINI:  -- is to run two separate processes.

21        THE COURT:  -- let's think about the -- that sometimes

22   we're stuck with the law, right.  So if Mr. Pascuzzi's many

23   clients file proofs of claim, which they will, you have the

24   right to object.  So let's just pick one claim.  He files one

25   claim for one agency, for $5,647,256.18, you can deny

PG&E Corp., Pacific Gas and Electric Co.

1    liability -- every penny and object to the claim.

2           MR. ORSINI:  We can, Your Honor.  I think --

3           THE COURT:  Now, I'll concede to you that it's maybe

4    not efficient to have a separate trial if that damage claim

5    came from one of the fires that you're litigating, but it's

6    just a liquidated disputed claim.  And I don't know what to

7    tell you, except that's the law.  It's not unliquidated.

8           Mr. Karotkin, different opinion?

9           And this is important, because it shows up in Chapter

10   13 all the time.  We talk about people's eligibility to be in

11   Chapter 13, because of their liquidated -- and it's always

12   getting confused between liquidated and unliquid -- and

13   contingent.  But your take?

14          MR. KAROTKIN:  I don't think just because he states an

15   amount that he's owed, it's a liquidated claim.  He thinks it's

16   liquidated.  But it's still a disputed, contingent claim

17   that --

18          THE COURT:  It's not contingent.

19          MR. KAROTKIN:  -- that has to be --

20          THE COURT:  The fire -- you're --

21          MR. KAROTKIN:  It's contingent as to our liability.

22          THE COURT:  No, Mr. Karotkin.  You are confusing three

23   concepts.  The Ninth Circuit and the BAP, and I would assume in

24   your part of the world, know the difference between contingent,

25   disputed, and unliquidated.  They're three different concepts.

PG&E Corp., Pacific Gas and Electric Co.

1          MR. KAROTKIN:  Your Honor, that means any fire

2    claimant can come in and say, I'm owed five billion dollars,

3    and that's liquidated --

4          THE COURT:  No.

5          MR. KAROTKIN:  -- and doesn't have to be estimated.

6          THE COURT:  No, no, the Ninth Circuit has told us what

7    that means.  It's a sum -- readily ascertainable as a sum

8    certain.

9          MR. KAROTKIN:  But it's not.

10         THE COURT:  I looked at the claims docket this

11   morning.  I was curious as to what the number of the claims

12   are.  And I noticed on the claims docket, in Prime Clerk, there

13   is a person who recently filed a claim for 16 -- 160 million,

14   or maybe it's 16 million.  And that sounds like an unliquidated

15   claim.

16         But if he's got a claim down to the penny, it can be

17   disputed, but it's liquidated.

18         MR. KAROTKIN:  But, Your Honor, in order to get from

19   here to confirmation, if we object to that claim, it has to be

20   either liquidated or estimated.

21         THE COURT:  No, it doesn't.  It can be objected to.

22         MR. KAROTKIN:  And it's objected to, how do we get to

23   confirmation, if it's not resolved?

24         THE COURT:  You put -- whatever you don't count his

25   vote, but you anticipate him.

PG&E Corp., Pacific Gas and Electric Co.

1    Mr. Pascuzzi, what do you do when you have a claim

2  objected and somebody wants to confirm a plan over you?  What

3  do you do?

4    MR. PASCUZZI:  Your Honor, there's a temporary

5  allowance.

6    THE COURT:  A temporary allowance, you have a

7  temporary allowance or you have a vote, or it doesn't matter if

8  he's outvoted.  I mean, there are a number of tools in the

9  toolbox, but you can't reinvent the definition.

10    MR. KAROTKIN:  Well, I respectfully --

11    THE COURT:  Okay.

12    MR. KAROTKIN:  -- disagree.

13    THE COURT:  You can disagree.  But I mean, the Ninth

14  Circuit has a number of cases on this point.

15    So, I mean, I don't know but, Mr. Pascuzzi, in

16  fairness to the other side, if your various agencies are all

17  over the place with liquidated and unliquidated, and it all

18  starts at a fire at one location, maybe there is a way to be

19  more efficient about this.

20    MR. PASCUZZI:  Yes, Your Honor.  And the claims

21  haven't been filed yet, so -- but primarily, I'm talking about

22  cost recovery claims of CAL FIRE, which are very detailed to

23  the penny.  They're treated like contract claims.  They're so

24  liquidated, they're even entitled to pre-judgment interest

25  under state law from the time they demand.

PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Well, the Ninth Circuit says readily

2     ascertainable, right?

3          MR. PASCUZZI:  Exactly.

4          THE COURT:  So --

5          MR. PASCUZZI:  So the other costs, emergency response

6     costs by the Office of Emergency Services, the Department of

7     Toxic Substances Control will have clean up and environmental

8     remediation types costs, these aren't the types of claims --

9     they're not fire victim claims.  Your Honor, there may be --

10    there probably will be some property damage claims for some of

11    the state agencies.  And I'm not going to concede, but maybe

12    those will be -- need to be in the estimation process, but I

13    kind of need to know ahead of time, as to our role in this

14    process.

15         THE COURT:  Well, look, the only thing I can say is, I

16    believe you and disagree with Mr. Karotkin on this legal

17    principal, but I have to keep an open mind, if there's an error

18    about it.

19         But you don't have to decide today, do you?  When the

20    claims deadline comes, that will be fish or cut bait.  If you

21    don't file the claims, you got problems.  And if you file one

22    claim that's down to the penny and another claim that's all in

23    zeros, maybe you will persuade your opponent to treat them

24    separately.  Maybe it will have to be teed up with a real

25    record and a real set of facts, early rather than later.  This

                    PG&E Corp., Pacific Gas and Electric Co.

1   sounds like something that's properly in this court --

2           MR. PASCUZZI:  Yes.

3           THE COURT:  -- not an Article III determination.

4           MR. PASCUZZI:  I agree with that, Your Honor.

5           THE COURT:  And I believe it would be fair to hear

6   both sides, and then say your claim is not subject to

7   estimation for blah-blah-blah.

8           Look, you know what else is true?  If the Tubbs jury

9   comes in and finds that for plaintiff A, either that plaintiff

10  gets zero or gets twenty million dollars, in either case that

11  claim is liquidated, period.  But you can still take it into

12  account as part of the estimation, that's all.

13          MR. PASCUZZI:  Thank you, Your Honor.

14          THE COURT:  All right.

15          MR. PASCUZZI:  I believe Mr. Troy from the U.S. DOJ's

16  office is on the phone.  He had a similar issue for the United

17  States of America.

18          And then the other thing, Your Honor, I wanted to talk

19  about is the discovery for CAL FIRE, but I'm putting that off.

20          THE COURT:  Well, but I'm -- we've gone for three

21  hours --

22          MR. PASCUZZI:  Understood.

23          THE COURT:  -- with everybody, so I'm going to hear

24  from Mr. Troy, and then I'm going to take a -- probably a long

25  break rather than a short break.  I'll see if there's any sense

PG&E Corp., Pacific Gas and Electric Co.

1    about whether we should make it a shorter break, but some of us

2    would like a personal break.

3            So, Mr. Troy, do you want to be heard?

4            MR. TROY:  Yes, Your Honor, thank you.

5            Matthew Troy, Department of Justice Civil Division on

6    behalf of various federal agencies.

7            Essentially, Your Honor, we agree wholeheartedly with

8    Mr. Pascuzzi's comments.  And we have, the federal government,

9    very similar type claims, agree with your comments in response

10   to that in the colloquy with Debtors' counsel.

11           And I think as has been pointed out by Ms. Dumas early

12   at the outset of this hearing, the federal government will have

13   a significant amount of claims in this case that are related to

14   the wildfires but are not truly wildfire claims as the debtor

15   is proposing to address in its estimation motion.

16           As Mr. Pascuzzi said, the United States is not a

17   victim of the federal (sic) fires.  In large part, their claims

18   will be for cost recovery of financial assistance and direct

19   assistance provided in response to the wildfires.

20           THE COURT:  But, Mr. --

21           MR. TROY:  They might have some component --

22           THE COURT:  Mr. Troy, they might be unliquidated.  In

23   other words, if your -- I take it that you're in the

24   FEMA -- you're covering FEMA, for example, right?

25           MR. TROY:  Yes, sir.

PG&E Corp., Pacific Gas and Electric Co.

1    THE COURT:  Okay.  So if FEMA paid out or expended

2  tens of millions of dollars dealing with the fire to do its

3  job, it may be that it hasn't quantified its claim yet.  That

4  sounds like an unliquidated claim to me.

5    MR. TROY:  I would submit, Your Honor, that in large

6  part they won't be.  But the bar -- the proof of claim will be

7  the proof of that.

8    THE COURT:  Right.  Look, I didn't know -- okay --

9    MR. TROY:  And so --

10   THE COURT:  -- I got it, proof of claim.

11   MR. TROY:  My only point, Your Honor, is, one, to at

12 least some extent, if not a substantial extent, the United

13 States claims will not be subject to an estimation procedure,

14 because in the United States' view, they are liquidated.

15       Secondly, to the extent that Your Honor looks at the

16 proofs of claims and agrees with the debtor to the extent that

17 they are unliquidated and therefore subject to an estimation

18 process, the Government's position is that those claims should

19 not be part of this estimation process that the debtors are

20 proposing on their estimation motion.  The United States claims

21 are significantly different in character, both on legal

22 liability theory and the nature of the damage, than what is

23 being addressed principally by the debtors' estimation motion,

24 which is individual tort claimants' damages.

25       THE COURT:  Okay.  Mr. Troy, thank you.



PG&E Corp., Pacific Gas and Electric Co.

1      All right.  Here's what I'm going to do.  There must

2  be somebody in the courtroom besides the judge and his

3  courtroom deputy that would like to take a personal break.  And

4  if not, you can all sit there while we take a break.

5      Mr. Karotkin or Mr. Orsini, on my agenda there's just

6  one item left, but it's a big one.  Do you want me to take a

7  fifteen-minute break or an hour-and-fifteen-minute break,

8  because, I mean, I'm not trying to kill people, and we want to

9  get it done.

10      MR. ORSINI:  I think from our perspective, fifteen

11  minutes would be preferable, instead of an hour and fifteen

12  minutes.

13      THE COURT:  Okay.  Because I would think that the

14  conversation is going to be a little shorter than I thought it

15  was going to be based upon what we talked about, based upon the

16  fact that you're going to be seeing Judge Donato here shortly.

17      MR. ORSINI:  I think that's right, Your Honor.

18      THE COURT:  Okay.  Well, I won't take votes on this.

19  I'll take Mr. Orsini's suggestion.

20      I will take a fifteen-minute break for everyone's

21  personal convenience.  And I will take up my thoughts on how to

22  deal with this last issue, this estimation liquidation question

23  that two specific counsel mentioned.  And then I'll give you my

24  thoughts on something about estimation.  And then we'll figure

25  out what to do after that.

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp., Pacific Gas and Electric Co.

1      So thank you.  I'll see you in a few minutes.

2      MR. ORSINI:  Thank you, Your Honor.

3      (Recess from 12:33 p.m., until 12:53 p.m.)

4      THE CLERK:  All rise.

5      THE COURT:  Okay.  Please remain seated.

6      So let's take a couple of housekeeping matters.

7      In looking at the calendar again and thinking about

8  Mr. Karotkin's expectation of a filing a plan by the 9th, it

9  makes -- it just wouldn't be time efficient for trying to

10 discuss it the next day.  That's just too soon for people to

11 absorb whatever he has to say.

12      Mr. Karotkin, I presume that date is pretty

13 inflexible, if not too much -- I mean, I'm not going to push

14 you to do it earlier.  Is there any chance of doing it earlier,

15 or is that just not reasonable?

16      MR. KAROTKIN:  It's not reasonable.

17      THE COURT:  Okay.  No, I take your word for it.

18      So, Ms. Parada, the next calendar we have is the 24th,

19 right?  Oh, I'm sorry, we have our dates here.

20      Well, I mean, do you agree with me, all of you

21 principal lawyers?  I mean, you don't want to try to talk about

22 what to do about this plan that was filed twelve hours earlier

23 or something like that, right, agree?

24      IN UNISON:  We agree.

25      THE COURT:  Okay.



PG&E Corp., Pacific Gas and Electric Co.

1          MR. KAROTKIN:  I completely agree.

2          THE COURT:  Yeah.  All right.  Then I'll put it on the

3    calendar.  For lack of a better term, we'll call it status

4    conference on Debtors' plan on September 24th.  And I

5    don't -- I won't ask for objections or anything.  It will be in

6    the nature of where do we go from here.  We'll have some

7    more -- perhaps there'll be more guidance on what's going on,

8    both at the Superior Court and in Judge Donato's court.

9          And by the way, on that subject, I was surprised when

10   I checked during the break that Judge Donato has not yet posted

11   the order that I thought he was going to post it.  I just -- I

12   have no comment on that, other than I'm sure it will happen

13   soon.

14         And then on the subject that we just talked about on

15   this estimation versus liquidated/unliquidated, I'm sorry for

16   imposing on lawyers who aren't familiar with it to act like we

17   think we know it here.  It's just -- it's a Chapter 13 concept

18   that is ingrained in the system of keeping distinction of

19   unliquidated, disputed, and contingent separate.

20         And so I believe when a fire occurs, that's the

21   contingency.  When a claimant states what it's owed, that is

22   the liquidation of the claim.  And when an opponent like the

23   debtor objects on whatever ground, that's the basis of the

24   dispute.  And the statute allows estimation of unliquidated and

25   contingent claims, not disputed claims.

PG&E Corp., Pacific Gas and Electric Co.

1        Now, that being said, it's not fair to the debtors,

2    Debtors' counsel, or anyone else that might believe that this

3    case requires something different.  So I believe, as I thought

4    about it during this break, that I'll be open to letting the

5    matter be briefed and dealt with.

6        To those of you who will be discussing scheduling with

7    Judge Donato, I think it's fair to defer to me on that

8    determination of what should be included or excluded from the

9    estimation in that category, because that's a legal issue.

10    That's not at all the same as to whether one estimation process

11    should include the personal injuries suffered by a personal

12    injury victim, emotional distress suffered by that victim or

13    another victim, or property damage to that victim's home or

14    possessions in one fire.

15        It gets more attenuated if -- as I said before, if you

16    have someone who suffered no personal-type injuries or

17    emotional-distress-type injuries, but only property damages,

18    but it's still a fire times twenty-one or twenty-two fires.  So

19    I -- consistent with what my thinking is, that would not be

20    efficient to bifurcate it into parts.

21        So I left it with Mr. Julian before the break, if

22    somebody wants to revisit that question, that's for another

23    day; it's not for me to deal with.  And I will welcome from the

24    debtor, if it's necessary, a motion to determine what is or

25    isn't appropriate for the estimation process when -- this

PG&E Corp., Pacific Gas and Electric Co.

1    notion of liquidated versus disputed.

2         What's left on my agenda for today, but again I don't

3    mean to say that if there's something else that should be

4    brought up, is this question of the discovery.  And, once

5    again, what I wrote is what discovery necessary, what is the

6    time frame preparatory to the scheduling of the final

7    estimation.  The more I think about it, the second half of that

8    question really belongs with another judge now.  But I will

9    give you a thought at least that came to mind, because one of

10   the issues that I think Mr. Orsini on the one hand, and I

11   believe it's the ad hoc committee on the other, perhaps differ

12   on is this notion of burden of proof.

13        I did a little bit of research on this subject, and

14   you'll be guided by the following opening sentence from a

15   decision.  This is from a Pennsylvania Bankruptcy Court

16   decision in 2007 called Frascella, In re Frascella.  And the

17   court said, "Estimation is at best an imprecise and uncharted

18   process.  The Bankruptcy Code and Rules provide no guidance on

19   how to proceed."  That's very encouraging.

20        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  We have

21   that issue resolved.

22        THE COURT:  Very encouraging.

23        And then it goes on to say how the court -- that court

24   likens it to the claims objection process.  And that's my

25   thinking too.  And I will add the following personal note.  The

PG&E Corp., Pacific Gas and Electric Co.

1    Frascella court ended by citing as authority for its

2    proposition a case called In re Heath that I wrote for the BAP.

3    So any time another court cites a decision of mine to support

4    its decision, that obviously is a well thoughtful (sic) and on-

5    point decision.

6         But the point is that I believe the proper outcome

7    here for the estimation process is to engage in what would have

8    happened if the claimants had filed their proofs of claim or

9    will file their proofs of claim by the deadline.  They would

10   presumably -- if it were a case that was the subject of a prior

11   settlement, the 2015 trial fire where PG&E agreed to pay a

12   fixed amount to someone and just hasn't been paid, that

13   claimant would have not only an undisputed claim, but clearly a

14   liquidated claim.  Where we're talking about the vast majority

15   of the claims in this case, where they are unliquidated for the

16   most part and disputed in a generic sense, when PG&E does not

17   admit to liability for any of these fires, that would be fair

18   game in my mind for estimation because of the unliquidated

19   nature, not because of -- a particular claim might be disputed.

20        The fact of the matter is in any mass tort or any case

21   that I'm aware of where there are multiple claims, there is

22   always a fringe number of people whose claims are completely

23   frivolous, and those are the kind of claims that can be dealt

24   with in the estimation or the objection -- excuse me, the

25   objection process.  For here, we have a vast number of claims

PG&E Corp., Pacific Gas and Electric Co.

1    that are not frivolous, but the debtors may question and

2    dispute the liability.  But, certainly, if the liability's

3    established, then it's perfectly okay to estimate the

4    unliquidated amount.

5           So in any case, whether it was one claimant or 30,000

6    claimants, if there is an objection to a claim, that is the

7    prima facie statement; the law and the rules presume a duly

8    filed claim is deemed allowed.  And the case law then says if

9    the debtor or trustee in a Chapter 7 case or in a Chapter 11

10   case objects, that is a prima facie challenge to that claim.

11   And then you -- the stage is set for an adjudication, and you

12   then go to the traditional burdens of proof of the claimant

13   going forward.

14          So in a hypothetical case, if the claimant files a

15   proof of claim that said I'm owed X dollars -- it doesn't

16   matter whether it's liquidated or unliquidated -- and supports

17   it with some basis on which that claimant asserts the

18   entitlement:  promissory note, judgment, complaint, something

19   like that; and then the objecting party rebuts that by an

20   objection based upon something.  Not just I object because I

21   object, but I object because satisfaction, I didn't do it, you

22   compromised, discharged, whatever defense, then that rebuts the

23   prima facie case.  And at trial, the plaintiff has the burden

24   of going forward.

25          I believe that's the same proper approach.  And this



PG&E Corp., Pacific Gas and Electric Co.

1    Frascella case that I cited, it's a bankruptcy court from 2007,

2    and it's at 360 B.R. 435.  And I believe the message from there

3    is that for estimation, you treat it like a -- like you would

4    do it on a claim objection.

5           That's another way of saying that when the debtor

6    files its -- or its estimation and says we didn't cause the

7    fire even if our equipment was the source of ignition,

8    which -- excuse me.  Even if our equipment was the cause of

9    fire, we are not liable for the fire, we are not legally liable

10   under any theory, then that frames the issue and then the

11   burden of going forward is on the claimant.

12          So, in my view, when the debtors respond to the basic

13   questions that the TCC and the subrogation committee and some

14   of the individual fire groups have said, show us your theory.

15   In other words, when Mr. Orsini at the last hearing said, we do

16   not concede liability, only causation, then I think a number of

17   the lawyers then and a number of the lawyers now have said

18   well, show me what it is, what is your theory.  And I believe

19   that's the proper thing.

20          So my sense is that in order to deal with the

21   discovery process, that Mr. Orsini and his side have to make

22   the prima facie -- have to pretend, if you will, engage in what

23   they would do if they were faced with all the claims that they

24   are now asking be estimated.  They would respond presumably by

25   saying, we don't owe it for the following reasons: inverse

PG&E Corp., Pacific Gas and Electric Co.

1    condemnation, legal question.  Causation, Tubbs fire,

2    exonerated by the CAL Forest.  The other fires -- Camp and the

3    other fires, we were the ignition source, but we didn't

4    cause -- we are not liable for the following reason.  And then

5    some explanation.

6          And then if I were presiding over the estimation

7    trial, which again, for those of you that are not bankruptcy

8    lawyers, this is not a traditional trial; it is an estimation

9    in a procedural way that the trial court -- the estimating

10   court is given broad discretion on how you proceed, who -- how

11   long, and what degree of proof, and so on.  And at the end of

12   the day, the estimator determines, well, I agree with the

13   debtors' argument, and therefore I estimate the claim at zero.

14   Or I agree with the victims and the evidence supports that the

15   Tubbs fire and all these other fires were the legal

16   responsibility of PG&E, and therefore the estimation goes to

17   the other extreme, or somewhere in between.  So that's the

18   process.

19         Now, with that intro, we turn to the question of well,

20   what should we be doing about discovery.  Mr. Orsini has

21   complained about some of the ways that the TCC has responded or

22   has initiated discovery.  But he, on the other hand, in his

23   August 24th letter, has said we'll give you all this

24   information.

25         I haven't -- certainly haven't studied that



PG&E Corp., Pacific Gas and Electric Co.

1    information, but I have read his letter.  And I believe his

2    letter invites and says -- let me -- excuse me for one minute.

3    It says, we've provided this 300 pages of this, and 800

4    interrogatories of that, and we've given access to this

5    database, and here's what you need to know.  I don't know

6    whether that's sufficient, but to me it's partway towards

7    responding to the very basic written interrogatories that the

8    TCC has served on the debtors that says, tell me why you're

9    liable -- or tell me why you're not liable, and tell me why we

10   don't have claims.

11          So that's a rambling way of -- Mr. Orsini, of telling

12   me -- telling you I think you've got to -- you've got to come

13   out and lay on the line what is your legal theory -- are your

14   legal theories.  And then that will switch the burden.  If we

15   were having the trial, you would have done it, and they would

16   have to prove their case.  So take it from there.

17          MR. ORSINI:  Thank you, Your Honor.

18          For the record, Kevin Orsini from Cravath for the

19   debtors.

20          Understand your points, Your Honor.  Certainly agree

21   on the burden of proof part.

22          With respect to identifying the bases for our denial

23   of liability, I candidly don't think it's that complicated.

24          THE COURT:  Okay.

25          MR. ORSINI:  With respect to the North Bay fires in

134

PG&E Corp., Pacific Gas and Electric Co.

1  particular, we've litigated those cases for over a year and a

2  half in state court.  Among the materials that we provided to

3  the debtors -- I'm sorry, we are the debtors -- to the TCC in

4  that letter was -- were all the interrogatory responses,

5  request for admission responses that detail where we are.

6       Also, just stepping back, the general idea, the

7  concept, the complaint that they don't know what our position

8  are, I think is refuted by their own filings.  If you go back

9  to their objections to the estimation hearing, they had two

10 appendices, Appendix A and B, which I have no doubt Your Honor

11 has fully committed to memory.

12      But Appendix A went through the legal elements of

13 their claims.  Appendix B went through the disputed factual

14 issues.

15      It's just a long way of saying, they know what the

16 issues are.

17      THE COURT:  Well, but what about the short way of

18 answering interrogatories 1 and 2?

19      MR. ORSINI:  And, Your Honor, I believe we've done

20 that, frankly, by providing the information we've already

21 provided.  We will provide formal responses to those

22 interrogatories that incorporate those prior statements.

23      THE COURT:  But that closes the book --

24      MR. ORSINI:  Yes, I agree.

25      THE COURT:  That closes the chapter on what -- your

PG&E Corp., Pacific Gas and Electric Co.

1   theory.

2          MR. ORSINI:  I agree, Your Honor.

3          THE COURT:  You can't come up with another theory next

4   week on something else.

5          MR. ORSINI:  I understand.

6          THE COURT:  Okay.

7          MR. ORSINI:  I understand.

8          THE COURT:  Well, I want to see if you're in

9   agreement.

10          MR. ORSINI:  I think I've closed most of my theories a

11   long time ago in responding to interrogatory requests.

12          THE COURT:  You may have, and I haven't memorized

13   them.  But I just want to make sure we're on the same page.

14          MR. ORSINI:  We're on the same page there, Your Honor.

15          One other note, I just want to -- well, two other

16   points.

17          With respect to discovery, I think Your Honor's right

18   that what we provided that's referenced in my August 24th

19   letter is a significant amount of information that goes a long

20   way towards swinging the pendulum in the way Your Honor's

21   described.  That is not the sum total of what we've agreed to

22   do with respect to discovery.

23          You may recall during the long discovery status

24   conference we had a couple of weeks ago, there were references

25   to the letter that Mr. Macon had sent me back in July.  It was

PG&E Corp., Pacific Gas and Electric Co.

1   about an eighteen-page discovery letter that was sent sort of

2   both by the state subrogation trial lawyers and the state

3   individual-plaintiff lawyers.

4           THE COURT:  I -- it's hard to remember.

5           MR. ORSINI:  And we've now responded to that.  We have

6   said that -- for example, they had identified eighty -- more

7   than eighty fact depositions they wanted to take.  We've said

8   fine, we won't object to those eighty fact depositions.

9   They've said they want a number of what are effectively Rule

10  30(b)(6) depositions on specified topics.  We've said sure.  We

11  understand there will be some key issues, like our vegetation

12  management programs, like de-energization.  We obviously need

13  the notices so we could all get comfortable with the scope of

14  the deposition.  Standard process procedure.

15          THE COURT:  Right.

16          MR. ORSINI:  And we've also identified dozens of

17  outstanding discovery requests that we've agreed to respond to.

18  Haven't gotten response to that yet; I'm sure we'll meet and

19  confer on that.

20          I did receive last night another letter from the TCC,

21  another eighteen-page letter, that itemized discovery they

22  want.  I'm trying to figure out how those two letters work

23  together.  There was a request that I respond with my position

24  on all that discovery by today.  Needless to say, that hasn't

25  and won't happen.  But we're working through those issues.

PG&E Corp., Pacific Gas and Electric Co.

1          And then more generally, there's obviously going to be

2     discovery going the other way.  None of that, I don't think, is

3     ripe for today.

4          THE COURT:  But it's discovery of -- I mean, not

5     discovery of individual claimants; not by --

6          MR. ORSINI:  So two things, Your Honor.

7          One, with respect to the third -- the subrogation

8     insurers, we need discovery into their underlying claims files

9     to make sure that they actually have validity to those claims.

10         THE COURT:  No, I understand.

11         MR. ORSINI:  So we're pushing forward on that, which

12    they --

13         THE COURT:  Is that something of predicate to the

14    estimation?

15         MR. ORSINI:  I think it absolutely is, Your Honor.  We

16    have to be able to show what it is that they actually have paid

17    out.  In fact, they --

18         THE COURT:  But if a victim lost a house worth a

19    million dollars, and an insurer paid them 800,000 dollars,

20    there's still a million-dollar potential claim, right?

21         MR. ORSINI:  Well, no.  The subroga --

22         THE COURT:  That might be two claimants.

23         MR. ORSINI:  Well, okay, yes, in your hypothetical.

24    I'm looking more at the other hypothetical, Your Honor.  Which

25    is in a circumstance where the insurer has paid out 1.2 million

PG&E Corp., Pacific Gas and Electric Co.

1    dollars for a home that's actual worth only a million dollars.

2         THE COURT:  Okay.

3         MR. ORSINI:  And maybe they've done that because they

4    misestimated the value.  Maybe they've done that because they

5    just tendered total loss.  Maybe they've done that because they

6    think the person is going to rebuild.

7         THE COURT:  Sounds like a disputed claim to me.

8         MR. ORSINI:  We're going to be entitled to challenge

9    all that information, and we certainly need discovery to get

10   into that.

11        On the individual front, Your Honor.  Look, this is I

12   think -- I think we all know, this is the hardest part of this

13   whole case, how to value the individual claims.

14        THE COURT:  Right.

15        MR. ORSINI:  Ms. Dumas -- you've heard from --

16        THE COURT:  But we've got to start by knowing where

17   your client admits culpability.

18        MR. ORSINI:  I understood that, and we're on the same

19   page on that front.

20        THE COURT:  Okay.

21        MR. ORSINI:  I understand that.

22        THE COURT:  Okay.

23        MR. ORSINI:  But what we heard earlier today from Ms.

24   Dumas is what we've heard throughout.  Which is effectively, as

25   Your Honor described it, backing into a number.  Tell us what

PG&E Corp., Pacific Gas and Electric Co.

1    you got and maybe we'll take that, or a little bit more, or a

2    little bit less.  Right.

3            Estimation is actually going to require them to show

4    what their claims are worth, not what we can pay.  Now,

5    obviously that's not going to include full, individual, damage

6    discovery with respect to every single one of the 30,000-

7    plus --

8            THE COURT:  Right.

9            MR. ORSINI:  -- individual plaintiffs.

10           THE COURT:  Right.  We can't do that.

11           MR. ORSINI:  That's one extreme; we're not going

12   there.  Right.

13           We also can't go to estimation with nothing.

14   Certainly, when they're throwing out numbers that are backed

15   into based upon net distributable value as she described.

16           And so one step in that process, Your Honor, is the

17   much discussed, never seen, BrownGreer database.  I believe we

18   do have an agreement.  I've said that before, we don't have a

19   stipulation in yet.  Mr. Skikos, who's one of the individual

20   plaintiff's lawyers, is here in the courtroom.  I'd ask him to

21   update both of us on the status of that.  But that's a process

22   to try to get more claims information, to try to see if there's

23   a process where we can agree on how we can start to close the

24   gap between my number, which is significantly below ten

25   billion, and the TCC's number, which ranges from thirty to

PG&E Corp., Pacific Gas and Electric Co.

1    fifty depending on the day.

2          But if that's unsuccessful, we are going to need to be

3    able to test some additional information so that we give the

4    Article III judge or Your Honor, who's doing the estimation,

5    some basis to extrapolate what these claims are worth.

6          And I candidly haven't come up with a perfect answer

7    to that one yet.  It may involve a questionnaire -- that's been

8    done in a lot of other bankruptcy cases -- that's given to some

9    statistically significant group of people.  It may be some

10   limited sets of documents that go to some statistically

11   significant set of people by fire.  Is a long way of saying I

12   don't know the right answer yet, Your Honor, I don't think any

13   of us do, but that's going to be a key issue that needs to be

14   addressed as well.

