Pages 1 - 51

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE: PG&E CORPORATION and    )
PACIFIC GAS AND ELECTRIC        )
COMPANY,                        )
                                )
            Debtors.            )    NO. 19-05257 JD
                                )
_____)

                        San Francisco, California
                        Tuesday, September 10, 2019

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Creditor Committee Official Committee of Tort Claimants:
                        BAKER & HOSTETLER LLP
                        Levi's Plaza
                        1160 Battery Street East - Suite 100
                        San Francisco, California  94111
                BY:  **ROBERT A. JULIAN, ATTORNEY AT LAW**
                     **KIMBERLY S. MORRIS, ATTORNEY AT LAW**

For Ad Hoc Group of Subrogation Claim Holders :
                        WILLKIE, FARR & GALLAGHER LLP
                        878 Seventh Avenue
                        New York, New York  10019
                BY:  **ANTONIO YANEZ JR., ATTORNEY AT LAW**
                     **BENJAMIN P. MCCALLEN, ATTORNEY AT LAW**

                        WILLKIE, FARR & GALLAGHER LLP
                        1875 K Street, N.W.
                        Washington, D.C.  20006
                BY:  **JOSEPH G. DAVIS, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Kevin Burnett and Plaintiffs-Creditors:
                            LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
3                           275 Battery Street - 29th Floor
                            San Francisco, California  94111
4                   BY:  **ELIZABETH J. CABRASER, ATTORNEY AT LAW**

5                           EDELSON PC
                            123 Townsend Street - Suite 100
6                           San Francisco, California  94107
                    BY:  **TODD LOGAN, ATTORNEY AT LAW**
7                        **RAFEY S. BALABANIAN, ATTORNEY AT LAW**

8    For North Bay Fire Victims:
                            COTCHETT, PITRE & MCCARTHY LLP
9                           San Francisco Airport Office Center
                            840 Malcolm Road
10                          Burlingame, California  94010
                    BY:  **FRANK M. PITRE, ATTORNEY AT LAW**
11

12   For Creditor California State Agencies:
                            FELDERSTEIN, FITZGERALD, WILLOUGHBY
                               PASCUZZI & RIOS LLP
13                          500 Capitol Mall - Suite 2250
                            Sacramento, California  95814
14                  BY:  **PAUL J. PASCUZZI, ATTORNEY AT LAW**

15   For Creditor Federal Agencies FEMA, Department of Agriculture,
     and Department of Interior:
16                          U.S. DEPARTMENT OF JUSTICE
                            Civil Division
17                          P.O. Box 875
                            Ben Franklin Station
18                          Washington, D.C.  20044
                    BY:  **MATTHEW J. TROY, ATTORNEY AT LAW**
19

20   For 4000-Plus Fire Creditors:
                            COREY, LUZAICH, DE GHETALDI & RIDDLE LLP
                            700 El Camino Real
21                          P. O. Box 669
                            Millbrae, California  94030
22                  BY:  **DARIO DE GHETALDI, ATTORNEY AT LAW**
                         **AMANDA L. RIDDLE, ATTORNEY AT LAW**

23

24

25

```
 1   APPEARANCES:   (CONTINUED)

 2   For State Farm Subrogation Claimant:
                         DECHERT LLP
 3                       1095 Avenue of the Americas
                         New York, New York  10036
 4               BY:  ALLAN S. BRILLIANT, ATTORNEY AT LAW

 5   For Creditor Committee Official Committee of Unsecured
     Creditors:
 6                       MILBANK, TWEED, HADLEY & MCCLOY LLP
                         1850 K Street, N.W. Suite 100
 7                       Washington, D.C.  20006
                 BY:  ANDREW LEBLANC, ATTORNEY AT LAW
 8                    DENNIS F. DUNNE, ATTORNEY AT LAW
     For Fire Victims:
 9                       WALKUP, MELODIA, KELLY & SCHOENBERGER PC
                         650 California Street - 26th Floor
10                       San Francisco, California  94108
                 BY:  MICHAEL A. KELLY, ATTORNEY AT LAW
11

12   For Creditor California Department of Toxic Substances:
                         DEPARTMENT OF JUSTICE
13                       Office of the Attorney General
                         300 S. Spring Street - Suite 1702
14                       Los Angeles, California  90013
                 BY:  JAMES R. POTTER, ATTORNEY AT LAW
15                    MATTHEW C. HEYN, ATTORNEY AT LAW

16   For Creditor Liberty Mutual Insurance, et al.:
                         COZEN O'CONNOR
17                       601 S. Figueroa Street - Suite 3700
                         Los Angeles, California  90017
18               BY:  HOWARD D. MAYCON, ATTORNEY AT LAW

19   For PG&E Equity Holders:
                         JONES DAY
20                       555 South Flower Street - 50th Floor
                         Los Angeles, California  90071
21               BY:  BRUCE BENNETT, ATTORNEY AT LAW

22   For GER Hospitality:
                         HALLISEY AND JOHNSON PC
23                       465 California Street - Suite 405
                         San Francisco, California  94104
24               BY:  JEREMIAH F. HALLISEY, ATTORNEY AT LAW

25
```

```
 1   APPEARANCES:   (CONTINUED)

 2   For GER Hospitality:
                         LAW OFFICES OF FRANCIS O. SCARPULLA
 3                       456 Montgomery Street - 17th Floor
                         San Francisco, California  94104
 4               BY:  FRANCIS O. SCARPULLA, ATTORNEY AT LAW

 5   For Ad Hoc Bondholder Committee:
                         AKIN, GUMP, STRAUSS, HAUER
 6                          & FELD LLP
                         580 California Street
 7                       San Francisco, California  94104
                 BY:  ASHLEY VINSON CRAWFORD, ATTORNEY AT LAW
 8
                         AKIN, GUMP, STRAUSS, HAUER
 9                          & FELD LLP
                         One Bryant Park
10                       New York, New York  10036
                 BY:  ABID QURESHI, ATTORNEY AT LAW
11
     For The Baupost Group, L.L.C., as the Managing General Partner
12   and/or Investment Manager of Certain Entities:
                         FRIEDMAN, KAPLAN, SEILER & ADELMAN LLP
13                       7 Times Square
                         New York, New York  10036
14               BY:  ERIC SEILER, ATTORNEY AT LAW

15   For Creditor SLF Fire Victim Claimants:
                         MARSHACK HAYS LLP
16                       870 Roosevelt
                         Irvine, California  92620
17               BY:  RICHARD A. MARSHACK, ATTORNEY AT LAW

18                       SINGLETON LAW FIRM
                         450 A Street - 5th Floor
19                       San Diego, California  92101
                 BY:  GERALD SINGLETON, ATTORNEY AT LAW
20
     For Debtor-in-Possession PG&E Corporation:
21                       CRAVATH, SWAINE & MOORE LLP
                         825 Eigth Avenue
22                       New York, New York  10019
                 BY:  KEVIN ORSINI, ATTORNEY AT LAW
23                       PAUL H. ZUMBRO, ATTORNEY AT LAW

24

25
```

1   **APPEARANCES**:   (CONTINUED)

