WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>-and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>            **Debtors.** | Case No.<br>No. 19-cv-05257-JD<br><br>**PARTIES' JOINT STATUS CONFERENCE STATEMENT IN ADVANCE OF OCTOBER 7, 2019 STATUS CONFERENCE ON ESTIMATION**<br><br>Bankr. Case No. 19-30088-DM |

PG&E Corporation and Pacific Gas and Electric Company (together, "**PG&E**" or the "**Debtors**"), the Official Committee of Tort Claimants (the "**TCC**"), the Official Committee of Unsecured Creditors (the "**OCC**") and the Ad Hoc Group of Subrogation Claim Holders ("**Ad Hoc**

1   **Subrogation Group**") (collectively, the "**Parties**") hereby submit this Joint Status Conference

2   Statement ("**Joint Statement**") in advance of the status conference scheduled for October 7, 2019.[1]

3   At the Court's September 10, 2019, hearing, the Court asked the Parties for a specific

4   proposal for estimation utilizing prior settlement benchmarks and supported by primarily expert

5   testimony. (Sept. 10, 2019 Hr'g Tr. at 37:7-19; Hr'g Minutes at 1.)  On September 20, the Debtors

6   sent the TCC their proposal for estimation, and on September 26, the TCC sent its proposal in

7   response.  The Parties have met and conferred and have been unable to come to agreement on a

8   proposed schedule.  Accordingly, the Parties present their separate statements below.

9   **I.     DEBTORS' SEPARATE STATEMENT**

10  As this Court noted at the status conference on September 10, 2019, the purpose of these

11  proceedings under Section 502(c) of the Bankruptcy Code is to conduct an "overall estimate" of

12  the aggregate value of unliquidated prepetition Wildfire Claims against the Debtors stemming from

13  the 21 major fires that occurred in Northern California in October 2017 and the 2018 Camp Fire.[2]

14  (Sept. 10, 2019 Hr'g Tr. at 8:8-12.)  Such an estimate is not an evaluation of individual claims, but

15  it is also not a guess.  As the Court articulated, it is a "middle ground" (*id.* at 28:9-11) between (1)

16  simply accepting at face value the amounts asserted by the claimants, and (2) requiring a full proof

17  of both liability and damages, as is required in all court proceedings outside of the unique setting

18  of Section 502(c) estimation proceedings.  This "middle ground" approach requires courts to

19  evaluate the viability of the asserted claims, the damages flowing from those claims and applicable

20  benchmarks, where appropriate or relevant, modified as necessary to account for distinguishing

21  factors.  Importantly, courts have recognized that, in fashioning the method of estimation, "the court

22  ─────────────────

[1] Unless separately defined, all capitalized terms are as defined in the Parties' Joint Status
23  Conference Statement (Dkt. 13).

[2] Any alleged victim of the 2017 and 2018 Wildfires is required to file a proof of claim by
24  October 21, 2019.  These claims are based on payments made by insurance companies to
individuals and businesses with insurance coverage for wildfire damages.  The estimation
25  proceeding discussed herein is to estimate the aggregate value of the claims alleged by individual
wildfire victims who were uninsured or underinsured or who contend that they are entitled to
26  additional recovery from the Debtors for damages available under a negligence cause of action
(*e.g.*, emotional distress).

27
The Debtors and the Ad Hoc Subrogation Group have reached a settlement to resolve all claims
28  arising from the 2017 and 2018 Wildfires that remains subject to bankruptcy court approval.

is bound by the legal rules which may govern the ultimate value of the claim." *See Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982).  Thus, "to estimate . . . unliquidated tort claims, the Court must apply the relevant laws of [the state] to the issues presented in the[] claims." *In re Farley, Inc.*, 146 B.R. 748, 753 (Bankr. N.D. Ill. 1992).

As the Court has already noted, ensuring due process in the estimation proceedings is crucial.  Both the wildfire claimants *and the Debtors* deserve to "have their day in court." (*See* Sept. 10, 2019 Hr'g. Tr. at 32:12-18.)  Indeed, due process is essential so that the Court can reach a fair estimation for *all* stakeholders to this bankruptcy.  When participating in the estimation process, the Debtors act as a fiduciary to the estate and all stakeholders.  That includes not only the wildfire victims, but also existing and future rate payers, local, state and federal governmental entities and all of the other secured and unsecured creditors and the Debtors' existing equity holders.  On the one hand, if the Court estimates the value of the Wildfire Claims too low, the victims of the various wildfires risk under-compensation.  On the other hand, if the Court estimates the value of the Wildfire Claims too high, the Debtors' other creditors—who are also entitled to recover on their legitimate claims—could themselves be under-compensated and the equity holders—which include the Debtors' current and retired employees as well as thousands of retirees who have invested in the Debtors through pension funds—could be adversely impacted.  To be sure, the victims of the various wildfires have suffered devastating losses.  They deserve fair compensation, which is exactly what the Debtors have sought throughout these Chapter 11 cases. But all of the other stakeholders also deserve fair treatment of their claims and property rights, and the Debtors have to balance all of these interests in proposing an equitable estimation process that also realistically enables the Debtors to meet the mandates of AB 1054 by June 30, 2020.

In furtherance of its broad fiduciary duties and in order to maximize efficiency, the Debtors have agreed not to contest, for purposes of this estimation process, the conclusions of the California Department of Forestry and Fire Protection ("Cal Fire") that the Debtors' electric equipment caused the 2017 North Bay Fires (with the exception of the Tubbs Fire) and the 2018 Camp Fire.  But by agreeing not to contest causation, the Debtors have not conceded that any of their actions with

respect to their equipment were unreasonable, out of compliance with applicable standards or negligent in any way. *As discussed below, the question of whether the Debtors were negligent— which is strongly disputed by the Debtors—is critical to the estimation process and could impact the total estimated liability by billions of dollars.* Separately, the Debtors recognize that discovery from every individual claimant is impossible. But that cannot mean that *no* evidence of the actual losses suffered by the wildfire victims can be obtained, or used for the purposes of estimation. Estimation absent any evidence of the actual losses suffered by the *actual* claimants in *these* wildfires is guaranteed only to achieve the wrong answer, in one direction or another.

Against this backdrop, and after considering the Court's comments during the previous status conference, the Debtors have modified their previous proposal in an effort to balance the competing considerations of fairness, efficiency and speed. Whereas the Debtors previously proposed four to six weeks of hearings, with multiple phases and mini-trials on material fires, the revised proposal would address all liability and damages issues in no more than 8-12 hearing days. Evidence related to the largest fires—particularly the Camp Fire and the Atlas Fire—would still be presented to the Court, but in the context of broader evidence about the Debtors' overall practices (relevant to the TCC's negligence claims) and in a manner that would allow the Court to reach a determination of potential liability with respect to all of the fires. Evidence with respect to damages would be offered primarily through expert testimony—with both sides working to reduce the number of damages experts to the maximum extent feasible. In sum, the Debtors' proposed approach would involve:

- A carefully tailored damages questionnaire served upon a subset of the wildfire victims who submit claims, in a manner consistent with the approach taken in other large, mass tort bankruptcy proceedings where such questionnaires have frequently been used.
- An estimation hearing consisting of:
  - Brief opening statements by both the TCC and Debtors.

- 4 -

- No more than 4-6 days of total trial time concerning liability issues, with a focus on expert evidence and limited fact witness testimony addressing primarily the Debtors' overall systems and practices concerning wildfire mitigation efforts.

- No more than 4-6 days of total trial time concerning damages issues, with a focus on expert analysis of (i) potentially relevant benchmarks, and (ii) estimates of actual losses suffered by the victims of the relevant Wildfires, based on both the results of the damages questionnaire and publicly available information concerning key damages categories.