15         THE COURT:  So what do we do for now for discovery

16   purposes?  Do you want to stick with the meet and confer or do

17   we --

18         MR. ORSINI:  I believe so, Your Honor.

19         I have -- so I have a letter out to them which tells

20   them what we'll do in response to Mr. Macon's letter.  I have a

21   letter from the TCC from last night.  I wasn't able to get a

22   response back today, but we're going to try and interlock those

23   two letters and see where the overlap is.  I bet a lot of it

24   will be things where we've already said we'll do it.  To the

25   extent that there are additional things that were not -- we

PG&E Corp., Pacific Gas and Electric Co.

1    haven't already committed to do, we'll obviously assess what

2    our position is on that.

3            And I think that we continue the meet and confer

4    process on that front.  And we have some interrogatories that

5    have been served on that we'll respond to --

6            THE COURT:  Okay.

7            MR. ORSINI:  -- in the way the Court described today.

8            THE COURT:  Mr. Julian, do you want to tell me what to

9    do?

10           MR. JULIAN:  Your Honor, the estimation issue before

11   this Court and Judge Donato is different than the issue in the

12   state court.

13           THE COURT:  Correct.

14           MR. JULIAN:  We sent them interrogatories that ask

15   them to  explain the legal and factual basis for denying

16   liability for the fires that they --

17           THE COURT:  That's your interrogatories 1 and 2,

18   right?

19           MR. JULIAN:  Yes.

20           THE COURT:  Yeah.

21           MR. JULIAN:  And we would like that answered within

22   two days.  The interrogatories that they served us Saturday

23   night, their answers in state court are insufficient for two

24   reasons.

25           THE COURT:  But -- well, go ahead, and then I have a



PG&E Corp., Pacific Gas and Electric Co.

1    question.

2           MR. JULIAN:  The first is they have nothing to do with

3    Camp.  Camp Fire litigation just started.  They've never served

4    interrogatory answers.

5           Second, the interrogatory answers that they served on

6    the plaintiffs' lawyers in state court do not explain the legal

7    basis or factual reasons for estimating the claims as zero in

8    this court.  And we need that basic answer to those

9    interrogatories and a production of the documents in support of

10   the interrogatories within two weeks.

11          They've spent thirty million dollars, Your Honor,

12   getting ready for today.  They're ready for trial, I get it.

13   I'm not.

14          And, Your Honor, they have the documents that show

15   their liability.

16          THE COURT:  Okay, wait one second here.

17          MR. JULIAN:  We don't.

18          THE COURT:  I'm looking at your interrogatory number

19   2.  And so number 1, I'm -- it's referring to CAL FIRE, so I

20   want to leave that for a minute.

21          It seems to me for interrogatory number 2, for each

22   fire -- so let's just pick Atlas, that's a fire that's

23   not -- we talked about today.  So affirmative defenses, legal

24   basis to say not liable; that's just the same thing twice, I

25   think.  And the factual basis for your nonliability.  I mean,

PG&E Corp., Pacific Gas and Electric Co.

1    and the rest of it -- I'm not going to read the rest of them to

2    you.  Why -- you're telling me that the responses they've done

3    in other state court stuff is not responsive to those

4    questions?

5            MR. JULIAN:  I don't believe so.

6            THE COURT:  And --

7            MR. JULIAN:  These are simple and straightforward.

8            THE COURT:  And what about Mr. Orsini's reference in

9    his August 24th letter that references a bunch of databases and

10   what have you, the answers aren't there?

11           MR. JULIAN:  Well, that was given to us Saturday

12   night.  And the databases --

13           THE COURT:  Okay, I don't know.  I don't look at them.

14           MR. JULIAN:  What we did last night was to give him

15   specific targeted discovery for the documents, the inspection

16   reports.  And these basic inspection reports and the basic

17   documents that they have and they've already prepared for the

18   thirty million dollars they charged the estate should be turned

19   over to us.  It's already --

20           THE COURT:  But I'm still trying to figure out

21   whether -- when you're waiting for answers to interrogs 1 and

22   2, and you're serving them with more.  If he -- don't you need

23   to do it in steps?  In other words, don't you need to see what

24   their position is on interrogatories 1 and 2?  And I'm -- I'm

25   not --

PG&E Corp., Pacific Gas and Electric Co.

1      MR. JULIAN:  Well -

2      THE COURT:  I'm not saying you can't get the other

3  stuff; I'm saying don't you need to get there by pinning them

4  down on --

5      MR. JULIAN:  No.

6      THE COURT:  -- what is the theory per the fire?

7      MR. JULIAN:  Well, let me explain that.

8      First, we asked for also in our letter request with

9  the interrogatory request, for all documents that support their

10  legal and factual basis, and a description of the witnesses.

11      THE COURT:  I think your interrogatory itself did.

12  For each fire, identify separately all documents.

13      MR. JULIAN:  And well, and the letter says to produce

14  it.

15      THE COURT:  Okay.

16      MR. JULIAN:  Not only identify it but produce it.

17      THE COURT:  Okay.  I understand.  But that's my point.

18  If they -- again, leave Camp aside for the moment -- no, I'm

19  sorry.  I'm sorry.

20      MR. JULIAN:  Camp is in there.

21      THE COURT:  No, no, I misspoke.

22      The CAL FIRE report relates to Tubbs, correct?  So if

23  a -- they answered interrogatory number 2 the way you think

24  they should, with documents, then that's what you want.

25      MR. JULIAN:  And the explanation of the legal theory



PG&E Corp., Pacific Gas and Electric Co.

1   and the factual basis too.

2          THE COURT:  I'm reading your interrogatories; that's

3   there.

4          MR. JULIAN:  Yes.

5          THE COURT:  Affirmative defenses, contentions, not

6   liable.  I mean, those are very straightforward.  I'm agreeing

7   with you, they are simple.  There are not two interrogatories,

8   there are about eight, but they're simple.

9          MR. JULIAN:  Then we're in agreement, Your Honor.

10          THE COURT:  Okay.  So I go back to my question again.

11          If I tell Mr. Orsini, you have to answer

12   interrogatories 1 and 2, why do you need the second, third set,

13   whatever you served on them yesterday?  I'm just trying to

14   figure out the sequencing for this stuff.

15          MR. JULIAN:  Because we've taken an educated look at

16   what he's written in his letters recently about the issues on

17   which they will deny liability.  And the fifteen pages of

18   documents that we've sent to them last night are the documents

19   that we need for that for that.

20          THE COURT:  But let me give you an example.  I can't

21   keep track of it as thoroughly as those of you who are living

22   this thing twenty-four hours a day, but there's one fire where

23   Mr. Orsini says that there was a healthy tree that had a limb

24   fall, and he believes that -- I guess his theory is that the

25   fire was caused by that healthy limb that fell, and therefore

PG&E Corp., Pacific Gas and Electric Co.

1   the company didn't do anything that makes it liable.  So that

2   would be to me an explanation, we're not liable for fire X

3   because it was caused by a healthy branch that fell, even

4   though it was within the proper limits, et cetera, et cetera.

5   That's an explanation, right?  You would agree that's an

6   explanation?  Whether you agree or disagree with the merits of

7   it, that would be the kind of thing that he would say why

8   his -- the debtors are not liable, right?

9              MR. JULIAN:  Correct.

10             THE COURT:  Okay.

11             MR. JULIAN:  And then in response, which is why we

12   sent the letter last night, we need copies of their inspection

13   reports on that tree, their maintenance records on that tree,

14   the report by the tree trimmers on that tree, to show that they

15   did not do their job with respect to that tree.

16             THE COURT:  But you don't need any of that if he

17   doesn't say the tree did it?  In other words, it's -- you want

18   responses if the answers are exculpatory, right?

19             MR. JULIAN:  Right.

20             THE COURT:  If he says we're not liable because the

21   tree fell by its own causes, then you want explanations, well,

22   what's the record, and et cetera, et cetera.  And I -- we don't

23   have to go into the details.

24             But if he doesn't say -- if he says well, that -- the

25   only reason that fire is is because we know that some arson

PG&E Corp., Pacific Gas and Electric Co.

1    started that fire, then you don't need tree reports.  You just

2    need the explanation for his defense.

3          MR. JULIAN:  But on some of these, Your Honor, let's

4    face it, we know what they're going to say.

5          On Camp, for example, the C-hook was worn or broken.

6          THE COURT:  I know.

7          MR. JULIAN:  We need all the inspection reports on

8    that.

9          THE COURT:  No, I know that.  I know that.

10         MR. JULIAN:  There's no reason to delay that.

11         Your Honor, they spent thirty million dollars getting

12   ready for this day; they can turn it over to us.

13         THE COURT:  Do you need it all for an estimation

14   trial?

15         MR. JULIAN:  Yes, we need it.

16         THE COURT:  And why?  Tell me why?  This is not a

17   trial, it's an estimation trial.

18         MR. JULIAN:  Correct.

19         THE COURT:  So if the trial is compressed, as we know

20   estimations are supposed to be, why do you need all the

21   details?

22         MR. JULIAN:  Because they are the ones who are saying

23   they're not liable.  They're the ones who say you need five

24   individual trials on liability for five individual fires.  If

25   they are the ones who are placing this at issue, we can only

PG&E Corp., Pacific Gas and Electric Co.

1    respond to the fact that they are saying they are not liable

2    because they supposedly did a good job repairing and inspecting

3    their C-hooks by looking at the documents that show they did a

4    terrible job.

5            THE COURT:  Okay.  I got you.  I just want to clarify

6    it in my mind.

7            MR. JULIAN:  And they have spent thirty million

8    dollars getting ready for this day.

9            THE COURT:  You're not -- you're saying that -- I got

10   it.

11           MR. JULIAN:  They have the documents, Your Honor.

12   What I would respectfully request is two things.  I would like

13   you to order them to answer those interrogatories 1 and 2

14   within fourteen days.

15           THE COURT:  Well, you said two days a minute ago,

16   so --

17           MR. JULIAN:  Within fourteen days.  And within five

18   days, a week, to tell us what, in our letter of last night,

19   they will produce on an expedited basis, and what they will not

20   produce.

21           THE COURT:  Let me get the other gentleman behind you

22   who wants to be heard.  I'll see what Mr. Orsini wants to do

23   with that.  We're not going to go all afternoon on this, so --

24           MR. JULIAN:  Thank you, Your Honor.

25           THE COURT:  Yes, sir?



PG&E Corp., Pacific Gas and Electric Co.

1        MR. CAMPORA:  Your Honor, my name is Steve Campora.

2        THE COURT:  Oh, yes.  Mr. Campora.  You've been here

3   before.

4        MR. CAMPORA:  I participated in the NorCal discovery,

5   and I have a very different view than Mr. Orsini as to what's

6   been done and not done.  The parties negotiated back and forth

7   over several months for a TAR program to produce documents,

8   PG&E delayed that more than a year, with repeated promises to

9   produce the documents.  And I'll explain to you why it's

10  necessary.

11        They were supposed to done on February 15.  PG&E filed

12  bankruptcy on January 29th and stopped looking for documents.

13  Now they're coming to this Court, denying liability on every

14  fire, while at the same time not giving us the documents.

15        THE COURT:  No, I understand.  But you're saying this

16  idea.  I'm just saying it differently.

17        MR. CAMPORA:  No.  No.  There's the issue.

18        THE COURT:  Okay.

19        MR. CAMPORA:  PG&E has lots of policies, Your Honor.

20  They'll produce them forever.  There's lots of policies.  We

21  could read them.  They're great policies.

22        The problem is, they don't follow them, and the

23  documents you need to show they don't follow them are the

24  emails between the employees and the emails between the

25  managers and the supervisors, and the documents that say we're

PG&E Corp., Pacific Gas and Electric Co.

1   6,000 trees behind, or there are hazard trees that haven't been

2   found by our process, and we haven't got it done.  We haven't

3   cut the 2015 trees, and we're in 2017.

4         So to come in and say that he's given us these

5   documents, they've given us six million documents.  Five

6   million of them are duplicates.  And in addition to that, Your

7   Honor, the documents -- we didn't take any depositions in

8   NorCal, because PG&E objected to us taking the depositions

9   until they produced all the documents, and then they didn't.

10  And that doesn't include Camp.

11        So what's happened is there are hazard tree analysis.

12  There's all kinds of documents and people that we haven't

13  gotten or received.  And from my perspective, if PG&E knew they

14  were going to object and claim they weren't liable for every

15  fire -- I'm not sure why they filed bankruptcy -- but they knew

16  they were going to deny liability, why'd they stop looking for

17  the documents?

18        THE COURT:  Well, I can't answer that.  And I --

19        MR. CAMPORA:  Okay.  But what I'm saying is we need

20  those documents.

21        THE COURT:  Okay.  Understood.  I want to move

22  forward.  I'm only trying to figure out what to order here

23  today, so --

24        MR. CAMPORA:  All I'm saying is, Your Honor, you're

25  talking about having an estimation proceeding, with us having

PG&E Corp., Pacific Gas and Electric Co.

1   time to put on experts or however it works.  We can't do that

2   without evidence.  And they've been delaying the discovery.

3   They delayed it against this morning, contesting producing

4   documents that are clearly relevant to the Camp fire.  And

5   until we get the evidence, we can't do our job no matter what

6   the estimation process turns out to be until we're given an

7   opportunity to view the evidence.

8           THE COURT:  Mr. Campora, I got to take someone behind

9   you.

10          MR. CAMPORA:  Thank you.

11          MR. MARSHACK:  I'll make it quick, Your Honor.

12          THE COURT:  You're back again.  Three times.

13          MR. MARSHACK:  I'll make it quick.  Richard Marshack,

14  Marshack Hays, on behalf of the SLF group, 5,500 fire victims.

15  SLF is involved in all but two fires.  We are involved in

16  Tubbs, pursuant to this Court's order for relief from stay.

17          THE COURT:  You don't have to go into detail.  I got

18  to move this case along.

19          MR. MARSHACK:  Okay.

20          THE COURT:  Tell me what you want me to do.

21          MR. MARSHACK:  Here's what I want you to do:  for

22  example, break today.  CAL FIRE, through Mr. Pascuzzi, looked

23  at us and said, we're getting requests from you guys.  We're

24  getting requests from TCC.  Please coordinate.  Here's our

25  request, that all discovery is served on all -- is served on

PG&E Corp., Pacific Gas and Electric Co.

1   everybody, and all responses are served on everybody, and that

2   the SLF group participates in the meet and confer.

3          Again, all discovery served on everybody.  All

4   responses served on everybody.  You've asked that there be an

5   active meet and confer.  We ask that we be invited to the meet

6   and confer.

7          Thank you, Your Honor.

8          THE COURT:  Mr. Orsini, where do we go from here, and

9   what are you going to do?  You going to -- I mean, Mr. Julian

10  had his deadline.  Oh, wait.  One more.

11         MR. ORSINI:  I'm not allowed to stand up here, Your

12  Honor.

13         THE COURT:  One more.  Yes, sir.

14         MR. SKIKOS:  I shot Mr. Orsini down.  Let the record

15  reflect that.

16         My name is Steve Skikos.  I am the keeper of the

17  BrownGreer database.  We have an agreement.

18         THE COURT:  It exists, huh?

19         MR. SKIKOS:  It exists.  We have an agreement.  And I

20  have been dying since January 31st, the first time I came into

21  this courtroom, to talk about case specifics.  But I do things

22  by consent.  And so I can tell you, I read the Gibson reference

23  Your Honor put in his order entitled, "The Judicial Management

24  of Mass Tort Cases".

25         I have gone through all the factors that she



PG&E Corp., Pacific Gas and Electric Co.

1   articulated in that.  I went through the Dow Corning case,

2   which I did in this courtroom in 1991.  I've gone through the

3   post-2000 historical settlements and how we can get informed

4   consent done.  I've gone through the litigation data.  And

5   because I do things by consent, I'm not going to go through it

6   all here, and I would probably drive everybody crazy and piss

7   everybody off.

8           But I will say this.  We have some serious work to do

9   on the case-specific side.  BrownGreer is not the elephant in

10  the room.  The elephant in the room is the over 10,000 people

11  who have no idea what's going on in this bankruptcy.

12          I've run the data on Prime Clerk, and I've run the

13  data in BrownGreer, and we are way behind.

14          THE COURT:  Of what?  I mean, what am I supposed to

15  do?  What's the action item for me today?

16          MR. SKIKOS:  Well, the action item for you today,

17  because I do things by consent, is to understand that that's an

18  issue.  The estimation, my proposal is going to be that the

19  estimation be based on total loss, because there's going to be

20  late claims.  I have other proposals that I'm going to make,

21  but like I said, we have to go through those.

22          Here's my endgame.  The people who have been impacted

23  by these fires need the opportunity to go through four parts of

24  informed consent.  You talk about the disclosure statement.

25  There are four parts of the informed consent in this case.

154

PG&E Corp., Pacific Gas and Electric Co.

1          The first part of the informed consent is meaningful

2    participation, an opportunity to be understood, to get the

3    facts to make a decision about participation in this

4    bankruptcy.  They don't have them yet.

5          The second part of informed consent is the part of

6    this estimation plan.  We have to connect reality to the plans

7    that are being presented.  The biggest mistake that we can make

8    in this case is to have an estimation hearing on experts only.

9    We can't do that.  We have to have real people.

10          THE COURT:  Well, I must interrupt you.  We're talking

11    about -- you're talking about how the estimation process

12    should -- the trial or the hearing should be conducted.  That's

13    not something I can deal with today.  That's for another judge

14    to deal with.

15          MR. SKIKOS:  Right.  But it connects.

16          THE COURT:  Well, okay.

17          MR. SKIKOS:  This all connects to the disclosure

18    statement you're talking about, because I've written a boatload

19    of informed consent letters, and the informed consent process,

20    which is part 3, has to have certain information.  The idea

21    that the people are -- yes, they're not -- are they going to

22    read -- ten percent of them are going to read it?  Well, they

23    need information to make an informed decision.  We're going to

24    get there.

25          My point is this.  It's not the elephant in the room.



PG&E Corp., Pacific Gas and Electric Co.

1    BrownGreer is not going to value cases.  I'm not the oracle at

2    BrownGreer.  I can't tell you what the value of the tort cases

3    are.  BrownGreer is not the 800-pound gorilla.  The 800-pound

4    gorilla is the presentation of plans without a single

5    evaluation of a consensual review of an individual case.

6         THE COURT:  I don't know what to make of your

7    statement.  I hear your words.  I don't know how to fit it into

8    the dynamics and the process of the Chapter 11 process and the

9    estimation mandate of Section 502(c).

10        MR. SKIKOS:  You asked about 502(c).  And there is

11   something in the mass tort world --

12        THE COURT:  That's right.

13        MR. SKIKOS:  -- that is connected to that.

14        THE COURT:  That's right.

15        MR. SKIKOS:  There are what we call science days,

16   liability days, human being days.

17        THE COURT:  Right.

18        MR. SKIKOS:  The only difference between your

19   estimation proceeding and what we call in the MDL world the

20   science day is that you make a decision.  But we have done

21   those before successfully, and if you merge what has been done,

22   the best of the mass tort world with the bankruptcy world with

23   the fire world, we can actually come up with a process that we

24   can try to consensually provide to you to conduct an estimation

25   trial that has credibility and meaning.

PG&E Corp., Pacific Gas and Electric Co.

1    And I'm not saying we should do this now.  I'm saying

2    we should have a meet and confer.  We should discuss it.  But

3    we have enough experience in the MDL world.  I've been court-

4    appointed liaison ten times.

5    THE COURT:  But what?  But I don't know what you want

6    to do, so --

7    MR. SKIKOS:  We're going to have real people at the

8    estimation hearing.

9    THE COURT:  Okay.

10   MR. SKIKOS:  We're going to have real evaluation of

11   cases with -- under California law, and part of the BrownGreer

12   agreement with Mr. Orsini, who he did in good faith, is to have

13   some mediations to set this up.

14   The estimation hearing that we are ultimately going to

15   do should not just be expert.  It should be real people, and it

16   should be real evaluations.  I know I'm jumping ahead, but --

17   THE COURT:  No, you're not jumping ahead.  I'm not

18   presiding over the estimation hearing.  A district judge

19   upstairs is going to do that.  And he's going to have a status

20   conference very soon.  I'm dealing with all these pure

21   bankruptcy issues.  Definition of unliquidated.

22   MR. SKIKOS:  Right.

23   THE COURT:  Plan and disclosure statement.  You

24   started by commenting on the disclosure statement, and you

25   haven't said anything about a disclosure statement.  So I don't

PG&E Corp., Pacific Gas and Electric Co.

1    know what your point is.

2         I mean, I understand the point.  I don't mean to sound

3    like I'm dismissing your concerns.  I accept your concerns.

4    But it's not something I can deal with today.  So what do you

5    want me to do today?

6         MR. SKIKOS:  Okay.  So today.  There's been an issue

7    raised regarding BrownGreer.

8         THE COURT:  Not today.

9         MR. SKIKOS:  There isn't?  Yes.  No, Mr. Orsini raised

10   it.  We have an agreement.

11        THE COURT:  Yes.  You have an agreement.

12        MR. SKIKOS:  Right.  We have an agreement.

13        THE COURT:  That to me is a nonissue today, but yes --

14        MR. SKIKOS:  Correct.

15        THE COURT:  You have an agreement.

16        MR. SKIKOS:  And we're moving forward.

17        THE COURT:  That's right.

18        MR. SKIKOS:  And I've raised some issues that I think

19   we need to have a meet and confer on for the terms of the

20   ultimate estimation.

21        THE COURT:  No, that's fine.  I'm all for that.  But

22   it's not an actual matter for me today.

23        MR. SKIKOS:  No.  This was my speech to the group.

24        THE COURT:  You're welcome to make it.

25        MR. SKIKOS:  Thank you.



PG&E Corp., Pacific Gas and Electric Co.

1          THE COURT:  Mr. Orsini, I think that we got --

2          MR. ORSINI:  I'm still not allowed to stand, Your

3   Honor.

4          THE COURT:  Oh, well.

5          MR. MCCALLEN:  Sorry, Your Honor.  But very, very

6   quickly.  Okay.

7          THE COURT:  I'll be back in a few minutes.  Just make

8   your speech.

9          MR. MCCALLEN:  Your Honor, we --

10          THE COURT:  No, go ahead.

11          MR. MCCALLEN:  Your Honor, we agree with the TCC's

12   position.

13          THE COURT:  Just restate your name again.

14          MR. MCCALLEN:  I'm sorry.

15          THE COURT:  I know who you are, but state it for the

16   record.

17          MR. MCCALLEN:  Of course, Your Honor.  Benjamin

18   McCallen.

19          THE COURT:  McCallen.

20          MR. MCCALLEN:  On behalf of the ad hoc subrogation

21   group.  Your Honor, we agree with the TCC's position with

22   respect to the interrogatories, and I just wanted to make one,

23   really, point of clarification.  As Your Honor pointed to in

24   our submission, when the TCC sent their interrogatories, we

25   submitted a letter to the debtors asking for them to identify

PG&E Corp., Pacific Gas and Electric Co.

1    the elements of our damages claims --

2              THE COURT:  Right.

3              MR. MCCALLEN:  -- they dispute and the basis for that.

4              THE COURT:  Right.

5              MR. MCCALLEN:  So to the extent that Your Honor

6    ultimately grants the relief that the TCC is asking for to

7    order the debtors to respond to the interrogatories, we'd just

8    like to clarify they'd have to respond to our letter as well.

9              THE COURT:  I mean, it's essentially their

10   interrogatories plus your letter.  That's just your version of

11   it.  I mean, it's the stuff you need to prepare yours.

12             MR. MCCALLEN:  Completely agree, Your Honor.

13             THE COURT:  Yes.  Okay.

14             MR. MCCALLEN:  I just wanted to make sure that the

15   record was clear on that.

16             THE COURT:  Okay.

17             MR. PASCUZZI:  Your Honor, Paul Pascuzzi, cocounsel

18   with the Attorney General's office for CAL FIRE on the

19   discovery issues.  Back to the discovery issues.

20             THE COURT:  Back to the discovery issues.

21             MR. PASCUZZI:  Your Honor, again I just -- I'm looking

22   for coordination and some help so that we're not getting

23   subpoenaed by the tort committee, the debtors --

24             THE COURT:  Well, you said before you wanted to do

25   that, yes.



PG&E Corp., Pacific Gas and Electric Co.

1    MR. PASCUZZI:  -- the plaintiffs' lawyers.  Yes.  And

2    if it seems that it's efficient to have a depository/repository

3    where everything goes that CAL FIRE produces, then everyone can

4    get it.  If there's something else, they can work through

5    together.  But this notion of us getting a subpoena from every

6    single party-in-interest for similar stuff or the same stuff,

7    it's just going to be inefficient.

8         THE COURT:  So what would you like me to do?

9         MR. PASCUZZI:  I'd like you to order the parties to

10   coordinate their discovery to CAL FIRE, so that we're looking

11   at one request and we can respond to it, instead of having to

12   deal with multiple requests that may be different.

13        THE COURT:  Okay.  So procedurally, how do you want me

14   to do it?  I mean, I can't just grant a motion on the fly here,

15   although what you're saying makes sense.  Do you think you

16   could do a proposed order and circulate it to the principal

17   players?  Would that work?

18        MR. PASCUZZI:  I could.

19        THE COURT:  I mean, tell me what would work for you

20   procedurally, so you don't have to reinvent the wheel and deal

21   with fifteen different requests.

22        MR. PASCUZZI:  Understood, Your Honor.  What I'm

23   hearing from people when I ask them to do this, and I haven't

24   spoken to the debtors yet about it, but what I'm hearing on the

25   other side is they're not coordinating.

PG&E Corp., Pacific Gas and Electric Co.

1       So we're working very well with the tort committee

2  folks.  We're getting separate subpoenas from the Singleton

3  group.  And we're asking them to coordinate, and I'm hearing

4  that's not possible for some reason.

5       So I need some help, for you to say coordinate, and

6  we'll see if it works out.  And if it doesn't, we'll be back

7  here saying --

8       THE COURT:  Well, let's use a more traditional

9  procedure using the legal process and motions and practices.

10  Make a motion for, sort of, a protective order for facilitating

11  your client's obligations to whomever has a right to subpoena

12  you for anything and set it out on an expedited basis.  I'll

13  shorten time.  I mean, we don't have to make it overly

14  cumbersome, but I can't make a ruling today for people that

15  aren't even here.

16       I realize the Singleton group, through its counsel,

17  has been very proactive, and certainly the TCC has, and Mr.

18  Pitre and Mr. Kelly and others, but there are others out there

19  that are not here, but you shouldn't be doing this over and

20  over again.  So I'm all for it, and to the extent that you can

21  get a buy-in by Mr. Orsini and Mr. Julian and their clients,

22  that makes it even better.  And in effect, set it as the

23  protocol for all discovery going forward.

24       MR. PASCUZZI:  That sounds fine, Your Honor.

25       THE COURT:  Try to make it work.  Okay.  Well, it



PG&E Corp., Pacific Gas and Electric Co.

1    would make sense.

2          MR. PASCUZZI:  We're here for the status conference to

3    discuss these issues, so I'm bringing it up for discussion.

4          THE COURT:  I'm glad you did.

5          MR. PASCUZZI:  Thank you, Your Honor.

6          THE COURT:  Mr. Orsini, the motion from Mr. Julian is

7    to give you a deadline.

8          MR. ORSINI:  No.  Your Honor, he modified the motion

9    while you were --

10          THE COURT:  I know he did.

11          MR. ORSINI:  -- speaking to others.

12          THE COURT:  But let's --

13          MR. ORSINI:  But we have consent here.

14          So on Mr. Pascuzzi's last point, I agree with him.  We

15    should be coordinating that.  They should only get one

16    subpoena.  So we'll work on that with him, Your Honor.

17          THE COURT:  But you agree, I can't just go on the fly

18    and do it.

19          MR. ORSINI:  No, no.  I agree.  I completely --

20          THE COURT:  I've got to do it procedurally correctly.

21          MR. ORSINI:  Completely agree with that procedurally,

22    Your Honor.

23          THE COURT:  And let me make a further addition to you.

24    A number of you are going to have your introduction in the

25    bankruptcy world to an experienced judge who is not a



PG&E Corp., Pacific Gas and Electric Co.

1    bankruptcy person.  So it's a whole different terminology that

2    people are going to be using.

3              MR. ORSINI:  He and I will have that in common, Your

4    Honor.

5              THE COURT:  Okay.  Just don't tell him you don't know

6    anything about that.

7              MR. ORSINI:  So with respect to the two open discovery

8    items that Mr. Julian asked for deadlines on:  the

9    interrogatories 1 and 2 and --

10             THE COURT:  And the McCallen addendum.

11             MR. ORSINI:  Right.  And the letter that I got last

12   night.

13             THE COURT:  Right.

14             MR. ORSINI:  On the interrogatories, I've agreed with

15   Mr. Julian that we'll answer them not in fourteen days but in

16   ten, next Friday.  Not this coming Friday, Friday the 6th.  And

17   we will --

18             THE COURT:  9/6.

19             MR. ORSINI:  Yes.  Yes, Your Honor.  And we will

20   respond to the letter that I received last name from Ms. Morris

21   with additional discovery requests by next Tuesday, September

22   3rd.

23             THE COURT:  And what about Mr. McCallen's?  He get

24   that same courtesy, that same deadline?

25             MR. ORSINI:  Remind me again which one.



PG&E Corp., Pacific Gas and Electric Co.

1     THE COURT:  Well, it's -- Mr. McCallen, you --

2     MR. MCCALLEN:  No.

3     THE COURT:  Go ahead.  You can say it from there.

4  It's sound from there.  Just make sure you're on the

5  microphone.

6     MR. MCCALLEN:  Of course.  In our letter we asked for

7  the elements of our damages that they were disputing and the

8  factual basis for those disputes.

9     MR. ORSINI:  Well, I can identify the elements.  The

10  problem with the facts is he still has them, but we'll provide

11  a response to him by next Friday as well.

12     THE COURT:  And so Ms. Morris' letter, but what about

13  that -- does that exclude or include the third-party subpoena?

14  I mean, third-party motion to compel, et cetera.

15     MR. ORSINI:  Oh.  Well, Ms. Morris and I will -- I

16  will commit on the record that Ms. Morris and I can meet and

17  confer this week and try to resolve those open issues.

18     THE COURT:  But that includes the third-party doc --

19     MR. ORSINI:  Yes, I understand, Your Honor.

20     THE COURT:  Okay.

21     MR. ORSINI:  I understand.

22     THE COURT:  All right.  As long as Ms. Morris says

23  she's okay with that, I'm okay with it.

24     MR. ORSINI:  Thank you.

25     THE COURT:  So, Mr. Orsini, do you -- so I will take



PG&E Corp., Pacific Gas and Electric Co.

1    it that you will work with Mr. Pascuzzi to deal with -- it is

2    kind of a unique situation with CAL FIRE.