2   For Debtor-in-Possession PG&E Corporation:
                          WEIL, GOTSHAL & MANGES LLP
3                         767 Fith Avenue
                          New York, New York  10153
4                  BY:   **STEPHEN KAROTKIN, ATTORNEY AT LAW**
                         **MATTHEW P. GOREN, ATTORNEY AT LAW**
5
                          KELLER & BENVENUTTI LLP
6                         650 California Street - Suite 1900
                          San Francisco, California  94108
7                  BY:   **TOBIAS S. KELLER, ATTORNEY AT LAW**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Tuesday - September 10, 2019**                    **10:02 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling Civil 19-5257, In Re PG&E |
| 5 | Corporation and Pacific Gas and Electric Company. |
| 6 | Do you want their appearances? |
| 7 | **THE COURT:**  Yes. |
| 8 | **THE CLERK:**  Okay.  Counsel, I'm going to need for you |
| 9 | to stand and make your appearances. |
| 10 | **MR. ORSINI:**  Good morning, Your Honor.  Kevin Orsini, |
| 11 | Cravath, Swaine & Moore, on behalf of the debtors. |
| 12 | **MR. ZUMBRO:**  Paul Zumbro, Cravath, Swaine & Moore, on |
| 13 | behalf of the debtors.  Good morning, Your Honor. |
| 14 | **MR. KAROTKIN:**  Good morning, Your Honor.  Steven |
| 15 | Karotkin, Weil, Gotshal & Manges, on behalf of the debtors. |
| 16 | **MR. GOREN:**  Good morning, Your Honor.  Matthew Goren, |
| 17 | Weil, Gotshal & Manges, on behalf of the debtors. |
| 18 | **MR. JULIAN:**  Good morning, Your Honor.  Robert Julian, |
| 19 | Baker Hostetler, for the Official Committee of Tort Claimants. |
| 20 | **MS. MORRIS:**  Good morning, Your Honor.  Kimberly |
| 21 | Morris of Baker Hostetler on behalf of the Official Committee |
| 22 | of Tort Claimants. |
| 23 | **MS. CABRASER:**  Good morning, Your Honor.  Elizabeth |
| 24 | Cabraser of Lieff, Cabraser, Heimann & Bernstein for the |
| 25 | Burnett and plaintiffs-creditors. |

1          **MR. YANEZ:**  Good morning, Your Honor.  Antonio Yanez,

2   Willkie, Farr & Gallagher, on behalf of the *Ad Hoc* Group of

3   Subrogation Claim Holders.

4          **MR. McCALLEN:**  Benjamin McCallen, Willkie, Farr &

5   Gallagher, also on behalf of the *Ad Hoc* Group Of Subrogation

6   Claim Holders.

7          **THE COURT:**  All right.  Welcome, everyone.  I'm

8   looking forward to working with you on this.

9       We'll just make our appearances.  I'm here and Magistrate

10  Judge Kim is here also so you will perhaps see her again in

11  another context.

12      Okay.  Who's going to take the lead, speaking leads?

13         **MR. ORSINI:**  Your Honor, Kevin Orsini.  I will for the

14  debtors.

15         **THE COURT:**  Come on up.

16         **MR. JULIAN:**  Robert Julian for the tort claimants,

17  Your Honor.

18         **THE COURT:**  Okay.

19         **MR. YANEZ:**  And, Your Honor, Antonio Yanez on behalf

20  of the subrogation group.

21         **THE COURT:**  All right.  Mr. Julian, why don't you join

22  us up here.

23         **THE CLERK:**  You need to come to the podium.

24         **THE COURT:**  Now, I have read with great interest

25  everyone's filings, as well as a number of other materials and

what I could find on 502(c) proceedings, which is not long or deep.

Now, here's what I've taken away, and let me just tell you what I want to accomplish this morning is setting our agenda for the next several months on what we're going to do culminating in a hearing of some sort, but to set the parameters for that.

We have a clear mandate -- I have a clear mandate under Section 502(c) to do two things:  An estimate, not a case-by-case adjudication of claims but an overall estimate, to be done without undue delay and, as some of the case law says, in a speedy fashion.

So those are the polestars that I am sailing towards with your help, and I will just tell you what I'm thinking so far. When I read everybody's submissions and I saw references to six weeks of hearings in the first or second quarter of next year, I concluded that that is not serving either the purpose of an estimate or speed.

So what I'd like to do first -- and there will be a number of things we'll cover, but this will be at least a door to walk through to get us started -- what exactly are you-all envisioning will happen at these multiple weeks of hearings? It just wasn't clear to me.  Who are the witnesses going to be? What are the issues going to be?  What are the legal and factual points that are going to be raised?

1    I'll just tell you, you know, on the one hand, we're

2 clearly not doing individual claims.  First of all, I have no

3 authority to bind anybody -- that's for others -- and, two, it

4 would take five years of -- every day for five years to get

5 that done.  So that's not what we're doing.

6    On the other hand, I'm not just going to pull a number out

7 of my head and say, "Here's the estimate," although it does

8 seem technically okay under 502(c) for me to do that.  We're

9 not going to do that so don't worry about that.

10    So I can't tell what the middle ground is going to be and

11 what you-all want to do at these hearings.  So who would like

12 to start?

13         MR. ORSINI:  I'm happy to begin, Your Honor, for the

14 debtors.

15         THE COURT:  Okay.

16         MR. ORSINI:  From our perspective -- again for the

17 record --

18         THE COURT:  You just have to keep reminding me who you

19 are.

20         MR. ORSINI:  -- Kevin Orsini from Cravath, Swaine &

21 Moore on behalf of the debtors.

22         THE COURT:  The debtors.

23         MR. ORSINI:  Yes, Your Honor.

24    So, Your Honor, I think you have it absolutely right at

25 the outset, which is we're not adjudicating claim by claim.  We

1   can't do that.  That's why estimation is necessary.

2       The overarching goal here has to be to do it quickly and

3   efficiently, both because that's what the Bankruptcy Code says

4   and that's what AB1054 requires for the debtors to be able to

5   merge by June of next year.

6       From our perspective at the highest of levels, when we get

7   to the actual estimation hearing -- and one point I'll make

8   right at the outset, Your Honor, is from the debtors'

9   perspective, we believe that at this point this court,

10  Your Honor and the district court, will be responsible for

11  estimating all of the claims whether they're core or noncore

12  claims.

13      That was our understanding of Judge Montali's expectation.

14  If that's not your understanding, we can discuss that, but --

15      **THE COURT:**  Well, yeah.  So, you know, I'm not a

16  bankruptcy judge so let me put it my way.  So that's personal

17  injury and property damage --

18      **MR. ORSINI:**  Everything.

19      **THE COURT:**  -- is that what you're saying?

20      **MR. ORSINI:**  Exactly, Your Honor.

21      **THE COURT:**  Okay.  That was my understanding, that

22  everything is going to be done here.  Any issue with that,

23  Mr. Julian?

24      **MR. JULIAN:**  It didn't start off that way, but that's

25  the way it is today, Your Honor, yes.

1          **THE COURT:**  And you're okay with that?

2          **MR. JULIAN:**  Yes, sir.

3          **THE COURT:**  And everybody's okay with that?  There's

4     nobody up here who has a problem with it at counsel table?

5          **MR. YANEZ:**  No, Your Honor.

6          **THE COURT:**  No?  Okay.  Good.

7          Yes.  Okay.  Good.  All right.

8          **MR. ORSINI:**  Okay.  So with that preliminary out of

9     the way, what do you actually have to address at an estimation

10    hearing?  Because I think that informs what you need to hear in

11    order to address it.

12         From our perspective there are two macro questions:

13    There's the liability question and there's the damages

14    question.  And as the estimation case law makes clear and as

15    Your Honor just put it, I think, on the first piece, the

16    liability question, you're not ultimately reaching a final

17    resolution on any of these claims.  You're not liquidating

18    them.  You're not finally determining them.  It's really more

19    of a question from your judicial experience, from the evidence

20    that's presented to the Court, and I'll get to how we envision

21    presenting that in a moment, but what do you believe the

22    likelihood is that these claimants, who have tens of thousands

23    of wildfire claims, could prove liability against PG&E?

24         And the second big piece of that, and then I'll return to

25    liability, but the second big piece of it is:  Okay, once we've

1  assessed what the likelihood of success is on the underlying

2  claims -- it could be zero, it could be 100, it could candidly

3  be any number in between -- there's then the question of what

4  are the ultimate damages.

5      And so the Court is going to have to take a look at the

6  pools of claimants who have submitted claims in this

7  bankruptcy -- they will have done so by October 21st, which is

8  the bar date for all claims -- and assess based upon not claim

9  by claim by claim but based upon expert testimony, sampling,

10  things of that nature, what is the total size of the potential

11  damages.  And let's just pick a fire.  There are many fires

12  here but Camp fire, for example, the 2018 fire.