- Discrete legal issues—such as the applicability of inverse condemnation to fires ignited by lines that served a private rather than public good—would be briefed and adjudicated by the Court in advance of the estimation hearing through summary judgment motions.

- A single round of pre- and post-hearing briefing that would encompass all disputed issues.

A more detailed description of the Debtors' proposed estimation structure is attached hereto as Exhibit A. The Debtors' proposed schedule for pre-hearing discovery and submissions, as well as post-hearing briefing and argument, is attached hereto as Exhibit B. Unfortunately, the Debtors and the TCC were unable to agree on this proposed structure or schedule, with three primary areas of dispute driving the different approaches.

*First*, the TCC and the Debtors dispute the extent to which this Court must hear evidence regarding the Debtors' potential liability. As explained below, it is critical that the Parties present evidence, albeit in a truncated fashion. Admitting causation for a fire does not equate to admitting legal liability, particularly as it relates to negligence. Because there are material categories of damages that are only available if the TCC is able to prove negligence, the Court must assess the likelihood of liability for negligence. Consequently, an estimation hearing involving contested questions of liability—as this one does—cannot be reduced to simply an exercise of multiplying

- 5 -

the average damages per claimant by the number of claimants, without a fundamental violation of the Debtors' due process rights.

*Second*, the schedule proposed by the TCC would provide no time for the development of any evidence about the actual losses suffered by the wildfire victims. If the TCC were to have its way, the Debtors' expert reports would be due 2.5 weeks after the bar date (the date by which all claims must be submitted). The problem with that approach is that discovery into the underlying losses in the form of a damages questionnaire—a common practice in cases such as this—cannot begin until after the bar date. To the extent the TCC is arguing the use of such a questionnaire (or the pursuit of actual discovery from the claimants in any other way) is unnecessary, such an argument has no merit. The Court cannot be asked to estimate the value of damages claims without being presented with evidence about what those damages actually are. Information obtained from an appropriate subset of claimants detailing their losses is an appropriate and highly relevant way to do that, supplemented with expert analyses based on other publicly available information.

*Third*, the TCC and the Debtors have a fundamental dispute about who should go first in both pre-hearing disclosures and at the hearing itself. As explained below, consistent with the burden of proof under bankruptcy and non-bankruptcy law, the TCC bears the burden of both demonstrating that the Debtors are liable and establishing the value of the Wildfire Claims. Placing the burden of proof on the Debtors violates due process and undermines the accuracy of the Court's estimation. For that reason, the TCC should proceed first, on liability and damages issues, as is set forth in the Debtors' proposed estimation hearing schedule (attached hereto as Exhibit B).

The following sections address these three points in greater detail, for the convenience of the Court.

A.      The Court Must Hear Evidence Regarding the Debtors' Alleged Liability.

During the meet and confer process, the TCC asserted that the estimation process should not include *any* evidence about whether the claimants actually can prove that the Debtors' are legally liable for the losses they seek to estimate. That position has no precedent and makes no sense. As this Court has noted, the facts could show that "[the Debtors] shouldn't be responsible

- 6 -

1    for this because [the Debtors] actually did something that was consistent with good practice and

2    this set of claims is not reasonable." (Sept. 10, 2019 Hr'g Tr. at 32:12-15.)  While it is obvious

3    why the TCC would want to skip over any requirement to offer evidence actually showing a

4    likelihood that the Debtors were liable for the wildfires, due process, existing precedent and the

5    interests of the other stakeholders preclude such an approach.

6          For the purposes of these cases, the question of legal liability is a critical gating issue.  As

7    the Court is aware, the Debtors have agreed not to contest causation for any fire other than Tubbs.

8    But that does *not* equate to legal liability for all of those fires.  In its simplest form, the claimants

9    allege the Debtors are liable to them for damages under two basic types of claims:  (1) strict liability

10   under inverse condemnation; and (2) negligence.  To be sure, the issue of strict liability under

11   inverse condemnation is likely to be addressed in advance of the hearing through the combination

12   of Judge Montali's ruling on the threshold question of whether inverse condemnation even applies

13   to the Debtors (which will be argued on December 11) and this Court's ruling on summary

14   judgment motions concerning the applicability of the *Cantu* doctrine to a subset of the wildfires.[3]

15   However, even if the Debtors are likely liable under inverse condemnation for some or all of the

16   wildfires at issue, that does not end the liability inquiry.  That is because there is a significant

17   difference between the damages available under inverse condemnation—which covers only

18   property damage—and the damages available if negligence is proven.

19         For example, without establishing negligence liability, the wildfire claimants cannot

20   recover for any damages related to personal injury or emotional distress.  *See Aikens v. Cty. of*

21   *Ventura*, 2008 WL 9436691, at *4 (Cal. Super. Ct. 2008) (inverse condemnation is "not a legal

22   doctrine under which personal tort damages are available"); *Varjabedian v. City of Madera*, 134

23   Cal. Rptr. 305, 313 (Ct. App. 1976) (vacated on separate grounds) ("It is settled law that the

24   measure of damages for inverse condemnation is determined by the value of the take [*sic*], and does

25   not entitle the condemnee to compensation for personal injuries, annoyance or other items of

26   _____

27   [3] Under the *Cantu* doctrine, inverse condemnation does not apply where the power lines at issue
     were constructed for a private—rather than a public—purpose.  *Cantu v. Pac. Gas & Elec. Co.*,
     189 Cal. App. 3d 160, 163 (Ct. App. 1987).  The Debtors anticipate raising a *Cantu* defense with

28   respect to the Adobe, Camp, Cherokee, Honey, La Porte, Nuns, Partrick and Pythian fires.

- 7 -

personal discomfort.").[4]   In fact, the TCC has repeatedly emphasized their view that personal injury and emotional distress damages constitute very material portions of their overall damages claims. (*See e.g.*, Aug. 14, 2019 Hr'g Tr. at 108:4-7 ("when you look at the total damages that are being estimated, about fifty percent are economic, about fifty percent are non-economic").)   Given the materiality of these issues, the TCC cannot reasonably ask the Court simply to ignore whether it is likely or not that the wildfire claimants actually could prove negligence by showing that the Debtors breached a relevant standard of care and that the alleged breach caused the relevant harm.  *See Mitchell v. Gonzales*, 54 Cal.3d 1041, 1052 (1991) ("If the conduct which is claimed to have caused the injury had nothing at all to do with the injuries, it could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries."); *McGarvey v. Pac. Gas & Elec. Co.,* 18 Cal.App.3d 555, 561 (1971) ("One of the elements of actionable negligence is the breach of a duty of care owed by the defendant to the plaintiff.").  Indeed, in a nod to their obligation to show a likelihood of success on the merits of their negligence claims, the TCC proposes that the Court rely upon the findings of third parties that have investigated the cause of the 2017 and 2018 wildfires.  But that entirely one-sided proposal—allowing only the TCC to submit liability evidence in the form of reports generated by third parties—is fundamentally inconsistent with due process, not to mention the Federal Rules of Evidence.  *In re Nickels Midway Pier, LLC*, 450 B.R. 58, 66 (D.N.J. 2011) ("[t]he Federal Rules of Evidence apply in bankruptcy proceedings. Fed. R. Bankr. P. 9017.").