3            MR. ORSINI:  Yes, Your Honor.

4            THE COURT:  And certainly don't exclude Singleton,

5    through Mr. Marshack or whoever it is.  Mr. Singleton is here.

6    Or one of them.  They've been very proactive in figuring out --

7            MR. ORSINI:  What I would propose to do, Your Honor,

8    is I will work with Mr. Pascuzzi.  If we can come up with

9    somebody that's satisfactory to us, we will then share it with

10   the ad hoc subro group, the TCC, Mr. Singleton.  And if there's

11   anybody else here who would like to see that, let me know.

12           THE COURT:  Okay.  Thank you.  I'll take that.

13           All right.  Anybody want to add any further?

14           All right.  Mr. Karotkin?

15           MR. KAROTKIN:  Not on discovery.  I don't know --

16           THE COURT:  Not on anything.

17           MR. KAROTKIN:  I don't know whether you were finished.

18           THE COURT:  No, I was going to ask if you'd come and

19   get into our Chapter 13 clinic while you're here in San

20   Francisco and handle a few cases for some of my debtors.

21           MR. KAROTKIN:  Sure.  Sure.  Would be happy to.

22           THE COURT:  Okay.  What can I do for you?

23           MR. KAROTKIN:  Just --

24           THE COURT:  Or whatever we need to discuss.

25           MR. KAROTKIN:  Just a quick housekeeping matter.

PG&E Corp., Pacific Gas and Electric Co.

1    Since I think the consensus is not to file a disclosure

2    statement on the 9th, can we submit a proposed order that

3    would --

4           THE COURT:  Yes, but I want you to file something, for

5    lack of a better term, what I call before a term, a disclosure-

6    statement term sheet --

7           MR. KAROTKIN:  Outline?

8           THE COURT:  -- or outline.

9           MR. KAROTKIN:  Okay.

10          THE COURT:  I mean, something that gives the different

11    counsel who are representing banks or financial institutions or

12    shareholders what the plan does for them.  They can read it in

13    the plan, but it's just helpful as a separate thing, kind of, a

14    preview of the disclosure statement.  Be creative.  So I will

15    be, you can be.

16          MR. KAROTKIN:  Okay.  Very well.  Thank you, sir.

17          THE COURT:  That's all?

18          MR. KAROTKIN:  That's it.

19          THE COURT:  Okay.  So you will have your plan on the

20    9th, and I don't -- I mean, I'm not inviting anybody to do

21    anything.  I'm sure those who want to take it and criticize it

22    can do so, but at our follow-up status conference my intention

23    then will be to hear where we go from there in terms of

24    procedural settings.

25          And if the answer is you're not ready to do it --

PG&E Corp., Pacific Gas and Electric Co.

1  you're not ready to set, for example, a deadline for

2  objections, or if there's a way to separate out those things

3  that necessarily depend upon the financial terms coming

4  together.  If there's a gap in it, et cetera.

5        And I know you're going to want to ask to deal with

6  the exclusivity issue.  I won't worry about that for now.

7        If you file the plan in the manner that we have

8  discussed, you've met that benchmark, and that triggers your

9  next grace period under the statute.  Okay.

10        MR. KAROTKIN:  Very well.

11        THE COURT:  I'm comfortable with that.  So you want a

12  separate order that dispenses from the disclosure statement

13  formally?  That's okay.  I'll do that.

14        MR. KAROTKIN:  Okay.  We'll just submit a --

15        THE COURT:  But the tradeoff is, on the assumption

16  that you file the plan.

17        MR. KAROTKIN:  Yes, I understand, sir.

18        THE COURT:  Okay.  Okay.  So --

19        MR. KAROTKIN:  Thank you.

20        THE COURT:  Anything else?  All right.  Thank you for

21  a long morning, everyone.  And I look forward to hearing from

22  you what happens upstairs.  Thank you.

23        (Whereupon these proceedings were concluded at 1:43 PM)