13      THE COURT:  Well, you picked a number last night,

14  didn't you?  You told the district -- you told the bankruptcy

15  judge approximately 17 billion.

16      MR. ORSINI:  Approximately 17.9 billion I think it

17  was, yes.

18      THE COURT:  Okay.  You've already set a floor.

19      MR. ORSINI:  That is the number up to which the plan

20  will be funded at this point, subject of course to estimation.

21  And one of the biggest disputed issues in these cases has been

22  what that number is.  We have very dramatically different views

23  as to what that number is, and that's going to be the second

24  piece of the estimation proceeding, the damages piece.

25      THE COURT:  By the way, so I haven't had a chance to

1    read that yet, but does that 17 billion roughly include the

2    Tubbs litigation?

3             MR. ORSINI:  So it would involve resolving all of the

4    wildfire claims including Tubbs, Your Honor.

5         And the way it's broken out, Your Honor, is we've set up a

6    trust cap of approximately $8.5 billion -- not approximately,

7    exactly $8.5 billion for the subrogated claims, the insurance

8    claims.

9         There is a billion-dollar settlement that we have reached

10   with a series of the public entities.  We reached that a few

11   months ago, including the town of Paradise, the County of

12   Butte, the town of Santa Rosa, various others.

13        So you have the 8.5 for the subrogation plaintiffs, you

14   have the billion dollars for the public entities, and then

15   there's $8.4 billion for all the other wildfire claims, which

16   are predominantly the individual victims either for their

17   uninsured claims or uninsurable claims.

18        So with respect to the liability issue, there are a whole

19   host of different causes of action asserted here, but it really

20   at its core comes down to two questions:  Whether inverse

21   condemnation applies, which is the strict liability standard

22   that I'm sure Your Honor has heard a lot about already; and

23   then there is the question of potential negligence.  And the

24   Court is ultimately going to have to reach both issues in the

25   event that Judge Montali does not rule in my favor on the one

1   issue that he's reserved, which is whether inverse even applies

2   to an investor-owned utility such as PG&E.

3        But putting that issue aside, the reason why the Court is

4   going to have to reach both issues is because let's assume

5   inverse condemnation Judge Montali rules does apply to PG&E.

6   That's a strict liability standard.  There will be some factual

7   questions with respect to certain fires as to whether or not

8   inverse applies; but let's assume for the moment for the

9   purposes of this discussion you conclude for the Atlas fire

10  inverse condemnation does apply.  Then you're going to have to

11  decide -- you're still going to have to decide the negligence

12  question.

13       Why?  There are different categories of damages that are

14  available under negligence causes of action as opposed to the

15  inverse condemnation costs.  Inverse is property damage.

16  Negligence brings in everything else.

17       And so for each of these significant fires, when the Court

18  is addressing the first critical question, which is likelihood

19  of liability, there's going to ultimately be the question of:

20  Did PG&E start the fire?  And as I'm sure the Court has seen

21  for the purposes of these proceedings, other than with respect

22  to Tubbs, we have said we will not contest causation.  So that

23  fundamental threshold issue we've taken off the table for the

24  purposes of trying to get through these proceedings quickly.

25       But even if we assume, based upon that, that for -- I'll

stick with the Atlas fire -- that we did cause the fire in the
way Cal Fire has reported, which is a tree broke in the wind,
fell over, and hit a power line, started a fire -- okay --
inverse condemnation in that circumstance will likely apply
depending upon what Judge Montali rules on the threshold
question; but the negligence question will involve an analysis
of:  What was the condition of that tree?  Was that the type of
tree that a reasonable utility should have seen and should have
cut down?

So there will be systemic questions about how PG&E goes
about vegetation management, whether it dedicates enough
resources, whether it's following the right standards, whether
it's training people appropriately.  That's the systemic
question but on any individual fire, of course, there has to be
this proximate causation.  Even if the argument is the system
was flawed, you'd have to show that a reasonable system would
have caught that tree.

And so each fire will present different facts, and this is
an issue that's come up in the state court system so --

**THE COURT:**  It just seem too granular to me.  That
seems antithetical to the goals to 502(c).

All right.  So there are two legal issues:  Are you on the
hook under inverse condemnation and negligence?  Maybe mixed
questions of law and fact, but the law part to me -- let me
just think out loud.

1          MR. ORSINI:  Sure.

2          THE COURT:  We're talking among friends.

3      The legal portion is:  Would a California state court

4  recognize that as a cause of action under California law?  And

5  it seems to me that's a readily and quickly answerable

6  question.  Probably yes.  So -- unless -- you know, who knows?

7  Maybe there's some legal reason why that's not the case, but

8  that seems quite ascertainable by relatively focused and short

9  case analysis.

10     And the next question is:  All right.  Do your fact

11  patterns -- fact patterns -- fall into the zone of potential

12  liability?

13     I'm estimating so all I'm doing is figuring out:  Is there

14  a cause of action?  Are there enough facts for that cause of

15  action to go forward?  If so, how many people would be covered

16  by this claim?

17          MR. ORSINI:  I think it's --

18          THE COURT:  I think it's a higher level inquiry than

19  what I hear you suggesting.  Maybe you're not suggesting it

20  isn't, but --

21          MR. ORSINI:  So I think it's a little bit more than

22  what Your Honor just described, respectfully.  I think it's not

23  just simply do the facts fall within the range of whether or

24  not they might have a cause of action.  There's then the

25  separate question of:  What's the likelihood based on those

1   facts that they would actually prevail?

2        It's not like a motion-to-dismiss standard where, you

3   know, under no set of facts that have been alleged could they

4   possibly prevail, so we're going to kick the case out.  It's

5   instead a question of:  Under these circumstances for in

6   particular the significant fires, is that the type of case that

7   has an 80 percent chance of winning in the state court system

8   or a 20 percent chance of winning?  And that's going to include

9   some level of fact-specific inquiry on at least the major

10  fires.

11       Now, I agree with Your Honor, we cannot possibly do that

12  for all 21 or 22 significant fires.  It's just not feasible.

13  It's not consistent with 502.  It's not something we can

14  possibly think of in the context of the time we have available

15  to us.

16       And so that's why our proposal is that we pick some of the

17  biggest fires.  Now, the Tubbs fire is the biggest swing factor

18  here; and, as Your Honor knows, we have our views as to whether

19  or not that should be done here --

20       **THE COURT:**  How is this being litigated in

21  Superior Court?

22       **MR. ORSINI:**  The Bankruptcy Court has lifted the stay

23  so that that can be litigated in Superior Court.  We would

24  respectfully ask for leave to file a motion to reinstate the

25  stay in front of Your Honor because we believe that sending it

```
1   to state court actually interferes with the goal of trying to

2   get to the end of this whole process.

3       And ultimately Judge Montali made the ruling that he

4   thought it should go to state court because it would help the

5   estimator, in his words.  Your Honor is the estimator.  In our

6   view, that ought to be a decision you make, but we can come

7   back to that.

8       But putting aside --

9           THE COURT:  Well, let's just pause on that for a

10  minute.

11      Is anybody here involved in that case?

12          MR. JULIAN:  Yes, Your Honor, the Tubbs --

13          THE COURT:  Oh, okay.

14          MR. JULIAN:  -- lead counsel are here.

15          THE COURT:  Why don't you have one person from Tubbs

16  come on up.

17          MR. JULIAN:  And, Your Honor, I do have some comments

18  on estimation.

19          THE COURT:  Well, of course.  I mean, you'll have

20  equal airtime.

21          MR. JULIAN:  Mr. Pitre is the lead counsel of the

22  North Bay leadership, Your Honor.

23          THE COURT:  Oh, okay.

24          MR. PITRE:  Good morning, Your Honor.  Frank Pitre,

25  Cotchett, Pitre & McCarthy, for lead counsel, along with
```

1    Mr. Kelly, who's also here for the North Bay fires.

2              **THE COURT:**  All right.

3              **MR. PITRE:**  We have a hearing set Monday for a

4    preference --

5              **THE COURT:**  You're the lead team on the Tubbs fire?