The TCC's suggestion that the Court ignore liability evidence in an estimation hearing involving fundamental and important issues of contested liability—which translate directly into a difference of billions of dollars of estimated damages—is also directly inconsistent with existing

---

[4] To the extent the TCC argues that the conclusions of any third party are sufficient for the Court to determine the Debtors were negligent *per se*, that is incorrect.  *First*, as discussed below, the Federal Rules of Evidence apply in the bankruptcy context, and the Court cannot simply rely on findings by other entities as a proxy for liability.  *In re Nickels Midway Pier, LLC*, 450 B.R. 58, 66 (D.N.J. 2011) ("[t]he Federal Rules of Evidence apply in bankruptcy proceedings. Fed. R. Bankr. P. 9017.").  *Second*, even if negligence *per se* applied to certain fires, it is merely a presumption that the Debtors would be entitled to rebut by showing that they acted as a reasonable person desiring to comply with the applicable statute would.  Cal. Evid. Code § 669; *Nevarrez v. San Marino Skilled Nursing & Wellness Ctr., LLC*, 221 Cal.App.4th 102, 125 (2013).

precedent.  Even in the cases where courts have looked to prior settlements in a contested estimation, those courts have done so only *after* undertaking a liability assessment to determine whether any prior settlements are probative.  For example, in *Specialty Products*, the court estimated the value of claims based on an analysis of past settlements, but only after hearing and analyzing the debtors' evidence and arguments regarding liability.  *In re Specialty Prod. Holding Corp.*, No. BR 10-11779-JKF, 2013 WL 2177694, at *4 (Bankr. D. Del. May 20, 2013) (analyzing evidence for and ultimately rejecting debtors' contention that "because their products contained chrysotile asbestos, they have less liability than producers who use other types of asbestos").  Other examples of disputed liability bankruptcies that included assessments of legal liability in the estimation context abound, and include the following matters:

- *In re Garlock Sealing Techs.*,  504 B.R. 71, 94 (Bankr. W.D.N.C. 2014) (adopting debtor's "'legal liability'" estimation approach, focusing on "merits of claims" and "predicting the likelihood of recovery for separate groups to reach an aggregate damage amount, and then reducing that by other sources of recovery");

- *In re POC Properties, LLC*, 580 B.R. 504, 509 (E.D. Wisc. 2017) (employing methodology of estimating tort claims that took into account the likelihood that "each party's version might or might not be accepted by a trier of fact");

- *ASARCO LLC*, Case No. 05-21207 at 8-9 (Bankr. S.D. Tex. Apr. 6, 2009) (adopting the "probabilistic approach" to estimation under which "[t]he estimated value of the claim is . . . the amount of the claim diminished by probability that it may be sustainable only in part or not at all");

- *In re Pac. Gas & Elec. Co.*, 295 B.R. 635, 642 (Bankr. N.D. Cal. 2003) (noting that "[i]n some cases parties have requested courts to estimate claims by assigning a present value to the probability that the claimants would be successful in an action in another court (i.e., allow claim in amount of 40% if only 40% of evidence supports the claim)");

1      •     *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 521 (Bankr. E.D.N.Y.

2          1994) ("The estimated value of a claim is then the amount of the claim diminished

3          by probability that it may be sustainable only in part or not at all."); and

4      •     *In re Farley, Inc.*, 146 B.R. 748, 753-54 (Bankr. N.D. Ill. 1992) (estimating

5          personal injury claims by "taking the stipulated figure for damages and then

6          discounting that figure by the high probability that [the Debtor] will not be found

7          liable in tort under Illinois law").

8          To be clear, the Debtors are not proposing a lengthy liability phase challenging each of the

9 tort claimants' claims with respect to each of the 2017 and 2018 Wildfires.  Instead, as required by

10 existing precedent and due process, the Debtors propose that there at least be some liability

11 evidence presented, which will be focused primarily on the Debtors' overall policies and procedures

12 in effect at the time of the 2017 and 2018 Wildfires, including the Debtors' vegetation management,

13 de-energization and equipment maintenance and inspection policies and practices, as well as

14 evidence about how those topics relate specifically to particular fires that are material to the overall

15 outcome of the estimation.  Those topics all relate directly to the likelihood that the TCC will be

16 able to prove negligence on the part of Debtors.

17          Even where benchmarks may exist to value these tort claims based on prior wildfire

18 resolutions, an assessment of the likelihood of liability is unavoidable.  (Sept. 10, 2019 Hr'g Tr. at

19 37:7-14 (Court noting that, for a hypothetical fire, a benchmark may have "to be discounted by 30

20 percent because this next fire that we're looking at didn't have these factors in it").)  Further, a

21 consideration of benchmarks without also hearing evidence regarding the Debtors' liability would

22 run contrary to the long-standing principle that the estimation of claims must be guided by

23 underlying state law, which does not entitle a plaintiff to damages before it has proven its case.

24      B.     <u>Estimation of the Total Damages Suffered by the Wildfire Victims Must Include</u>

25          <u>Some Actual Evidence of the Damages Suffered by the Wildfire Victims.</u>

26          In estimating the value of the wildfire claims under Section 502(c), the Court is being asked

27 to estimate how much the wildfire victims would have recovered in the state court system had the

28

Debtors never filed these Chapter 11 proceedings.  While there are certain categories of damages that can be estimated using (in part) public data—and the Debtors intend to do so using expert testimony—there is no substitution for understanding the actual losses sustained by actual members of the wildfire claimant class of creditors.   For example, the Court will have to estimate how many wildfire victims will actually rebuild their homes rather than simply sell the property and move, perhaps to a less wildfire prone area.  *See Orndorff v. Christiana Cmty. Builders*, 217 Cal. App. 3d 683, 686–87 (Ct. App. 1990).  The Court will also have to estimate the extent to which property losses exceed insurance recoveries to determine how much is left to recover after insurance payments.  Evidence of total damages is relevant even where the Court utilizes benchmarks to estimate damages, because of differences in the primary factors driving the damages values in the benchmark case as compared to the claims at issue.   The best source for this information is from at least a subset of the claimants themselves.

Unfortunately, throughout these proceedings, the TCC has done everything possible to avoid providing *actual* information about the actual value of the wildfire claims, relying instead on unsubstantiated claims and faulty math such that their total claimed damages have fluctuated from $54 billion (Bankr. Dkt. 2843 at 25) to $30 to $40 billion (Aug. 14, 2019 Hr'g Tr. at 136:23-137:1; Aug. 27, 2019 Hr'g Tr. at 41:1-6, 44:13-15) to an apparent willingness to now accept approximately $13 to $14 billion (Bankr. Dkt. 4006).  Consistent with this approach, the TCC now proposes to offer only the evidence of a hand-selected group of wildfire victims in an attempt to prove up the value of the claims of tens of thousands of others.  While the Debtors certainly do not contest that some of the wildfire victims suffered through terrible circumstances and sustained unspeakable losses that have profound lasting effects, the testimony of a small number of victims cannot lay the foundation for all of the damages suffered by thousands of victims from more than 20 different fires, across different communities and geographic areas.  The individuals whom the TCC selects to testify will not be representative of the different types of emotional distress damages allegedly suffered by the other wildfire claimants because of the significant range in the severity of emotional distress claims across all wildfire claimants.