24

25



```
 1                          I N D E X

 2    RULINGS:                                    PAGE  LINE

 3    Debtors' second lease extension motion is      6      9

 4    granted.

 5    Application of the official committee of        9      6

 6    tort claimants to retain and employ Trident

 7    DMG LLC as communications consultant

 8    effective as of July 18, 2019, is granted.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          C E R T I F I C A T I O N

2

3    I, Clara Rubin, certify that the foregoing transcript is a true

4    and accurate record of the proceedings.

5

6

7

8

9

10

11    _____

12    /s/ CLARA RUBIN

13

14    eScribers

15    7227 N. 16th Street, Suite #207

16    Phoenix, AZ 85020

17

18    Date:  August 28, 2019

19

20

21

22

23

24

25

**$**

**$5,647,256.18 (1)**
116:25

**A**

**AB1054 (7)**
15:2;26:4;28:3;66:2,
9;67:14;68:2
**abandoned (1)**
11:18
**Abid (1)**
49:15
**ability (1)**
12:4;37:23;39:1
**able (12)**
10:13;40:19;47:25;
75:9;76:15;78:13;
88:14,21;92:23;
137:16;140:3,21
**abreast (1)**
99:15
**absolute (1)**
14:24
**Absolutely (8)**
21:21,21;22:2;40:17,
24;45:6;80:24;137:15
**absolute-priority (1)**
57:25
**absorb (1)**
125:11
**accept (2)**
115:17;157:3
**acceptable (2)**
58:2;59:13
**accepted (1)**
105:12
**accepting (1)**
14:4
**access (1)**
133:4
**accompanies (1)**
22:14
**accomplishment (1)**
65:20
**accordingly (1)**
70:7
**account (4)**
28:5;36:18;75:19;
121:12
**accountable (1)**
14:23
**accounting (1)**
38:5
**accurate (1)**
87:5
**achieved (1)**
66:8
**acknowledged (1)**
56:13
**across (2)**

16:14;99:10
**act (3)**
22:20;58:22;126:16
**action (3)**
87:3;153:15,16
**actions (1)**
19:16
**active (1)**
152:5
**acts (1)**
87:20
**actual (6)**
32:10;74:11,13;76:6;
138:1;157:22
**actually (12)**
18:5;20:6;57:23;
68:20;82:4;101:17,19;
115:17;137:9,16;
139:3;155:23
**ad (6)**
25:9;49:19;79:19;
128:11;158:20;165:10
**add (6)**
10:8;19:4;50:19;
112:17;128:25;165:13
**added (1)**
9:13
**addendum (1)**
163:10
**addition (3)**
25:4;150:6;162:23
**additional (5)**
6:14;39:9;140:3,25;
163:21
**add-on (1)**
112:13
**address (21)**
5:18;22:3;24:19;
25:25;26:1,4,10;28:17;
29:8;30:24;35:15;
46:17;64:6;70:2;86:18;
89:2;107:13,15;108:6,
8;122:15
**addressed (5)**
70:1;78:8;86:19;
123:23;140:14
**addressing (1)**
78:17
**adequate (6)**
15:4;30:1;32:19;
55:13;63:9;84:22
**adjudication (2)**
107:21;130:11
**adjudications (1)**
66:22
**adjudicative (1)**
78:16
**adjusted (2)**
24:19;29:8
**adjustment (1)**
79:20
**adjustments (1)**
97:17

**admission (1)**
134:5
**admit (1)**
129:17
**admits (1)**
138:17
**adopt (1)**
91:23
**adopted (2)**
82:22;85:24
**advance (2)**
74:9;78:15
**advice (1)**
106:10
**advise (1)**
7:19
**advisors (1)**
40:14
**advisory (6)**
66:13,18;67:5;70:14;
72:23;78:8
**advocates (2)**
67:9,10
**advocating (1)**
16:3
**Affairs (1)**
113:19
**affected (3)**
17:22;32:18;101:19
**affirmative (2)**
142:23;145:5
**afternoon (1)**
148:23
**Again (41)**
13:12;16:2;20:13;
24:12,20;25:6,23;28:7;
29:13,18,22;32:8;
33:19;34:18;38:21;
39:16;44:18;49:18;
52:23;59:11;67:4;
68:10;71:20;75:24;
77:25;86:8;90:24;95:8;
100:18;125:7;128:2,5;
132:7;144:18;145:10;
151:12;152:3;158:13;
159:21;161:20;163:25
**against (9)**
15:7,9;16:15;18:10,
12;34:9;81:20;90:18;
151:3
**agencies (6)**
113:16;114:4;115:2;
119:16;120:11;122:6
**agency (3)**
71:11;113:21;116:25
**agenda (3)**
5:19;124:5;128:2
**aggregate (7)**
35:21;37:16,21;42:7;
51:25;55:21;56:18
**ago (7)**
22:11;90:10;93:3;
103:10;135:11,24;

148:15
**agree (38)**
16:22;17:9,11;21:20;
30:9;35:16;38:10;60:4;
63:17;83:23;84:3;
92:19;102:12;103:22;
114:22,24;121:4;
122:7,9;125:20,23,24;
126:1;132:12,14;
133:20;134:24;135:2;
139:23;146:5,6;
158:11,21;159:12;
162:14,17,19,21
**agreed (10)**
30:6;36:15;37:8;
40:1;73:25;101:14;
129:11;135:21;136:17;
163:14
**agreeing (1)**
145:6
**agreement (17)**
27:16;36:21;45:20;
61:20;66:25;67:1,2;
135:9;139:18;145:9;
152:17,19;156:12;
157:10,11,12,15
**agrees (2)**
94:17;123:16
**ahead (11)**
6:5;18:23;36:5;
41:25;82:13;120:13;
141:25;156:16,17;
158:10;164:3
**Akin (2)**
49:15;82:7
**Alan (1)**
64:4
**alleged (1)**
62:7
**allow (1)**
103:17
**allowance (3)**
119:5,6,7
**allowed (5)**
39:8;62:1;130:8;
152:11;158:2
**allows (1)**
126:24
**almost (1)**
50:11
**along (4)**
42:10;66:22;110:25;
151:18
**although (5)**
17:21;51:12;61:17;
79:25;160:15
**always (3)**
7:23;117:11;129:22
**Amanda (1)**
19:3
**amended (2)**
75:18,21
**amendment (1)**

86:9
**America (1)**
121:17
**Among (1)**
134:2
**amount (32)**
15:1,2;25:10;27:19;
30:5;31:6;35:23;36:20;
37:16,19;40:1,1;47:13,
14;51:25;56:20;59:8;
60:14;62:1;72:12;73:4,
25;75:25;76:17;77:10;
115:8,10;117:15;
122:13;129:12;130:4;
135:19
**amounts (3)**
29:2;36:15;37:22
**analysis (4)**
36:7;37:20;40:9;
150:11
**analyze (1)**
12:4
**analyzing (1)**
60:25
**Angeles (1)**
91:4
**announce (1)**
111:10
**answered (3)**
73:7;141:21;144:23
**anticipate (5)**
7:25;8:6;71:1;
109:13;118:25
**anticipation (1)**
105:5
**anxiously (1)**
36:5
**apart (1)**
57:15
**apologize (1)**
36:6
**apparently (1)**
78:5
**Appeal (1)**
94:15
**appearing (1)**
35:13
**appendices (1)**
134:10
**Appendix (3)**
134:10,12,13
**applaud (1)**
59:6
**applicable (1)**
81:2
**application (1)**
9:12
**applies (5)**
81:21,22,25;84:1;
94:15
**apply (4)**
82:3;90:14;93:1,4
**appointed (1)**

156:4
**appreciate (3)**
35:14;41:9;99:23
**apprised (1)**
99:19
**approach (1)**
130:25
**appropriate (8)**
9:19;13:6;15:1;
33:23;52:3;99:10;
106:17;127:25
**approval (6)**
57:7;65:5,14,15,22;
71:11
**approvals (1)**
66:21
**approve (3)**
57:9;68:7;74:11
**approved (1)**
56:22
**approves (2)**
67:16;71:22
**April (7)**
12:1;19;13:14,15;
16:8;75:3,15
**area (2)**
17:25;103:6
**Arent (1)**
60:13
**argue (1)**
84:13
**argued (1)**
87:10
**arguing (1)**
92:20
**argument (13)**
43:4;58:1;82:12,14,
21;90:9;92:25;93:6;
94:1,7;107:24;108:17;
132:13
**arguments (4)**
14:4;22:16;87:10;
92:17
**around (5)**
24:25;32:19;39:20;
92:7;112:17
**arson (1)**
146:25
**Article (7)**
104:9,17;106:15;
110:14;112:22;121:3;
140:4
**articulated (1)**
153:1
**asbestos (1)**
112:14
**ascertainable (2)**
118:7;120:2
**aside (2)**
23:24;144:18
**aspect (1)**
34:22
**asserts (1)**

130:17
**assess (1)**
141:1
**assessing (1)**
15:12
**assessment (2)**
20:22;83:8
**assign (1)**
100:12
**assigned (1)**
16:20
**assistance (3)**
7:12;122:18,19
**associated (1)**
92:24
**assume (8)**
8:19;24:25;51:3;
62:11;71:16;78:3;
81:19;117:23
**assuming (3)**
36:10;88:11,11
**assumption (2)**
25:16;167:15
**assumptions (2)**
28:15;45:8
**assure (1)**
97:20
**Atlas (1)**
142:22
**attenuated (1)**
127:15
**Attorney (2)**
113:16;159:18
**AUGUST (12)**
5:1;16:9;21:13;
22:15,16;23:14;64:7;
94:9;107:16;132:23;
135:18;143:9
**authority (2)**
68:3;129:1
**authorize (1)**
68:25
**available (2)**
38:25;63:9
**avoid (1)**
49:1
**await (1)**
78:16
**aware (5)**
12:23,23;68:6;89:19;
129:21
**away (1)**
17:5
**awkward (1)**
105:9

**B**

**back (30)**
12:19;22:24;26:16;
27:21;30:10;31:1,1;
36:19;42:9,13;45:18;
52:4;60:25;84:4;85:1,

8;86:12;94:9;110:19;
134:6,8;135:25;
140:22;145:10;149:6;
151:12;158:7;159:19,
20;161:6
**backed (1)**
139:14
**background (3)**
58:20;106:16;112:20
**backing (1)**
138:25
**backwards (1)**
39:19
**bait (1)**
120:20
**Baker (1)**
8:8
**BakerHostetler (2)**
10:23;35:13
**ball (2)**
50:11;110:4
**Bank (2)**
6:20;36:13
**bankruptcy (53)**
8:18,19;12:22;16:21;
26:23;28:3;31:24;
54:12,16,21;58:1,20,
24;64:17,17,24;65:1;
66:17;67:4,8,11;68:6,
11,19,24;69:5;70:9,16;
74:10;76:15,20;77:2,
16;78:19,24;79:7;
81:10;93:20;94:13;
112:18;128:15,18;
131:1;132:7;140:8;
149:12;150:15;153:11;
154:4;155:22;156:21;
162:25;163:1
**banks (1)**
166:11
**BAP (2)**
117:23;129:2
**bar (5)**
84:21,23;85:18;
112:14;123:6
**based (11)**
18:8,14;27:17;28:14;
36:4;82:14;124:15,15;
130:20;139:15;153:19
**baseline (2)**
62:9,14
**bases (1)**
133:22
**bashful (2)**
100:6;106:25
**basic (7)**
24:22;26:16;131:12;
133:7;142:8;143:16,16
**Basically (1)**
9:1
**basis (15)**
9:22;108:5;126:23;
130:17;140:5;141:15;

142:7,24,25;144:10;
145:1;148:19;159:3;
161:12;164:8
**Bay (2)**
86:15;133:25
**bear (2)**
26:24;66:24
**become (1)**
79:5
**becomes (2)**
42:6;90:12
**becoming (1)**
32:17
**bed (1)**
95:13
**began (1)**
112:17
**begin (8)**
64:24;65:3;66:18,20;
70:15,25;72:1;102:16
**beginning (1)**
65:1
**behalf (11)**
5:16;20:1;35:13;
46:8;49:17;54:2;60:13;
61:6;122:6;151:14;
158:20
**behind (5)**
7:11;148:21;150:1;
151:8;153:13
**believes (1)**
145:24
**belong (1)**
16:17
**belongs (1)**
128:8
**below (3)**
80:20;102:8;139:24
**benchmark (1)**
167:8
**beneficial (1)**
39:3
**benefit (2)**
54:9;75:21
**Benjamin (1)**
158:17
**besides (1)**
124:2
**best (5)**
30:2;73:10;90:14;
128:17;155:22
**bet (1)**
140:23
**Beth (1)**
60:12
**better (8)**
44:4;46:14;74:20;
104:21;108:18;126:3;
161:22;166:5
**beyond (2)**
9:18;12:10
**bifurcate (6)**
103:13;106:4;

109:12;111:25;112:24;
127:20
**bifurcating (1)**
103:24
**bifurcation (1)**
103:20
**big (12)**
10:1;16:5;22:11;
26:22;33:5;35:19;39:3;
44:10;56:15;83:12;
107:6;124:6
**bigger (1)**
16:12;22:22;84:13
**biggest (1)**
154:7
**big-picture (1)**
56:13
**big-time (1)**
16:24
**bill (2)**
67:21;112:13
**billion (25)**
36:23,25;37:7,18,20,
22;40:3;41:4,5;44:14,
15;46:25;47:1,2;56:25;
60:15;62:6,9,11,13,15;
77:12,12;118:2;139:25
**bit (9)**
12:10;41:25;53:9;
54:10;84:16;106:16;
128:13;139:1,2
**blah-blah-blah (1)**
121:7
**blank (3)**
75:25;76:11;77:15
**blanks (1)**
29:24
**board (2)**
8:24;55:9
**boatload (1)**
154:18
**bogus (2)**
42:22,22
**BOKF (1)**
60:13
**bond (1)**
36:13
**bondholders (9)**
25:9;39:4;49:23,25;
50:3,17;52:1;53:18;
57:22
**bonds (1)**
39:5
**bones (2)**
24:10;63:3
**book (3)**
32:21;33:1,16;41:13;
45:11;59:3;134:23
**borrowed (1)**
47:3
**both (17)**
10:2;23:3;24:20;
25:9;28:19;29:10;

34:19;49:2;61:12;
102:13;107:8,9;121:6;
123:21;126:8;136:2;
139:21
**bounced (1)**
8:15
**BR (1)**
131:2
**branch (1)**
146:3
**break (17)**
30:11,12;63:24;
79:13;121:25,25;
122:1,2;124:3,4,7,7,20;
126:10;127:4,21;
151:22
**breakdowns (1)**
42:6
**Breyer (1)**
99:17
**brief (19)**
11:17;20:24;71:17;
80:23;84:12;85:19;
91:6;94:18;95:2,3,19,
20,24;96:14;107:14,16,
24;108:3;109:14
**briefed (3)**
84:7;107:14;127:5
**briefing (8)**
83:11;84:11,14;
94:10,12,17;101:15,16
**briefly (4)**
62:5;82:14;86:8;
101:6
**bring (1)**
94:9
**bringing (2)**
89:11;162:3
**brings (2)**
38:21;47:11
**broad (2)**
114:2;132:10
**broad-brush (1)**
66:10
**broader (2)**
21:6;22:3
**broken (1)**
147:5
**brought (3)**
88:18;90:3;128:4
**BrownGreer (9)**
139:17;152:17;
153:9,13;155:1,2,3;
156:11;157:7
**BROWNSTEIN (4)**
60:12,13,17;61:4
**Buckley (2)**
87:11;90:25
**Buckley's (1)**
93:9
**build (1)**
46:14
**built (4)**

82:19;83:5,5;89:4
**bunch (2)**
48:3;143:9
**burden (10)**
10:12;33:13;52:14;
59:15;105:16;128:12;
130:23;131:11;133:14,
21
**burdens (1)**
130:12
**burning (1)**
112:6
**business (2)**
36:4;79:8
**buy-in (1)**
161:21

**C**

**C&C (1)**
97:7
**CAL (13)**
113:17;114:5,9;
119:22;121:19;132:2;
142:19;144:22;151:22;
159:18;160:3,10;165:2
**calculate (1)**
38:3
**calculation (2)**
111:3,5
**calendar (4)**
34:12;125:7,18;
126:3
**CALIFORNIA (16)**
5:1;19:8;39:9;64:5;
81:1;82:15,22;87:12;
93:2;94:14,14;98:23;
113:16,19;115:1;
156:11
**call (12)**
16:13;61:25;79:15;
93:17;99:3;105:13,15;
106:10;126:3;155:15,
19;166:5
**Cal-L (1)**
78:23
**called (14)**
15:17;17:13,13;18:4,
18;32:22;63:3,3;64:16;
93:19,21;114:1;
128:16;129:2
**calls (2)**
7:24;8:13
**came (8)**
16:14;73:20;106:3;
112:13,21;117:5;
128:9;152:20
**Camp (13)**
12:4,19;13:3;15:13;
23:9;132:2;142:3,3;
144:18,20;147:5;
150:10;151:4
**CAMPORA (10)**

149:1,1,2,4,17,19;
150:19,24;151:8,10
**can (102)**
7:9,16;10:1;11:20;
18:13;19:1;33:13;
35:23;37:23;38:5,10,
24;39:4;41:11,12;
42:22;43:4;46:14;48:8;
49:1;50:19;53:2,3,14;
56:14;68:16,18;70:15;
72:21;73:11,12;75:24;
77:22;78:3;81:9,10;
82:11;84:5,9,12;88:24;
90:13,14;92:6,7;94:1,
13;96:4,14,19;97:13,
20,22;98:16;99:9,15,
19;103:1;105:20;
106:10;107:9;108:19,
20;110:19;114:25;
115:24,25;116:25;
117:2;118:2,16,21;
119:13;120:15;121:11;
124:4;129:23;139:4,
23,23;147:12,25;
152:22;153:3;154:7,
13;155:23,24;157:4;
160:3,4,11;161:20;
164:3,9,16;165:8,22;
166:2,12,15,22
**candidly (4)**
11:14,19;133:23;
140:6
**Cantu (10)**
82:15,21;83:3;86:19;
87:4;89:3,4,8;94:11;
95:6
**Cantu-type (1)**
90:3
**capable (1)**
96:3
**capital (7)**
47:13,19,20;68:9;
72:16,25;74:16
**capitalize (1)**
77:14
**capped (1)**
56:24
**care (4)**
21:10;49:5;59:13;
97:8
**carefully (2)**
51:10;101:9
**careless (1)**
14:22
**Caribou- (1)**
12:17
**Caribou-Palermo (1)**
17:20
**Carlson (1)**
112:12
**cars (1)**
112:6
**case (57)**

7:14,23;16:21;17:25;
18:9,12;35:8;39:15;
43:23;46:13,14;55:3,7;
61:9;62:1;65:24;66:23;
71:3;73:10;80:24;84:4;
88:10;91:7,20;97:24;
98:8,11;99:11;109:1,1,
10;110:24;112:3;
115:22;116:15;121:10;
122:13;127:3;129:2,
10,15,20;130:5,8,9,10,
14,23;131:1;133:16;
138:13;151:18;152:21;
153:1,25;154:8;155:5
**case/worst (1)**
73:10
**cases (20)**
14:20;35:1,7;60:18;
64:18;65:2,7,15;72:5;
87:13;106:25;116:6;
119:14;134:1;140:8;
152:24;155:1,2;
156:11;165:20
**case-specific (1)**
153:9
**cash (2)**
39:6;48:2
**categories (1)**
20:23
**category (2)**
37:1;127:9
**causation (3)**
103:14;131:16;132:1
**cause (4)**
16:4;131:6,8;132:4
**caused (7)**
13:2;82:18;89:5;
104:4;113:3;145:25;
146:3
**causes (1)**
146:21
**CCSF (1)**
96:6
**Cecily (1)**
35:12
**center (1)**
13:20
**certain (15)**
28:14,14;29:9;39:5;
61:6;65:8;67:12;69:7;
87:19;88:20;112:21;
113:20;115:7;118:8;
154:20
**certainly (16)**
43:21;46:20;50:19;
61:17;71:17;80:1;
90:14;102:9;107:6;
130:2;132:25;133:20;
138:9;139:14;161:17;
165:4
**cetera (6)**
146:4,4,22,22;
164:14;167:4

**challenge (7)**
79:1;81:22;84:1,7;
115:17;130:10;138:8
**challenges (1)**
76:16
**challenging (1)**
56:6
**chance (3)**
42:18;53:11;125:14
**change (3)**
6:11;25:14,19
**changes (1)**
69:25
**Chapter (16)**
26:16;35:4;65:7,14,
23;67:16;71:5;116:6;
117:9,11;126:17;
130:9,9;134:25;155:8;
165:19
**character (1)**
123:21
**characterize (2)**
39:16;116:14
**charge (2)**
8:7;105:21
**charged (1)**
143:18
**charm (1)**
92:13
**cheaper (2)**
8:7;9:4
**check (1)**
53:5
**checked (1)**
126:10
**choice (5)**
88:10;90:15;110:3,
16;113:7
**C-hook (1)**
147:5
**C-hooks (1)**
148:3
**chooses (2)**
7:10;9:17
**Circuit (5)**
116:5;117:23;118:6;
119:14;120:1
**circulate (1)**
160:16
**circumstance (5)**
7:10;38:1,2,19;
137:25
**circumstances (5)**
32:4;34:7;44:18;
52:3;83:1
**cited (1)**
131:1
**cites (1)**
129:3
**citing (1)**
129:1
**City (1)**
95:22

PG&E CORPORATION AND PACIFIC
GAS AND ELECTRIC COMPANY

Case No. 19-30088
August 27, 2019

**Civil (1)**
122:5
**claim (46)**
16:15,16,16;46:25;
110:23;111:4,15;
112:1,2;114:19;
116:23,24,25;117:1,4,
6,15,16;118:13,15,16,
19;119:1;120:22,22;
121:6,11;123:3,4,6,10;
126:22;129:8,9,13,14,
19;130:6,8,10,15;
131:4;132:13;137:20;
138:7;150:14
**claimant (9)**
116:1;118:2;126:21;
129:13;130:5,12,14,17;
131:11
**claimants (11)**
10:24;24:16;35:14;
37:25;40:2;41:4;
103:12;129:8;130:6;
137:5,22
**claimants' (3)**
14:6,15;123:24
**claims (95)**
7:14;8:5;15:7,9;
25:24,25;29:10;33:25;
35:21,21,22,22,22;
36:14,15,17,19,25;
37:2,4,6,21,23;38:3,7;
39:21;42:7;56:19;
59:22;62:1,7,15;72:6;
73:5;80:17,19;93:19;
98:4,4;106:5,5;107:19;
110:25;113:21,21;
114:2,2,3,5,7,10;115:2,
13;116:15,15,16;
118:10,11,12;119:20,
22,23;120:8,9,10,20,
21;122:9,13,14,17;
123:13,16,18,20;
126:25,25;128:24;
129:15,21,22,23,25;
131:23;133:10;134:13;
137:8,9;138:13;139:4,
22;140:5;142:7;
153:20;159:1
**clarification (2)**
82:5;158:23
**clarified (1)**
80:15
**clarify (5)**
56:14;80:12;106:2;
148:5;159:8
**clarity (6)**
24:18;32:11;39:12;
57:8;62:24;114:18
**class (9)**
36:17;50:17,18,18,
22;55:15;57:15;61:9;
77:6
**classes (7)**

25:1,2;26:25;47:24;
50:17;61:9;74:1
**classification (2)**
24:6;77:9
**clean (1)**
120:7
**clear (18)**
14:6;39:15;51:4;
66:1;78:5;80:20;87:5,
7,22;95:18;98:23;
103:5;105:3,22;
107:16;114:3,15;
159:15
**Clearly (5)**
24:3;58:7;71:2;
129:13;151:4
**Clerk (3)**
118:12;125:4;153:12
**client (4)**
9:24;50:22;92:22;
138:17
**clients (10)**
23:7;40:14,22;42:7;
43:2;49:3;63:5;103:25;
116:23;161:21
**client's (1)**
161:11
**climate (1)**
67:18
**clinic (1)**
165:19
**clock (1)**
16:9
**close (2)**
62:4;139:23
**closed (1)**
135:10
**closes (2)**
134:23,25
**clue (1)**
66:4
**cocounsel (1)**
159:17
**co-counsel (1)**
113:15
**Code (1)**
128:18
**cold (2)**
97:12,23
**colleagues (3)**
10:13;49:2;79:6
**collectively (1)**
35:23
**colloquy (1)**
122:10
**combination (1)**
61:12
**combine (1)**
47:22
**combined (2)**
55:1;111:16
**comfortable (3)**
99:24;136:13;167:11

**coming (7)**
7:23;32:5;84:21;
101:1;149:13;163:16;
167:3
**commenced (1)**
66:17
**comment (4)**
76:19;87:4;101:6;
126:12
**commenting (1)**
156:24
**comments (7)**
41:9;44:8;46:9,21;
96:16;122:8,9
**Commission (42)**
28:1;29:25;30:19;
64:6,8,15,24;65:5,7,14,
22;66:13,17;67:4,5,11,
16;68:4,4,7,9,23,25;
69:15,16;70:4,5,9,14,
20,24;71:4,22;72:22;
73:3,13;74:11;75:24;
76:1;78:3,17,23
**commissioners (3)**
67:3,7;76:10
**Commission's (9)**
65:1,19;68:1,3;69:4;
72:9,19,23;74:21
**commit (2)**
77:15;164:16
**commitment (2)**
51:20;63:6
**commitments (4)**
51:15,19;63:13,15
**committed (6)**
47:13,14,19;74:21;
134:11;141:1
**committee (16)**
7:18;8:12;9:17,20;
10:24;14:6,15;35:13;
44:4;46:8;56:17;79:19;
128:11;131:13;159:23;
161:1
**committees (3)**
34:19,19;46:22
**committees' (1)**
32:18
**committing (1)**
73:5
**common (2)**
32:17;163:3
**communicate (3)**
7:24;10:14;100:18
**communicating (1)**
103:7
**communication (1)**
103:4
**companies (5)**
24:16;29:11;39:1;
106:5;110:12
**company (15)**
15:7,11;21:15;37:25;
38:19;40:6;41:6;47:4;

60:20;68:18;73:4,19;
75:20;77:15;146:1
**company's (4)**
68:9;69:11;72:16,25
**compel (4)**
20:4;21:3,24;164:14
**competing (2)**
24:24;56:21
**complained (1)**
132:21
**complaint (2)**
130:18;134:7
**completed (1)**
74:25
**completely (8)**
31:4;63:12,17;126:1;
129:22;159:12;162:19,
21
**Completion (1)**
72:7
**complex (1)**
91:2
**complexity (1)**
43:8
**complicated (3)**
79:5;100:19;133:23
**complicates (1)**
104:1
**complied (1)**
69:7
**comply (1)**
26:3
**component (2)**
90:18;122:21
**components (2)**
40:16;113:4
**compressed (2)**
44:25;147:19
**compromised (1)**
130:22
**concede (5)**
42:25;77:10;117:3;
120:11;131:16
**conceded (2)**
42:24;62:19
**concept (7)**
24:23;27:11;63:12;
112:16,18;126:17;
134:7
**concepts (4)**
15:2;31:7;117:23,25
**concern (3)**
65:6;70:19;72:3
**concerning (3)**
67:12;69:20;70:22
**concerns (4)**
60:21;113:14;157:3,
3
**concession (1)**
50:23
**concessions (1)**
44:22
**conclude (2)**

42:11;79:13
**concluded (1)**
167:23
**conclusion (2)**
67:6;71:4
**conclusions (2)**
70:12;78:15
**condemnation (12)**
79:18,24;80:22;81:1,
20,24;87:4,9;90:10;
94:15;111:1;132:1
**condition (3)**
71:4,14;74:24
**conditions (2)**
65:23;71:19
**conduct (5)**
17:7;69:18,22;
105:19;155:24
**conducted (1)**
154:12
**confer (12)**
11:16,19;32:16;
136:19;140:16;141:3;
152:2,5,6;156:2;
157:19;164:17
**conference (24)**
5:5,7;23:1;34:14;
52:8,22;99:12,18;
100:4,8;101:22,25;
104:24;105:4;108:25;
109:2,5,6,8;126:4;
135:24;156:20;162:2;
166:22
**confident (1)**
63:9
**confidential (1)**
66:14
**confirm (1)**
119:2
**confirmable (3)**
57:18;70:20;77:3
**confirmation (12)**
36:2,21;57:19,19,24;
58:3;75:3,15;76:21;
110:7;118:19,23
**confirmed (3)**
24:2;43:3;93:2
**confused (1)**
117:12
**confusing (1)**
117:22
**confusion (2)**
48:25;64:13
**conjunction (2)**
97:7;99:11
**connect (1)**
154:6
**connected (1)**
155:13
**connection (1)**
15:13
**connects (2)**
154:15,17

**consensual (2)**
45:20;155:5
**consensually (1)**
155:24
**consensus (1)**
166:1
**consent (18)**
40:23;43:3;108:10,
21;110:1,3,3;152:22;
153:4,5,17,24,25;
154:1,5,19,19;162:13
**consents (1)**
109:16
**consider (1)**
90:14
**consideration (2)**
56:22;67:2
**considerations (1)**
28:4
**considered (3)**
13:10;107:3,4
**consistency (1)**
67:18
**consistent (3)**
15:2;69:6;127:19
**constant (1)**
48:9
**constituency (3)**
7:20;40:4;52:15
**constituents (1)**
55:16
**Constitution (1)**
81:6
**constrained (2)**
39:7,7
**constructed (1)**
83:2
**constructionist (1)**
20:16
**consult (1)**
33:22
**consultants (1)**
18:3
**Consulting (1)**
17:16
**contacting (1)**
100:16
**contained (1)**
13:2
**contains (1)**
70:12
**contemplated (1)**
69:1
**contentions (1)**
145:5
**Contested (2)**
93:21,21
**contesting (2)**
44:23;151:3
**context (8)**
13:11;20:7;44:21;
61:21;62:18;66:14;
72:24;93:18

**contingencies (4)**
51:23,23,24,24
**contingency (1)**
126:21
**contingent (7)**
117:13,16,18,21,24;
126:19,25
**continue (6)**
7:9,14;42:10;44:5;
84:12;141:3
**continued (1)**
98:11
**continuing (1)**
42:3
**contract (1)**
119:23
**contractor (13)**
10:19;13:8;20:14:22,
24;16:15,16,24;17:19;
19:9,13,16;20:9
**contractors (15)**
12:9,14,17;14:10,12,
18;15:5,8,10,11,22;
17:17;18:10,12,14
**contractors' (1)**
19:5
**contractual (1)**
50:2
**contrary (2)**
57:6;85:25
**contribution (1)**
90:19
**contributions (1)**
67:19
**control (5)**
34:6,7;113:18;114:6;
120:7
**controlling (1)**
81:12
**convenience (1)**
124:21
**conventions (1)**
46:12
**conversation (3)**
22:5;23:14;124:14
**conversations (2)**
44:7;71:2
**convert (1)**
39:3
**convinces (1)**
9:25
**cooperate (3)**
98:7;102:19,21
**cooperation (1)**
97:3
**cooperative (1)**
101:11
**coordinate (7)**
95:21,23;96:13;
151:24;160:10;161:3,5
**coordinating (2)**
160:25;162:15
**coordination (1)**

159:22
**copies (1)**
146:12
**Cordova (1)**
97:1
**core (11)**
107:14,21;108:2,7,
10,21,22;109:15;112:7,
16,18
**Corning (1)**
153:1
**corporate (2)**
67:17;70:1
**correctly (1)**
162:20
**correspondence (1)**
20:19
**cost (5)**
48:25;113:25;115:2;
119:22;122:18
**costs (3)**
120:5,6,8
**cost-shifting (1)**
87:20
**counsel (16)**
5:7;18:23;22:8;
32:18;42:19;86:14,15;
87:3;95:22;96:13,17;
122:10;124:23;127:2;
161:16;166:11
**counsel's (1)**
63:18
**count (3)**
16:8;102:15;118:24
**counting (2)**
89:6,6
**county (3)**
37:8,11;101:18
**couple (5)**
5:8;46:9;90:10;
125:6;135:24
**course (13)**
23:9;50:4;51:10,12;
60:19;65:14,15;76:9;
88:25;99:22;102:22;
158:17;164:6
**COURT (667)**
5:3,11,13,15,17,21,
23,25;6:3,5,7,9,13,16,
18,20,24;7:2,7,16,21;
8:3,9,11,13;9:6;10:7,
10,18,22,25;11:2,4,7,
11,23;12:2,6,15,21,23;
13:4,25;14:7,13,21;
15:19;16:2,7,10,19,22;
17:9,11;18:1,21;19:2,
17,19,23;20:11,13,15;
21:8,18,22;22:1,7,24;
23:5,22,24;24:9,14,21,
21,22;25:6,22;26:2,5,7,
9,12,16,21,23,23;27:5,
10,13;28:4,9,13,19,22,
25;29:4,6,12,15,15,17,

21;30:5,8,10,22,25;
31:13,16,18,20;32:2,7,
13,16,24;33:3,5,7,16,
18;34:1,3,24;36:5;
37:1,7,10,13,15;38:9,
14,16,22;39:18,25;
40:11,18,22,25;41:7,9,
17,20,23;42:1,2,4,13,
15,17;43:13,15,22,24;
44:1,3,7,12;45:2,4,12,
15,18,21,22,24;46:4,
16;47:6,10;48:1,6,11,
16,22,24;49:10,13,16,
18;50:6,8;51:6,8,21;
52:4,10,21;53:1,5,13,
22;54:1,3,5,7,8,10,10,
12,15,17,19,22,25;
55:4,6,8,12;56:8,9,12;
57:4,8,11,13;58:11,17,
18,22;59:7,11,24;60:4,
6,9,16;61:3,13,15,19,
23;62:16,19;63:1,7,16,
21,23;64:2,10,11,14,
19,22;65:10,17;66:1,4;
67:20,25;68:10,12,15,
17,19,22,24;69:2,9;
70:24;71:6,9,11,15,20,
25;72:4,14,73:2,18,24;
74:7,14,17;75:1,13,24;
76:3,5,7,9,13,20,24;
77:2,19;78:6,12,20,24;
79:3,6,12;80:10,13,21;
81:3,8,10,10,11,14,16;
82:1,8,10,13,17,20,22;
83:9,18,23;84:5,17;
85:2,7,10,13,21,22,25;
86:4,17,21,25;87:3,24;
88:7,23,25;89:12,15,
17,21,24;90:5,23;91:1,
3,4,9,12,14,16,19,21,
23,24;92:1,4,12,14;
93:2,8,13,15,17,25;
94:13,14,14,19,21,23;
95:1,4,7,12,17,21;96:2,
6,10,16,23,25;97:2,6,9;
98:1,3,9,12;99:4,9,13,
14,15,19,22,25;100:1,
11,15,17,18,20,25;
101:3,5,7,11,24;102:2,
5,7,8,14,17,19,24;
103:2,7,8;104:7,14,16;
105:1,8,12,18;106:1,3,
9,13;107:18;108:12,15,
19;109:3,6,18,20;
110:4,11,21;111:1,6,9,
15,18,21,24;112:10,18;
113:9,12,22,24;114:11,
14,17,21,23,25;115:5,
7,14,19,21,24;116:5,
12,19,21;117:3,18,20,
22;118:4,6,10,21,24;