6              **MR. PITRE:**  Yes, Your Honor.

7              **THE COURT:**  In San Francisco Superior?

8              **MR. PITRE:**  Yes, Your Honor.

9              **THE COURT:**  Okay.  So what's happening?  You have a

10   trial setting conference on Monday?

11             **MR. PITRE:**  Yes, Your Honor.  It's a motion for a

12   preference because the individuals qualify to have their case

13   tried within 120 days of the hearing, which is scheduled for

14   Monday.

15             **THE COURT:**  And when are you -- I know this is hard to

16   predict, but when do you think you'll know about the preference

17   decision?

18             **MR. PITRE:**  Monday.

19             **THE COURT:**  Oh.  A bench ruling.  You'll know Monday?

20             **MR. PITRE:**  Yes.

21             **THE COURT:**  Okay.

22        All right.  And if that's true, then you'll be in trial by

23   December, something like that?

24             **MR. PITRE:**  End of December, early January.

25             **THE COURT:**  And how long do you think the trial will

1   go?

2          **MR. PITRE:**  Five to six weeks max.

3          **THE COURT:**  So if everything goes as planned, and they

4   rarely do -- it's a live show -- but if things go as planned,

5   you expect to have a verdict by, say, the end of February at

6   the latest.

7          **MR. PITRE:**  Mid-February to early February, but

8   mid-February to be safe.

9          **THE COURT:**  Early to mid-February, okay.

10      All right.  I'll just tell you I'm not really inclined to

11   stop that.  They have their day in court.  There's no reason

12   for me to interfere with that.  There are concepts of comity in

13   federalism as well as bankruptcy, and my tradition is not to

14   interfere in state court proceedings unless there is a good

15   reason for it.

16      I don't see any reason why we need to brief it.  I mean,

17   what would you say about Tubbs that would be likely to lead to

18   a different outcome?

19          **MR. ORSINI:**  I understand your point about comity,

20   Your Honor, but I actually don't think this is a question of

21   interfering with the state court proceedings.  The bankruptcy

22   statute by operation stays all state court proceedings.  This

23   was actually an affirmative decision by the Bankruptcy Court to

24   lift that automatic presumptive standard.

25          **THE COURT:**  No, I understand, but it's there now.  Why

1   would I reach out and switch gears again?

2        MR. ORSINI:   Because, Your Honor, we believe that

3   going down to a jury trial with an unrepresentative set of

4   plaintiffs on a schedule, which I think Mr. Pitre has set forth

5   is in the best of cases, a schedule which might not hold, they

6   are trying to try a case involving over 40 individual

7   plaintiffs, including the damages phase of that trial, that's

8   going to take some significant time.

9        And our concern is going down to try one set of claims

10  with an unrepresentative group of plaintiffs who they have hand

11  selected is ultimately not going to dispose of the liability

12  with respect to Tubbs.   Far from it.

13       The Bankruptcy Court said it would finally adjudicate

14  those issues.   No, it won't.   That will be one resolution of

15  one jury trial.   It will still be if we win, they will be right

16  back here in front of Your Honor explaining these are the five

17  reasons why you should not now estimate Tubbs at zero because

18  this jury instruction was wrong, this pretrial ruling was

19  wrong, this instruction prejudiced us.

20       And they're going to ask you to say, "Well, I have that

21  jury verdict, but I should ignore that jury verdict or I should

22  say that's an outlier.   In fact, you'd probably win eight out

23  of the ten remaining ones."   And that's going to require

24  Your Honor to understand what those issues were.   It's going to

25  require you to understand the general facts related to Tubbs.

 1          And if we lose, we'll likely be here arguing the same

 2     things.  Your Honor presides over jury trials, has tried jury

 3     cases.  You understand all the issues incumbent in potential

 4     appeals and disagreements about how that's done.

 5          From our perspective, sending one unrepresentative trial

 6     out --

 7              THE COURT:  You know what the cardinal rule is.  The

 8     jury is always right.  So what you're essentially describing is

 9     the functional equivalent of a JMOL motion or a post-verdict

10     motion --

11              MR. ORSINI:  Well --

12              THE COURT:  -- and I would apply similar standards.

13     So I'm not terribly concerned about having to relitigate Tubbs

14     in its entirety.  I think that's unlikely.

15          Here's what I would like to do.  You should file something

16     with me on Monday or Tuesday as soon as you know what the

17     disposition of the preference question will be.

18          If preference is granted and the trial date is set on the

19     schedule that's been described, I will almost certainly not do

20     anything to derail that.  If for some reason a preference isn't

21     granted or trial date is set much farther out than plaintiffs

22     are anticipating, I might take a look at it.

23          Either way, I do think the Tubbs valuation is a fair

24     valuation point for the estimate, and there may be some

25     discussion we have here; but if it's zero or 100 billion, I'll

1   take that into account.  But I don't need much more than that

2   and I don't see any reason to rob the plaintiffs of their day

3   in court in state court, which they're certainly entitled to at

4   this stage.

5       So that's how I'm going to leave that.  Okay?

6           **MR. PITRE:**  Thank you, Your Honor.

7           **THE COURT:**  All right.

8       Okay.  Mr. Julian can come back.

9           **MR. ORSINI:**  So back to the other fires, Your Honor.

10          **THE COURT:**  Yes.

11          **MR. ORSINI:**  So as I was saying, there's literally no

12  way that we could together deal with that level of granularity

13  as to all the other fires.  We just can't do it.  I completely

14  agree with Your Honor.

15          **THE COURT:**  Just tell me what you think will happen at

16  the hearing.  How do you want to do the hearing?

17          **MR. ORSINI:**  Here's how we'd like to do the hearing.

18  So what we have done is we have identified -- and I think we

19  actually agree on at least four of the six non-Tubbs fires --

20  we've identified the most significant non-Tubbs fires.

21      And I just want to be clear when I say "significant."

22  Obviously each fire is incredibly significant to anyone who

23  suffered a loss in connection with that fire; that is, that is

24  obviously true.  I'm not trying to suggest otherwise.  I'm

25  talking simply about how do we get to the best outcome for all

1    of this with a larger number.

2              **THE COURT:**  I understand.

3              **MR. ORSINI:**  And so that would require and suggest we

4    focus on the fires with the biggest number of claimants.  The

5    Camp fire is a no-brainer.  The Camp fire was the 2018 fire

6    that decimated the town of Paradise, tragically took over 80

7    lives.  That is a fire that PG&E has admitted, not just in the

8    context of estimation but outside, that its transmission lines

9    sparked.

10            That fire involves very unique sets of issues as compared

11   to a lot of the other fires.  That is a fire involving the

12   failure of a piece of equipment, a hook that broke on a tower.

13   And so there's going to be questions about the inspection

14   process, the construction process, the maintenance process

15   related to whether or not the failure of that hook constitutes

16   negligence in particular.

17            And so we think that fire has to be subject to a hearing

18   before this Court because it's, frankly, *sui generis* as

19   compared to any of the other fires we're talking about.

20            **THE COURT:**  Okay.  So that's maybe three days.  A

21   couple of percipient witnesses and maybe an expert.

22            **MR. ORSINI:**  That's exactly how we think about it,

23   Your Honor.

24            **THE COURT:**  All right.  So that leaves you five and a

25   half weeks left.

```
 1          MR. ORSINI:  So let me keep going down the list.

 2          THE COURT:  Okay.  But, no, I mean, does that sound

 3   about right, Mr. Julian?  You haven't had a chance to say much

 4   yet so far, but --

 5          MR. JULIAN:  Five or six days --

 6          THE COURT:  Okay.

 7          MR. JULIAN:  -- on liability, not on damages.

 8          THE COURT:  Five or six days on the hook?

 9          MR. JULIAN:  Your Honor, we just got their -- yeah.

10   They raised more issues than they're talking about, but if I

11   may address estimation overall --

12          THE COURT:  Yes.

13          MR. JULIAN:  -- in answering your question.

14          THE COURT:  Let's just pause for a moment and let

15   him -- yes, go ahead.

16          MR. JULIAN:  Sure.  First of all, the cases they're

17   talking about, the principles they're talking about, apply when

18   one is estimating claims for determining how big of a claim you

19   have to vote in a bankruptcy case or whether the plan is

20   feasible.

21       We're here for a completely different reason, and there's

22   a different standard that applies to that.  We're here by their

23   own admission to estimate how many claims will be allowed for

24   purposes of payment in a capped trust.

25       And the reason why I say there's a difference is because
```

1   when you're estimating -- when the Bankruptcy Court estimates

2   claims to determine a tort claim as for contract claimants --

3   contract claim or tort claim of a million dollars for purposes

4   of voting, if the judge is wrong, it doesn't matter because the

5   reorganized debtor comes out of bankruptcy and pays that claim

6   eventually whether it was $500,000 or a million two.