1    As Judge Montali has previously recognized, nobody "would think" the claims form being

2 used for the filing of claims in this proceeding provides "sufficient information" regarding the value

3 of the wildfire claims.  (June 26, 2019 Hr'g Tr. at 109:8-14.)  More information is plainly required,

4 and the only question is how to obtain it and the schedule required to incorporate that information

5 into the expert testimony that will be provided to this Court.  Here too, the Debtors' proposal to use

6 a questionnaire that will be provided to a subset of wildfire claimants fits directly within existing

7 precedent.  *See, e.g., Garlock*, 504 B.R. at 95  (noting that "Garlock's estimate was derived in large

8 part from [a] database [that] was constructed primarily from questionnaires ('PIQ's') and two

9 supplemental questionnaires sent to the current claimants' law firms"); *In re A.H. Robins Co.*, 862

10 F.2d 1092, 1093 (4th Cir. 1988) (discussing a detailed proof of claim questionnaire as "an essential

11 step in perfecting [a claimant's] proof of claim").  As those courts did, this Court may order the

12 completion of a damages questionnaire pursuant to Bankruptcy Rule 2004(a), which provides that

13 "[o]n motion of any party in interest, the court may order the examination of any entity."  An

14 examination under Bankruptcy Rule 2004 may relate "to any matter which may affect the

15 administration of the debtor's estate."  Bankruptcy Rule 2004(b), (c); *In re Sutera*, 141 B.R. 539,

16 541 (Bankr. D. Conn. 1992) ("It is well settled that a Rule 2004 examination is a proper procedure

17 to inquire into the basis for a filed proof of claim."); *In re Arkin-Medo, Inc.*, 44 B.R. 138, 140

18 (Bankr. S.D.N.Y. 1984) (allowing Bankruptcy Rule 2004 examination of all facts and

19 circumstances surrounding a disputed claim).

20    A draft of the Debtors' proposed questionnaire, which has been shared with the TCC, is

21 attached hereto as Exhibit C.  As the Court will see, the questionnaire will obtain information

22 concerning the specific damages that a subset of wildfire claimants is seeking, including a

23 breakdown of damages by category, and the bases for those damages.  The Debtors designed this

24 questionnaire based on precedent from other mass tort cases. *See, e.g.*, *In re Garlock*, Case No. 10-

25 31607, Docket No. 1390 (Bankr. W.D.N.C. June 21, 2011) (ordering questionnaire in asbestos

26 litigation over tort claimants' objection that, in the context of aggregate estimation, individualized

27 information is unnecessary); *In re W.R. Grace & Co.*, Case No. 01-1139, Docket No. 9301 (Bankr.

28

- 12 -

D. Del. Aug. 31, 2005) at 2 (approving that questionnaire could be sent to each of the more than 100,000 pre-petition claimants); *In re G-I Holdings Inc.*, Case No. 01-30135, 2006 WL 2403531 at *23 n.38, 39 (Bankr. D.N.J. Aug. 11, 2006) (court remarking in asbestos litigation that it "already told [the tort claimants' committee] that if the debtor is going to proceed with an estimation theory, they're going to be allowed to get evidence that they feel is necessary to make their claim in this case."); *In re Specialty Prods. Holding Corp.*, Case No. 10-11780, Docket 1466 at 2 (Bankr. D. Del. 2011) (approving questionnaire and ordering it to be completed by all Mesothelioma Claimants).

As noted, the Debtors have shared the damages questionnaire with the TCC and propose to have this questionnaire form sent to a sample of claimants after the October 21 bar date. To the extent the parties are unable to agree on the form of the questionnaire or the number of claimants to whom it will be sent, the Debtors will seek the Court's intervention in advance of the October 21 bar date so that the Parties and the Court can keep the estimation schedule on track while also ensuring that the necessary information is obtained to conduct a meaningful estimation hearing.

C.    The Estimation Hearing Should Proceed Like Any Other Contested Hearing or Bench Trial:  The Claimants Seeking Damages Should Go First

Under state law—which guides the liability determinations in estimation—the burden of proof is on the wildfire claimants. *Leyva v. Garcia*, 20 Cal. App. 5th 1095, 1104, 236 Cal. Rptr. 3d 128, 134 (Ct. App. 2018) ("On the issue of causation, as *on other issues essential to the cause of action for negligence*, the plaintiff, in general, has the burden of proof.") (emphasis added).[5] Trials do not start with the defense laying out its case for a good reason; the evidence offered to defeat liability has to be tailored to the evidence that is actually offered by the claimants pursuing relief.

Under bankruptcy law, the burden of going forward also lies with the TCC.  As Judge Montali explained at a hearing on August 27, the claimant has "the burden of going forward" in an

---

[5] As discussed above, the Debtors have agreed not to contest, for purposes of this estimation process, Cal Fire's conclusions that the Debtors' electric equipment caused the 2017 and 2018 Wildfire (with the exception of the Tubbs Fire).  The Debtors have not conceded that they were negligent and strongly dispute the TCC's allegations to the contrary.

estimation proceeding under Section 502(c) of the Bankruptcy Code just as the claimant has the burden in the context of a traditional claims objection under Section 502(b): "[I]f the debtor or trustee in a Chapter 7 case or in a Chapter 11 case objects [to claims], that is a prima facie challenge to that claim.  And then . . . the stage is set for an adjudication, and *you then go to the traditional burdens of proof of the claimant going forward*."  (Aug. 27, 2019 Hr'g Tr. at 130:8-13) (emphasis added); *see also id.* at 131:5-11 ("[W]hen the debtor files . . . its estimation [motion] and says . . . we are not liable for the fire, we are not legally liable under any theory, then that frames the issue and then the burden of going forward is on the claimant."); *see also In re Frascella Enterprises, Inc.*, 360 B.R. 435, 459 n.49 (Bankr. E.D. Pa. 2007) ("If the objecting party succeeds in overcoming the *prima facie* effect of the proof of claim, the ultimate burden of persuasion then rests on the claimant.").

Here, the TCC served contention interrogatories on the Debtors requesting that the Debtors explain, on a fire-by-fire basis, the factual and legal bases for the Debtors' claims that they are not legally liable for each fire, including by indicating the individuals and documents that support the Debtors' claims.  On September 6, 2019, the Debtors served responses to the TCC's contention interrogatories, comprising more than 200 pages and identifying hundreds, if not thousands, of pages of documents supporting the bases for the Debtors' contention that they are not legally liable for any of the 2017 or 2018 Wildfires.  As Judge Montali noted, this was more than sufficient for the Debtors to meet any other burden they might have to establish a *prima facie* challenge to the claims, and the burden is now on the claimants to set forth the basis for their claims and make the case for an estimate of their aggregate value.  (Aug. 27, 2019 Hr'g Tr. at 130:14-24 ("So in a hypothetical case, if the claimant files a proof of claim that said I'm owed X dollars -- it doesn't matter whether it's liquidated or unliquidated -- and supports it with some basis on which that claimant asserts the entitlement: promissory note, judgment, complaint, something like that; and then the objecting party rebuts that by an objection based upon something.  Not just I object because I object, but I object because satisfaction, I didn't do it, you compromised, discharged, whatever

1  defense, then that rebuts the prima facie case. *And at trial, the plaintiff has the burden of going*

2  *forward*.") (emphasis added).)

3          Under the TCC's schedule, the Debtors would be required to serve expert reports on

4  November 6, while the TCC would not have to share the names or opinions of its own experts until

5  it serves rebuttal reports on November 22.  This is fundamentally unfair and inefficient.  The TCC

6  has brought claims against the Debtors and has the burden of proving the basis for and value of

7  those claims.  It makes no sense for the Debtors to tell the TCC why it should not be liable before

8  the TCC offers its evidence on liability.  Nor does it make any sense for the Debtors to tell the TCC

9  what the claims of its constituents are worth before they put any value on their own claims.  The

10  burden of going forward—both in pre-hearing exchanges and during the estimation hearing—

11  should be placed on the TCC.  That approach is reflected in the Debtors' proposed schedule attached

12  hereto as Exhibit B.

13  **II.      STATEMENT OF THE TCC AND THE AD HOC SUBROGATION GROUP**

14          The TCC and the Ad Hoc Subrogation Group (together with the TCC, "**Claimants**") hereby

15  submit the following status conference statement regarding the process and structure of the

16  estimation hearing to determine the value of their claims arising from the 2017 and 2018 wildfires

17  ("**Fire Claims**").  The Claimants and the Debtors have met and conferred, but disagree on several

18  issues that will require resolution by the Court.