119:6,11,13;120:1,4,
15;121:1,3,5,14,20,23;

122:20,22;123:1,8,10,
25;124:13,18;125:5,17,
25;126:2,8,8;128:15,
17,22,23,23;129:1,3;
131:1;132:9,10;
133:24;134:2,17,23,25;
135:3,6,8,12;136:4,15;
137:4,10,13,18,22;
138:2,7,14,16,20,22;
139:8,10;140:15;
141:6,7,8,11,12,13,17,
20,23,25;142:6,8,16,
18;143:3,6,8,13,20;
144:2,6,11,15,17,21;
145:2,5,10,20;146:10,
16,20;147:6,9,13,16,
19;148:5,9,15,21,25;
149:2,13,15,18;150:18,
21;151:8,12,17,20;
152:8,13,18;153:14;
154:10,16;155:6,12,14,
17;156:5,9,17,23;
157:8,11,13,15,17,21,
24;158:1,4,7,10,13,15,
19;159:2,4,9,13,16,20,
24;160:8,13,19;161:8,
25;162:4,6,10,12,17,
20,23;163:5,10,13,18,
23;164:1,3,12,18,20,
22,25;165:4,12,16,18,
22,24;166:4,8,10,17,
19;167:11,15,18,20
**court- (1)**
156:3
**courtesy (1)**
163:24
**courtroom (7)**
18:23;84:24;124:2,3;
139:20;152:21;153:2
**courts (3)**
17:16;27:18;98:14
**Court's (7)**
21:2;23:12;59:6;
69:5;102:8;107:21;
151:16
**cover (2)**
21:24;92:24
**covering (3)**
105:4,5;122:24
**CPUC (10)**
28:3;31:8,12;34:19;
41:15;43:8;58:3;77:23;
79:8,16
**crack (2)**
39:17;42:2
**cracked (1)**
16:5
**Craig (2)**
86:15;87:2
**cram (1)**
57:22
**Cravath (1)**
133:18

PG&E CORPORATION AND PACIFIC
GAS AND ELECTRIC COMPANY

Case No. 19-30088
August 27, 2019

**crazy (1)**
153:6
**created (2)**
18:7;66:9
**creative (1)**
166:14
**credibility (1)**
155:25
**credible (1)**
43:1
**creditors (3)**
46:8;47:24;49:7
**creditors' (1)**
9:20
**criminal (1)**
12:25
**critical (15)**
8:16;12:3,6;13:18;
15:20;16:23;24:4;
29:14;67:14;72:9;73:7;
86:12;100:20;104:17;
106:19
**criticize (1)**
166:21
**culpability (2)**
16:14;138:17
**culture (4)**
35:6,7;67:17;69:24
**cumbersome (1)**
161:14
**curious (1)**
118:11
**current (3)**
36:12;38:23;39:10
**customers (2)**
17:23;89:7
**cut (4)**
42:9;49:8;120:20;
150:3

**D**

**damage (11)**
82:18;107:19;
110:24;112:2,25;
114:5;117:4;120:10;
123:22;127:13;139:5
**damages (12)**
13:22;38:7;103:19,
25;111:4,14,15;113:2;
123:24;127:17;159:1;
164:7
**data (3)**
153:4,12,13
**database (3)**
133:5;139:17;152:17
**databases (2)**
143:9,12
**date (13)**
23:23;34:11;47:1;
60:1;84:21,23;85:4,16,
18;86:11,11;100:3;
125:12

**dates (5)**
9:23;22:14;83:12,12;
125:19
**day (11)**
17:2;61:6;75:6;
125:10;127:23;132:12;
140:1;145:22;147:12;
148:8;155:20
**days (12)**
10:1;90:10;102:15;
141:22;148:14,15,17,
18;155:15,16,16;
163:15
**deadline (11)**
7:14;31:3;52:6,24;
74:22;120:20;129:9;
152:10;162:7;163:24;
167:1
**deadlines (1)**
163:8
**deal (34)**
10:1;15:3;19:23;
25:17;40:6;41:5,11,11,
12,15;46:1;52:19;66:5;
79:17;83:6,12;84:5,8,
9;86:8;87:25;94:3,11;
103:13;124:22;127:23;
131:20;154:13,14;
157:4;160:12,20;
165:1;167:5
**dealing (9)**
8:4;39:12,14;44:16;
46:20;48:5;112:25;
123:2;156:20
**deals (2)**
49:8;110:24
**dealt (5)**
21:5;81:9;116:11;
127:5;129:23
**death (2)**
110:8;112:5
**debt (10)**
36:13,14,14;39:2;
47:3;61:12;63:10;68:8,
25;72:25
**debtor (31)**
7:3;9:7,20;14:23,24;
16:17;23:25;28:20;
35:24;36:4;37:23;39:5,
7;42:10,11,18,19;44:4;
56:22;62:2;73:9;75:9,
5;85:2;90:18;122:14;
123:16;126:23;127:24;
130:9;131:5
**debtors (37)**
5:16;10:2;11:10;
17:3,3;20:1;24:2;
27:15;35:19;36:11,20;
37:8;41:15;42:2;44:19;
49:24;51:15;60:19;
61:24;62:8;63:8;75:9;
81:23;123:19;127:1;
130:1;131:12;133:8,

19;134:3,3;146:8;
158:25;159:7,23;
160:24;165:20
**debtors' (12)**
5:20;21:3;32:17;
34:16;39:15;43:19;
77:25;122:10;123:23;
126:4;127:2;132:13
**debtor's (3)**
98:15;114:1,18
**debts (1)**
59:10
**decide (7)**
29:25;53:11;88:13;
92:23;98:21;104:8;
120:19
**decided (1)**
93:7
**decides (2)**
9:24;97:12
**deciding (1)**
110:13
**decision (18)**
42:18;43:6;70:11;
91:23;93:3;97:10;
101:9;104:16;109:10,
16;128:15,16;129:3,4,
5;154:3,23;155:20
**decisions (5)**
23:8;94:15;102:11;
106:19,20
**declarations (1)**
6:12
**dedicated (1)**
80:6
**deemed (2)**
51:25;130:8
**de-energization (1)**
136:12
**deeply (1)**
49:5
**defense (4)**
14:24;87:13;130:22;
147:2
**defenses (3)**
13:21;142:23;145:5
**defer (7)**
11:24;22:20;31:25;
33:21;53:11;106:14;
127:7
**deferred (2)**
32:10;105:14
**definition (4)**
58:15;114:14;119:9;
156:21
**definitive (3)**
70:20;74:15;101:25
**degree (2)**
110:13;132:11
**delay (7)**
18:18;57:5;84:20;
98:9;101:20;104:2;
147:10

**delayed (2)**
149:8;151:3
**delaying (1)**
151:2
**deliberations (1)**
70:21
**deliver (1)**
19:7
**delivered (1)**
89:5
**deltas (1)**
26:21
**demand (1)**
119:25
**denial (1)**
133:22
**denied (3)**
90:20;92:5;104:10
**Dennis (1)**
46:7
**deny (8)**
22:21;88:11;90:15;
95:9,10;116:25;
145:17;150:16
**denying (4)**
22:9;108:5;141:15;
149:13
**Department (6)**
91:5;113:18,18;
114:6;120:6;122:5
**depend (1)**
167:3
**depending (2)**
25:14;140:1
**depends (2)**
83:18;88:17
**deposition (2)**
88:3;136:14
**depositions (5)**
136:7,8,10;150:7,8
**depository/repository (1)**
160:2
**deputy (1)**
124:3
**describe (2)**
44:17;71:3
**described (12)**
17:19;36:16;38:6;
71:1,19;72:21;74:2;
92:11;135:21;138:25;
139:15;141:7
**description (1)**
144:10
**designed (1)**
14:25
**desire (1)**
45:4
**detail (2)**
134:5;151:17
**detailed (2)**
70:11;119:22
**details (4)**
32:5;61:2;146:23;

147:21
**determination (6)**
29:15;45:21;68:11,
19;121:3;127:8
**determine (8)**
15:15,15;42:9;68:18;
69:16;94:13;109:15;
127:24
**determined (3)**
17:20;30:5;74:5
**determines (1)**
132:12
**develop (1)**
70:10
**dictate (1)**
36:21
**differ (1)**
128:11
**difference (5)**
35:18;44:11,13;
117:24;155:18
**differences (1)**
65:11
**different (34)**
12:8,8;25:20;26:25;
28:16,22;33:12;40:8;
41:14;42:16;43:10;
46:19;48:23,24;56:1;
61:15;68:14,21;87:15;
97:17;99:9,23;102:7;
114:7;117:8,25;
123:21;127:3;141:11;
149:5;160:12,21;
163:1;166:10
**differently (3)**
21:19;73:24;149:16
**difficult (2)**
35:8;78:21
**dilute (1)**
61:12
**DIP (1)**
36:19
**direct (3)**
16:16;72:17;122:18
**direction (1)**
59:6
**directly (1)**
17:21
**disagree (8)**
38:10;62:3;83:19;
105:23;119:12,13;
120:16;146:6
**disappoint (1)**
55:10
**disappointed (1)**
92:12
**disappoints (1)**
81:19
**discharged (1)**
130:22
**disclose (1)**
48:19
**disclosed (3)**

57:15;76:17;88:5

**disclosing (1)**
52:14

**disclosure (57)**
27:23;30:13,14,16;
31:3,5,15;32:1,10,19;
33:9,10,22;35:2,5;
41:13;42:21;45:5,7;
46:15;48:14,17,21;
49:22;50:9,13,13;
52:18;54:11;55:1,11,
24;56:4;57:7,9,13,21;
58:8,16;59:1,16;60:3,
7;61:16;63:20;71:2,3,
16,18;153:24;154:17;
156:23,24,25;166:1,14;
167:12

**disclosure- (1)**
166:5

**disclosure-statement (1)**
58:4

**discount (1)**
35:25

**discounted (1)**
40:1

**discovery (55)**
11:13;12:9,19;13:6;
15:25;16:14;18:19;
20:2;21:7,20;22:3,18;
44:22;83:8;87:21;88:2;
98:7;102:23;103:19;
106:14;108:6;114:16;
121:19;128:4,5;
131:21;132:20,22;
135:17,22,23;136:1,17,
21,24;137:2,4,5,8;
138:9;139:6;140:15;
143:15;149:4;151:2,
25;152:3;159:19,19,
20;160:10;161:23;
163:7,21;165:15

**discretion (1)**
132:10

**discuss (9)**
66:15;88:6;104:20,
25;110:21;125:10;
156:2;162:3;165:24

**discussed (5)**
34:17;88:5;112:15;
139:17;167:8

**discussing (3)**
89:8;109:21;127:6

**discussion (12)**
21:6;22:22;25:7;
34:10,17;59:12;71:25;
79:10;103:10,11;
112:7;162:3

**discussions (7)**
66:14,18,24;67:6;
78:8;79:22;96:17

**dismiss (1)**
92:16

**dismissing (1)**

157:3

**dispenses (1)**
167:12

**dispute (15)**
82:2;88:10,12;90:15,
21;92:9;94:2,3;95:9;
114:19;116:2,2;
126:24;130:2;159:3

**disputed (19)**
73:5;92:16,21;93:6;
114:23;115:14,19,21;
117:6,16,25;118:17;
126:19,25;128:1;
129:16,19;134:13;
138:7

**disputes (3)**
80:5;115:24;164:8

**disputing (2)**
114:21;164:7

**distinction (1)**
126:18

**distinguishes (1)**
92:25

**distraction (1)**
48:17

**distress (5)**
105:14;106:6;110:9;
112:5;127:12

**distributable (12)**
35:24;36:9;37:24;
38:18,25;39:13,19;
41:6;42:8;46:23;61:25;
139:15

**distribution (1)**
110:7

**district (15)**
23:11;24:21;26:23;
35:2;45:22;55:1;81:11;
85:22;109:6,7,8;110:4;
112:13;114:17;156:18

**Division (1)**
122:5

**doable (1)**
76:14

**doc (1)**
164:18

**docket (3)**
113:17;118:10,12

**doctrine (4)**
79:25;81:1;82:15;
83:3

**document (5)**
10:19;13:8;17:18;
45:8;75:10

**documents (46)**
11:21;12:3,24;13:24;
14:8,9;15:21;17:14;
19:12;20:4,5,9,20,21,
23,24;21:9,21;22:4,13;
140:10;142:9,14;
143:15,17;144:9,12,24;
145:18,18;148:3,11;
149:7,9,12,14,23,25;

150:5,5,7,9,12,17,20;
151:4

**DOJ's (1)**
121:15

**dollar (1)**
104:3

**dollars (19)**
26:24;55:20;60:15;
62:7,9,13,15;118:2;
121:10;123:2;130:15;
137:19,19;138:1,1;
142:11;143:18;147:11;
148:8

**Donato (16)**
13:5;32:6;98:21;
104:20;105:6;106:16;
107:8;110:19,25;
111:17,22;112:24;
124:16;126:10;127:7;
141:11

**Donato's (2)**
106:9;126:8

**done (35)**
19:15;30:17;34:4,25;
36:25;43:9;51:13;55:3;
70:17;74:9;79:1,4;
88:15;92:11,15;99:17;
106:25;108:15,16,19;
124:9;133:15;134:19;
138:3,4,5;140:8;143:2;
149:6,6,11;150:2;
153:4;155:20,21

**doomed (1)**
92:5

**doubt (2)**
93:5;134:10

**Dow (1)**
153:1

**down (18)**
17:24;38:17;42:16;
43:12;48:12;55:17;
57:23;87:12;90:8,17;
97:2;98:17;100:1;
107:2;118:16;120:22;
144:4;152:14

**dozens (1)**
136:16

**draft (1)**
75:25

**drafting (4)**
39:20;50:21;97:11;
112:12

**drafts (1)**
32:21

**draw (1)**
8:23

**drive (4)**
28:22;80:5;83:14;
153:6

**driving (1)**
26:12

**due (3)**
94:18;95:2,5

**duly (1)**
130:7

**Dumas (48)**
7:7;33:12;35:9,12,
12;37:3,9,11,14,16;
38:10,15,17;39:24;
40:10,17,21,24;41:1,8,
16,19,22,24;42:2,5,16;
43:14,21,23,25;44:2,6,
8,13;45:3,6,14,16,23,
25;46:24;56:12;62:3;
80:15;122:11;138:15,
24

**Dumas' (2)**
46:21;77:11

**DUNNE (13)**
46:6,7,17;47:8,11;
48:2,7,12,21,23;49:4;
51:12;63:11

**Dunne's (1)**
46:4

**duplicates (1)**
150:6

**during (4)**
79:22;126:10;127:4;
135:23

**duty (2)**
7:19;19:6

**dying (1)**
152:20

**dynamics (3)**
38:23;48:18;155:8

### E

**earlier (13)**
32:21;76:19;80:24;
84:12;85:3;86:19;
102:17,18,20;125:14,
14,22;138:23

**early (5)**
57:6;58:7;102:22;
120:25;122:11

**earnest (1)**
66:19

**ease (1)**
10:12

**easier (1)**
40:5

**easiest (2)**
57:13;58:25

**easily (1)**
18:20

**easy (7)**
35:6;59:12;88:1,2;
90:11;110:14,15

**echo (1)**
74:18

**economical (1)**
107:18

**Edison (2)**
91:5,6

**educated (1)**

145:15

**effect (4)**
39:4;68:6;72:12;
161:22

**effective (2)**
60:1;71:22

**effectively (4)**
83:24;101:14;136:9;
138:24

**effectiveness (3)**
65:23;71:5,19

**efficient (7)**
109:25;111:25;
117:4;119:19;125:9;
127:20;160:2

**efficiently (1)**
92:7

**effort (1)**
90:16

**efforts (1)**
48:14

**eight (3)**
38:12;62:13;145:8

**eighteen (13)**
36:23;37:21;38:12,
13;39:2;40:8,9;46:25;
56:24;62:6,9,10,15

**eighteen-page (2)**
136:1,21

**eighty (4)**
41:5;136:6,7,8

**either (14)**
27:17;29:14;36:14;
40:1;45:20;79:25;94:7;
100:6;104:23;107:7,9;
118:20;121:9,10

**elaborate (2)**
54:10;59:14

**electric (1)**
69:21

**electricity (1)**
19:7

**elements (4)**
134:12;159:1;164:7,
9

**elephant (3)**
153:9,10;154:25

**eleven- (1)**
108:10

**eligibility (2)**
116:6;117:10

**eligible (1)**
67:14

**else (18)**
13:22,24;21:10;25:2;
36:12;50:14;53:3;
79:12;85:14;100:10;
113:10;121:8;127:2;
128:3;135:4;160:4;
165:11;167:20

**else's (1)**
104:13

**elsewhere (1)**

72:8
**email (3)**
17:19,21;18:3
**emails (4)**
17:15;18:16;149:24,
24
**embed (1)**
88:19
**embedded (1)**
87:23
**emerge (1)**
60:19
**Emergency (4)**
113:17;114:7;120:5,
6
**emotional (5)**
105:14;106:6;110:9;
112:4;127:12
**emotional-distress (1)**
38:7
**emotional-distress-type (1)**
127:17
**employee (2)**
19:10;36:14
**employees (2)**
18:2;149:24
**employment (1)**
9:12
**encourage (1)**
104:24
**encouraging (2)**
128:19,22
**end (10)**
9:24;16:9;17:2;23:8;
24:10;34:13;71:12;
76:8;77:23;132:11
**ended (2)**
75:14;129:1
**endgame (1)**
153:22
**ends (2)**
8:14;24:3
**engage (5)**
20:20,22;103:20;
129:7;131:22
**engagement (5)**
7:8,9;9:11,12,18
**enjoy (1)**
99:24
**enough (7)**
24:9;53:19;58:17;
59:3;85:18;100:3;
156:3
**enter (1)**
64:15
**enterprise (6)**
36:2,3,7;40:19;47:4;
56:11
**entire (2)**
18:7;98:23
**entirely (1)**
14:5
**entities (2)**

25:5;37:12
**entitled (7)**
7:13;24:17;101:16;
115:13;119:24;138:8;
152:23
**entitlement (2)**
97:14;130:18
**entity (1)**
35:22;59:9;69:6
**environmental (1)**
120:7
**envision (2)**
55:24;88:15
**equation (1)**
90:19
**equipment (2)**
131:7,8
**equity (12)**
27:2;39:3,9;48:3;
61:11;63:8,10;68:8;
69:1,11;72:25;77:6
**equivalent (2)**
88:8;92:16
**error (1)**
120:17
**especially (1)**
109:5
**essential (5)**
12:17;13:1;14:14;
72:19,23
**essentially (3)**
108:25;122:7;159:9
**established (1)**
130:3
**estate (4)**
46:21;48:4;49:6;
143:18
**estimate (2)**
130:3;132:13
**estimated (6)**
36:15;47:14;114:14;
118:5,20;131:24
**estimating (2)**
132:9;142:7
**estimation (121)**
8:4;12:7,11,12;13:7,
10,17,19,21,21;14:25;
15:21,25;16:10;18:19;
20:3;22:6,19;24:3,13;
25:15,16;26:22;28:15;
29:8;30:17;32:4;34:4,
8;38:14,18;40:4,13;
41:21;43:9;44:9;51:14;
58:11;62:17,23;72:3,7,
18;73:8;74:20,23;
75:19,22;77:23;78:1;
79:22,23;84:10;90:7,
19;93:19,19;98:19;
100:21;103:15;104:25;
105:6;107:14,16;
109:14;111:12,14,15;
114:1,8,20;115:4;
116:17;120:12;121:7,

12;122:15;123:13,17,
19,20,23;124:22,24;
126:15,24;127:9,10,25;
128:7,17;129:7,18,24;
131:3,6;132:6,8,16;
134:9;137:14;139:3,
13;140:4;141:10;
147:13,17;150:25;
151:6;153:18,19;
154:6,8,11;155:9,19,
24;156:8,14,18;157:20
**estimations (1)**
147:20
**estimator (1)**
132:12
**et (6)**
146:4,4,22,22;
164:14;167:4
**evaluate (2)**
67:12;68:5
**evaluated (1)**
38:23
**evaluating (1)**
18:6
**evaluation (2)**
155:5;156:10
**evaluations (1)**
156:16
**even (33)**
13:1;19:15;20:5;
23:15;24:3;32:5;38:4;
42:24;45:10;57:23;
59:11;62:11;76:16,19;
77:21;81:10,11,22;
88:11;96:7;103:21;
104:9;107:2,10;
109:21;111:6;112:15;
119:24;131:7,8;146:3;
161:15,22
**event (2)**
64:19,25
**eventually (2)**
44:21,22
**everybody (16)**
25:2;34:8,15;41:2;
49:7;52:15;54:9;58:8;
98:15;121:23;152:1,1,
3,4;153:6,7
**everybody's (2)**
55:9;90:16
**everyone (6)**
35:16;36:8;74:19,22;
160:3;167:21
**everyone's (1)**
124:20
**evidence (5)**
74:12;132:14;151:2,
5,7
**evident (1)**
42:6
**evidentiary (4)**
67:3;70:6;98:10;
105:19

**ex (1)**
101:12
**exact (1)**
116:10
**exactly (19)**
24:16;28:21;38:15;
39:24;40:10;45:14;
49:4,7;51:14;62:23;
79:2;81:15,17;87:5,5;
95:25;99:14,20;120:3
**exam (1)**
19:20
**example (15)**
7:17;11:15;17:12;
69:15;70:9;83:15;
87:18;90:3;114:10;
122:24;136:6;145:20;
147:5;151:22;167:1
**exceeds (2)**
47:4;61:25
**except (1)**
117:7
**excess (1)**
42:8
**exclude (2)**
164:13;165:4
**excluded (1)**
127:8
**exclusive (1)**
42:3
**exclusivity (9)**
23:10;25:8;33:8;
42:23;43:4,7;51:11;
76:25;167:6
**exculpatory (1)**
146:18
**excuse (6)**
37:7;83:20;95:16;
129:24;131:8;133:2
**execution (5)**
26:19,25;61:11;63:4,
13
**exegesis (1)**
71:24
**exercise (1)**
70:5
**exist (1)**
51:19
**existing (1)**
68:3
**exists (2)**
152:18,19
**exit (1)**
68:6
**exonerated (1)**
132:2
**expansive (1)**
28:2
**expect (5)**
46:20;53:10;77:13;
102:4,12
**expectancy (1)**
15:12

**expectation (2)**
100:14;125:8
**expectations (2)**
55:10;57:9
**expected (1)**
76:10
**expects (1)**
64:15
**expedient (1)**
44:14
**expedited (2)**
148:19;161:12
**expeditious (1)**
107:17
**expended (1)**
123:1
**experience (5)**
75:4,9;101:24;
105:23;156:3
**experienced (2)**
96:3;162:25
**experiences (1)**
102:10
**expert (1)**
156:15
**experts (2)**
151:1;154:8
**explain (14)**
33:13;36:1;60:3;
66:22;71:12;72:10;
82:11;105:11;108:15,
21;141:15;142:6;
144:7;149:9
**explaining (1)**
52:12
**explanation (8)**
28:2;100:25;132:5;
144:25;146:2,5,6;
147:2
**explanations (1)**
146:21
**explanatory (1)**
35:16
**expressing (1)**
35:17
**extend (3)**
9:17,24;10:10
**extended (1)**
82:23
**extension (3)**
5:20;6:17;98:5
**extent (13)**
13:8;45:6;46:14;
49:24;83:22;84:8;
123:12,12,15,16;
140:25;159:5;161:20
**extra (3)**
84:25;85:6,19
**extrapolate (1)**
140:5
**extreme (3)**
61:20;132:17;139:11

PG&E CORPORATION AND PACIFIC
GAS AND ELECTRIC COMPANY

Case No. 19-30088
August 27, 2019

# F

**face (2)**
66:1;147:4
**faced (2)**
32:4;131:23
**facie (4)**
130:7,10,23;131:22
**facilitate (2)**
70:21;72:18
**facilitating (1)**
161:10
**fact (22)**
14:4;20:4;24:4;
70:12;81:18;87:7;
88:20;92:9,17,18,19,
20,25;93:6;105:15;
110:5;124:16;129:20;
136:7,8;137:17;148:1
**factors (1)**
152:25
**facts (23)**
21:15;80:5;81:7;
82:2;83:4,8,13,19;
87:23;88:1,10,12;
90:15,20;94:1,2,2,3;
95:9;106:7;120:25;
154:3;164:10
**factual (22)**
70:6,10;80:5;81:24;
82:1;84:8;86:20;87:17;
90:2,12;91:7,18;108:5,
22;116:10;134:13;
141:15;142:7,25;
144:10;145:1;164:8
**factually (1)**
89:8
**fail (1)**
15:17
**failed (3)**
13:2;15:13;17:22
**failure (1)**
15:17
**fair (7)**
25:3,4;82:4;121:5;
127:1,7;129:17
**fairly (1)**
35:17
**fairness (1)**
119:16
**faith (1)**
156:12
**fall (3)**
61:24;83:2;145:24
**familiar (4)**
54:19,25;90:6;
126:16
**fancy (1)**
27:23
**far (3)**
56:20;76:17;107:18
**farther (1)**

9:1
**faster (1)**
103:18
**favor (1)**
63:19
**favorably (1)**
97:18
**favorite (1)**
50:12
**feasibility (1)**
68:11
**feasible (4)**
30:2;52:12;58:2;
60:23
**February (3)**
77:24;78:2;149:11
**federal (9)**
43:15;81:6;99:25;
100:20;109:3;122:6,8,
12,17
**feel (3)**
99:22,24;113:6
**feet (3)**
97:12,23,24
**Feld (1)**
49:15
**fell (3)**
145:25;146:3,21
**fellow (1)**
55:21
**felt (2)**
110:3,16
**FEMA (4)**
37:4;122:24,24;
123:1
**few (5)**
22:10;64:8;125:1;
158:7;165:20
**fielding (1)**
8:17
**fifteen (3)**
124:10,11;145:17;
160:21
**fifteen-minute (2)**
124:7,20
**fifty (3)**
44:18,25;140:1
**fight (1)**
44:20
**figure (10)**
34:13;40:15;44:24;
53:20;92:6;124:24;
136:22;143:20;145:14;
150:22
**figured (1)**
38:11
**figuring (1)**
165:6
**file (25)**
16:23;21:9;23:20;
33:19;42:20;50:1;52:6,
17;56:23;75:21;85:3;
91:6;92:10;93:17,24;

95:19,20;116:23;
120:21,21;129:9;
166:1,4;167:7,16
**filed (25)**
6:14;14:9;20:4;31:1;
47:12;51:3,16,21;61:1;
66:21;74:10;75:2,5,13,
18;93:11;96:22;
106:24;118:13;119:21;
125:22;129:8;130:8;
149:11;150:15
**files (6)**
23:25;56:23;116:24;
130:14;131:6;137:8
**filing (9)**
21:3;23:19;31:25;
32:9;33:21;64:18,23;
75:14;125:8
**filings (1)**
134:8
**fill (1)**
29:23
**filled (1)**
77:21
**final (4)**
73:3,14;78:1;128:6
**finalization (1)**
75:22
**finally (1)**
69:24
**financed (1)**
39:13
**financial (9)**
24:10;42:6;45:9,16;
56:1;77:14;122:18;
166:11;167:3
**financially (1)**
60:20
**financing (18)**
33:25;39:8;51:10,15,
19,22,25;53:3;63:8,9,
14;69:1;72:12,15;73:1,
21;74:15;75:23
**finding (2)**
25:24;98:10
**findings (5)**
67:12,17;68:2;70:6,
12
**finds (1)**
121:9
**fine (15)**
5:25;6:9;10:6;31:18;
46:10;57:16;86:9;
94:12;99:6;100:16,19;
109:19;136:8;157:21;
161:24
**fines (1)**
69:17
**finished (1)**
165:17
**finite (1)**
37:8
**fire (69)**

12:5,19,20;13:3;
15:14;23:9;24:16;
28:20;34:5;44:20,23,
23;54:6;55:16;56:19;
81:25;83:2,19;86:15;
87:11;101:19;104:4;
106:7;113:2,17,21;
114:1,5,9;117:20;
118:1;119:18,22;
120:9;121:19;123:2;
126:20;127:14,18;
129:11;131:7,9,9,14;
132:1,15;140:11;
142:3,19,22,22;144:6,
12,22;145:22,25;146:2,
25;147:1;149:14;
150:15;151:4,14,22;
155:23;159:18;160:3,
10;165:2
**fire-related (1)**
114:2
**fires (24)**
14:5;33:14;56:19;
81:23;82:24;89:8,10,
13,15,18,21;90:2;
117:5;122:17;127:18;
129:17;132:2,3,15;
133:25;141:16;147:24;
151:15;153:23
**firm (3)**
8:8,9;10:13
**first (18)**
9:9;11:17;41:13;
42:2;49:20;52:5;65:25;
67:4;86:8;96:22;100:8;
104:4;105:20;109:15;
142:2;144:8;152:20;
154:1
**fish (2)**
84:13;120:20
**fit (2)**
90:11;155:7
**five (5)**
118:2;147:23,24;
148:17;150:5
**fix (2)**
115:8,10
**fixed (4)**
25:17;115:8,10;
129:12
**fixing (1)**
27:18
**flesh (2)**
76:15;77:19
**fleshed (1)**
31:8
**flip (1)**
100:17
**flipside (1)**
29:22
**floor (1)**
90:9
**fluid (4)**

27:11;63:11,18;
74:22
**fly (2)**
160:14;162:17
**focus (2)**
12:8;41:18
**focused (1)**
13:18
**focusing (2)**
16:11;58:5
**fold (2)**
22:22;83:25
**folder (1)**
21:9
**folks (1)**
161:2
**follow (4)**
75:9;78:3;149:22,23
**following (6)**
64:18;67:3;128:14,
25;131:25;132:4
**follows (2)**
75:17;80:25
**follow-up (1)**
166:22
**footnote (2)**
101:10,11
**forces (1)**
26:24
**Forest (1)**
132:2
**forever (1)**
149:20
**forget (2)**
77:1;99:3
**form (4)**
55:6;66:25;72:12;
77:2
**formal (4)**
53:16;65:22;70:15;
134:21
**formally (1)**
167:13
**formula (1)**
90:19
**formulation (1)**
65:4
**forth (5)**
22:12;24:6;86:13;
95:5;149:6
**fortunately (1)**
45:25
**forty (9)**
38:13;40:9;41:4;
44:14,18,25;47:2;
77:12;80:17
**forums (1)**
17:15
**forward (26)**
5:19;8:6;10:18;
22:18;24:18;27:12;
29:7;30:19;33:24;
44:10;48:15;53:4;

84:10;86:11;97:24;
98:19;104:19;105:18;
130:13,24;131:11;
137:11;150:22;157:16;
161:23;167:21
**found (3)**
8:7;16:23;150:2
**four (6)**
15:24;16:1;20:23;
67:21;153:23,25
**fourteen (4)**
39:2;148:14,17;
163:15
**Fox (1)**
60:13
**frame (4)**
44:15,25;66:15;
128:6
**framed (1)**
13:9
**frames (1)**
131:10
**FRANCISCO (7)**
5:1;45:10;62:16;
97:2;101:20;112:17;
165:20
**frankly (5)**
59:4;64:11;110:12;
115:10;134:20
**Frascella (4)**
128:16,16;129:1;
131:1
**frequently (1)**
8:1
**Friday (4)**
163:16,16,16;164:11
**friends (1)**
83:22
**fringe (1)**
129:22
**frivolous (2)**
129:23;130:1
**front (10)**
13:20;15:6;87:11;
97:7;103:6;111:16,22;
138:11,19;141:4
**fruit (1)**
66:24
**frustrated (1)**
13:14
**fry (1)**
84:13
**full (5)**
36:13;57:16;59:23;
60:3;139:5
**full-blown (1)**
103:18
**fully (3)**
50:2;80:2;134:11
**function (1)**
70:5
**functions (1)**
72:19

**fund (8)**
25:10,18;56:24;66:9;
67:15;72:13;73:12,25
**fundamental (2)**
38:11;115:12
**fundamentally (2)**
92:8;116:17
**funding (12)**
26:6,9;27:8,9,16;
28:12;30:1;31:6;47:23;
59:10;73:11;76:17
**further (4)**
11:15;34:10;162:23;
165:13
**future (2)**
87:15;107:19

**G**

**gamble (1)**
112:23
**game (1)**
129:18
**gap (2)**
139:24;167:4
**Garrison (1)**
64:5
**gas (1)**
69:21
**gave (1)**
42:2
**general (2)**
36:21;134:6
**generally (2)**
11:13;137:1
**General's (2)**
113:16;159:18
**generic (1)**
129:16
**gentleman (1)**
148:21
**gets (13)**
27:21;30:10;47:12;
56:9;74:4,5;75:18;
97:12;100:19;104:2;
121:10,10;127:15
**Gibson (1)**
152:22
**given (14)**
14:11;21:1;43:7;
44:15;70:14;83:1;
106:15;132:10;133:4;
140:8;143:11;150:4,5;
151:6
**gives (4)**
31:25;84:22,23;
166:10
**giving (4)**
34:11;43:20;78:15;
149:14
**glad (1)**
162:4
**global (8)**

65:5,21;66:25;67:1;
69:13,13,15;76:2
**goal (3)**
48:16;65:14;76:19
**goals (4)**
65:4,21;66:8;67:18
**God (1)**
16:24
**goes (20)**
14:18;17:5,25;18:9,
11;26:24;28:19;30:4;
31:1;45:18;51:9;52:4;
73:4;100:22;105:18,
20;128:23;132:16;
135:19;160:3
**Good (29)**
5:10,17;6:25;7:1;
10:11,21,22;17:3;33:1;
35:11,12;49:1,18;
53:18,24;54:7;60:12;
64:1;73:22;77:8;82:19,
24,24;86:7,7;87:1;
102:10;148:2;156:12
**gorilla (2)**
155:3,4
**Gotshal (1)**
5:14
**governance (1)**
67:17
**governing (1)**
70:4
**government (2)**
122:8,12
**Government's (1)**
123:18
**grace (1)**
167:9
**grant (5)**
8:15;22:21;96:20;
104:11;160:14
**grants (1)**
159:6
**Great (8)**
6:6;9:3;45:20;49:1;
54:9;61:3;91:21;
149:21
**greater (1)**
56:20
**ground (2)**
13:10;126:23
**group (14)**
25:9,14;47:1;49:19;
53:18;95:23;140:9;
151:14;152:2;157:23;
158:21;161:3,16;
165:10
**groups (2)**
112:21;131:14
**guess (11)**
7:3;9:8;10:2;42:5;
45:7;74:18;83:10;89:9;
98:22;113:1;145:24
**guesses (1)**

36:22
**guidance (2)**
126:7;128:18
**guided (1)**
128:14
**Gump (1)**
49:15
**gut (1)**
83:10
**guys (1)**
151:23

**H**

**habit (1)**
104:22
**hairsplitting (1)**
18:4
**half (6)**
28:6;39:11;93:3;
103:10;128:7;134:2
**Halloween (1)**
34:4
**halves (1)**
27:22
**hand (4)**
29:21;66:13;128:10;
132:22
**handful (2)**
82:23;114:4
**handle (1)**
165:20
**handled (2)**
6:22;91:5
**hang-up (1)**
58:12
**happen (16)**
7:17;34:5;40:12,13,
13;42:25;47:19;50:8;
70:18;73:23;74:2;
97:15,21;99:1;126:12;
136:25
**happened (6)**
16:8;99:20;100:10;
101:14;129:8;150:11
**happening (2)**
17:22;99:14
**happens (3)**
29:8;45:21;167:22
**happy (6)**
83:25;84:19;86:21;
100:25;116:16;165:21
**hard (1)**
136:4
**hardest (1)**
138:12
**hat (1)**
92:14
**Hauer (1)**
49:15