7          When you're dealing with what they're trying to do here

8   and like what happens in a mass tort case, it's this:  Their

9   plan essentially says that everyone in this case gets paid in

10  full except for the wildfire victims comprised of the insurers,

11  of some public entities, and the victims themselves.  And the

12  victims are going to have to live with whatever money is put

13  into that trust, and the amount of money that's put into that

14  trust is determined by your determining the value of those

15  claims as determined in the tort system in two ways:

16  Settlements and jury trials.

17         So you're predicting what will happen in settlements

18  historically with PG&E and what would happen in the future in

19  jury trials.  And here's the rub.  And there are only two cases

20  that really talk about this, *Dow Corning* involving products

21  liability, and the *Archbishop of Portland* cases involving mass

22  tort sexual abuse cases involving emotional distress; and the

23  judges in those cases said, "You know, if we estimate and we're

24  wrong and the trust is capped and the money is put in based on

25  my estimate, the judge's estimate, and the tort victims later

1  have their jury trials, as they're entitled to because they're

2  personal injury claims, the later jury trials could turn out to

3  be establishing damages higher than the estimation did."

4         **THE COURT:**  Let me -- yes, I fully embrace that.  I

5  get it.

6         **MR. JULIAN:**  Okay.

7         **THE COURT:**  So, look, here are the two poles in my

8  view.  Maybe I'm wrong, but here's how I'm thinking of it.  On

9  the one hand is making sure that everyone who's injured will be

10  made whole.  Okay?

11         **MR. JULIAN:**  Yes, Your Honor.

12         **THE COURT:**  On the other hand is the debtors' need to

13  have a number that they can plan with so that their plan of

14  reorganization can be approved.  Something's happening at the

15  PUC.  You know, there's a lot of downstream effects so you both

16  need an estimate of what the amount of money is going to be,

17  but the clear goal of estimation is to make sure nobody gets

18  stiffed at the end of it for legitimate claims.  So I'm not

19  worried about that.  I really want to focus on how we're going

20  to get there.

21         **MR. ORSINI:**  Right, Your Honor.

22         **THE COURT:**  And let me just jump-start it a little

23  bit.  Okay?

24     We have ruled out, I believe -- I certainly have -- we're

25  not doing individualized claim hearings.  That's just not

1    consistent at all with Section 502(c) or the amount of time we

2    have, and it's unrealistic and it doesn't matter anyway because

3    I can't bind anybody's hands.  So we're not going to add up

4    each claim individually.  That's an impossible task.

5         And I'm not -- as I said earlier, I'm not just going to

6    take 17 billion, multiply it by 2 and a half, and call it a

7    day, although I think in all seriousness I could do that, but

8    I'm not going to.

9         So what's the middle ground?  I'm asking you for the

10   middle ground.  I have come up with one and I'll just propose

11   it to you.  One middle ground would be to -- if there are legal

12   issues on liability, we can address those.  Those are, I think,

13   relatively straightforward as I suggested; but then past that,

14   what about something like this:

15        We have experts come in.  I think this data is readily

16   available, maybe it's not; but I think someone could say --

17   someone has done, I'm sure, detailed studies about what an

18   average wrongful death claim or payout is in a fire situation

19   for various regions of the state or maybe California as a

20   whole.

21        I'm sure there's data what the average property damage

22   claim is for fire.  Maybe it's by region in California or on

23   the state as a whole.  And then we multiply that by the number

24   of people who realistically -- it's an estimate, it's not an

25   exact headcount and it's also not a guess, it's an estimate --

1    people who realistically have a claim.

2        And that seems to me to be a week, maybe eight-day

3    expert -- I would probably do something like, you know, I'm

4    fond of a procedure called "hot tubbing" where we just have the

5    experts come in, and I mediate the discussion and we quickly

6    establish common ground among the people who are best situated

7    to know.

8        I mean, isn't something like that --

9            MR. JULIAN:  Yes, Your Honor, with one footnote.

10           THE COURT:  Oh, so you agree.

11           MR. JULIAN:  With one footnote.

12           THE COURT:  Okay.  I don't really do footnotes but go

13   ahead, yes.

14           MR. JULIAN:  In 2015 there was the Butte fire.  In

15   fact, they want to estimate the remaining Butte fire claims

16   that have not been paid.  There's --

17           THE COURT:  2015, yes.

18           MR. JULIAN:  546 homes were destroyed, some couple

19   hundred other structures.  They've paid out so far $900 million

20   in settlements and they've booked 1.1 billion total for that.

21       And we have been asking for their documentation -- we just

22   got it -- because we believe that the average payout in that

23   case for the property damage, the personal injury damages of

24   people suffocating and fleeing the fire and getting burned and

25   fearing for their lives, and the lost profits for the

1    businesses and the lost use of the homes, I'm going through the

2    damages now -- the tree, the forestation -- serves as a good

3    estimate of the per structure and per person damages for this

4    case --

5              **THE COURT:**  So --

6              **MR. JULIAN:**  -- with one footnote.

7              **THE COURT:**  -- it's a benchmark.

8              **MR. JULIAN:**  Yes.

9              **THE COURT:**  Yes, Butte is a benchmark.

10             **MR. JULIAN:**  More importantly, and all the cases say

11   this, the debtors' historical settlement values are the most

12   important predictor of what they will settle these cases for or

13   what they will try them for in the tort system in the state

14   court, which is what we're here for.

15        The footnote is this:  They contend -- and I'll give you

16   my response -- they contend, the debtor contends that because

17   the Butte fire involved a tree falling on the line and here we

18   have fires started by trees falling on lines, branches falling

19   on lines, fuses blowing up, and in Camp a hook, an old

20   antiquated hook falling apart after they knew it was going to

21   fall apart, that those negligence issues have to be wrapped

22   into the case.

23        And my response is this, and they don't like it, my

24   response is:  If you look at the CPUC decisions and the

25   Cal Fire reports, you see a pattern of negligence in this case.

1    Indeed, Judge Alsup has commented on it numerous times.

2         And so what we want to do is show that the pattern of

3    negligence is systemic and they want to go fire by fire and

4    make us go fire by fire.  It's a tension in this case.  We have

5    to be prepared for the fact that you may let them do that, and

6    so we have just recently asked for the discovery of the

7    documents and the e-mails that show that on each equipment

8    there are problems.

9         **THE COURT:**  Let me just stop you.  We're going to

10   reason backwards from what the hearing will look like.  That

11   will drive the discovery and that will drive the schedule.  So

12   let's just talk about the hearing first because that will

13   define what's going to be relevant and not relevant.

14        Now, let's just build.  All right.  So the footnote to

15   what I said is a good one, Butte.  Why don't we start with

16   Butte as a proxy.  We're going to have to modify it there's no

17   doubt.  Every fire is different and the geography, the

18   causation issues, whether there are contributing factors, I get

19   that.

20        **MR. JULIAN:**  There's a second fire on damages that's

21   important.  The San Bruno fire --

22        **THE COURT:**  Let's just start with the concept of using

23   benchmarks.  All right?  That gives us a lot of good

24   information so we don't have to just start from zero.  We don't

25   have time for that and it's not consistent with 502(c) if we

1  have this data that's out there in my view.