19          The first issue, raised on behalf of the TCC alone, is whether the Court must estimate

20  PG&E's liability for the fires at issue, which PG&E's discovery answers says involves evaluation

21  of 269 witnesses and millions of documents.   The test for estimation is "probable" liability.  Thus,

22  the question before the Court is whether PG&E's admissions of its "probable" liability in its August

23  2019 SEC filings, and PG&E's admission that the Fire Claimants' have a "probability of success"

24  on the claims in this estimation proceeding as stated in PG&E's September 24, 2019 settlement

25  motion (Bankr. Dkt. No. 3992), and other admissions of probable liability by PG&E are sufficient

26  for the Court to conclude that, under these expedited circumstances, it is unnecessary to consider

27  any evidence of no liability PG&E may attempt to offer.

28

The second issue, raised on behalf of the Claimants jointly, is the order and timing of the parties' disclosures.  The Debtors (who have been preparing their estimation case for nearly a year, while using the automatic stay to forestall any discovery by the Claimants since these chapter 11 cases were filed at the end of January) are refusing to disclose the legal and factual bases upon which they seek, by way of estimation, to challenge the Claimants' claims, asserting that the Claimants must "go first" and set forth the evidence they intend to present at trial. As explained below, this turns the governing bankruptcy law related to estimation and objections to proofs of claim in bankruptcy on its head, in addition to being fundamentally unfair to the Claimants who have been forced into bankruptcy proceedings and now estimation, all at the Debtors' choosing.

Several additional disagreements related to scheduling and related issues are also set forth below.

1. **The TCC Contends that this Court Can Determine that PG&E's Liability is Probable Based on PG&E's Admissions, the Investigative Record and the Law (Solely on behalf of the TCC)**

For estimation, the Court "'only needs to reasonably estimate the probable value of the claim.'"  *In re Pacific Gas & Electric Co.*, 295 B.R. 635, 642 (Bankr. N.D. Cal. 2003) *quoting Federal Press*, 116 B.R. 650, 653 (Bankr. N.D. Ind. 1989).  This means that in this estimation proceeding the question for the Court on the issue of liability is whether a showing of liability is probable.

There is ample evidence in the public domain that would allow this Court to conclude, for purposes of estimation, that the Debtors' are more likely than not liable for all of the fires at issue, thus obviating the need for a liability phase of the estimation hearing, and allowing the parties to proceed directly to the issue of damages.  For instance, PG&E's 10-Q, dated August 9, 2019, states that PG&E's reasonable estimation of loss liability is probable (using the same "reasonably estimate probable value" wording from the first *Pacific Gas & Electric Co.* case, *supra*) and that the amount of damages is probable at $18 billion and possible at over $30 billion.  *Id.* at 55, 76. Hence, PG&E's 10-Q admits that PG&E's loss liability for all fires is "probable" and the only question remaining is the amount of the damages above $18 billion.  PG&E's 10-Q provides:

- 16 -

"The aggregate liability of $17.9 billion for claims in connection with the 2018 Camp Fire and the 2017 Northern California Wildfires corresponds to the *lower end* of the range of PG&E Corp. and the Utility's *reasonably estimated probable losses* and is subject to change based on additional information." *Id.* at 55 (emphasis supplied).

"[I]t is reasonably possible that the amount of the loss will be greater than the amount accrued." *Id.* at 53-54. "[A]ggregate possible losses, if the Utility were found liable for certain or all of the costs, . . . could exceed $30 billion." *Id.*at 76.

The TCC further contends that PG&E's liability for the Fire Claims is also probable based on PG&E's settlement with the subrogation claim holders of $11 billion, where the subrogation claimants contend they have already paid $15.8 billion of insurance claims and may pay upwards of $20 billion.[6]  The wildfire victims and their insurers are prosecuting a single claim: the insureds' wildfire claim.  When an insurer prosecutes a portion of the wildfire claim, the insurer steps into the shoes of the insured to the extent of the insurers' payment.  *21st Century Ins. Co. v. Superior Court*, 213 P.3d 972, 976 n.3 (Cal. 2009).  The insurers' rights are derivative of the insureds' claim.  Hence, it is the TCC's position that the tortfeasors' agreement to pay part of the wildfire claim constitutes an agreement to pay the other part of the claim, and the only question is the dollar amount.  This is because the tortfeasor cannot agree to liability on part of a single cause of action and deny liability for the rest of the same single unified cause of action.  PG&E moved the bankruptcy court to approve the settlement paying the subrogation claimants $11 billion on the following basis in its motion: "The court must apprise itself 'of all relevant facts necessary for an intelligent and objective opinion of the *probabilities of ultimate success* should the claim be litigated.'"  Bankr. Dkt. No. 3992 at 24 (emphasis supplied), *citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  PG&E's admission in its motion that the wildfire claims have a "probability of ultimate success should the claim be litigated" is an admission that the insured wildfire victims' claims have "probable value" as explained in *In re Pacific Gas & Electric Co.*, 295 B.R. 635, 642 (Bankr. N.D. Cal. 2003), and thus liability for the wildfire victims' claims for purposes of estimation is also "probable."

---

[6] The Ad Hoc Subrogation Group and the Debtors have reached a settlement that remains subject to bankruptcy court approval.  If the bankruptcy court grants approval of the settlement, the Ad Hoc Subrogation Group will no longer be a party to the estimation proceedings.

PG&E's settlement with the subrogation claimants as evidence of "probable" liability is consistent with estimation cases which use a debtor's prior settlement history as the most probative evidence for estimating the debtor's liability for the claims. *See, e.g., In re Eagle-Picher Indus., Inc.,* 189 B.R. 681, 686 (Bankr. S.D. Ohio 1995), *as amended* (Dec. 14, 1995) ("To begin without utilizing information known about *these* debtors and their history in the handling of claims which have been asserted against them in the past, and their disposition, is to ignore a valuable experiential resource.") (emphasis in original).  Here, the Court has the benefit of PG&E settling the exact claims it is contesting here – the only difference is that PG&E is settling the Fire Claims in this very case itself.

In addition, as can be further presented to the Court in detail in any manner it deems appropriate, Cal Fire and CPUC investigations both resulted in findings that PG&E equipment caused the fires at issue in these proceedings (but not the Tubbs Fire), and Judge Alsup has also made findings about systemic abuses at PG&E that are relevant to their liability here.  And while PG&E argues in these proceedings that it is not "legally liable," its Chief Financial Officer admitted that "the Chapter 11 Cases are not a strategy or attempt to avoid PG&E's responsibility for the heartbreaking and tragic loss of life, devastating damage and destruction to homes and businesses, and harm to the communities that has been incurred as a result of the 2017 and 2018 Northern California wildfires."  Amended Declaration of Jason P. Wells, dated Feb. 1, 2019, at 4 (Bankr. Dkt. No. 263).  In estimation proceedings where the standard is "probable" liability, this Court can and should give sufficient weight to the declaration of PG&E's CFO to avoid PG&E presenting various (as yet unknown) witnesses to argue the opposite of its CFO's sworn statements.

There are other legal reasons why PG&E's liability is probable, if not guaranteed, for all fires. *Scally v. Pacific Gas & Electric Co*., 23 Cal.App.3d 806, 815 (Cal. App. 1972) states that a fire started by an uninsulated line is *res ipsa loquitor*, and in such a case, PG&E would be presumptively negligent, meaning liability is at least probable.  In this case, fires involved sparks from uninsulated wires.  In addition, Cal Fire and the CPUC reported that half of the fires involved PG&E violations of safety laws, which would give rise to PG&E's negligence *per se*.  Hence,

- 18 -

liability on the part of PG&E is probable for this additional reason.