**Hays (2)**
53:25;151:14
**hazard (2)**

150:1,11
**heads-up (1)**
9:21
**healthy (3)**
145:23,25;146:3
**hear (12)**
18:21;19:1;30:12;
34:19;46:21;49:10;
85:21;86:21;121:5,23;
155:7;166:23
**heard (18)**
10:4;11:21;55:25;
63:4;67:9;72:11;73:9;
77:5,6;79:12;94:5;
103:4;113:10;122:3;
138:15,23,24;148:22
**hearing (31)**
31:3;32:5;34:13;
52:7;53:10,15;63:4;
66:6;76:20,24,25,25;
79:23;91:13;97:3;
98:20;100:12;105:19;
106:4;122:12;131:15;
134:9;154:8,12;156:8,
14,18;160:23,24;
161:3;167:21
**hearings (5)**
67:3;70:6;74:11;
100:3;101:12
**heart (4)**
14:18;17:25;18:9,11
**Heath (1)**
129:2
**heavy (1)**
8:23
**held (6)**
12:25;14:23;96:8;
101:17,18,20
**help (11)**
7:12;8:8,10;9:4;
29:23;38:22;49:11;
74:3;96:19;159:22;
161:5
**helpful (7)**
49:4;53:19;64:9;
88:7;107:5,10;166:13
**helping (1)**
8:25
**here's (7)**
8:22;55:5;124:1;
133:5;151:21,24;
153:22
**hey (1)**
39:1
**hide (1)**
50:11
**high (4)**
17:22;73:18,19,20
**higher (4)**
35:24;38:3;40:5;
73:12
**higher- (1)**
38:6

**himself (1)**
98:21
**historical (1)**
153:3
**hoc (6)**
25:9;49:19;79:19;
128:11;158:20;165:10
**hold (1)**
98:16
**holders (1)**
60:22
**holds (1)**
92:22
**home (3)**
97:10;127:13;138:1
**homes (1)**
89:5
**Honor (213)**
5:10;6:2;7:1,18;10:6,
17,21;11:1,9,14,25;
12:13;13:23;14:3,17;
15:23;16:1,18;17:6,12;
19:1,25;20:19;21:5,19;
22:2;24:11;25:23;27:7;
28:10,23;31:23,25;
33:2;35:12;41:24;
45:16;46:3,6,7,10,11;
47:13,17;48:8,13;
49:12,20;51:4,9,10,18,
22;52:1,20;53:21,24;
54:8,18;55:2;57:3;
59:21;60:8,12,17,20,
25;61:6,21;62:17;64:1,
6,23;65:24;66:7,19;
67:13,24;69:8;70:2,19,
25;72:4;73:17;74:6,18;
75:12,16;78:14;79:11;
80:9,16,23;81:15,17,
19;82:5;84:11,19,22;
85:12,17,17;86:3,7,24;
87:2;88:18;89:3,20,23;
90:1,22;91:25;92:8,18;
93:16;94:17;95:11,16;
96:15,24;97:8;99:8;
100:14,24;101:4,17;
102:4;103:4;104:3;
105:2,22;106:12;
107:13;113:8,11,13,20;
114:24;115:23;116:4,
10;117:2;118:1,18;
119:4,20;120:9;121:4,
13,18;122:4,7;123:5,
11,15;124:17;125:2;
128:20;133:17,20;
134:10,19;135:2,14;
137:6,15,24;138:11,25;
139:16;140:4,12,18;
141:10;142:11,14;
145:9;147:3,11;
148:11,24;149:1,19;
150:7,24;151:11;
152:7,12,23;158:3,5,9,
11,17,21,23;159:5,12,

17,21;160:22;161:24;
162:5,8,16,22;163:4,
19;164:19;165:3,7
**Honor's (7)**
51:11;63:19;103:5;
104:6;105:5;135:17,20
**hook (2)**
15:5,6
**hope (9)**
5:4;31:7,22;35:16;
46:20;47:8;77:10;
78:20;79:4
**hopefully (5)**
44:5;65:21;66:24;
72:8;74:23
**hoping (2)**
35:15;92:13
**horrible (1)**
112:4
**hour (1)**
124:11
**hour-and-fifteen-minute (1)**
124:7
**hours (3)**
121:21;125:22;
145:22
**house (1)**
137:18
**housekeeping (2)**
125:6;165:25
**houses (1)**
112:5
**how're (1)**
28:6
**huge (1)**
62:21
**huh (1)**
152:18
**human (1)**
155:16
**hung (1)**
19:20
**hypothetical (5)**
37:17;55:13;130:14;
137:23,24

## I

**idea (7)**
71:18;77:8;80:16;
134:6;149:16;153:11;
154:20
**identifiable (1)**
18:20
**identification (2)**
108:4;109:15
**identified (4)**
60:21;84:23;136:6,
16
**identify (6)**
18:13;89:12;144:12,
16;158:25;164:9
**identifying (1)**

133:22
**ignition (2)**
131:7;132:3
**III (7)**
104:9,17;106:15;
110:14;112:22;121:3;
140:4
**imagine (5)**
39:20;59:17;68:16;
69:15;75:17
**immediacy (1)**
12:10
**immediately (2)**
70:16;78:10
**impact (3)**
30:1;72:17;73:21
**impacted (1)**
153:22
**impair (1)**
48:19
**impaired (12)**
24:6;25:1,5;36:17;
47:24;50:20;59:22,24;
61:8,10;73:25;77:6
**impairing (1)**
57:23
**implicated (1)**
85:24
**importance (3)**
12:10;13:16;67:14
**important (11)**
19:14;22:13;49:23;
51:12,18;66:11,19;
74:24;78:11;103:8;
117:9
**importantly (1)**
58:2
**imposing (1)**
126:16
**impossible (3)**
78:2,2,4
**imprecise (1)**
128:17
**impressed (1)**
97:18
**improved (1)**
42:12
**inclined (1)**
99:4
**include (8)**
6:14;10:2;37:12;
105:2;127:11;139:5;
150:10;164:13
**included (3)**
10:3;45:9;127:8
**includes (2)**
106:3;164:18
**including (3)**
20:21;93:2;97:11
**incorporate (1)**
134:22
**increased (1)**
87:19

**Indeed (2)**
66:15;70:16
**indemnified (1)**
9:15
**indenture (2)**
60:13,24
**individual (17)**
25:25;35:21;37:19;
38:2;47:2;80:17;
123:24;131:14;137:5;
138:11,13;139:5,9,19;
147:24,24;155:5
**individual-plaintiff (1)**
136:3
**inefficient (1)**
160:7
**inflexible (1)**
125:13
**inform (1)**
36:7
**information (23)**
9:2;10:15;12:25;
15:14,20;19:24;21:11;
33:24;45:9,16;53:19;
55:13;56:2,3;132:24;
133:1;134:20;135:19;
138:9;139:22;140:3;
154:20,23
**informed (10)**
55:15;104:23;153:3,
24,25;154:1,5,19,19,23
**infrastructure (2)**
19:7;69:22
**ingrained (1)**
126:18
**initial (2)**
11:18;103:23
**initiated (2)**
75:5;132:22
**initiation (1)**
64:25
**injuries (4)**
112:3;127:11,16,17
**injury (9)**
97:23;105:14;106:6;
107:19;110:8;111:16;
112:3;113:4;127:12
**innovative (1)**
41:12
**innovators (1)**
35:1
**input (1)**
60:6
**inquiry (1)**
22:11
**insider (1)**
9:1
**insolvent (1)**
41:6
**inspect (1)**
15:15
**inspecting (1)**
148:2

**inspection (2)**
143:15,16;146:12;
147:7
**instead (3)**
103:23;124:11;
160:11
**instituting (1)**
64:16
**institutions (2)**
56:1;166:11
**instrument (1)**
39:3
**insufficient (1)**
141:23
**insurance (9)**
14:11;24:16;29:11;
36:23;38:4;39:1;62:7;
106:5;110:12
**insurer (2)**
137:19,25
**insurers (4)**
36:24;62:8;72:7;
137:8
**intend (4)**
23:20;41:25;50:2;
111:4
**intended (2)**
44:9;109:14
**intends (1)**
60:24
**intensity (1)**
12:8
**intent (2)**
107:20;110:23
**intention (4)**
41:3;52:6;53:13;
166:22
**interest (3)**
30:2;60:19;119:24
**interests (1)**
77:14
**interfering (1)**
99:25
**interim (1)**
66:21
**interlock (1)**
140:22
**intermediaries (1)**
8:17
**intermediate (1)**
82:22
**interplay (1)**
79:16
**interpret (1)**
108:23
**interrelated (1)**
63:12
**interrogatories (21)**
133:4,7;134:18,22;
141:4,14,17,22;142:9,
10;143:24;145:2,7,12;
148:13;158:22,24;
159:7,10;163:9,14

**interrogatory (9)**
134:4;135:11;142:4,
5,18,21;144:9,11,23
**interrogs (1)**
143:21
**interrupt (3)**
67:20;68:10;154:10
**into (38)**
10:1;11:20;15:25;
17:1;18:19;22:22;23:2;
28:4;30:4;35:3;36:18;
44:16;59:15;75:19,25;
77:17;83:2,25;84:9;
90:8,11;95:12;98:12;
103:14,23;114:16,16;
121:11;127:20;137:8;
138:10,25;139:15;
146:23;151:17;152:20;
155:7;165:19
**intro (1)**
132:19
**introduce (1)**
86:14
**introduction (1)**
162:24
**inverse (22)**
79:18,24;80:22;81:1,
20,24;82:18;84:1,12;
87:4,9;89:11;90:10;
93:3;94:15;110:23;
111:1,3,4,14;112:1;
131:25
**investigation (2)**
12:9;64:16
**investigations (1)**
12:25
**investor (2)**
55:14;87:20
**investor- (1)**
84:1
**investor-owned (2)**
81:2;94:16
**invitation (1)**
50:10
**invite (2)**
79:8;107:2
**invited (1)**
152:5
**invites (1)**
133:2
**inviting (1)**
166:20
**invoices (1)**
18:16
**involve (1)**
140:7
**involved (10)**
8:25;16:10;22:25;
32:6;43:11;98:19;
100:20;112:12;151:15,
15
**involvement (1)**
49:5

**involves (2)**
65:16;69:22
**involving (2)**
70:6;104:17
**isolated (1)**
13:13
**issuance (2)**
68:25;69:1
**issue (58)**
7:2,3;9:13;13:9;
17:24;20:7,12;22:3;
35:10,15;41:20;44:20;
46:1;50:5;58:3;72:3;
75:16,20;79:18,24;
80:23;82:25;83:25;
84:6;85:24;86:12;87:8,
17,22;88:14,20;91:13;
93:7;94:10,11,18;95:6;
96:11;98:6;101:8;
103:13;104:9;108:9,
24;113:20;121:16;
124:22;127:9;128:21;
131:10;140:13;141:10,
11;147:25;149:17;
153:18;157:6;167:6
**issued (4)**
23:13;39:5,9;104:21
**issues (67)**
7:23;9:2;11:16,22;
12:4;13:18,20;24:18,
20;28:16,18;30:15;
32:11;44:22;48:3,5;
51:5;56:16;58:4;65:6;
66:10,11,15;69:25;
70:7,11,14;72:22;76:4;
77:20;78:7,18;80:9;
81:18;84:9,25;86:19,
20;87:12,17;88:4,6;
90:2;91:8,18;92:9,17;
102:12,13;104:2;
108:22;109:15;116:10,
13;128:10;134:14,16;
136:11,25;145:16;
156:21;157:18;159:19,
19,20;162:3;164:17
**item (5)**
5:18;57:21;124:6;
153:15,16
**itemized (1)**
136:21
**items (3)**
23:1;106:13;163:8

**J**

**Jackson (2)**
97:8;99:11
**January (5)**
77:24;78:1;102:16;
149:12;152:20
**Jessica (1)**
5:12
**Jim (1)**

61:6
**job (6)**
74:21;123:3;146:15;
148:2,4;151:5
**JOHNSTON (13)**
61:5,6,14,17,20,24;
62:23;63:2,8,17,21,22;
77:5
**joinder (1)**
96:14
**Jones (1)**
61:6
**Judge (53)**
13:5;32:6;43:12;
87:11;90:25;93:9;97:8;
98:6,9,21;99:4,11,17,
17,18;100:11,13,17,18;
102:2,10,10;104:17,20;
105:5,21,23;106:9,15,
16;107:7;109:8;
110:14,19,25;111:12,
16,22;112:12,13,23,24;
124:2,16;126:8,10;
127:7;128:8;140:4;
141:11;154:13;156:18;
162:25
**judges (5)**
12:8;43:9,15;77:16;
99:23
**judge's (1)**
99:25
**judgment (13)**
55:15;82:7;83:15,16,
24,24;87:7;88:9;92:5;
93:18,22,22;130:18
**Judicial (1)**
152:23
**Julian (78)**
7:7,15,18,22;8:4,10,
12,22;10:6,8,17;33:12;
44:17;94:5,9,20,25;
95:2,5,11,21;96:12,15;
107:12,13;108:14,17;
109:19;110:10,20,23;
111:3,8,13,20,22;
112:9;113:8;127:21;
141:8,10,14,19,21;
142:2,17;143:5,7,11,
14;144:1,5,7,13,16,20,
25;145:4,9,15;146:9,
11,19;147:3,7,10,15,
18,22;148:7,11,17,24;
152:9;161:21;162:6;
163:8,15
**Julian's (2)**
46:1;100:6
**July (1)**
135:25
**jumped (1)**
41:24
**jumping (2)**
156:16,17
**June (4)**

16:8;43:7;66:8;
74:21
**jurisdiction (4)**
65:19;107:22,25;
108:10
**jury (3)**
109:7,8;121:8
**Justice (1)**
122:5

**K**

**Karnow (1)**
102:10
**Karotkin (101)**
5:3;6:23,24,25;7:1,5;
22:24;23:3,18,20,23;
24:8,11,15;25:4,21,23;
26:3,6,8,10,15,20;27:4,
6,11;28:8,10,14,21,23;
29:1,5,7,16,20;30:7,9,
21,23;31:9,14,17,19,
21;32:3,8,14,23;33:1,4,
6,15,17,19;34:2,23;35:
36:16;40:14;42:24;
45:19;46:1;50:10;52:5;
53:6;63:3,11;98:15;
100:5;117:8,14,19,21,
22;118:1,5,9,18,22;
119:10,12;120:16;
124:5;125:12,16;
126:1;165:14,15,17,21,
23,25;166:7,9,16,18;
167:10,14,17,19
**Karotkin's (5)**
52:12;53:14;75:6;
77:12;125:8
**keep (7)**
22:14;27:6;61:5;
85:8;111:4;120:17;
145:21
**keeper (1)**
152:16
**keeping (1)**
126:18
**Kelly (5)**
96:18;99:2,9,13;
161:18
**kept (1)**
99:15
**Kevin (2)**
20:1;133:18
**key (3)**
75:20;136:11;140:13
**kid (1)**
56:18
**kill (1)**
124:8
**Kimberly (1)**
10:23
**kind (32)**
7:12;13:6,12;22:12,
18,25;28:4;35:1,19;

39:11,18;45:5;46:13,
22,23;47:4,13,15,22;
48:9;14;52:8;73:8;
76:21,23;77:13;88:15;
120:13;129:23;146:7;
165:2;166:13
**kinds (5)**
59:15;69:3;77:17;
113:3;150:12
**knew (3)**
17:7;150:13,15
**knowing (2)**
13:19;138:16
**knowledge (2)**
8:20,21
**known (3)**
15:25;82:15;87:15
**knows (4)**
73:4,15;99:14;100:6
**Kornberg (73)**
27:25;29:22;30:24;
31:10,11;49:10,14;
61:5;63:23;64:1,4,4,11,
15,21,23;65:12,18;
66:3,7;67:23;68:1,13,
16,20,23;69:8,10;71:8,
10,14,16,24;72:2,15;
73:16,19;74:6,8,15,18;
75:12,16;76:1,4,6,8,12,
23;77:18;78:4,7,13;
79:2,4,11;101:6,8;
102:1,4,6,18,21,25;
103:3;104:13,15;
105:2,7,12;106:2,8,12
**Kornberg's (1)**
92:22

**L**

**lack (2)**
126:3;166:5
**ladder (1)**
12:8
**land (4)**
46:19;47:18;89:5;
114:16
**lands (1)**
47:14
**landslide (1)**
89:6
**language (1)**
9:11
**large (4)**
62:12;63:6;122:17;
123:5
**last (20)**
24:25;35:3;63:4;
70:24;76:25;98:20;
103:11;107:23,23;
124:22;131:15;136:20;
140:21;143:14;145:18;
146:12;148:18;162:14;
163:11,20

PG&E CORPORATION AND PACIFIC
GAS AND ELECTRIC COMPANY

Case No. 19-30088
August 27, 2019

**late (2)**
64:18;153:20
**later (7)**
13:4;16:7;24:5;
52:23;84:7;109:10;
120:25
**latest (1)**
102:15
**launched (1)**
78:19
**law (21)**
35:3;70:13;71:9;
81:1;82:15;88:21,22;
90:14;92:15;93:1;95:8;
110:5,8;111:11;
115:22;116:22;117:7;
119:25;130:7,8;156:11
**law-trained (1)**
8:14
**lawyer (4)**
8:8,25;16:3;54:16
**lawyerly-like (1)**
10:14
**lawyers (31)**
7:24;8:15,24;25:11,
12,13;27:14;30:12;
54:12;55:25;58:1,22;
59:18;86:2;96:3;97:16,
22;98:13;103:20;
104:19;112:23;125:21;
126:16;131:17,17;
132:8;136:2,3;139:20;
142:6;160:1
**lay (1)**
133:13
**layman's (1)**
108:11
**lays (1)**
28:3
**lead (2)**
86:15;87:3
**leads (1)**
48:7
**learn (1)**
26:17
**learned (3)**
33:7;36:3;112:11
**lease (1)**
5:20
**least (14)**
9:19;18:14;43:11;
50:14;51:21;52:14;
55:19,20;56:21;58:14;
81:23;88:8;123:12;
128:9
**leave (6)**
32:14;45:1;107:7;
113:9;142:20;144:18
**leaving (1)**
23:24
**left (4)**
109:18;124:6;
127:21;128:2

**legal (29)**
14:5;21:15;50:25;
81:14;83:25;84:6;
89:22;90:11;94:10,11,
18;108:4,21;111:1;
116:13;120:16;123:21;
127:9;132:1,15;
133:13,14;134:12;
141:15;142:6,23;
144:10,25;161:9
**legally (1)**
43:2;91:11;131:9
**legislation (1)**
27:2
**legislative (2)**
51:24;52:24
**lend (1)**
93:21
**less (10)**
10:14;17:23;37:24;
61:21;73:21,21,21;
93:14;110:18;139:2
**lesser (3)**
13:16;98:19;110:12
**letter (32)**
21:13,13;22:15;80:4;
81:18;83:13;89:13,13;
132:23;133:1,2;134:4;
135:19,25;136:1,20,21;
140:19,20,21;143:9;
144:8,13;146:12;
148:18;158:25;159:8,
10;163:11,20;164:6,12
**letters (5)**
51:20;136:22;
140:23;145:16;154:19
**letting (1)**
127:4
**level (2)**
87:19;112:15
**levels (2)**
46:19;47:22
**liabilities (2)**
72:9,11
**liability (18)**
14:10;19:5;69:17;
108:5;117:1,21;
123:22;129:17;130:2;
131:16;133:23;141:16;
142:15;145:17;147:24;
149:13;150:16;155:16
**liability's (1)**
130:2
**liable (19)**
13:22,24;19:11;
21:12,16;131:9,9;
132:4;133:9,9;142:24;
145:6;146:1,2,8,20;
147:23;148:1;150:14
**liaison (1)**
156:4
**life (1)**
15:12

**lift (1)**
101:9
**light (2)**
89:8;115:1
**liked (1)**
102:6
**likelihood (1)**
17:22
**Likely (5)**
7:14;17:23;39:25;
55:22;72:11
**likens (1)**
128:24
**likes (1)**
52:16
**limb (2)**
145:23,25
**limit (2)**
96:8,10
**limited (2)**
68:2;140:10
**limits (1)**
146:4
**line (15)**
12:18;13:2;15:15;
17:15,20,20;30:25;
31:1;62:5;75:3,10;
79:19;82:23;83:1;
133:13
**linear (2)**
30:13;47:16
**lines (6)**
17:10;18:5,6;19:6;
42:10;80:6
**LIOU (20)**
5:10,12,12,13,14,16,
18,22,24;6:1,4,6,8,11,
14,17,18,19,22,24
**liquidated (20)**
47:3;114:10,12,13;
115:25;117:6,11,12,15,
16;118:3,17,20;119:17,
24;121:11;123:14;
128:1;129:14;130:16
**liquidated/unliquidated (1)**
126:15
**liquidation (2)**
124:22;126:22
**list (1)**
106:15
**listed (2)**
78:10;89:17
**listen (2)**
50:6;106:18
**listens (1)**
99:19
**literal (2)**
19:20;20:15
**literally (1)**
20:15
**litigable (1)**
50:5
**litigated (1)**

134:1
**litigating (1)**
117:5
**litigation (5)**
12:20;86:16;96:17;
142:3;153:4
**litigations (1)**
102:11
**Little (20)**
22:9;30:3;33:7;35:4;
41:25;46:13;53:8;
54:10;59:14;68:20;
84:15;93:20;103:17;
106:16;112:11,20;
124:14;128:13;139:1,2
**live (1)**
17:24
**living (1)**
145:21
**LLP (1)**
46:7
**loan (1)**
42:19
**loans (1)**
36:19
**locate-and-mark (1)**
69:21
**location (2)**
83:20;119:18
**logistics (1)**
86:9
**long (16)**
29:13;30:4;45:9;
71:25;73:14;93:9;
103:10;121:24;132:11;
134:15;135:11,19,23;
140:11;164:22;167:21
**look (19)**
11:20;18:5;32:20;
44:24;48:23;61:10;
70:4;75:2;77:7;93:5;
105:8;109:18;120:15;
121:8;123:8;138:11;
143:13;145:15;167:21
**looked (3)**
24:24;118:10;151:22
**looking (13)**
9:1;11:21;13:23;
39:18;109:23;125:7;
137:24;142:18;148:3;
149:12;150:16;159:21;
160:10
**looks (7)**
29:25;51:14;77:9;
80:4;105:7,25;123:15
**looming (1)**
43:7
**loose (1)**
24:3
**Los (1)**
91:4
**losing (1)**
38:5

**loss (2)**
138:5;153:19
**losses (2)**
92:24;112:25
**lost (3)**
81:21;90:16;137:18
**lot (11)**
5:7;23:6,10;44:16;
62:16;72:21;74:3,9;
84:13;140:8,23
**lots (3)**
30:14;149:19,20
**lot's (2)**
23:7,8
**loud (2)**
98:22;103:4
**lower (3)**
8:8;40:5;73:12
**lunch (1)**
63:24
**luxury (1)**
52:25

**M**

**Macon (1)**
135:25
**Macon's (1)**
140:20
**magic (2)**
30:2;73:10
**magnitude (1)**
38:6
**maintain (2)**
19:6,7
**maintenance (1)**
146:13
**major (1)**
35:18
**majority (1)**
129:14
**makes (7)**
34:2;109:11;111:24;
125:9;146:1;160:15;
161:22
**making (8)**
9:14;34:18;44:22;
47:16;49:1;98:24;
102:20;105:13
**manage (1)**
108:25
**management (4)**
99:12;109:1;136:12;
152:23
**managers (3)**
27:14,15;149:25
**mandate (1)**
155:9
**mandated (2)**
97:25;98:3
**Manges (1)**
5:14
**Manhattan (3)**

33:14;45:10;59:3
**manner (3)**
10:14;46:11;167:7
**many (15)**
8:19;12:4,24;43:9;
63:10;64:12;67:8;78:7,
7;83:4;90:6;93:10,20;
96:17;116:22
**marching (1)**
111:11
**mark (1)**
55:14
**MARSHACK (44)**
53:24,25,25;54:1,2,4,
5,6,8,14,16,18,20,24;
55:2,5,8;56:7,9;57:3,5,
12;58:9,13,21;59:4,8,
20;60:2,5,8;95:16,17,
18,25;96:5,8;151:11,
13,13,14,19,21;165:5
**mass (4)**
129:20;152:24;
155:11,22
**material (2)**
70:10;88:10
**materials (1)**
134:2
**mathematics (1)**
40:8
**matter (18)**
5:19;59:25;61:10;
71:17;79:17;85:23;
88:15;93:21;100:18;
109:17;110:5;119:7;
127:5;129:20;130:16;
151:5;157:22;165:25
**matters (11)**
5:5,8;34:15;69:14;
78:11;79:14;92:18,21;
93:21;104:1;125:6
**Matthew (1)**
122:5
**maximize (2)**
107:21;108:19
**may (35)**
8:16,17,17;13:24;
16:8;24:19,25;27:11;
36:22;37:5,20;38:1;
39:8;47:19,19,23,24;
48:2;51:24;60:21;
65:13;83:2;101:6,17;
103:17;104:18;114:4;
120:9;123:3;130:1;
135:12,23;140:7,9;
160:12
**maybe (39)**
5:8;9:21;14:22;15:5;
17:4;25:14;31:6;36:10;
42:12;44:21;47:2;
50:23;63:24;64:8;
76:20,25;77:1,5,23,24,
24,24;80:4;99:2;
104:10,21;107:5,20;

113:3;117:3;118:14;
119:18;120:11,23,24;
138:3,4,5;139:1
**McAllister (1)**
43:14
**McCallen (20)**
86:4,7,18,24;158:5,9,
11,14,17,18,19,20;
159:3,5,12,14;163:10;
164:1,2,6
**McCallen's (1)**
163:23
**McKinsey (4)**
17:16;18:2;20:21;
21:10
**MDL (2)**
155:19;156:3
**mean (90)**
5:6;7:10;8:15;13:17;
14:1;21:8,14;23:6,24;
24:4,5;28:19;34:1;
36:1;9;39:7,22;40:11;
41:17;47:17;50:15;
54:20;55:21,25;58:22;
59:17;60:23;66:4;
68:17;69:2;71:6,12;
75:7,8;78:17,21,22;
79:24;83:10,20;87:25;
88:1;90:13;92:6;94:2;
96:3,7;97:13,15;
100:17;103:9;104:7;
105:8,9,20;106:7;
110:6,17,18;111:6,9,
19,21,24;112:3;
114:21;116:2;119:8,
13,15;124:8;125:13,20,
21;128:3;137:4;
142:25;145:6;152:9;
153:14;157:2,2;159:9,
11;160:14,19;161:13;
164:14;166:10,20
**meaning (1)**
155:25
**meaningful (1)**
154:1
**means (15)**
26:18,25;54:10;
61:11;63:4,13;73:2;
93:4;102:14;110:17,
17;114:23;115:14;
118:1,7
**meant (1)**
111:18
**Meanwhile (1)**
30:17
**meat (3)**
24:9;63:3;84:9
**mediation (3)**
106:23;107:1,3
**mediations (1)**
156:13
**meet (12)**
11:19;32:16;40:15;

136:18;140:16;141:3;
152:2,5,5;156:2;
157:19;164:16
**meet-and- (1)**
11:15
**members (2)**
7:23;8:10
**memorized (1)**
135:12
**memory (1)**
134:11
**mentioned (6)**
24:23;66:7;69:13;
70:15;89:4;124:23
**merge (1)**
155:21
**merits (4)**
81:13;92:20;95:12;
146:6
**message (2)**
98:22;131:2
**met (2)**
66:15;167:8
**metaphors (1)**
78:23
**methods (1)**
7:25
**microphone (1)**
164:5
**mid- (1)**
9:18
**might (19)**
7:17;13:22;15:7;
28:20;34:7,12;47:19,
21,22;61:15;64:9;
79:23,25;112:17;
122:21,22;127:2;
129:19;137:22
**Milbank (1)**
46:7
**million (12)**
118:13,14;121:10;
137:19,25;138:1;
142:11;143:18;147:11;
148:7;150:5,6
**million-dollar (1)**
137:20
**millions (1)**
123:2
**mind (10)**
24:1;27:6;100:4;
109:9,24;112:22;
120:17;128:9;129:18;
148:6
**mine (1)**
129:3
**mini (1)**
88:14
**minimum (1)**
40:15
**minor (1)**
7:8;9:8;12:13
**minute (4)**

65:9;133:2;142:20;
148:15
**minutes (2)**
22:11;124:11,12;
125:1;158:7
**misestimated (1)**
138:4
**missing (1)**
40:3
**misspoke (1)**
144:21
**mistake (1)**
154:7
**misunderstanding (1)**
64:13
**misunderstood (1)**
79:23
**mix (1)**
17:1
**mode (1)**
48:9
**model (1)**
18:7
**modified (3)**
26:4;94:12;162:8
**modify (1)**
96:10
**moment (5)**
23:17;42:21;78:25;
106:14;144:18
**money (9)**
15:1,2;25:10,20;
29:3;36:18;40:14;47:3;
73:6
**month (2)**
8:24;9:17
**months (5)**
15:24;16:1;20:8;
57:17;149:7
**more (41)**
19:14;22:25;24:5,18;
28:2;32:11;33:10,24;
37:10,11;38:19;40:12;
41:2;53:16;55:18,23;
59:14,15;61:8,21;74:3;
78:22;79:5;84:16;
85:18;100:19;119:19;
126:7,7;127:15;128:7;
136:6;137:1,24;139:1,
22;143:22;149:8;
152:10,13;161:8
**morning (21)**
5:10,17;6:25;7:1;
10:21,22;35:11,12;
52:7;53:10,24;60:11,
12;64:1;72:11;74:19;
86:7;87:1;118:11;
151:3;167:21
**MORRIS (34)**
10:21,23,23;11:1,3,6,
24,25;12:3,12,16,22,
24;13:23;14:3,8,14,20;
15:9,20;16:6,18,20;

17:6,10,12;18:2;19:4,
12;22:9;163:20;
164:15,16,22
**Morris' (1)**
164:12
**most (14)**
11:20;12:5;25:1;
28:5;44:14;58:2;67:9;
86:12;93:2;103:7;
107:17;109:25;129:16;
135:10
**motion (47)**
5:20;6:9,21;11:15,
16;14:1,1;20:4;21:3,
23,25;22:21;51:11;
52:2;84:20;85:2;87:7;
88:9,17;89:2;90:3,16,
20;92:3,5,10,16;93:17,
18,23,24;95:10,10;
104:10;114:1,1,18;
115:4;122:15;123:20,
23;127:24;160:14;
161:10;162:6,8;164:14
**motions (8)**
25:8;88:18;89:11;
93:10;100:4;101:25;
102:3;161:9
**motives (2)**
57:5,6
**mousetrap (1)**
46:14
**move (5)**
29:7;33:24;48:15;
150:21;151:18
**moves (1)**
24:18
**moving (6)**
12:7;27:11;85:19;
86:10,11;157:16
**much (27)**
8:25;9:4,10;10:16;
19:17;23:20;26:22,24;
27:1,1,24;28:2;32:24;
34:6,25;40:8;48:8;
55:19,19,23;63:12;
76:14;93:8;109:5;
115:17;125:13;139:17
**multibillion (1)**
37:5
**multiple (2)**
129:21;160:12
**multistep (2)**
65:3,4
**must (5)**
67:16;68:4;69:16;
124:1;154:10
**myriad (2)**
70:14;76:2
**myself (3)**
45:25;109:25;110:13

**N**

**name (5)**
43:12;149:1;152:16;
158:13;163:20
**narrow (1)**
72:22
**narrowed (1)**
109:11
**natural (1)**
69:21
**nature (4)**
14:11;123:22;126:6;
129:19
**near (2)**
9:23;47:14
**necessarily (4)**
31:14;52:7;65:16;
167:3
**necessary (8)**
36:19;72:13;96:11;
98:7;107:20;127:24;
128:5;149:10
**need (78)**
10:15;27:23,25;28:1;
30:22;31:12,14;32:24;
39:17;43:10,16,16;
44:24;45:10,12,16;
49:7;51:14;53:4;55:16,
23;56:3,5;59:2,8,8,9,
11,14,20,23;73:13;
79:21;80:20;84:8;88:2;
89:1;92:3;97:16;100:7;
103:23;104:20;107:3,
10;109:14;114:15,15;
115:4;120:12,13;
133:5;136:12;137:8;
138:9;140:2;142:8;
143:22,23;144:3;
145:12,19;146:12,16;
147:1,2,7,13,15,20,23;
149:23;150:19;153:23;
154:23;157:19;159:11;
161:5;165:24
**needed (1)**
73:21
**Needless (1)**
136:24
**needs (12)**
7:4;22:18;34:17;
38:11,17;76:17;80:2,
15;88:4;102:23;
114:17;140:13
**negligence (10)**
9:13,15;14:20;17:25;
18:9,12;19:11,13,15;
111:16
**negligent (2)**
14:22;104:5
**negotiate (2)**
27:19;67:5
**negotiated (3)**
66:12;74:23;149:6
**negotiating (2)**
27:17;76:2

**negotiation (3)**
17:1;26:23;44:4
**negotiations (2)**
7:22;8:5
**neither (2)**
22:21;107:8
**net (4)**
35:24;36:20;38:3;
139:15
**neutral (1)**
35:15
**neutrality (1)**
67:18
**new (3)**
27:2;61:11,11
**next (13)**
34:12;42:25;43:20;
52:7;53:20;97:11;
125:10,18;135:3;
163:16,21;164:11;
167:9
**Nice (1)**
63:24
**night (9)**
136:20;140:21;
141:23;143:12,14;
145:18;146:12;148:18;
163:12
**nineteen (1)**
37:18
**ninety (1)**
59:5
**Ninth (5)**
116:5;117:23;118:6;
119:13;120:1
**nobody (3)**
43:25;78:25;98:5
**noncore (7)**
107:14,25;108:7;
109:16;112:8,17,19
**nondelegable (1)**
19:6
**none (3)**
18:17;79:8;137:2
**nonissue (1)**
157:13
**nonlawyers (1)**
10:13
**nonliability (1)**
142:25
**nonregulated (1)**
69:6
**nontort (1)**
39:21
**NorCal (2)**
149:4;150:8
**normal (4)**
46:12,13;49:22;
93:25
**North (2)**
86:15;133:25
**Northern (3)**
19:8;54:25;98:23

**notably (1)**
67:9
**note (3)**
128:25;130:18;
135:15
**noted (1)**
74:22
**noteholder (1)**
49:19
**noteholders (3)**
60:18,21;61:2
**notes (1)**
60:14
**notice (1)**
9:21
**noticed (2)**
31:23;118:12
**notices (1)**
136:13
**notion (5)**
35:5;100:2;128:1,12;
160:5
**November (6)**
7:9;9:19,23;85:3,15;
95:2
**nowhere (1)**
112:14
**number (50)**
12:16;21:1;23:15;
25:19;27:3;36:7,22;
37:8,20;38:2;39:15,21;
40:5,6,19;41:4;45:19;
47:18,18,22;62:20;
73:12,13,18,19,20,20;
74:4,5;77:6;80:20;
89:4;115:24;116:7;
118:11;119:8,14;
129:22,25;131:16,17;
136:9;138:25;139:24,
25;142:18,19,21;
144:23;162:24
**numbers (7)**
25:14;28:14;46:24;
48:18;62:6;77:21;
139:14
**nut (2)**
16:5;39:17

## O

**object (13)**
50:25;57:24;77:20;
103:21;116:16,24;
117:1;118:19;130:20,
21,21;136:8;150:14
**objected (4)**
118:21,22;119:2;
150:8
**objecting (3)**
56:6;108:1;130:19
**objection (8)**
9:7;116:15;128:24;
129:24,25;130:6,20,

131:4
**objections (4)**
53:16;126:5;134:9;
167:2
**objective (1)**
58:13
**objectives (1)**
58:9
**objectors (1)**
84:15
**objects (2)**
126:23;130:10
**obligated (1)**
18:16
**obligations (1)**
161:11
**observed (1)**
72:4
**obvious (2)**
71:21;79:3
**obviously (18)**
27:6;28:17;30:12;
31:25;32:9;48:16;75:6;
88:18,22;97:15;101:8;
103:15;104:1;129:4;
136:12;137:1;139:5;
141:1
**OCC (1)**
10:2
**occur (1)**
105:6
**occurs (1)**
126:20
**October (4)**
9:24;31:3;85:11;
94:18
**off (7)**
15:5,24;18:19;