2       So let's build on the idea of a benchmark and then modify

3  it as you two will meet and confer.  We're not deciding it now.

4  We're just scoping general parameters.

5       What I would probably do is have you two go out and

6  everyone else who wants to be involved and then have a detailed

7  proposal of what specifically the hearings will look like based

8  on that kind of information, maybe supplemented by experts who

9  would say "Here's some additional data points on what these

10 claims are like in fires generally" and, you know, we take it

11 from there.

12      And then if there are individual issues, "Well, we

13 shouldn't be responsible for this because we actually did

14 something that was consistent with good practice and this set

15 of claims is not reasonable."  Of course, everybody will have

16 their day in court.  Due process is our lodestar so no one is

17 going to get -- on either end no one is going to be, you know,

18 locked in a closet.  Okay?  They will be heard.

19      So how about that as just kind of a focusing idea?

20          **MR. ORSINI:**  So a couple reactions, Your Honor.

21          **THE COURT:**  Is it Mr. Orsini?

22          **MR. ORSINI:**  Yes, Kevin Orsini for the debtors.

23      A couple reactions, Your Honor.  I think what you

24 described is very consistent with what we were thinking about,

25 particularly for the damages piece.  Sort of as I described it

1    before, there's liability and there's damages.  We would fully

2    expect that this calculation of --

3            **THE COURT:**  Well, I'm sorry.  I hate to interrupt.

4    We're going to do this all at one time.  We're not bifurcating

5    anything.

6            **MR. ORSINI:**  That's fine.  That's fine.

7            **THE COURT:**  We're not bifurcating anything.

8            **MR. ORSINI:**  That's fine.

9            **THE COURT:**  It's a unitary proceeding.

10           **MR. ORSINI:**  The question of what's the total size of

11   the damages pool before you start getting into questions about

12   are we actually liable for that, what's the likelihood of

13   liability, we agree it's going to be done almost certainly

14   100 percent by expert testimony using the types of analyses you

15   just described:  Average cost of rebuild, average diminution

16   value of the structure.  In fact, we've done a tremendous

17   amount of work on that.

18           **THE COURT:**  Well, and what you-all have paid in the

19   past.

20           **MR. ORSINI:**  What we have paid in the past with

21   respect to Butte, which is why we've agreed to produce that

22   information and we've now produced all that information.

23       But to your point, Your Honor, it was a different fire at

24   a different time.  So it is a benchmark and the question will

25   be --

1          THE COURT:  We're estimating.  We're estimating.

2          MR. ORSINI:  Right.

3          THE COURT:  So benchmarks are good.

4          MR. ORSINI:  I'm not suggesting they're not, but you

5    also need --

6          THE COURT:  When you start saying things like it was a

7    different age and a different day, you know, I'm looking for

8    data points that I can use.  Of course, that's obviously true,

9    but I'm looking for an estimate that can be done without, as

10   the statute says, undue delay.

11         MR. ORSINI:  Completely agree with that, Your Honor,

12   which is why we've agreed to produce those materials.  We would

13   fully expect it to be part of this.  In fact, we believe that

14   it supports the numbers we already have in here.

15         THE COURT:  Okay.

16         MR. ORSINI:  My point is very simply that what the

17   experts will also have to address to help you in evaluating

18   that benchmark is what do the facts look like on the ground

19   generally speaking with respect to these fires; right?

20         And this is a discussion for another day, but there will

21   need to be some development of facts in terms of the losses

22   that have actually been suffered by the claimants in these

23   fires in order to support that analysis.

24         As I explained to Judge Montali, on the one end of the

25   spectrum is we could take discovery from every single fire

```
 1   victim.  That's never going to happen.  We're not going to do
 2   that.  We're not going to ask for that.
 3        On the other end of the spectrum we could understand
 4   literally nothing about what the actual losses are associated
 5   with any of the claims in these various fires.  There's got to
 6   be somewhere in the middle.  It's probably, frankly, closer to
 7   the left side than it is to the right -- which is going to be
 8   hard on the transcript, I apologize -- but the basic point
 9   being we will need to do some development of real facts to
10   assist the Court in looking at those benchmarks as to what the
11   actual losses have been suffered in connection with these
12   fires.  That's my only point.
13        THE COURT:  Yes.  Okay.
14        Before we do that, Mr. Julian, anything else to add?
15   Because I'm going to give you your assignments now, but go
16   ahead, Mr. Julian.
17        MR. JULIAN:  The only other thing is, I don't know if
18   you want Magistrate Kim or Judge Montali to do this, but the
19   San Bruno fire killed many people and the wrongful death
20   damages that they paid in that case are very similar to Butte,
21   and we've got the Butte settlement history but we don't have
22   the -- I know you don't want to get into discovery today
23   probably, but --
24        THE COURT:  Oh, no, we are.
25        MR. JULIAN:  We need the San --
```

1          **THE COURT:**  I said we were going to do it backwards.

2          **MR. JULIAN:**  We need the San Bruno conflagration that

3     is before Judge Alsup, the wrongful death damages and property

4     damage settlements in there, because the wrongful death are

5     very similar to the death damages that we're seeking in this

6     case.

7          **MR. ORSINI:**  Your Honor, if I may briefly on that

8     point.

9          **THE COURT:**  Yes.

10         **MR. ORSINI:**  That's already been litigated and decided

11    by Judge Montali.  They sought that discovery in front of

12    Judge Montali.  He said that they were not entitled to that

13    discovery.

14         **MR. JULIAN:**  I disagree.

15         **MR. ORSINI:**  If we're going to relitigate, we can, but

16    Judge Montali has already decided that issue.

17         **THE COURT:**  Well, it's a new day so I need more

18    information about that.

19       But here's your task:  So I think we all are on the same

20    page conceptually.

21         **MR. JULIAN:**  We are, Your Honor.

22         **THE COURT:**  Okay.  So you two and whoever else on both

23    sides of the aisle, so to speak, want to participate,

24    everyone's invited, I'd like you to do this in a week -- if you

25    need more time, we can talk about that -- but a week from today

1    I want a specific proposal based on the idea of using estimates

2    that are derived from the benchmarks that we talked about

3    supplemented by experts with an eye towards, to the extent

4    either of you, either group, or any group believes the

5    benchmarks should be modified up or down or whatever direction,

6    someone to come in and say why.

7         But as a reasonable approximation, not as matters of

8    individualized proof.  Just someone to come in and say:  Okay.

9    Here's what happened in Butte -- maybe this is what PG&E's

10   expert would say -- but all of that has to be discounted by

11   30 percent because this next fire that we're looking at didn't

12   have these factors in it or the property values there were

13   consistently lower than they were in Butte County or whatever

14   else.  You understand what I'm saying.

15        **MR. ORSINI:**  Yes, Your Honor.

16        **THE COURT:**  Okay.  But that will give us at least a

17   focus and will streamline things considerably.  So you two get

18   together and put that in specific detail.  Okay?

19        Is a week going to be enough?

20        **MR. ORSINI:**  I think you tell us it will be a week,

21   and we'll get it done in a week.

22        **MR. JULIAN:**  If it were just Mr. Orsini and me, it

23   probably would, but we tend to have other committees and fire

24   victims and class action folks weighing in; and when Mr. Orsini

25   and I put together the joint statement, we needed more time.

1          **THE COURT:**  You know, everybody should do it.

2          **MR. JULIAN:**  I would say ten days to two weeks.

3          **THE COURT:**  Two weeks?

4          **MR. ORSINI:**  Two weeks.  I would say ten days,

5     Your Honor.

6          **MR. JULIAN:**  Ten days is fine.

7          **MR. ORSINI:**  We need to get this process going.

8          **THE COURT:**  Two weeks but you can beat the clock.  So

9     if you get it done earlier, you can -- two weeks is an outer

10    boundary.  Let's do that.  Okay?

11         **MR. JULIAN:**  Thank you, Your Honor.