The TCC respectfully contends that, taken separately or together, the categories of evidence above establish the Claimants' probable success on the issue of liability for each of the relevant fires. *See e.g.,* Cal. Pub. Res. Code § 4435 ("If any fire originates from the operation or use of any [device] which may kindle a fire, the occurrence of the fire is *prima facie* evidence of negligence . . . ."); *People v. S. Pac. Co.*, 139 Cal. App. 3d 627, 632-33 (Cal. Ct. App. 1983).

### 2. PG&E Should Disclose their Bases for Objecting to the Claims by Way of Estimation Now

PG&E has chosen to avail itself of chapter 11 protection and invoke the claim resolution process under federal bankruptcy law.  It is a fundamental tenet of bankruptcy law that a proof of claim that is filed in accordance with the bankruptcy rules is *prima facie* proof of the validity and amount of the claim; it then falls to the party ***objecting*** to the claim (here, PG&E) to rebut the validity of the challenged claim.  *See* 11 U.S.C. § 502(b); Bankruptcy Rule 3001(f); *See In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991) (a debtor's objection must "produce evidence and show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves"); *see also In re White*, 168 B.R. 825, 829 (Bankr. D. Conn. 1994) ("'the objecting party has the initial burden of producing sufficient evidence to rebut the claimant's prima facie case'" and may not do so by merely stating that the amount of the claim is not correct); *In re S. California Plastics, Inc.*, 165 F.3d 1243, 1248 (9th Cir. 1999).  PG&E knows this, because Judge Montali made clear that the Debtors bear the initial burden to specify the bases for their objections to the Fire Claims.  *See, e.g.*, August 27, 2019 Hr. Tr. at 133:11-14 ("So that's a rambling way of – Mr. Orsini, of telling me –telling you I think you've got to – you've got to come out and lay on the line what is your legal theory – are your legal theories.").

Moreover, it is the Debtors—not the Claimants—who have moved for estimation under 11 U.S.C. § 502(c).  It is for the Debtors' benefit that Claimants are being forced to operate under an extremely truncated and expedited process to conduct that estimation in a time frame sufficient to meet the requirements of A.B. 1054, which will allow the reorganized Debtors to take advantage

1   of the state wildfire fund.  While all parties appreciate the need to move expeditiously, due process

2   demands that these proceedings not come at the expense of Claimants' right to have a full and fair

3   opportunity to defend against the Debtors' demand that they be estimated at less than their claimed

4   value.

5           PG&E has steadfastly refused to outline their estimation case in clear terms with sufficient

6   specificity to allow the fire victims to prepare for the estimation hearing.  PG&E still has not stated

7   how it intends to prove, in this estimation proceeding, that the Debtors are not liable for the fires

8   that they admit were caused by PG&E's equipment.  PG&E has said that the Debtors were not

9   negligent, but has not articulated in clear and simple terms how the Debtors intend to make that

10  showing at the estimation hearing.  Finally, PG&E has not stated what elements of the Claimants'

11  damages claims it contests.

12          Having moved to challenge the Fire Claims in an estimation proceeding (and having had

13  sole access to the relevant evidence in their possession since January when the chapter 11 cases

14  were filed and the automatic stay imposed), the Debtors must have a clear understanding of the

15  aspects of the Fire Claims they intend to dispute.  Yet, PG&E has identified 269 witnesses and

16  millions of documents in their interrogatory answers, and argue the Debtors have satisfied their

17  estimation discovery and disclosure responsibilities. That disclosure is the equivalent of PG&E's

18  state court trial disclosure; but this is not a state court trial, but rather an estimation proceeding

19  under Section 502(c) of the Bankruptcy Code.  The bankruptcy law governing proofs of claim, as

20  well as common sense and basic principles of fairness, dictate that the Debtors should identify their

21  estimation witnesses and documents they are going to use in estimation, because the parties need

22  to prepare for the estimation hearing, not a state court trial.

23          Even more remarkably, the Debtors' position is that Claimants must disclose the details of

24  their case before Debtors and without the benefit of a clear explanation of Debtors' estimation case.

25  In the Debtors' view, Claimants should guess how Debtors intend to support their unquantified

26  estimation amounts and then identify the documents, fact and expert witnesses they intend to offer

27  to respond to the Debtors' undisclosed estimation case, as reflected in the Debtors' proposed

28

1   schedule.

2        A few simple examples illustrate the prejudice that the Debtors' position imposes on the

3   Claimants.   In recent interrogatory responses, the Debtors identified 269 potential individuals

4   (many of whom are employees or former employees of the Debtors) who *may* have relevant

5   information, and could be fact witnesses at trial.  However, the Debtors are refusing to disclose

6   now which of those witnesses they reasonably anticipate calling at trial.  Instead, the Debtors

7   propose that the Claimants take depositions by November 22, and *then* the Debtors disclose their

8   trial fact witnesses two weeks later, on December 6.  In other words, the Claimants must either take

9   269 depositions by November 22, or guess which fact witnesses they should depose, with the risk

10  that they will not have deposed whomever the Debtors intend to call at the hearing.

11       Similarly, the Debtors assert that estimation will be a largely expert driven process, and

12  their bankruptcy court filings demonstrate that they retained a stable of experts many months ago.

13  Yet Debtors are unwilling to disclose which experts they expect to testify and on what subjects

14  until December 2, 2019 -- *more than two months from now* and astoundingly ten days *after* they

15  would require Claimants to disclose their testifying experts.  There is no way to reconcile Debtors'

16  position with basic principles of fairness and due process.

17       The Debtors also argue that Claimants must disclose their witnesses and case theories first,

18  because in their view the Claimants must put on their case first at the hearing.  This misses the point

19  entirely.  The question is not who goes first at trial.  The question is what must the Debtors disclose

20  about their case to discharge their initial burden to object to the Fire Claims, first under applicable

21  bankruptcy law, and second to satisfy the requirements of due process given the extremely

22  expedited nature of the proceedings resulting from Debtors' need to satisfy the provisions of

23  A.B. 1054.  To be clear, Claimants disagree that they are required to present their case first at the

24  hearing, but that issue can be resolved at a later date.  For the time being, the immediate and urgent

25  issue is that Claimants are entitled to full disclosure of Debtors' estimation case to permit them to

26  prepare a response.  Due process demands no less.

27  **3.  Review of the Questionnaire is Premature**

28

1    The TCC understands that PG&E is attaching to this statement its questionnaire to fire

2    victims.  The TCC requested a copy of PG&E's questionnaire since at least August 13, 2019 (Ltr.

3    to K. Orsini from R. Julian) so that the parties could meet and confer all issues related to the

4    questionnaire.  On Friday, September 27, 2019, PG&E sent its draft questionnaire to the TCC.

5    Given that the questionnaire was circulated only one business day ago, the TCC believes that any

6    review of the substance or form of the questionnaire is premature.

7    **4.  Summary of Issues to be Addressed by the Court**

8    *First*, the TCC asks this Court to determine whether it is necessary to address liability at the

9    estimation proceeding at all and, if so, the extent to which the Court is willing to rely on Cal Fire

10   and CPUC findings as well as the Debtors concessions, so that the Claimants may know how to

11   prepare their case and address the millions of pages and hundreds of witnesses identified by PG&E.

12   *Second*, whether PG&E should identify the witnesses, documents and theories they believe

13   are relevant for their estimation case, as opposed to the 269 witnesses and millions of pages of

14   documents identified in their interrogatory responses.