107:19;114:16;121:19;
153:7
**offered (3)**
79:18;99:9;109:22
**offering (1)**
27:2
**Office (6)**
113:16,17;114:6;
120:6;121:16;159:18
**official (4)**
9:20;10:24;35:13;
46:8
**often (2)**
15:15,16
**OII (14)**
64:17,24;65:1;66:17;
67:4,8,11;69:20,24;
70:9,16;74:10;75:5;
78:19
**Oldco (1)**
63:10
**on- (1)**
129:4
**once (5)**
61:1,1;66:17;104:11;

128:4
**one (104)**
8:13,13,15;9:8;11:7;
12:18,19;16:11,13;
17:12,16,17;22:13;
24:4;25:11,13;26:17,
22;27:22;29:21;33:5,7;
34:5,6;36:25;37:1,7,8,
11,22;38:11,12,13;
40:8,9;41:11;42:11;
43:1,11,16;46:17;
48:25;50:12;57:21;
61:8;62:5;66:12;68:16;
71:21;73:7;80:12;
85:25;86:11;87:2,6,
88:3,7;90:24;92:20;
94:6,6;95:24;97:9;
99:2;103:6;105:9;
106:7,7,13;113:2,2,14;
114:9;116:24,24,25;
117:5;119:18;120:21;
123:11;124:6,6;
127:10,14;128:9,10;
130:5;133:2;135:15;
137:7;139:6,11,16,19;
140:7;142:16;145:22;
152:10,13;158:22;
160:11;162:15;163:25;
165:6
**one-on-one (1)**
52:15
**ones (8)**
11:18;26:22;89:18,
19;92:23;147:22,23,25
**ongoing (2)**
65:8;100:3
**only (46)**
5:8;6:11;7:2,3;9:16;
10:12;14:9;15:9;19:13;
36:16,22;37:1,3,3;
48:8;57:12;59:20;
64:11;65:7;90:24;
94:16;97:19;98:1,6;
99:12,20;103:3;105:6;
110:13,24;112:5,24;
115:13;120:15;123:11;
127:17;129:13;131:16;
138:1;144:16;146:25;
147:25;150:22;154:8;
155:18;162:15
**oOo- (1)**
5:2
**open (5)**
107:7;120:17;127:4;
163:7;164:17
**opened (1)**
16:23
**opening (4)**
20:24;44:8;70:16;
128:14
**operated (1)**
8:23;13:1;17:10
**opinion (2)**

35:18;117:8
**opinions (1)**
  43:10
**opponent (3)**
  94:3;120:23;126:22
**opponents (2)**
  83:18;85:14
**opportunity (7)**
  10:3;35:14;67:8;
  98:8;151:7;153:23;
  154:2
**oppose (1)**
  96:2
**opposition (6)**
  9:9;49:21;84:23;
  85:6;86:11;88:9
**optimistically (1)**
  36:10
**option (2)**
  109:22;112:22
**oracle (1)**
  155:1
**order (42)**
  6:1;9:14;10:5,8;
  15:23;23:5,13;24:23;
  26:3;31:23;49:8;55:12;
  64:7,16;70:24;75:3,15;
  78:1;92:24;94:10;
  95:19;97:11;104:21;
  106:23;108:6,24;
  111:12,14;113:14;
  118:18;126:11;131:20;
  148:13;150:22;151:16;
  152:23;159:7;160:9,
  16;161:10;166:2;
  167:12
**ordered (1)**
  94:12
**original (3)**
  47:21;79:22;104:8
**Orsini (146)**
  11:7,9,14;13:17;
  16:13;18:21;19:19,22,
  25;20:1,12,14,18;
  21:17,19,23;22:2,23;
  34:3;77:12;80:4,9,11,
  14,18,22;81:5,9,13,15,
  17;82:4,9,11,14,18,21;
  83:17,22;84:18;85:5,8,
  12,16;86:3,10,19;89:7,
  9,17,19,23;92:4,8,15;
  93:15,16;94:17,24;
  95:19;98:14;99:15;
  100:5,10;101:10;
  111:10;114:25;115:3,
  6,9,16,20,23;116:9,13,
  19,20;117:2;124:5,10,
  17;125:2;128:10;
  131:15,21;132:20;
  133:11,17,18,25;
  134:19,24;135:2,5,7,
  10,14;136:5,16;137:6,
  11,15,21,23;138:3,8,

15,18,21,23;139:9,11;
140:18;141:7;145:11,
23;148:22;149:5;
152:8,11,14;156:12;
157:9;158:1,2;161:21;
162:6,8,11,13,19,21;
163:3,7,11,14,19,25;
164:9,15,19,21,24,25;
165:3,7
**Orsini'll (1)**
  23:2
**Orsini's (7)**
  22:15;37:20;46:1;
  80:18;87:4;124:19;
  143:8
**others (9)**
  13:5;22:17;28:1;
  29:22;65:20;85:21;
  161:18,18;162:11
**otherwise (1)**
  50:4
**ought (5)**
  21:5;22:3;31:5;
  32:18;76:15
**Ours (1)**
  94:20
**ourselves (1)**
  56:18
**out (57)**
  8:25;9:5,9,10;16:3;
  18:5;24:15,20;28:3;
  31:8;34:13;36:24;
  38:11;39:22;40:15;
  41:13;42:12;44:19,24;
  48:17;49:11;52:11;
  53:20;62:6;73:20;
  76:15,22;77:19;87:6;
  90:17,24;92:6;94:8;
  100:12;106:23;107:6;
  112:14;115:11,11;
  122:11;123:1;124:25;
  133:13;136:22;137:17,
  25;139:14;140:19;
  143:20;145:14;150:22;
  151:6;161:6,12,18;
  165:6;167:2
**outcome (6)**
  80:5;83:14;92:12;
  103:8;109:24;129:6
**outline (9)**
  50:13;75:6,7,8,8;
  77:25,25;166:7,8
**outset (1)**
  122:12
**outside-the-box (2)**
  61:22;63:19
**outstanding (5)**
  12:1;15:24;60:14;
  65:6;136:17
**outvoted (1)**
  119:8
**over (16)**
  8:15;31:3,5;105:24;

109:2;119:2,17;132:6;
134:1;143:19;147:12;
149:7;153:10;156:18;
161:19,20
**overarching (2)**
  35:20;72:5
**overlap (1)**
  140:23
**overly (1)**
  161:13
**overrule (2)**
  9:6;94:14
**overseeing (1)**
  102:11
**oversimplification (1)**
  25:7
**owe (3)**
  17:3;115:25;131:25
**owed (5)**
  116:1;117:15;118:2;
  126:21;130:15
**own (7)**
  7:9;9:15;17:7;69:5;
  109:23;134:8;146:21
**owned (4)**
  84:2;87:8,16;88:19

**P**

**package (1)**
  75:23
**page (10)**
  26:13;28:7;36:16;
  58:15;93:9;96:8,10;
  135:13,14;138:19
**pages (8)**
  45:13;59:3;93:10,12,
  25;108:3;133:3;145:17
**paid (12)**
  55:18;57:16;59:22,
  25;60:2;115:7,11;
  123:1;129:12;137:16,
  19,25
**Palermo (1)**
  12:18
**pans (1)**
  24:15
**papers (8)**
  7:6,11;27:23;60:16;
  63:5;80:3;83:24;
  106:24
**Parada (1)**
  125:18
**paragraph (2)**
  107:23,23
**paragraphs (1)**
  67:21
**parallel (2)**
  30:15;69:4
**parameters (1)**
  41:6
**Parks (1)**
  113:20

**part (51)**
  11:12;13:9;15:13,16;
  16:4,12,21;17:1,6,6,19;
  18:11,17;20:3;21:6,11,
  12;22:11,18;25:1;28:5;
  35:5,6,7;39:11;41:4;
  60:24;73:1;80:8;83:14;
  90:8,8,9;105:14;
  113:14;114:8;115:4;
  116:16;117:24;121:12;
  122:17;123:6,19;
  129:16;133:21;138:12;
  154:1,5,5,20;156:11
**parte (1)**
  101:12
**partial (2)**
  83:16;93:22
**participant (1)**
  79:9
**participate (2)**
  66:9;67:15
**participated (1)**
  149:4
**participates (1)**
  152:2
**participation (2)**
  154:2,3
**particular (10)**
  47:22;55:20;83:1,19,
  20;91:20;101:10;
  109:24;129:19;134:1
**particularly (7)**
  40:22;53:9;82:25;
  96:18;98:13;99:24;
  102:6
**parties (19)**
  17:14;30:5;33:23;
  34:20;51:21;52:1;
  66:15;67:8;70:11;
  73:24;80:17;84:24;
  101:14;107:1;108:9;
  110:18;112:23;149:6;
  160:9
**parties-in-interest (1)**
  64:12
**partly (2)**
  43:6;96:19
**parts (6)**
  13:2;15:13;90:8;
  127:20;153:23,25
**partway (1)**
  133:6
**party (4)**
  12:17;15:5;16:15;
  130:19
**party-in-interest (1)**
  160:6
**PASCUZZI (36)**
  113:11,12,13,15,23,
  25;114:13,15,22,24;
  116:4;119:1,4,15,20;
  120:3,5;121:2,4,13,15,
  22;122:16;151:22;

159:17,17,21;160:1,9,
18,22;161:24;162:2,5;
165:1,8
**Pascuzzi's (3)**
  116:22;122:8;162:14
**passed (1)**
  24:25
**past (2)**
  7:9;99:17
**path (3)**
  39:15;42:16;78:22
**paths (1)**
  78:22
**Paul (3)**
  64:4;113:15;159:17
**pay (11)**
  27:1;36:19,24;37:23;
  38:19;73:5,6;74:5;
  98:17;129:11;139:4
**paying (1)**
  115:11
**payment (2)**
  36:13;72:6
**payments (4)**
  36:23;38:4;62:8,12
**PE (3)**
  35:22;36:25;37:1
**penalties (1)**
  69:17
**pendency (1)**
  8:5
**pending (3)**
  65:10;69:14,20
**pendulum (1)**
  135:20
**Pennsylvania (1)**
  128:15
**penny (5)**
  116:1;117:1;118:16;
  119:23;120:22
**people (32)**
  8:14;10:14;13:5,17;
  28:17;29:1;34:21;
  52:10;59:5,18;66:12;
  82:23;83:4;88:4,5;
  94:6;106:24;124:8;
  125:10;129:22;140:9,
  11;150:12;153:10,22;
  154:9,21;156:7,15,7;
  160:23;161:14;163:2
**people's (2)**
  112:5;117:10
**per (1)**
  144:6
**percent (2)**
  59:5;154:22
**percentage (1)**
  59:17
**percentages (1)**
  68:8
**perfect (2)**
  83:15;140:6
**perfectly (2)**

46:10;130:3

**perform (1)**
12:17
**performed (4)**
14:16,17;15:12;20:9
**performing (1)**
8:16
**perhaps (9)**
10:13;34:16;44:6,8;
50:23;61:17;98:19;
126:7;128:11
**period (7)**
9:18;32:10;42:3;
63:15;77:24;121:11;
167:9
**permissible (1)**
43:3
**permission (2)**
87:14,14
**permit (1)**
64:24
**person (6)**
14:22;98:3;108:11;
118:13;138:6;163:1
**personal (18)**
9:14;97:15,23;
105:14;106:6;107:19;
110:8;111:16;112:2,3,
25;113:4;122:2;124:3,
21;127:11,11;128:25
**personally (1)**
34:6
**personal-type (1)**
127:16
**perspective (7)**
11:15;68:14;75:17;
80:11;116:14;124:10;
150:13
**persuade (3)**
110:19;112:24;
120:23
**persuaded (5)**
10:11;43:7;97:18;
102:19;104:11
**persuasive (1)**
96:20
**pervious (1)**
102:10
**PG&E (49)**
12:16;13:1;15:14,24;
17:7,10,13;18:2,6,8,10;
19:6,10,10,10,10,10,16;
36:1;41:2;53:6;65:6,
20,25;66:8,12,18;67:6,
14;69:16;72:22;78:9;
81:2,21;89:4;93:4;
97:3;98:6;104:5,5,5;
108:5;129:11,16;
132:16;149:8,11,19;
150:8,13
**PG&E's (11)**
14:4;17:7;18:11;
19:15;64:18;66:25;

67:16;68:6;69:17,20,
25
**PGE's (1)**
13:21
**ph (1)**
78:23
**phase (3)**
67:7;80:24;83:7
**phone (8)**
11:6;32:21;33:1,16;
45:10;59:3;99:3;
121:16
**phones (1)**
99:18
**physics (1)**
102:25
**pick (3)**
99:3;116:24;142:22
**picked (1)**
80:16
**piece (3)**
84:5;90:17;115:9
**pieces (1)**
39:10
**pin (1)**
107:2
**pinning (1)**
144:3
**pipeline (3)**
65:11,12,13
**piss (1)**
153:6
**pitch (1)**
49:2
**Pitre (17)**
96:18,19,24;97:1,7,
22;98:2,5;99:8;100:8,
14,24;101:2,4,12;
102:12;161:18
**pivot (1)**
48:12
**place (6)**
46:24;62:21;67:22;
74:4;77:22;119:17
**placing (1)**
147:25
**plaintiff (5)**
35:22;97:13;121:9,9;
130:23
**plaintiffs (6)**
19:4;47:2;91:6;
102:20,22;139:9
**plaintiffs' (5)**
59:18;86:2;112:14;
142:6;160:1
**plaintiff's (1)**
139:20
**plan (97)**
7:20;8:5;15:3;23:21,
25;24:1,1,17,19;25:17;
26:3;27:22;30:13,15;
31:2,8,12;33:20;34:16;
35:2,5;36:11,12;38:23;

39:21;42:11,20,22;
43:1,19;44:21;45:8;
46:18;47:20,23;48:5;
49:25;50:16,16,21;
51:16,20;55:1,17;56:6,
23;57:7,18;58:7;59:10;
60:23,23,25;61:1;
63:19;64:18,24;65:15,
16,22,23;66:13,20,25;
67:12,16;69:1;70:21,
22;71:5,21;72:13,15;
73:25;74:10,15,16;
75:5,17,21;76:6,16;
77:3,3,9,17;119:2;
125:8,22;126:4;154:6;
156:23;166:12,13,19;
167:7,16
**plan-and-disclosure- (1)**
56:15
**plan-disclosure-statement (1)**
79:15
**plans (7)**
24:5,24;36:4;38:24;
56:21;154:6;155:4
**plan's (1)**
77:7
**playbook (1)**
105:10
**players (2)**
79:7;160:17
**plays (1)**
24:20
**pleading (1)**
113:17
**please (4)**
57:8;64:14;125:5;
151:24
**pleased (3)**
46:21;97:1;100:9
**plug (1)**
103:14
**plugged (3)**
74:4;75:25;76:16
**plus (17)**
37:22,22;38:12,12,
13,13;40:8,8,9,9;41:20;
43:8,8;45:22;47:2;
139:7;159:10
**pm (3)**
125:3,3;167:23
**podium (1)**
56:10
**point (48)**
11:18;13:13;14:25;
15:6;16:22;21:24;22:6;
27:13,14,21;30:10;
34:8;42:24;43:5;46:17;
47:11,16;62:24;63:2;
75:1;77:1;80:6;81:21;
83:12;87:6;89:2;92:2;
95:25;98:14,20;
100:16;103:3;108:8,
23;113:5,6;116:3,9;

119:14;123:11;129:5,
6;144:17;154:25;
157:1,2;158:23;162:14
**pointed (4)**
9:9,10;122:11;
158:23
**points (4)**
35:17;61:7;133:20;
135:16
**poles (1)**
89:6
**policies (3)**
149:19,20,21
**pool (1)**
15:21
**pools (1)**
14:11
**populace (1)**
98:23
**portion (2)**
20:10;30:18
**position (15)**
16:25;18:4;75:20;
80:19;101:18,19;
107:25;108:18;123:18;
134:7;136:23;141:2;
143:24;158:12,21
**positions (1)**
22:12
**possessions (1)**
127:14
**possibility (1)**
76:22
**possible (1)**
161:4
**possibly (3)**
52:11;59:1;90:13
**post (1)**
126:11
**post-2000 (1)**
153:3
**posted (1)**
126:10
**post-reorganization (1)**
72:16
**pot (2)**
25:18;30:4
**potential (2)**
69:25;137:20
**potentially (1)**
103:12
**practices (1)**
161:9
**pre- (1)**
109:10
**precedent (2)**
71:4;81:12
**precluded (1)**
92:17
**predicate (1)**
137:13
**preferable (1)**
124:11

**preference (1)**
97:4,13,13;101:16
**preferences (1)**
103:5
**preferential (1)**
103:21
**prejudge (1)**
70:7
**pre-judgment (1)**
119:24
**preliminary (3)**
66:21;70:17;78:15
**premise (1)**
43:5
**preparatory (1)**
128:6
**prepare (1)**
159:11
**prepared (6)**
7:5;23:13;88:6;
104:20;110:11;143:17
**pre-petition (2)**
69:18,22
**present (1)**
50:16
**presentation (1)**
155:4
**presented (3)**
43:18;67:7;154:7
**preserve (3)**
107:24,25;108:17
**preserving (1)**
108:2
**preside (1)**
105:24
**President (1)**
35:3
**presiding (2)**
132:6;156:18
**press (1)**
8:2
**pressing (1)**
45:17
**presumably (3)**
66:13;129:10;131:24
**presume (5)**
5:7;97:13;102:7;
125:12;130:7
**presumption (2)**
25:3,4
**pretend (2)**
57:15;131:22
**pre-trial (5)**
108:25;109:2,5,6,7
**pretty (3)**
44:25;77:8;125:12
**preview (1)**
166:14
**previous (1)**
56:10
**price (1)**
98:17
**prima (4)**

PG&E CORPORATION AND PACIFIC
GAS AND ELECTRIC COMPANY

Case No. 19-30088
August 27, 2019

130:7,10,23;131:22
**primarily (1)**
119:21
**Prime (2)**
118:12;153:12
**principal (5)**
97:16;104:19;
120:17;125:21;160:16
**principally (1)**
123:23
**prior (8)**
12:20;66:5;76:20,24;
79:21;106:4;129:10;
134:22
**priority (1)**
15:6
**private (4)**
80:7;82:24;83:21;
90:4
**privately (4)**
52:15;87:8,16;88:19
**proactive (2)**
161:17;165:6
**probably (11)**
42:22,25;47:6;54:13;
57:1;59:19;88:3;
112:11;120:10;121:24;
153:6
**problem (11)**
5:21;10:5;17:5;28:6;
40:20;90:20;104:12;
115:8,10;149:22;
164:10
**problems (2)**
41:11;120:21
**procedural (3)**
88:16;132:9;166:24
**procedurally (4)**
160:13,20;162:20,21
**procedure (9)**
8:19;63:19;100:21;
106:21,22;114:8;
123:13;136:14;161:9
**procedures (1)**
109:1
**proceed (3)**
86:25;128:19;132:10
**proceeding (13)**
12:22;19:15;23:6;
44:10;46:11;74:20;
75:19,22;100:21;
108:2,6;150:25;155:19
**proceedings (8)**
65:8;70:4;72:3,7,18;
109:12;114:17;167:23
**process (67)**
8:4;12:7,11,13;
14:25;15:21;24:13;
27:22;29:8;30:13,19;
34:8;38:14,18,23;40:4,
5;48:24;49:21;51:2;
57:6;60:24;64:13;65:3,
4;66:20;67:5;70:25;

71:4,12;73:8;76:8;
78:16;84:10;86:1;90:7;
93:19;103:15;104:25;
105:21;107:10;116:17;
120:12,14;123:18,19;
127:10,25;128:18,24;
129:7,25;131:21;
132:18;136:14;139:16,
21,23;141:4;150:2;
151:6;154:11,19;
155:8,8,23;161:9
**processes (6)**
41:15;65:2;70:3;
73:3;74:2;116:20
**produce (10)**
15:23;18:16;20:23;
144:13,16;148:19,20;
149:7,9,20
**produced (3)**
17:15,17;150:9
**produces (1)**
160:3
**producing (1)**
151:3
**product (3)**
15:10;40:4;44:3
**production (2)**
18:17;142:9
**professionals (2)**
9:11;77:16
**program (2)**
44:17;149:7
**programs (1)**
136:12
**projections (2)**
36:4;45:8
**promises (1)**
149:8
**promissory (1)**
130:18
**prompt (2)**
53:15;72:17
**promptly (2)**
52:7;66:20
**proof (9)**
105:16;123:6,7,10;
128:12;130:12,15;
132:11;133:21
**proofs (4)**
116:23;123:16;
129:8,9
**proper (6)**
17:4;67:19;129:6;
130:25;131:19;146:4
**properly (1)**
121:1
**property (10)**
38:7;107:18;110:24;
112:2,25,25;114:4;
120:10;127:13,17
property-damage/personal-injury (1)
114:3
**proponent (1)**

66:13
**proponents (1)**
36:12
**proportion (1)**
62:12
**proposal (6)**
50:11;85:13,16;
104:8;105:7;153:18
**proposals (2)**
42:12;153:20
**propose (5)**
9:22;11:18;83:6;
84:18;165:7
**proposed (12)**
6:1;36:11;38:24;
56:21;79:18,19;80:23;
86:10;92:10;103:19;
160:16;166:2
**proposing (4)**
46:25;84:4;122:15;
123:20
**proposition (1)**
129:2
**prospect (1)**
58:6
**protective (1)**
161:10
**protocol (1)**
161:23
**prove (1)**
133:16
**proven (1)**
35:23
**provide (11)**
27:8;28:12;36:13;
54:9;73:11;77:2;100:9;
128:18;134:21;155:24;
164:10
**provided (8)**
15:10;18:15;95:19;
122:19;133:3;134:2,
21;135:18
**providing (2)**
44:21;134:20
**provision (1)**
68:2
**public (14)**
25:5;27:2;35:22;
37:12;59:16;64:5;80:7;
82:19,24;83:21;87:8,
16;90:4;93:1
**public- (1)**
17:23
**public-entity (1)**
47:1
**puppet (1)**
106:21
**pure (6)**
84:6;89:21;90:10;
94:10,11;156:20
**purely (2)**
88:21,21
**purporting (1)**

49:24
**purpose (1)**
72:5
**purposes (6)**
37:17;50:19;56:14;
110:6,7;140:16
**purse (1)**
92:22
**pursuant (1)**
151:16
**push (3)**
15:24;18:19;125:13
**pushing (2)**
98:18;137:11
**put (15)**
23:16;27:1;30:15;
42:12;44:16;45:19;
55:13;59:2;95:13;
106:14;107:19;118:24;
126:2;151:1;152:23
**puts (1)**
50:22
**putting (2)**
112:16;121:19
**puzzle (1)**
39:10

## Q

**quantification (2)**
72:5,10
**quantified (2)**
56:20;123:3
**quarrel (1)**
45:4
**quasi-judicial (1)**
70:5
**questionnaire (1)**
140:7
**quick (6)**
9:20;61:7;102:11;
151:11,13;165:25
**quickly (5)**
42:23;84:5;93:7;
102:25;158:6
**quite (1)**
90:6
**quote (1)**
17:21
**quoted (1)**
55:12
**QURESHI (16)**
49:12,14,15,16,17,
19;50:7;51:3,7,9;52:9,
20,22;53:2,12,21

## R

**raise (11)**
11:17;20:5,24;47:25;
49:20;51:9;73:6;92:23;
107:9;108:9;109:4
**raised (15)**

21:4;39:6;64:7;
70:11,23;85:25;104:7;
109:20,21,22;113:15,
20;157:7,9,18
**raises (2)**
48:3;94:3
**raising (1)**
47:20
**rambling (1)**
133:11
**range (3)**
25:11;73:15,16
**ranges (1)**
139:25
**rate (3)**
67:18;69:11;88:4
**ratemaking (5)**
65:16;68:3;72:19,24;
74:13
**ratepayer (1)**
67:9
**ratepayers (2)**
67:19;73:22
**rates (5)**
8:8;30:1;68:5;72:17;
92:24
**rather (8)**
9:10;16:7;52:23;
84:7;85:1;86:11;
120:25;121:25
**re (2)**
128:16;129:2
**reach (2)**
29:14;49:8
**reached (2)**
65:22;67:6
**react (1)**
62:5
**reaction (1)**
53:17
**read (22)**
20:15;25:17;29:12,
13,13;30:3;51:10;59:5,
18;67:21;89:13;101:8,
10;111:13,14;133:1;
143:1;149:21;152:22;
154:22,22;166:12
**readily (2)**
118:7;120:1
**reading (3)**
67:22;80:3;145:2
**ready (8)**
16:10;52:2;142:12,
12;147:12;148:8;
166:25;167:1
**real (7)**
120:24,25;154:9;
156:7,10,15,16
**realistically (1)**
36:10
**reality (1)**
154:6
**realize (2)**

34:3;161:16
**realizes (1)**
41:2
**really (16)**
9:3;22:10;23:14,18;
27:22;29:17;42:9;
44:23;58:5;64:2;85:5;
104:3;110:21;116:17;
128:8;158:23
**reason (16)**
11:23;18:13,18;
40:12;46:12;51:22;
57:12;92:6;100:2;
108:1;109:4;114:9;
132:4;146:25;147:10;
161:4
**reasonable (3)**
47:5;125:15,16
**reasonableness (1)**
68:5
**reasons (9)**
12:18;90:6;97:15,19;
105:11;106:18;131:25;
141:24;142:7
**reassessment (1)**
48:9
**rebuild (1)**
138:6
**rebuts (2)**
130:19,22
**recall (9)**
25:7,11;65:24;85:23;
101:17;109:22;114:18;
135:23
**receive (1)**
136:20
**received (3)**
18:17;150:13;163:20
**recent (1)**
93:3
**recently (2)**
118:13;145:16
**receptive (1)**
42:23
**Recess (1)**
125:3
**recognition (1)**
67:19
**recognize (1)**
50:2
**recognized (1)**
86:5
**recollection (1)**
109:20
**recommendation (3)**
85:22,24;105:11
**record (15)**
20:1;46:7;49:14;
70:10;80:12,20;87:22;
102:7;120:25;133:18;
146:22;152:14;158:16;
159:15;164:16
**records (1)**

146:13
**recovery (4)**
113:25;115:2;
119:22;122:18
**redetermining (1)**
25:8
**red-hot (1)**
97:23
**reduced (2)**
9:1;38:17
**reevaluation (1)**
48:10
**refer (2)**
64:16;65:8
**reference (4)**
23:11;111:13;143:8;
152:22
**referenced (2)**
31:24;135:18
**references (2)**
135:24;143:9
**referred (1)**
67:13
**referring (2)**
81:18;142:19
**reflect (1)**
152:15
**reflecting (2)**
6:11;32:3
**refuted (1)**
134:8
**regard (4)**
58:15;88:4;89:3;
90:2
**regarding (3)**
78:1;89:11;157:7
**regardless (2)**
19:8;43:9
**regular (3)**
53:6;99:12;100:3
**regulatory (1)**
65:8
**reinvent (1)**
119:9;160:20
**reiterated (1)**
42:19
**relate (6)**
12:4;15:22;19:13,14;
28:5;72:2
**related (5)**
12:12;65:2;67:13;
114:1;122:13
**relates (5)**
17:7;62:12;63:2;
71:1;144:22
**relating (7)**
64:17;65:6;67:17;
69:17,21,25;74:13
**relative (1)**
13:16
**releases (1)**
8:2
**relevant (5)**

33:24;55:15;70:19;
92:10;151:4
**reliable (1)**
60:20
**relief (6)**
21:25;96:20;104:10,
12;151:16;159:6
**rely (1)**
53:14
**relying (1)**
53:14
**remain (1)**
125:5
**remains (1)**
100:22
**remediation (1)**
120:8
**remember (5)**
25:12;75:10,11;
116:7;136:4
**Remind (1)**
163:25
**reminding (1)**
37:4
**remote (1)**
17:24
**renew (2)**
43:4;52:2
**reorganization (2)**
39:4;67:1
**reorganized (4)**
68:8;69:10;72:25;
77:15
**repairing (1)**
148:2
**repeat (1)**
90:7
**repeated (2)**
20:19;149:8
**repeatedly (1)**
72:4
**rephrase (1)**
50:15
**replaced (1)**
15:18
**reply (4)**
11:17,22;95:3;
114:18
**report (6)**
97:1;99:15;100:5,9;
144:22;146:14
**reports (7)**
15:14;99:13;143:16,
16;146:13;147:1,7
**representatives (3)**
27:15;32:18;67:9
**representing (5)**
25:13;27:14,15;56:1;
166:11
**request (17)**
7:11;11:25;17:13,18;
18:18;19:20;20:6;21:5;
22:10,13;134:5;

136:23;144:8,9;
148:12;151:25;160:11
**requested (1)**
109:7
**requests (10)**
20:8;21:24;22:4;
135:11;136:17;151:23,
24;160:12,21;163:21
**require (9)**
66:16;70:5,20,24;
74:12;78:11;81:7;83:7;
139:3
**required (4)**
29:9;65:1;68:2;
70:21
**requirement (1)**
93:9
**requirements (2)**
29:23;43:8
**requires (3)**
69:23;74:15;127:3
**requiring (1)**
66:11
**rescue (1)**
46:5
**research (1)**
128:13
**resolution (15)**
15:4;16:21;29:15;
49:3,8;66:11,16;69:23;
72:6,18;78:11;84:20;
92:17;100:21;116:14
**resolve (6)**
65:15;70:10;80:7;
83:23;86:22;164:17
**resolved (4)**
77:20;82:6;118:23;
128:21
**respect (23)**
7:20;25:24,25;29:10;
35:19;38:25;51:4,16,
19;69:18;80:22;81:18;
84:11;115:11;133:22,
25;135:17,22;137:7;
139:6;146:15;158:22;
163:7
**respectfully (2)**
119:10;148:12
**respective (1)**
68:8
**respond (14)**
86:2;88:21;91:7;
107:11;131:12,24;
136:17,23;141:5;
148:1;159:7,8;160:11;
163:20
**responded (2)**
132:21;136:5
**responding (5)**
11:9;22:25;94:7;
133:7;135:11
**response (17)**
9:10;10:4;17:18;

21:14;22:15,16;23:12;
86:4;107:10;120:5;
122:9,19;136:18;
140:20,22;146:11;
164:11
**responses (7)**
134:4,5,21;143:2;
146:18;152:1,4
**responsibility (4)**
14:5;69:12;105:13;
132:16
**responsible (1)**
19:16
**responsive (2)**
21:4;143:3
**rest (4)**
7:5;85:8;143:1,1
**restate (1)**
158:13
**result (4)**
17:2,4;33:9;71:13
**results (4)**
74:20,23;75:19,21
**return (3)**
69:11;87:20;103:21
**reverse-engineering (1)**
46:23
**review (1)**
155:5
**reviewed (2)**
5:23;6:9
**revised (1)**
6:1
**revisit (1)**
127:22
**revisited (1)**
28:17
**Richard (2)**
53:24;151:13
**RIDDLE (4)**
19:1,3,3,18
**Rifkind (1)**
64:5
**Right (140)**
6:13;7:21;9:25;
14:13;15:1,1,19;17:4,5,
5;20:6,16,17,18;21:1,
18,22,23;22:1,2;24:23;
25:22;27:3,4;28:13,21;
29:12;30:5,8,23;31:9,
16,25;32:2,2,7;34:12;
35:9;37:2,8,12,18;
38:16;40:10,16;41:3,
24;42:1,7,18;45:15,22;
48:1,6,11;50:17,21;
51:2;53:1,6,7,15;54:5;
55:12;58:12;59:18;
60:1,16;63:16;65:17;
66:1;67:21;68:12;
71:15,20,24;72:14;
76:3,12;78:12;79:1;
80:5,24;81:3,13;87:1;
89:20,24;91:9;92:19;

98:4;101:5;102:15,24;
105:17;106:1;112:10;
113:1,22;116:22,24;
120:2;121:14;122:24;
123:8;124:1,17;
125:19,23;126:2;
135:17;136:15;137:20;
138:14;139:2,8,10,12;
140:12;141:18;146:5,
8,18,19;154:15;155:12,
14,17;156:22;157:12,
17;159:2,4;161:11;
163:11,13;164:22;
165:13,14;167:20
**rights (2)**
50:3;112:23
**ripe (1)**
137:3
**rise (1)**
125:4
**risk (8)**
17:14;18:7;20:21;
25:6;87:13,15,18;
110:11
**role (4)**
104:18;106:15,16;
120:13
**room (5)**
40:13;41:2;153:10,
10;154:25
**roughly (2)**
36:23;103:9
**round (2)**
39:21;43:20
**rule (8)**
41:13;57:25;81:11,
20;90:18;91:16;102:2;
136:9
**ruled (1)**
91:17
**rules (10)**
13:10;31:24;34:18;
41:14;51:1;69:21;82:3;
93:25;128:18;130:7
**ruling (5)**
51:11;76:21;91:25;
92:1;161:14
**rulings (3)**
70:22;78:15;109:11
**run (4)**
15:16;116:20;
153:12,12
**running (1)**
41:23

**S**

**safe (1)**
25:16
**safely (1)**
19:8
**safety (4)**
17:24;67:10,17;

69:24
**same (33)**
13:13;25:1;26:13;
28:7;33:9,22;36:16;
40:18;45:18;46:22,24;
58:15;67:22;68:19;
75:6;84:22;85:9;89:7;
105:16,18,19;115:10;
116:10;127:10;130:25;
135:13,14;138:18;
142:24;149:14;160:6;
163:24,24
**SAN (7)**
5:1;45:10;62:15;
97:2;101:20;112:17;
165:19
**sanction (2)**
98:10,11
**sanctioning (1)**
98:13
**satisfaction (1)**
130:21
**satisfactory (1)**
165:9
**satisfy (1)**
37:23
**Saturday (2)**
141:22;143:11
**saw (1)**
36:5
**saying (30)**
13:12,12;28:10,23;
29:5;41:1;47:17;50:9;
55:5;78:25;83:9;88:9;
107:20;131:5,25;
134:15;140:11;144:2,
3;147:22;148:1,9;
149:15,16;150:19,24;
156:1,1;160:15;161:7
**scalability (1)**
46:18
**scale (1)**
47:16
**scenario (1)**
47:5
**schedule (15)**
23:19;53:6;78:21;
83:11;84:11,14;85:9,
18;86:10,13;87:25;
90:12;92:11;94:10;
95:9
**scheduled (3)**
34:17;52:23;56:21
**scheduling (3)**
86:9;127:6;128:6
**school (1)**
26:17
**science (2)**
155:15,20
**scope (2)**
108:6;136:13
**score (1)**
17:14

**scoring (2)**
18:6,8
**scream-or-die (1)**
9:21
**seated (1)**
125:5
**second (15)**
5:18,20;21:13;28:6;
39:11;51:7;81:19;83:7;
99:1;107:23;128:7;
142:5,16;145:12;154:5
**Secondly (1)**
123:15
**Section (2)**
57:21;155:9
**sections (1)**
29:14
**securities (2)**
9:2;59:18
**securitization (1)**
39:8
**seeing (2)**
48:13;124:16
**seek (1)**
24:2
**seeking (3)**
14:8,9;50:4
**seeks (1)**
87:19
**seem (2)**
25:11;28:5
**seemed (2)**
90:11;109:24
**seems (15)**
6:9;10:11;12:9;13:7;
16:4,11;26:21;31:4;
32:8,15;43:18;53:8;
113:1;142:21;160:2
**segue (1)**
44:9
**send (3)**
91:25;110:19,23
**senior (4)**
25:9;53:17;57:22;
60:14
**sense (16)**
24:1;34:2;37:21;
48:11;52:11;56:13;
76:14;109:11;110:15;