12         **THE COURT:**  Now, what would you like to do in the

13    meantime?  Do you just want to wait until we get that done and

14    then decide discovery or what?

15         And, by the way, I think we can have the hearings -- I

16    would like to have the hearings in January at the latest.  So

17    keep that in mind.  I think if we get this streamlined in the

18    way that I think is appropriate, that should be absolutely no

19    problem.  Okay?

20         So you should be targeting mid to late January for the

21    hearings.  And I'll leave it up to you to decide how you want

22    to do it, but five weeks is not, in my view, consistent with

23    the spirit of 502(c).  Maybe it is.  We'll see.  But it seems

24    to me that if we do the benchmarks the right way with experts

25    and maybe a little bit of factual data here and there, this can

 1   be done in two or three weeks.  Okay?

 2          **MR. JULIAN:**  Thank you, Your Honor.

 3          **THE COURT:**  All right.  Now, anything else?  Do you

 4   want to just come back in two weeks or do you want to do

 5   something?

 6          **MR. JULIAN:**  I think in the interim I'd like to talk

 7   to our discovery team.  I'll get to you the transcript of

 8   Judge Montali's discussion on San Bruno because we think it's

 9   important data, and we'll submit a letter brief to you as

10   appropriate.

11          **THE COURT:**  Okay.

12          **MR. ORSINI:**  Your Honor, if I may, just two additional

13   points.

14          **THE COURT:**  Okay.  Well, let's -- all right.  So

15   you're the TCC; is that right, Mr. Julian?

16          **MR. JULIAN:**  TCC.

17          **THE COURT:**  Okay.

18          **MR. JULIAN:**  For plaintiffs.

19          **THE COURT:**  So the TCC is going to submit a discovery

20   proposal.  You can respond let's say five days after they do

21   that.  Okay?

22          **MR. ORSINI:**  Okay.

23          **THE COURT:**  All right.

24      Okay.  Yes.

25          **MR. ORSINI:**  First, I just want to clarify one thing

1   for the record, Your Honor, going back to the conversation we

2   had about the numbers that were in our plan.

3       Just to be very clear, that's not a floor on what we

4   perceive the liability to be; right?  Those are set as caps on

5   what we believe the potential liability could be subject to

6   estimation, but we're certainly not conceding that that is the

7   magnitude of liability as to any of those classes except with

8   respect to, of course, the public entities with whom we've

9   settled.

10      THE COURT:  Well, but you're saying it's at least that

11  much.

12      MR. ORSINI:  No, we're not, Your Honor.  We're not

13  saying it's at least that much.  We've said that we will put

14  forth a plan that includes funding of up to that amount subject

15  to estimation.  We believe that the actual liability numbers

16  may be significantly lower than that, and that ultimately is

17  going to be what Your Honor has to resolve at the estimation

18  hearings.

19      MR. JULIAN:  And, Your Honor, I only know what they

20  put in their 10-Q, that it was -- they booked 14 billion

21  because it was a minimum and it could be over 30 billion, and

22  the document we filed with Dennis Montali had the number pegged

23  around 50 billion on the basis of the Butte settlement ratio

24  analysis, but that's for a discussion another day.

25      THE COURT:  Okay.  You had another point?

1          **MR. ORSINI:**  I can raise it at the end, Your Honor.

2          **THE COURT:**  All right.  Anything else for today?

3          **MR. ORSINI:**  No, subject to that one point.

4          **THE COURT:**  All right.  So it's going to be all on you

5   for two weeks.

6          **MR. JULIAN:**  Yes, Your Honor.

7          **THE COURT:**  I'll have you back two weeks from today.

8          **MR. JULIAN:**  Yes, Your Honor.

9          **THE COURT:**  So what you should probably do actually

10  is -- Lisa, what is two weeks from today?

11          (Courtroom deputy and the Court conferring.)

12          **MR. ORSINI:**  Can I raise one scheduling issue,

13  Your Honor?

14          **THE COURT:**  Well, I'm just trying to deal with mine

15  here.

16                    (Pause in proceedings.)

17          **THE COURT:**  You know, I am going to have you back,

18  this is a little bit less time, Mr. Julian, than you were

19  thinking, but I'm going to have you back on Friday,

20  September 19th.

21      Is that the 19th?

22          **THE CLERK:**  Thursday is the 19th.

23          **THE COURT:**  I'm sorry, the 20th.  Friday,

24  September 20th.

25          **MR. JULIAN:**  That's fine, Your Honor.

1          THE COURT:  Okay.

2          MR. ORSINI:  Your Honor --

3          THE COURT:  Which means I need to get the plan from

4  you by --

5              (Courtroom deputy and the Court conferring.)

6          THE COURT:  So Friday the 19th --

7          THE CLERK:  Thursday is the 19th.

8          THE COURT:  I'm sorry, Friday the 20th.  And I need to

9  get your proposal, then, by no later than the -- let's say

10  5:00 o'clock on the 18th.

11          MR. ORSINI:  If I may, Your Honor.  I apologize.

12          THE COURT:  Yes.

13          MR. ORSINI:  I have a one-day trial in Delaware

14  Chancery Court on Friday the 20th of September that's been

15  scheduled for a few months now.

16          THE COURT:  Is that likely to go?

17          MR. ORSINI:  Yes.  It's almost certain to go.

18          THE COURT:  Okay.  In that case, I cannot see you

19  until October 7th.

20          THE CLERK:  That's a Monday.

21          THE COURT:  Yes.

22      So that's going to give you plenty of time so it should be

23  perfect by the time I see it.  Okay?

24          MR. ORSINI:  If I'm wrong, Your Honor, about that

25  going, I can notify the Court as soon as it settles if it works

1    out.

2          **THE COURT:**  Well, you two should just get started with

3    the idea that if the 20th gets continued or something, you can

4    come in on the 20th.  Okay?

5          But otherwise I'll see you on Monday the 7th at

6    10:00 a.m., and get the plan in -- if it's going to be Monday

7    the 7th, just get it in by a week before then.  Okay?

8          All right.  And as this is going -- after that, I'm going

9    to start setting our dates and we'll define with specificity

10   what the scope of discovery will be at that point.

11         And you-all are looking at your experts.  I mean, I think

12   you have a fair idea now so this is going to move -- consider

13   this effectively an expedited bench trial.

14         **MR. ORSINI:**  Absolutely.

15         **THE COURT:**  So just make it happen.

16         **MR. JULIAN:**  Yes.

17         **THE COURT:**  Anything else for today?

18         **MR. ORSINI:**  Your Honor, the one final point I've been

19   asked to raise, just for the sake of transparency, I understand

20   that Your Honor has personal knowledge, personal relationship

21   with one of our directors, Jeffrey Bleich, who I believe has

22   also been appointed by the Court as a special master.

23         **THE COURT:**  Special master in my antitrust case.

24         **MR. ORSINI:**  We do not believe that there's any issue

25   associated with that.  We have no question about the Court's

1    impartiality.  We just thought it would be important for us to

2    raise it.

3            THE COURT:  All right.  I agree.

4        MR. JULIAN:  Thank you.

5            THE COURT:  Anything else from anyone?

6        MR. JULIAN:  No.  I think we're fine.

7            THE COURT:  Yes.  Come on up.

8        MR. PASCUZZI:  Thank you, Your Honor.

9            THE COURT:  Yes.

10       MR. PASCUZZI:  Paul Pascuzzi for the California state

11   agencies.  My firm is co-counsel.

12           THE COURT:  Oh, yes.  Thank you.  Yeah.

13       MR. PASCUZZI:  And the attorney for the United States

14   is here as well.

15           THE COURT:  Okay.

16       MR. PASCUZZI:  Your Honor, we had put an insert into

17   the joint status conference statement and wanted to alert the

18   Court of one issue that the Bankruptcy Court was still going to

19   be dealing with with respect to the unique claims,

20   fire-suppression-type claims that are technically, quote, "fire

21   related" but they are very distinct from the tort victims

22   claims.