15   *Third*, whether the Court will entertain motions for summary judgment. The Debtors'

16   schedule would have the parties spend nearly a month engaged in summary judgement briefing—

17   a diversion that the parties have neither the time nor the need for in these expedited proceedings.

18   In their estimation motion, the Debtors' previously asked Judge Montali to set aside the inverse

19   condemnation issue for briefing, to which Judge Montali agreed.  If there were additional issues

20   that they believed could be decided as a matter of law, the Debtors should have so stated.  More

21   importantly, this is not a full trial on the merits, but an estimation proceeding—the "summary

22   judgment" standard simply does not apply.

23   *Fourth*, what the total length of the hearing should be.   The Claimants think two weeks is

24   sufficient while the Debtors propose three.  This discrepancy is likely due in large part to the

25   Claimants' disagreement regarding the extent and scope of the liability proceeding as outlined

26   above.

27   *Fifth,* whether the TCC will be permitted to present testimony from victims forced to flee

28

1   from the fires to establish the very-real nature of their mental and physical trauma.  The Debtors,

2   unsurprisingly, seek to limit the damages phase to experts, excluding all testimony from the victims

3   whose claims have given rise to these proceedings in the first place.

4       **5.  Proposed Schedule**

5           The Claimants present the below proposal in response to the Court's request to provide

6   information on how to conduct the estimation hearings.  This presentation explains the subject

7   matter of the expert witnesses the Claimants intend to rely upon during the hearing.  The Claimants

8   request that if the Court wishes to hear testimony on liability, PG&E disclose its experts in the same

9   fashion so the parties can prepare for the hearing on an even basis.

10          The Claimants' Plan for the Estimation Trial:  5-7 days per side[7]

11   1.  Opening statement, including submission of the multitude of findings by state agencies that

12      PG&E equipment caused the fires and PG&Es 10-Q statements that PG&E is liable for the

13      fires.  To ensure that the hearing is streamlined, the TCC requests that the Court rely upon

14      the findings of Cal Fire, the CPUC, Judge Alsup and any other government entity that has

15      investigated the cause of the 2017 and 2018 wildfires, as well as PG&E's admissions.

16   2.  The TCC intends to present testimony from victims regarding fleeing the fire traumas, as

17      examples that show the nature of their trauma is mental, physical and real.  In addition, a

18      PTSD expert would testify that the victims' emotional distress trauma and damages are real

19      and subject to compensation.

20   3.  The TCC is in general agreement with PG&E that the presentation of damage expert

21      testimony can likely be streamlined with a single witness likely presenting live testimony

22      on multiple damage categories, and relying on opinions submitted by other experts through

23      written reports.  Damage expert(s) will model the volume and amount of all compensatory

24      damages suffered by fire victims (economic and non-economic), punitive and exemplary

---

[7] The precise length of the Claimants case will depend on the scope of evidence that the Court intends to hear on liability as well as the issues that the Debtors intend to challenge, which will not be known to Claimants until they receive the Debtors' disclosures.  Expert testimony may be shortened significantly via "hot-tubbing" or submission of expert reports in lieu of direct testimony.

damages, attorneys' fees, and interest.  As appropriate, an additional expert may use the San Bruno and 2015 Butte settlements as benchmarks and testify regarding adjustments to the damage figures that would be appropriate to compensate the victims of the 2015, 2017 and 2018 fires and will show PG&E's settlement behavior when faced with potential liability: (a) PG&E disputes its liability in each of the fire cases on the same grounds irrespective of the type of fire, and PG&E's cause of the fire, (b) PG&E settles fire cases for amounts that recognize its liability, irrespective of the nature of its contentions that it is not liable; and (c) PG&E has settled such cases historically in part in an effort to avoid an adverse verdict on negligence, which would preclude PG&E from passing on the costs to resolve the claims to ratepayers.

4. Subject to modification based upon the Debtors' disclosures, the Ad Hoc Subrogation Group anticipates presenting two or four expert witnesses related to the payment of claims and setting of reserves, as well as relevant industry benchmarks.  While issues related to liability will largely if not entirely overlap for the Ad Hoc Subrogation Group and TCC, the issues related to damages will not.  The Ad Hoc Subrogation Group has claims for damages of approximately $20 billion, and that case will be presented independently from the TCC case, through different experts.  Depending on the issues that the Debtors intend to challenge, it is anticipated that case will require two to three days of evidence.

5. If the Court determines that it must hear further evidence about PG&E's liability for the fires, the Claimants would present additional evidence, including expert and fact witnesses, on the general topics suggested by PG&E (Vegetation Management, De-Energization and climate change, and electrical line operation, inspection and maintenance), including evidence that PG&E's mismanagement and negligence in these areas with respect to the 2015, 2017 and 2018 wildfires was similar and systemic.

6. The Claimants' rebuttal case would involve presentation of limited evidence, as appropriate.

7. The Claimants' closing argument will include a summary of the case, and argument that the trust may be underfunded unless the Court uses an appropriate multiplier to increase the

- 24 -

estimation to protect the victims from underfunding, as well as a proposal of what an appropriate multiplier should be.

Claimants' Proposed Schedule

- October 15, 2019
  - Substantial completion of document productions, without wavier of Claimants' right to make additional requests as necessary
  - Produce documents on a rolling basis as they become available for production
  - Substantial completion of examination of physical evidence
  - Debtors to disclose list of fact witnesses they intend to call at trial
  - Debtor's to disclose expert witnesses they intend to call at trial and the issues each witness will address
  - Claimants to identify list of fact witnesses in their control who they intend to call at trial

- October 16-Nov. 15, 2019
  - Fact and non-party depositions
  - Subject to Claimants' reservation of rights to depose additional witness based on Debtors' responses to discovery and the Court's guidance on the scope of the estimation trial

- November 6, 2019
  - Debtors serve expert reports

- November 22, 2019
  - Claimants serve expert reports

- December 9-20, 2019
  - Expert depositions completed

- January 6, 2020
  - Exchange exhibit lists and deposition designations

- January 8, 2020
  - Submit pre-trial briefs

- January 9, 2020
  - Exchange objections to exhibits and counter depo designations

- January 10, 2020
  - Complete meet-and-confer process as to exhibits

- January 13, 2020
  - File list of admissible and disputed exhibits, witness list and deposition designations

- 25 -

- Mid-January
  - Hearing

### III.   STATEMENT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS

The Creditors' Committee represents the interests of a broad constituency of unsecured creditors holding over $22 billion in claims against the Debtors, including union members and retirees, contract counterparties, vital lenders and financial institutions, and small and mid-sized businesses that supply critical services and materials to the Debtors.

The Creditors' Committee supports the Debtors' scheduling proposal, but only once clarified and/or modified to allow for the Creditors' Committee to fully participate in the estimation proceedings, including through briefing and the presentation of expert reports and testimony. Absent full participation rights, the Creditors' Committee will be unable to discharge its fiduciary duties to its constituency.  *See* 11 U.S.C. § 1103(c) (a creditors' committee is empowered, *inter alia*, to "investigate . . . any other matter relevant to the case or to the formulation of the plan" and "advise those represented by such committee of such committee's determinations as to any plan formulated").  The Creditors' Committee will nevertheless coordinate with other parties, including the Debtors and TCC, to avoid duplication of submissions and to ensure that the process remains orderly and on schedule.