111:24;116:18;121:25;
129:16;131:20;160:15;
162:1
**sent (7)**
107:16;135:25;
136:1;141:14;145:18;
146:12;158:24
**sentence (2)**
71:21;128:14
**separate (10)**
70:6;79:17;80:9;
116:20;117:4;126:19;
161:2;166:13;167:2,12
**separately (5)**

11:12;41:14;70:12;
120:24;144:12
**September (16)**
23:19;29:2;31:2;
33:20;47:12;50:1;
51:17;64:18;75:14,18;
77:8;97:4;100:9;
101:21;126:4;163:21
**sequence (1)**
23:16
**sequencing (2)**
30:11;145:14
**series (1)**
11:16
**serious (1)**
153:8
**served (13)**
20:8;83:4;133:8;
141:5,22;142:3,5;
145:13;151:25,25;
152:1,3,4
**service (1)**
8:16
**services (6)**
7:4;12:17;15:12;
113:18;114:7;120:6
**serving (1)**
143:22
**session (1)**
103:24
**set (24)**
22:12;24:6;32:5;
41:14;52:7;62:5;69:10;
87:21;95:5;97:4;
100:12;102:15,18,21;
106:7;113:2;120:25;
130:11;140:11;145:12;
156:13;161:12,22;
167:1
**sets (3)**
70:17;94:10;140:10
**setting (4)**
85:17;86:13;88:16;
103:22
**settings (1)**
166:24
**settled (1)**
47:1
**settlement (16)**
38:4;40:3;65:5,10,
21;66:14,18,25;67:1;
69:14,16;72:8;74:24;
76:2;78:8;129:11
**settlements (1)**
153:3
**seventeen-and-a-half (1)**
60:15
**several (2)**
58:19;149:7
**shapes (1)**
72:16
**share (3)**
58:9,13;165:9

**shared (1)**
51:20
**shareholders (5)**
61:7,9,12;63:5;
166:12
**shed (1)**
115:1
**sheet (2)**
50:12;166:6
**shift (1)**
85:1
**ship (1)**
109:2
**short (3)**
5:8;121:25;134:17
**shorten (3)**
101:15;103:15;
161:13
**shorter (2)**
122:1;124:14
**shortfall (2)**
40:6,7
**shortly (2)**
104:24;124:16
**shot (1)**
152:14
**show (10)**
17:16;21:12;131:14,
18;137:16;139:3;
142:14;146:14;148:3;
149:23
**shows (1)**
117:9
**sic (7)**
6:20;7:8;13:16;
17:16;22:9;122:17;
129:4
**side (25)**
13:17;27:22;31:5;
45:5;50:10;61:24;79:7,
9;83:23;88:5;89:10;
94:6;97:12,23;98:15;
100:5,17;104:8;
105:20;111:11;112:11;
119:16;131:21;153:9;
160:25
**sides (3)**
38:22;49:2;121:6
**sidetracked (1)**
97:20
**signal (1)**
107:17
**signed (1)**
35:3
**significance (1)**
102:9
**significant (13)**
12:16;14:11;60:18;
64:25;71:14,18;78:10,
18;80:14;122:13;
135:19;140:9,11
**significantly (3)**
80:19;123:21;139:24

**similar (6)**
9:11;77:22;78:3;
121:16;122:9;160:6
**similarly (1)**
104:16;109:9
**Simon (30)**
86:15,22;87:1,2,2;
88:3,14,17,24;89:1,14,
16,25;90:1,22,24;91:2,
4,10,13,15,17,20,22,25;
92:2;93:8,8,11,14
**simple (13)**
25:19;34:24;35:6;
50:21;55:18,24;79:24;
80:1;81:6;98:6;143:7;
145:7,8
**simplified (5)**
35:2,4;55:1,11;58:16
**simplifies (1)**
51:2
**simplify (3)**
45:5;50:9;90:5
**simplifying (1)**
58:5
**simply (7)**
8:7;21:25;57:8;
82:16;92:25;107:7;
108:4
**single (6)**
17:18;92:18,19;
139:6;155:4;160:6
**Singleton (5)**
161:2,16;165:4,5,10
**sit (3)**
32:19;89:19;124:4
**sitting (2)**
9:22;99:11
**situation (5)**
52:24;63:18;74:22;
90:24;165:2
**six (2)**
57:17;150:5
**sixty-four-million- (1)**
104:2
**size (2)**
14:11;47:14
**Skikos (22)**
139:19;152:14,16,
19;153:16;154:15,17;
155:10,13,15,18;156:7,
10,22;157:6,9,12,14,
16,18,23,25
**sky (1)**
63:14
**SLF (4)**
54:4;151:14,15;
152:2
**slight (1)**
79:19
**slim (1)**
71:18
**slow (1)**
98:17

**small (2)**
35:1;55:3
**smaller (1)**
39:14
**snobby (1)**
58:22
**so-called (1)**
69:24
**solved (1)**
40:20
**solvent (5)**
36:11;46:20;48:4;
49:6;62:2
**somebody (8)**
13:5;21:10;53:3;
107:11;119:2;124:2;
127:22;165:9
**somebody's (1)**
44:15
**somehow (1)**
13:9
**someone (10)**
11:4;36:12;60:9;
79:9;104:13;107:8;
109:6;127:16;129:12;
151:8
**sometimes (2)**
99:16;116:21
**somewhere (1)**
132:17
**Sonoma (1)**
101:18
**soon (7)**
31:6;34:12;52:8;
78:18;125:10;126:13;
156:20
**sooner (6)**
16:7;52:23;74:19;
84:7,21;104:20
**sorry (8)**
76:23;125:19;
126:15;134:3;144:19,
19;158:5,14
**sort (15)**
11:12;13:15,20;
21:14;25:14;26:16;
35:17;36:6;38:11;39:3,
11;44:10;83:6;136:1;
161:10
**sound (3)**
60:20;157:2;164:4
**sounds (9)**
25:19;78:21,25;
83:15;118:14;121:1;
123:4;138:7;161:24
**source (3)**
30:1;131:7;132:3
**sources (10)**
26:8;9;27:8,16;
28:11;39:8;40:15;
47:23;63:10;73:11
**Southern (1)**
87:12

**speak (9)**
11:5;18:24;31:10;
35:9;56:14;60:9;85:21;
98:9,21
**SPEAKER (2)**
94:22;128:20
**speakers (2)**
56:10;77:6
**speaking (3)**
13:16;19:12;162:11
**specialist (1)**
8:7
**specific (6)**
15:21;64:6;70:23;
103:25;124:23;143:15
**specifically (4)**
18:17;19:14;23:10;
89:10
**specifics (1)**
152:21
**specified (1)**
136:10
**speech (2)**
157:23;158:8
**speedy (1)**
72:17
**spent (5)**
115:17,18;142:11;
147:11;148:7
**splitting (1)**
90:7
**spoken (1)**
160:24
**spread (3)**
80:16;87:13,15
**spreading (1)**
87:18
**staff (6)**
66:14,18;67:5;70:15;
72:23;78:9
**staffing (1)**
112:15
**stage (3)**
70:17;103:17;130:11
**stakeholder (1)**
60:18
**stakeholders (2)**
52:16,17
**stand (3)**
52:10;152:11;158:2
**Standard (1)**
136:14
**standards (2)**
57:19,20
**standing (1)**
52:2
**start (12)**
5:6;13:1;14:15;
22:12;46:9;57:20;62:9,
14;74:10;78:9;138:16;
139:23
**started (7)**
11:4;31:12;75:14;

83:2;142:3;147:1;
156:24
**starting (1)**
78:18
**starts (1)**
119:18
**State (21)**
39:9;80:1;81:1;87:3;
92:11,15;113:16,19,19,
21;114:4;119:25;
120:11;134:2;136:2,2;
141:12,23;142:6;
143:3;158:15
**stated (6)**
21:19;70:12;73:24;
82:16;107:24;108:3
**statement (64)**
27:24;30:14,14,16;
31:3,5,15;32:1,10,20;
33:9,22;35:3;41:13;
42:21;45:5,7;46:15;
48:14,17,21;49:22;
50:9,13,14,14;52:4,18;
53:14,15;54:11;55:1,
11,24;56:5,16;57:7,10,
13;58:8,16;59:1,16;
60:3,7;63:20;71:2,3,6,
9,17,18;79:21;130:7;
153:24;154:18;155:7;
156:23,24,25;166:2,6,
14;167:12
**statements (4)**
33:10;61:16;86:20;
134:22
**states (6)**
117:14;121:17;
122:16;123:13,20;
126:21
**States' (1)**
123:14
**state's (1)**
67:18
**stating (2)**
71:20;79:3
**station (2)**
30:17;109:18
**statistically (2)**
140:9,10
**status (15)**
5:5,6;23:1;34:14;
99:12;100:4,5,8;
104:24;126:3;135:23;
139:21;156:19;162:2;
166:22
**statute (6)**
55:12,14;67:15;
110:6;126:24;167:9
**statutes (1)**
70:4
**statutorily (1)**
97:24;98:3
**statutory (2)**
7:19;101:16

**stay (5)**
101:9;104:10,12;
107:18;151:16
**stays (1)**
110:24
**step (3)**
77:14;80:8;139:16
**stepped (2)**
37:4;63:5
**stepping (1)**
134:6
**steps (1)**
143:23
**Steve (2)**
149:1;152:16
**stick (6)**
23:16;46:12;93:24;
95:8;97:12;140:16
**sticking (1)**
22:10
**sticks (1)**
85:16
**still (27)**
8:25;10:19;12:24;
17:2;23:10,19;25:16;
48:4;60:11;74:1;78:2;
81:14,23;83:7;84:21,
22;108:18;109:9,13;
110:2;117:16;121:11;
127:18;137:20;143:20;
158:2;164:10
**stipulation (3)**
97:3;103:19;139:19
**stipulations (1)**
6:15
**stockholders (1)**
39:10
**stop (1)**
150:16
**stopped (1)**
149:12
**stops (1)**
30:17
**story (2)**
25:20;97:17
**straight (1)**
22:14
**straightforward (2)**
143:7;145:6
**strange (1)**
106:21
**Strauss (1)**
49:15
**streamline (1)**
48:14
**streamlined (3)**
49:21;54:1;61:18
**streamlining (1)**
48:16
**street (4)**
43:13;90:8;99:11;
100:1
**stretch (1)**

12:10
**strings (1)**
92:22
**strongly (1)**
99:22
**structure (7)**
47:21;68:9;70:1;
72:16,25;74:16;77:9
**structures (1)**
17:22
**stuck (1)**
116:22
**studied (1)**
132:25
**stuff (8)**
77:17;94:11;143:3;
144:3;145:14;159:11;
160:6,6
**styles (1)**
99:24
**subject (22)**
12:20;22:8,18;32:8;
34:9;45:19;51:23;
62:20;87:9;96:13;
98:12;99:7;108:22;
113:10;114:20;121:6;
123:13,17;126:9,14;
128:13;129:10
**submission (1)**
158:24
**submit (4)**
10:4;123:5;166:2;
167:14
**submitted (2)**
67:2;158:25
**subordinated (1)**
50:18
**subpoena (4)**
160:5;161:11;
162:16;164:13
**subpoenaed (1)**
159:23
**subpoenas (1)**
161:2
**subro (2)**
95:25;165:10
**subroga (1)**
137:21
**subrogation (16)**
25:9,13,24;27:18;
29:19;35:21;40:2;
46:25;53:18;62:7,15;
106:4;131:13;136:2;
137:7;158:20
**subros (1)**
115:11
**Substances (3)**
113:18;114:6;120:7
**substantial (3)**
72:12;74:12;123:12
**successful (1)**
71:3
**successfully (1)**

155:21
**suddenly (1)**
90:12
**suffer (1)**
106:6
**suffered (3)**
127:11,12,16
**sufficient (2)**
52:1;133:6
**sufficiently (1)**
51:4
**suggest (1)**
86:1
**suggested (6)**
46:11;79:17;85:2,14,
17;106:24
**suggesting (7)**
42:5;43:21;49:7;
69:4;80:15;85:3,5
**suggestion (8)**
33:21;62:3;84:15;
98:8;99:12;103:12;
106:3;124:19
**suggestions (1)**
99:20
**suggests (2)**
7:8;43:19
**sum (3)**
118:7,7;135:21
**summary (12)**
59:10;82:7;83:15,16,
24,24;87:7;88:9;92:5;
93:18,22,22
**superior (7)**
43:13;45:21;62:16;
91:4;96:23;97:2;98:9;
99:4;100:1,17;105:1;
126:8
**supervisors (1)**
149:25
**supplemental (1)**
6:12
**support (7)**
48:13;71:17;74:5;
93:24;129:3;142:9;
144:9
**supportive (1)**
57:1
**supports (2)**
130:16;132:14
**suppose (2)**
73:19;111:10
**supposed (4)**
15:3;147:20;149:11;
153:14
**supposedly (1)**
148:2
**Supreme (3)**
91:24;93:1;94:14
**Sure (32)**
6:11;9:15;34:23;
41:9;52:18;53:12;56:5;
58:14,14;59:11;64:10;

65:24;69:7;73:16,22;
79:6;83:9;88:23;97:14;
105:3;106:18;126:12;
135:13;136:10,18;
137:9;150:15;159:14;
164:4;165:21,21;
166:21
**surprised (2)**
33:8;126:9
**suspect (4)**
47:6;56:25;84:3;
107:2
**swing (1)**
62:21
**swinging (1)**
135:20
**switch (1)**
133:14
**switches (1)**
104:12
**switching (1)**
31:2
**system (2)**
18:8;126:18

## T

**table (2)**
79:7;112:18
**tag-teaming (1)**
23:3
**takeaway (1)**
66:19
**talk (15)**
13:4;16:2;23:1;
34:15;41:10;59:17;
64:2;77:5;79:14;95:14;
117:10;121:18;125:21;
152:21;153:24
**talked (5)**
56:11;107:1;124:15;
126:14;142:23
**talking (16)**
13:6;20:7;38:12,13;
54:13;56:12,15;62:14;
114:2,5;119:21;
129:14;150:25;154:10,
11,18
**TAR (1)**
149:7
**target (2)**
25:10;76:21
**targeted (2)**
44:16;143:15
**task (1)**
57:14
**TCC (32)**
7:4,9;16:15,25;
20:20;21:10;22:15;
35:19;42:9,11,13;
44:16;53:17;56:25;
62:4;85:14;86:2;95:20;
96:1;108:20;109:4;

131:13;132:21;133:8;
134:3;136:20;140:21;
151:24;158:24;159:6;
161:17;165:10
**TCC's (3)**
139:25;158:11,21
**team (1)**
17:19
**teasing (1)**
92:2
**teed (1)**
120:24
**telephone (1)**
99:16
**telephonic (1)**
99:18
**telling (11)**
16:4;27:7;51:1;
76:14;98:14;101:3;
104:22;107:5;133:11,
12;143:2
**tells (1)**
140:19
**temporary (3)**
119:4,6,7
**tempted (1)**
50:11
**ten (18)**
10:1;37:20,22;38:13;
40:8;44:14,18,24;
77:12;80:17,18,18;
89:17;93:14;139:24;
154:22;156:4;163:16
**ten-day (2)**
9:21;10:10
**tendered (1)**
138:5
**tens (2)**
123:2
**tentative (2)**
76:21;77:3
**term (7)**
32:17;50:12;52:16;
126:3;166:5,5,6
**terminate (4)**
43:4,6;51:11;52:2
**terminating (1)**
42:23
**terminology (2)**
93:20;163:1
**terms (18)**
24:15;27:13;34:24;
36:16;43:1;50:12;
55:20;56:15;66:10;
77:9;86:12;101:23;
103:8;112:1,1;157:19;
166:23;167:3
**terrible (1)**
148:4
**test (1)**
140:3
**testimony (2)**
74:12;103:24

**than-calculated (1)**
38:7
**Thanks (1)**
10:16
**that'll (1)**
34:9
**theories (3)**
21:15;133:14;135:10
**theory (11)**
7:11;123:22;131:10,
14,18;133:13;135:1,3;
144:6,25;145:24
**thereafter (1)**
95:5
**therefore (14)**
25:6;27:19;40:11;
42:8;44:3,9;56:4;
72:17;114:19;115:3;
123:17;132:13,16;
145:25
**there'll (4)**
24:18;77:5;87:21;
126:7
**There're (1)**
27:21
**There've (1)**
20:23
**thinking (6)**
34:22;61:22;84:25;
125:7;127:19;128:25
**third (6)**
17:14;63:2;92:13;
108:8;137:7;145:12
**third- (3)**
12:16;15:4;16:14
**third-party (20)**
10:19;12:9,13;13:8,
19;14:21;15:7,10,11,
22;16:24;17:17;18:10,
12,14;19:5;20:9;
164:13,14,18
**thirty (5)**
139:25;142:11;
143:18;147:11;148:7
**thirty-five (1)**
54:21
**thirty-seven (1)**
54:20
**Thomas (1)**
87:11
**thoroughly (1)**
145:21
**though (5)**
57:24;76:16;86:14;
109:17;146:4
**thought (20)**
9:16;34:11,18;37:15;
41:17;64:7;79:23;
83:10;88:1;91:7,10,18;
94:21;97:9,10;111:6;
124:14;126:11;127:3;
128:9
**thoughtful (1)**

129:4

**thoughts (2)**
124:21,24

**three (11)**
9:17;36:12;40:16;
45:12;59:3;61:7;67:21;
117:22,25;121:20;
151:12

**threshold (4)**
40:15;81:22;83:25;
84:6

**threw (1)**
62:6

**throughout (1)**
138:24

**throw (1)**
90:24

**throwing (1)**
139:14

**ticking (1)**
16:9

**tied (1)**
66:25

**tight (2)**
53:9;78:21

**times (5)**
58:19;113:3;127:18;
151:12;156:4

**time's (1)**
92:13

**timing (5)**
13:7;34:6;48:25;
102:9;104:25

**today (48)**
5:4,19;10:20;11:8,
12;13:4;17:1;20:19;
24:24;28:11;34:14;
40:13;41:10,18;42:17,
19;43:17;48:8,13;64:2;
70:20;73:25;86:22;
94:12;97:11;105:4;
107:15;120:19;128:2;
136:24;137:3;138:23;
140:22;141:7;142:12,
23;150:23;151:22;
153:15,16;154:13;
157:4,5,6,8,13,22;
161:14

**today's (2)**
23:6;56:13

**together (6)**
50:6;98:24;112:16;
136:23;160:5;167:4

**told (5)**
36:24;43:11;56:2;
106:16;118:6

**took (1)**
109:25

**toolbox (1)**
119:9

**tools (1)**
119:8

**topic (1)**

79:13

**topics (1)**
136:10

**tort (22)**
10:24;14:6,15;35:14,
21;36:15,17;37:25;
41:4;46:19,22;47:14;
103:12;110:8;123:24;
129:20;152:24;155:2,
11,22;159:23;161:1

**torts (1)**
56:17

**toss (2)**
41:12;110:4

**total (5)**
36:2;61:25;135:21;
138:5;153:19

**towards (3)**
76:18;133:6;135:20

**Toxic (3)**
113:18;114:6;120:7

**track (11)**
23:19;30:16,16;
42:20;52:5;69:4;76:18;
77:22;78:3;79:16;
145:21

**tracks (1)**
30:15

**trade (1)**
36:14

**tradeoff (1)**
167:15

**traditional (5)**
30:13;59:16;130:12;
132:8;161:8

**train (1)**
109:18

**transactions (1)**
67:13

**trauma (1)**
112:4

**treat (3)**
36:19;120:23;131:3

**treated (3)**
39:14;61:2;119:23

**treating (1)**
35:5

**treatment (4)**
26:18;33:25;56:3,10

**Tredinnick (2)**
95:22;96:6

**tree (10)**
145:23;146:13,13,
14,14,15,17,21;147:1;
150:11

**trees (4)**
112:6;150:1,1,3

**trench (2)**
89:4,5

**trial (33)**
41:21;88:14;100:12,
12;101:17;102:15;
103:8,10,13,16,20,21;

105:21,23,24,25;109:7,
9;117:4;129:11;
130:23;132:7,8,9;
133:15;136:2;142:12;
147:14,17,17,19;
154:12;155:25

**trials (1)**
147:24

**trick (1)**
92:14

**Trident (7)**
6:20;7:4;8:14,16,20;
9:24,25

**Trident's (2)**
7:9;9:18

**tried (4)**
98:8;104:4;105:11;
109:11

**trier (1)**
105:15

**trigger (1)**
64:22

**triggering (1)**
64:19

**triggers (1)**
167:8

**trimmers (1)**
146:14

**trouble (2)**
13:19;98:16

**Troy (12)**
121:15,24;122:3,4,5,
21,22,25;123:5,9,11,25

**truck (1)**
19:10

**true (5)**
9:12;45:23;100:17;
115:10;121:8

**truly (1)**
122:14

**truncated (1)**
9:3

**trust (2)**
56:24;77:11

**Trustee (5)**
10:3;54:21;60:14,24;
130:9

**try (15)**
24:2;31:11;46:15,23;
77:4;79:13;88:8;90:16;
125:21;139:22,22;
140:22;155:24;161:25;
164:17

**trying (15)**
15:24;16:2;38:21,22;
39:16;41:10;44:23;
50:8;55:8;124:8;125:9;
136:22;143:20;145:13;
150:22

**Tubbs (13)**
26:22;28:20;34:5;
38:5;56:19;62:13,21;
104:4;121:8;132:1,15;

144:22;151:16

**TUESDAY (2)**
5:1;163:21

**turn (4)**
10:1;39:19;132:19;
147:12

**turned (2)**
73:20;143:18

**turns (1)**
151:6

**twelve (1)**
125:22

**twenty (3)**
56:25;93:11;121:10

**twenty-five (1)**
93:25

**twenty-four (1)**
145:22

**twenty-nine (1)**
37:22

**twenty-one (1)**
127:18

**twenty-two (2)**
113:3;127:18

**twice (2)**
92:11;142:24

**two (39)**
5:5;9:17;22:12;25:2;
26:21,24;27:22;32:18;
40:12;43:11,15;49:2,
20;56:21;61:8,14;
65:21;73:6;78:22;80:9;
99:12,23;101:12;
116:20;124:23;134:9;
135:15;136:22;137:6,
22;140:23;141:22,23;
142:10;145:7;148:12,
15;151:15;163:7

**type (3)**
33:25;52:22;122:9

**types (7)**
21:20;38:24;48:5;
102:12;114:7;120:8,8

**typically (1)**
55:3

---

**U**

**ultimate (3)**
65:4;84:20;157:20

**ultimately (8)**
20:3;62:11,17;70:18;
72:15;82:5;156:14;
159:6

**Um-hum (11)**
8:3;16:6;24:14;
29:20;31:13;41:16;
42:4;44:12;60:16;63:7;
77:18

**unable (1)**
42:9

**uncertainty (1)**
24:12

**uncharted (1)**
128:17

**uncommon (1)**
50:21

**unconstitutional (1)**
81:5

**uncontested (1)**
5:19

**under (23)**
7:19;24:17;29:9;
34:7;37:25;38:1,19;
44:17;46:18;47:4;
60:22;67:15;68:3;81:1,
6;82:15;83:1;107:21;
109:1;119:25;131:10;
156:11;167:9

**underlying (4)**
51:20;82:9;83:19;
137:8

**understands (5)**
14:17;34:8;47:6;
102:8,14

**understood (8)**
81:3;86:24;106:8;
121:22;138:18;150:21;
154:2;160:22

**undisputed (2)**
83:6;129:13

**unfortunate (1)**
13:15

**Unfortunately (1)**
48:18

**UNIDENTIFIED (2)**
94:22;128:20

**uniform (1)**
19:10

**unimpair (3)**
48:2;49:25;50:4

**unimpaired (6)**
25:2;49:6;50:23,24;
60:22,23

**unique (1)**
165:2

**uniquely (1)**
8:18

**UNISON (1)**
125:24

**United (5)**
121:16;122:16;
123:12,14,20

**universe (1)**
51:14

**University (1)**
113:19

**unless (7)**
14:23;71:22;86:23;
87:13,14;100:2;107:11

**unlimited (4)**
27:9;29:2;63:13,14

**unliquid (1)**
117:12

**unliquidated (21)**
73:5;114:20,21;

PG&E CORPORATION AND PACIFIC
GAS AND ELECTRIC COMPANY

Case No. 19-30088
August 27, 2019

115:3,5,15,21;117:7,
25;118:14;119:17;
122:22;123:4,17;
126:19,24;129:15,18;
130:4,16;156:21
**unnecessary (1)**
31:4
**unrelated (1)**
23:9
**unremarked (1)**
62:25
**unsecured (1)**
46:8
**unsettled (1)**
110:6
**unsuccessful (1)**
140:2
**up (49)**
5:3;7:23;8:14;12:7,
25;16:23;18:24;19:20;
32:5,19;34:9;41:23;
47:17;52:10;55:17;
58:17;63:5,14;77:14;
80:16;85:8,19;86:5;
87:12;90:8,17;92:4;
98:16;99:3;100:2;
101:21;104:11;106:4;
109:1;116:6,6,8;117:9;
120:7,24;124:21;
128:4;135:3;140:6;
152:11;155:23;156:13;
162:3;165:8
**up/down (3)**
80:25;81:6;102:13
**up-and-down (1)**
87:7
**upcoming (1)**
24:13
**update (2)**
101:11;139:21
**upload (2)**
6:5;10:8
**upon (14)**
18:7,14;27:17;62:25;
68:6;70:16;82:15;
109:25;110:13;124:15,
15;130:20;139:15;
167:3
**up-or-down (1)**
87:22
**upstairs (2)**
156:19;167:22
**urgency (1)**
98:24
**use (11)**
40:7;43:1;50:12;
52:16;55:6;83:21;
84:20;90:4,4;114:9;
161:8
**used (5)**
12:16;15:14,14;
17:14;107:25
**useful (1)**

104:6
**using (4)**
29:18;77:25;161:9;
163:2
**usually (1)**
45:7
**Utilities (4)**
64:5;88:19;93:1;
94:16
**utility (8)**
63:10;81:2;84:2;
87:8,16,16,19;103:6

**V**

**vacuum (1)**
72:20
**validity (1)**
137:9
**valuation (1)**
61:10
**value (29)**
35:24;36:2,3,7,9,20;
37:24;38:18,20,25;
39:13,19;40:19;41:3,6;
42:8;46:23;47:4,15;
56:11;59:9;61:25;
80:17,19;138:4,13;
139:15;155:1,2
**variety (4)**
57:20;65:6;69:14;
106:18
**various (6)**
5:7;89:8;90:8;
109:11;119:16;122:6
**vary (1)**
27:1
**vast (2)**
129:14,25
**vastly (1)**
61:25
**vegetation (1)**
136:11
**vehicle (1)**
47:20
**ventriloquist (1)**
106:20
**venue (1)**
104:12
**verdict (1)**
103:14
**versa (1)**
69:5
**version (2)**
68:11;159:10
**versus (10)**
44:18;80:7;81:11;
105:4;107:14;108:7;
109:15;110:7;126:15;
128:1
**Veteran's (1)**
113:19
**vetted (2)**

31:8;80:2
**viable (3)**
10:19;60:19;79:25
**vice (1)**
69:5
**victim (11)**
37:6;38:2;55:20;
74:1;113:21;120:9;
122:17;127:12,12,13;
137:18
**victims (30)**
7:12;8:13,20;9:8;
17:3,4;26:25;27:17,24;
29:10,18,18,21;30:4;
33:14;37:19;46:19;
50:19;54:6;55:16,21;
57:16;59:13,21;60:2;
76:18;77:11;110:12;
132:14;151:14
**victims' (2)**
72:6;106:5
**victim's (1)**
127:13
**view (12)**
6:4;13:13;32:3;
35:17;43:6;85:25;
100:11;109:5;123:14;
131:12;149:5;151:7
**views (6)**
33:8,12;44:11,13;
103:7;104:6
**violates (1)**
57:25
**violation (1)**
69:20
**virtually (1)**
104:18
**vis-a-vis (1)**
49:23
**voice (1)**
105:24
**vote (10)**
50:25;55:17;57:1,17;
74:12;76:6,7,10;
118:25;119:7
**voter (1)**
56:4
**voters (1)**
57:21
**votes (1)**
124:18
**voting (1)**
58:4

**W**

**wait (4)**
18:13;57:22;142:16;
152:10
**waiting (2)**
61:5;143:21
**waive (1)**
97:13

**Walker (1)**
99:17
**walking (1)**
99:10
**wants (12)**
42:13;60:9;86:18;
95:22;96:2;98:22;
100:18;107:11;119:2;
127:22;148:22,22
**warranted (1)**
21:25
**waste (1)**
21:2
**wasted (1)**
33:10
**water (1)**
89:5
**way (8)**
8:8;9:5;17:12;20:17;
24:2;28:22;29:12;35:3,
15;39:13,20;40:15;
42:13;44:14;46:22;
48:18;61:18;66:22;
77:4;88:2;89:7;90:22;
91:5,15;92:6;94:4;
96:4;98:16,17;108:23;
110:4;111:18;112:11;
119:18;126:9;131:5;
132:9;133:11;134:15,
17;135:20,20;137:2;
140:11;141:7;144:23;
153:13;167:2
**ways (2)**
28:19;132:21
**website (2)**
7:25;8:2
**wedded (1)**
23:15
**week (15)**
35:4;70:24;84:17,19,
21,25;85:6,8,19;86:11;
93:3;103:9;135:4;
148:18;164:17
**weeks (2)**
135:24;142:10
**weigh (1)**
95:22
**weighed (1)**
22:17
**Weil (1)**
5:14
**Weiss (1)**
64:4
**welcome (3)**
60:6;127:23;157:24
**well-drafted (1)**
50:16
**weren't (1)**
150:14
**Wharton (1)**
64:5
**what-about (1)**
107:6

**what'd (1)**
42:25
**what's (21)**
7:20;13:25;33:23,24;
40:3;53:17;55:21;
56:10;85:10;99:19,20;
105:1;111:11;115:1;
126:7;128:2;146:22;
149:5;150:11;153:11,
15
**wheel (1)**
160:20
**Whereupon (1)**
167:23
**whole (12)**
11:13,16;16:12,21;
22:17;38:14;39:22;
48:3;112:16,18;
138:13;163:1
**wholeheartedly (1)**
122:7
**whomever (1)**
161:11
**who's (8)**
5:3;8:14;16:3;24:6;
77:19;86:15;139:19;
140:4
**whose (1)**
129:22
**who've (1)**
22:17
**why'd (1)**
150:16
**wildfire (8)**
19:3;29:10;66:9;
67:15;72:6;122:14
**wildfire-related (1)**
72:10
**wildfires (4)**
69:19;92:24;122:14,
19
**willing (8)**
9:6;11:19;20:20,22;
28:11;102:21,22;
103:22
**wires (1)**
17:24
**wisdom (1)**
99:6
**wish (1)**
105:12
**withdrawal (3)**
23:11;105:12;111:13
**within (10)**
37:23;40:19;41:5;
65:18;141:21;142:10;
146:4;148:14,17,17
**without (9)**
8:23;43:3;87:7;94:1,
2;95:12;109:21;151:2;
155:4
**witnesses (1)**
144:10

**word (7)**
9:7,8;40:7;70:3;
98:25;107:25;125:17
**words (17)**
12:7;19:20;30:2;
35:25;37:24;56:17;
64:8;77:4;86:10;98:18;
99:6;111:25;122:23;
131:15;143:23;146:17;
155:7
**work (42)**
14:16,17,22;19:9;
20:9;42:10;44:16,20;
47:23;64:8;68:1;69:5,
6;70:16,17;72:9,21,23;
73:16;74:9,10,25;75:8;
79:10;80:7,7;90:13;
94:7;96:21;99:16;
103:23;109:23;110:18;
136:22;153:8;160:4,
17,19;161:25;162:16;
165:1,8
**workable (1)**
47:21
**working (6)**
9:4;18:6;41:5;78:9;
136:25;161:1
**works (5)**
33:1;47:15;96:12;
151:1;161:6
**world (10)**
48:23;57:14;117:24;
155:11,19,22,22,23;
156:3;162:25
**worn (1)**
147:5
**worry (3)**
42:21;43:16;167:6
**worth (5)**
43:19;137:18;138:1;
139:4;140:5
**written (3)**
133:7;145:16;154:18
**wrong (8)**
30:20;38:1;40:7;
42:18;44:15;110:14;
111:10;113:1
**wrongful (1)**
110:8
**wrote (2)**
128:5;129:2

## Y

**year (3)**
57:16;134:1;149:8
**years (1)**
54:20
**yes/no (1)**
80:25
**yesterday (5)**
87:11;91:17;97:2;
101:13;145:13

75:4,15;85:15
**16 (2)**
118:13,14
**160 (1)**
118:13
**16th (4)**
97:5;100:9;101:21;
102:13
**17th (2)**
78:1,2
**1984 (1)**
112:13
**1991 (1)**
153:2
**19th (1)**
90:9

## 2

**2 (12)**
50:18;108:3;134:18;
141:17;142:19,21;
143:22,24;144:23;
145:12;148:13;163:9
**20 (2)**
64:7;94:10
**2004 (1)**
19:20
**2007 (2)**
128:16;131:1
**2015 (2)**
129:11;150:3
**2017 (3)**
69:18;82:25;150:3
**2018 (1)**
69:18
**2019 (1)**
5:1
**2020 (2)**
43:8;66:8
**20th (3)**
23:13;75:2,13
**22 (1)**
94:18
**22nd (1)**
22:15
**24th (7)**
21:13;22:16;125:18;
126:4;132:23;135:18;
143:9
**25 (6)**
94:19,21,21,22,23;
95:1
**25th (3)**
85:11;94:24,25
**27 (1)**
5:1
**29th (1)**
149:12
**2X (2)**
25:18;47:18

## Z

**zero (3)**
121:10;132:13;142:7
**zeros (1)**
120:23

## 1

**1 (11)**
50:17,22;85:3;
134:18;141:17;142:19;
143:21,24;145:12;
148:13;163:9
**1,000 (1)**
17:23
**1.2 (1)**
137:25
**1:43 (1)**
167:23
**10 (1)**
91:5
**10,000 (1)**
153:10
**101 (2)**
26:17,17
**1054 (3)**
29:9,12;30:3
**10-K (1)**
59:17
**10-Q (1)**
59:16
**10th (1)**
53:7
**11 (8)**
26:17;65:7,14,23;
67:16;71:5;130:9;
155:8
**1103 (1)**
7:19
**1129 (1)**
57:21
**11s (1)**
35:4
**11th (1)**
53:7
**12:33 (1)**
125:3
**12:53 (1)**
125:3
**12th (2)**
31:2;75:2
**13 (5)**
116:6;117:10,11;
126:17;165:19
**14 (1)**
31:4
**14th (1)**
102:16
**15 (3)**
95:2;108:3;149:11
**15th (3)**

## 3

**3 (2)**
50:18;154:20
**30 (1)**
66:8
**30,000 (1)**
130:5
**30,000- (1)**
139:6
**300 (1)**
133:3
**3016 (2)**
31:24,25
**3017 (1)**
31:24
**30b6 (1)**
136:10
**30th (1)**
43:8
**31st (1)**
152:20
**3421 (1)**
113:17
**360 (1)**
131:2
**3rd (1)**
163:22
**3X (1)**
47:18

## 4

**4 (1)**
101:10
**435 (1)**
131:2

## 5

**5,500 (1)**
151:14
**502c (2)**
155:9,10

## 6

**6,000 (1)**
150:1
**6th (1)**
163:16

## 7

**7 (1)**
130:9
**7th (1)**
107:16

## 8

**800 (1)**

133:3
**800,000 (1)**
137:19
**800-pound (2)**
155:3,3

## 9

**9/6 (1)**
163:18
**9th (16)**
23:19;29:2;31:2;
33:20;34:12;47:12;
50:2;51:17;56:23,23;
75:14,18;77:8;125:8;
166:2,20