23           THE COURT:  Your colleague can come on up.

24       So let me just cut to the chase.  So you two want to be

25   exempted from -- the state agencies and the federal agencies

```
 1   want to be out of this process.  Is that what you're --

 2          MR. PASCUZZI:  Yes, Your Honor.

 3          THE COURT:  Okay.

 4          MR. PASCUZZI:  There's two bases.

 5          THE COURT:  Well, before -- I didn't get the sense

 6   that the debtor disagreed with that.

 7          MR. ORSINI:  No, we do, Your Honor.

 8          THE COURT:  Oh.

 9          MR. ORSINI:  We don't agree with their analysis so

10   that is still an open issue.

11          THE COURT:  Oh, you do?  Oh.

12          MR. ORSINI:  We were going to propose to brief --

13          THE COURT:  I missed that.

14          MR. ORSINI:  -- either to the Court or to the

15   Bankruptcy Court.

16          THE COURT:  Oh, okay.

17          MR. PASCUZZI:  Your Honor, Judge Montali at the last

18   hearing in the Bankruptcy Court said that he thought he could

19   decide whether our claims are liquidated or unliquidated.  If

20   they are liquidated, then they are not subject to estimation

21   under 502(c).  We believe substantially all of our claims will

22   be liquidated.  They're not filed yet so it's hard to make that

23   determination.  We're working closely to get them filed as soon

24   as possible, and then the Bankruptcy Court will decide that

25   according to what Judge Montali said at the last one.
```

1          THE COURT:  Well, would you like Judge Montali to do

2     that?

3          MR. PASCUZZI:  We would, Your Honor.  I mean, he's

4     pretty -- he deals with liquidated/unliquidated issues all the

5     time.  No disrespect.

6          THE COURT:  Fine with me.  So why don't you go do

7     that.  And that will resolve the issue; right?

8          MR. ORSINI:  It will, Your Honor.

9          THE COURT:  Okay.  So I don't have to --

10          MR. PASCUZZI:  The second part of the issue,

11     Your Honor, is let's say there are some parts of the claims

12     that are unliquidated, they're very distinct from individual

13     tort victims' claims.  And obviously those tort victims' claims

14     are very, very important and we're concerned about getting

15     caught up in, you know, the rumble for all of that and not

16     really being able to present our case on our important claims

17     as well.

18        So we're talking about fire suppression costs, we're

19     talking about environmental cleanup by the Department of Toxic

20     Substances Control, emergency services and disaster aid

21     provided by the Office of Emergency Services and the federal

22     agencies.

23          THE COURT:  Yes, and Butte already settled; right?

24     Butte County?

25          MR. PASCUZZI:  This is different.

1      **THE COURT:**  No, no, I know, but that's the type of

2  claim that they -- damage to the city --

3      **MR. PASCUZZI:**  I don't think it's similar types of

4  claims, Your Honor.

5      **THE COURT:**  How long do you think Judge Montali will

6  need to -- have you moved already?  Have you already asked him

7  to resolve this?

8      **MR. PASCUZZI:**  He said he would resolve it, but the

9  claims need to be filed first and the bar date is October 21st,

10  and we're trying to get our claims in as soon as we can.

11      **THE COURT:**  Oh, a month away --

12      **MR. PASCUZZI:**  Yes.

13      **THE COURT:**  Two months -- a month and --

14      **MR. PASCUZZI:**  Yes.

15      **THE COURT:**  All right.  Well, you know, I can't hold

16  the train up.

17      **MR. PASCUZZI:**  No, understood.

18      **THE COURT:**  So what are you proposing we do?

19      **MR. TROY:**  Your Honor, Matthew Troy, Department of

20  Justice, Civil Division, on behalf of the federal agencies with

21  claims here and the largest of which is FEMA.

22      And to go back to your question about what are your

23  claims, they are not tort claims for personal injury or

24  wrongful death.  They're not even truly tort claims.  We're not

25  victims.  FEMA, pursuant to federal law and required by such,

1  responded to a disaster and incurred expenses in the form of

2  direct financial assistance to public entities as well as to

3  individuals that are now seeking to recover.  So simply seeking

4  to recover financial assistance in the form of response costs

5  mandated by law.

6      So that's why our claims --

7          **THE COURT:**  I get it.

8      **MR. TROY:**  So to get to your question, though, I think

9  what Mr. Pascuzzi laid out is correct.  File the claims,

10  determine if they're unliquidated or not.  If they are

11  liquidated, by law they're not subject to 502(c).

12      If some portion of them is deemed by Judge Montali to be

13  unliquidated, we simply wanted to point out to Your Honor right

14  here right now that we still think that our claims are

15  sufficiently distinct and unique from individual tort victims'

16  claims that they shouldn't be caught up in this estimation

17  proceeding.  This estimation proceeding.

18          **THE COURT:**  Oh, well, I think time alone will make you

19  on a different track.  So, I mean, they're not even going to

20  know from Judge Montali until maybe first week of November.

21      **MR. ORSINI:**  Well, I think that's their choice,

22  Your Honor.  If the claims are, as they have been asserting,

23  liquidated already -- i.e., their worth of sum that's easily

24  ascertainable -- why can't they file their claims now; right?

25  It doesn't make any sense.

1          **THE COURT:**  Well --

2          **MR. ORSINI:**  They can file --

3          **THE COURT:**  -- I'm not going to micromanage people's

4    claim filing, but --

5          **MR. ORSINI:**  In any event, one other point --

6          **THE COURT:**  The Court has set a deadline,

7    Judge Montali set a deadline of -- what was it?  October?

8          **MR. PASCUZZI:**  21st.

9          **MR. TROY:**  October 21st is the deadline to file proof

10   of claims.

11         **THE COURT:**  I'm not going to effectively trump him and

12   set a new deadline.  They can do the deadline that was set.

13   All I'm saying is, by the operation of the dates alone, they're

14   not going to be able to probably be ready should anything come

15   here.  I don't even -- not even getting into the qualitative

16   differences among the claims.  So we may have an ancillary

17   short -- I can't imagine it would be terribly complicated, but

18   maybe a short ancillary hearing in February, or something like

19   that, just to address the state.

20         **MR. ORSINI:**  I think it's a little sufficient unto the

21   day.  We'll see what the schedule looks like once they get

22   their claims in and Judge Montali decides the issue.

23         **THE COURT:**  It may be a nonissue too.  I mean, you may

24   work everything out, it may all be liquidated, and you may not

25   have to come back.

1      **MR. ORSINI:**  And there will also be very important

2   legal issues that the Court can address before any hearings,

3   including the fact that FEMA doesn't actually have a cause of

4   action against PG&E.  Those types of things we can address as

5   soon as the claims are actually submitted.

6      **THE COURT:**  Okay.

7   All right.  Is that good?

8      **MR. TROY:**  Yes, Your Honor.  Thank you.

9      **THE COURT:**  So, in other words, we're just going to

10  see how it goes but I am presuming, subject to change, that

11  under your current schedule, you're probably not going to be

12  able to be on the same track anyway.  Okay?

13  So I will leave the possibility of a short ancillary --

14  you know, I'm not saying "ancillary" in a way that they're

15  small, but -- "subsequent" is better -- a subsequent proceeding

16  if we need to do that.  Okay?

17     **MR. TROY:**  I understand, Your Honor.  Thank you.

18     **THE COURT:**  That's going to all depend on

19  Judge Montali's determination.

20     **MR. PASCUZZI:**  Thank you, Your Honor.

21     **THE COURT:**  Anything else for today?

22     **MR. ORSINI:**  Nothing else from us, Your Honor.  Thank

23  you.

24     **THE COURT:**  All right.  From anybody?  Nothing?

25                    (No response.)

1       **THE COURT:**  Okay.  Good.  Thank you.

2              (Proceedings adjourned at 10:52 a.m.)

3                      ---oOo---

4

5

6              **CERTIFICATE OF REPORTER**

7       I certify that the foregoing is a correct transcript

8  from the record of proceedings in the above-entitled matter.

9

10  DATE:   Tuesday, September 10, 2019

11

12

13

14  _____

15      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25