Any concern that the Creditors' Committee's participation is unnecessary because its interests are not implicated is unfounded.  Although the claims that will be the subject of estimation are primarily those of the wildfire claimants and related parties, this does not make the Creditors' Committee, or the interests it represents, any less relevant.  Indeed, the TCC, the appointed fiduciary for the wildfire claimants, has on multiple occasions stated its belief that the value of its constituents' aggregate claims may exceed the net distributable value of the Debtors' assets such that, depending on the results of estimation, the Debtors could be left insolvent.[8]  That result would

---

[8] *See* Hr'g Tr. (Aug. 27, 2019), Case No. 19-30088 (Bankr. N.D. Cal.), at 35:182-25 (Ms. Dumas: "***There's a major difference of opinion between the debtors and the TCC, with respect to, kind of, a big overarching question, and that is whether or not in the aggregate*** the tort claims, subrogation claims, individual plaintiff claims, and PE claims -- public entity claims -- ***whether those collectively are in an amount that can be proven to be higher than the net distributable value of the debtor***[.]" (emphasis added)); *id.* at 41:1-6 (Ms. Dumas:  "I think everybody in the

leave all unsecured creditors, including the broad constituency the Creditors' Committee represents, impaired.  Sidelining the Creditors' Committee in these circumstances would unfairly deprive holders of $22 billion in claims a voice in proceedings that may dramatically impact their interests.

Full participation by the Creditors' Committee is also consistent with remarks from this Court and with the role played by official creditor committees in other mass tort bankruptcy cases. Indeed, the Court confirmed at the September 10, 2019 status conference that it perceived participation rights to be broad, noting that "everyone's invited."  *See* Hr'g Tr. (Sep. 10, 2019), Case No. 19-05257 (N.D. Cal.) at 36:22-24.  And active participation by the Creditors' Committee in these estimation proceedings would be within the norm of other mass tort bankruptcy cases. *See, e.g.*, *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 683 (Bankr. S.D. Ohio 1995), *as amended* (Dec. 14, 1995) (creditors' committee presented separate expert testimony from that of the debtors and the tort claimant groups); *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 746-47 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989) (creditors' committee, together with debtors and tort claimant representatives, developed a database to aid in estimation in concert with the Court's expert; creditors' committee submitted an independent claims estimate); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 125 (D. Del. 2006) (court considered testimony from estimation experts for each of the creditors' committee, various tort claimants' committees, and a group of plan proponents).

Finally, the Creditors' Committee disputes any suggestion that it should be barred from fully participating in the estimation proceeding for fear that allowing such (ordinary) participation would "open the floodgates" for other interested parties to participate, which could overwhelm and disrupt the process.  That concern misapprehends and threatens to marginalize the unique, statutory role creditors' committees fulfill in bankruptcy proceedings.  *See, e.g.*, *In re Penn-Dixie Indus.,*

---

room realizes that PG&E doesn't have more value than it has. Right? So there's not an intention, on the part of tort claimants, to say, our number is forty billion or eighty billion and deal with it. ***We're working within the parameters of the distributable value and an insolvent company***." (emphasis added)).

*Inc.*, 9 B.R. 941, 944 (Bankr. S.D.N.Y. 1981) ("Reorganization committees are the primary negotiating bodies for the plan of reorganization."); *In re Structurlite Plastics Corp.*, 91 B.R. 813, 818 (Bankr. S.D. Ohio 1988) ("The drafters of the Bankruptcy Code clearly envisioned a prominent role for creditors' committees in the reorganization process."). Perhaps the Court will find it appropriate to rein in the proceedings with respect to creditor groups who are *already* represented by a fiduciary, but it should not silence the Creditors' Committee—*itself* a fiduciary—whose constituents' claims hang in the balance.

We look forward to addressing these issues with the Court.

1    Dated: September 30, 2019

2

3

4                                            CRAVATH, SWAINE & MOORE LLP

                                              */s/ Kevin J. Orsini*
5                                            Paul H. Zumbro
                                             Kevin J. Orsini
6                                            Omid H. Nasab
                                             825 Eighth Avenue
7                                            New York, NY 10019
                                             Telephone: 212.474.1000
8                                            Facsimile:  212.474.3700
                                             Email: pzumbro@cravath.com
9                                            Email: korsini@cravath.com
                                             Email: onasab@cravath.com
10
                                             WEIL, GOTSHAL & MANGES LLP
11
                                             Stephen Karotkin
12                                           Ray C. Schrock, P.C.
                                             Jessica Liou
13                                           767 Fifth Avenue
                                             New York, NY 10153-0119
14                                           Telephone: 212.310.8000
                                             Facsimile: 212.310.8007
15                                           Email: stephen.karotkin@weil.com
                                             Email: ray.schrock@weil.com
16                                           Email: jessica.liou@weil.com

17                                           KELLER & BENVENUTTI LLP

18                                           Tobias S. Keller (SBN 151445)
                                             Jane Kim (SBN 298192)
19                                           650 California Street
                                             San Francisco, CA 94108
20                                           Telephone: 415.496.6723
                                             Facsimile: 650.636.9251
21                                           Email: tkeller@kellerbenvenutti.com
                                             Email: jkim@kellerbenvenutti.com
22
                                             *Counsel for the Debtors and Debtors in Possession*
23

24                                           MILBANK LLP

25                                            */s/ Samir L. Vora*
                                             Dennis F. Dunne
26                                           Samuel A. Khalil
                                             55 Hudson Yards
27                                           New York, NY 10001-2163
                                             Telephone: 212.530.5000
28

- 29 -

1    Facsimile:  212.530.5219
Email: ddunne@milbank.com

2    Email: skhalil@milbank.com

3    Gregory A. Bray (SBN 115367)
Thomas R. Kreller (SBN 161922)

4    2029 Century Park East – 33rd Floor
Los Angeles, CA 90067-3019

5    Telephone:    424.386.4000
Facsimile:    213.629.5063

6    Email: gbray@milbank.com
Email: tkreller@milbank.com

7

8    *Counsel for the Official Committee of Unsecured Creditors*

9

10    BAKER & HOSTETLER LLP

     */s/ Lauren T. Attard*

11    Robert A. Julian
Cecily A. Dumas (SBN 111449)

12    1160 Battery Street, Suite 100
San Francisco, CA 94111

13    Telephone:    628.208.6434
Facsimile:    310.820.8859

14    Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

15

16    Eric E. Sagerman (SBN 155496)
Lauren T. Attard (SBN 320898)

17    BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400

18    Los Angeles, CA 90025-0509
Telephone:    310.820.8800

19    Facsimile:    310.820.8859
Email: esagerman@bakerlaw.com

20    Email: lattard@bakerlaw.com

21    *Counsel to the Official Committee of Tort Claimants*

22

23    WILLKIE FARR & GALLAGHER LLP

24       */s/ Benjamin P. McCallen*

25    Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)

26    Benjamin P. McCallen (*pro hac vice*)
Joseph G. Davis

27    Antonio Yanez, Jr. (*pro hac vice*)

28

- 30 -

787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
       jminias@willkie.com
       bmccallen@willkie.com
       jdavis@willkie.com
       ayanez@willkie.com

DIEMER & WEI, LLP
Kathryn S. Diemer (#133977)
100 West San Fernando Street, Suite 555
San Jose, CA 95113
Telephone: 408-971-6270
Facsimile: 408-971-6271
Email: kdiemer@diemerwei.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

Pursuant to Local Rule 5-1(i)(3), I, Jane Kim, attest that concurrence in filing this document has been obtained from the other signatories.

KELLER & BENVENUTTI LLP

 */s/ Jane Kim*
Tobias S. Keller (SBN 151445)
Jane Kim (SBN 298192)
650 California Street
San Francisco, CA 94108
Telephone: 415.496.6723
Facsimile: 650.636.9251
Email: tkeller@kellerbenvenutti.com
Email: jkim@kellerbenvenutti.com

- 31 -