Pages 1 - 77

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE: PG&E CORPORATION and   )
PACIFIC GAS AND ELECTRIC   )
COMPANY,   )
   )
          Debtors.   )   **NO. 19-05257 JD**
   )
_____)

San Francisco, California
Monday, October 7, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Creditor Committee Official Committee of Tort Claimants:
          BAKER & HOSTETLER LLP
          Levi's Plaza
          1160 Battery Street East - Suite 100
          San Francisco, California  94111
   BY:  **ROBERT A. JULIAN, ATTORNEY AT LAW**
        **KIMBERLY S. MORRIS, ATTORNEY AT LAW**

          BAKER & HOSTETLER LLP
          11601 Wilshire Boulevard, Suite 1400
          Los Angeles, California  90025-0509
   BY:  **LAUREN ATTARD, ATTORNEY AT LAW**

For Ad Hoc Group of Subrogation Claim Holders :
          WILLKIE, FARR & GALLAGHER LLP
          878 Seventh Avenue
          New York, New York  10019
   BY:  **BENJAMIN P. MCCALLEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
         Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Camp Fire Claimants:
                         TOSDAL LAW FIRM
3                        777 South Highway 101, Suite 215
                         Solana Beach, California  92075
4                   BY:  **THOMAS TOSDAL, ATTORNEY AT LAW**

5    For North Bay Fire Victims:
                         COTCHETT, PITRE & MCCARTHY LLP
6                        San Francisco Airport Office Center
                         840 Malcolm Road
7                        Burlingame, California  94010
                    BY:  **FRANK M. PITRE, ATTORNEY AT LAW**

8

     For Official Committee of Unsecured Creditors:
9                        MILBANK
                         55 Hudson Yards
10                       New York, New York  10001
                    BY:  **ALAN J. STONE, ATTORNEY AT LAW**

11

     For PG&E Shareholders:
12                       JONES DAY
                         555 South Flower Street, 50th Floor
13                       Los Angeles, California  90071
                    BY:  **JAMES OLIN JOHNSTON, ATTORNEY AT LAW**

14

     For Creditor California State Agencies:
15                       FELDERSTEIN, FITZGERALD, WILLOUGHBY
                           PASCUZZI & RIOS LLP
16                       500 Capitol Mall - Suite 2250
                         Sacramento, California  95814
17                  BY:  **PAUL J. PASCUZZI, ATTORNEY AT LAW**

18   For Creditor Federal Agencies FEMA, Department of Agriculture,
     and Department of Interior:
19                       U.S. DEPARTMENT OF JUSTICE
                         Civil Division
20                       P.O. Box 875
                         Ben Franklin Station
21                       Washington, D.C.  20044
                    BY:  **MATTHEW J. TROY, ATTORNEY AT LAW**

22

     For Fire Victims:
23                       WALKUP, MELODIA, KELLY & SCHOENBERGER PC
                         650 California Street - 26th Floor
24                       San Francisco, California  94108
                    BY:  **KHALDOUN A. BAGHDADI, ATTORNEY AT LAW**

25

**APPEARANCES**:   (CONTINUED)

Individual Fire Victim Creditors:
                         COREY, LUZAICH, DE GHETALDI, NASTARI &.
                          RIDDLE LLP
                         700 El Camino Real
                         P.O. Box 669
                         Millbrae, California 94030-0669
                 BY:  **AMANDA L. RIDDLE, ATTORNEY AT LAW**

For Creditor Liberty Mutual Insurance, et al.:
                         COZEN O'CONNOR
                         601 S. Figueroa Street - Suite 3700
                         Los Angeles, California  90017
                 BY:  **HOWARD D. MAYCON, ATTORNEY AT LAW**

For Ad Hoc Committee of Senior Unsecured Noteholders:
                         AKIN, GUMP, STRAUSS, HAUER
                            & FELD LLP
                         580 California Street
                         San Francisco, California  94104
                 BY:  **ASHLEY VINSON CRAWFORD, ATTORNEY AT LAW**

For Creditor SLF Fire Victim Claimants:
                         MARSHACK HAYS LLP
                         870 Roosevelt
                         Irvine, California  92620
                 BY:  **RICHARD A. MARSHACK, ATTORNEY AT LAW**

                         SINGLETON LAW FIRM
                         450 A Street - 5th Floor
                         San Diego, California  92101
                 BY:  **GERALD SINGLETON, ATTORNEY AT LAW**

For Debtor-in-Possession PG&E Corporation:
                         CRAVATH, SWAINE & MOORE LLP
                         825 Eigth Avenue
                         New York, New York  10019
                 BY:  **KEVIN ORSINI, ATTORNEY AT LAW**
                      **PAUL H. ZUMBRO, ATTORNEY AT LAW**

For Debtor-in-Possession PG&E Corporation:
                         WEIL, GOTSHAL & MANGES LLP
                         767 Fith Avenue
                         New York, New York  10153
                 BY:  **STEPHEN KAROTKIN, ATTORNEY AT LAW**
                      **MATTHEW P. GOREN, ATTORNEY AT LAW**
                      **JESSICA LIOU, ATTORNEY AT LAW**

<u>**Monday - October 7, 2019**</u>                                    <u>**2:04 p.m.**</u>

<u>**P R O C E E D I N G S**</u>

---000---

**THE CLERK:**  Calling civil 19-5257, In Re PG&E

Corporation and Pacific Gas & Electric Company.

Counsel, will you please come forward and state your

appearances for the record if you intend on speaking.

**MR. JULIAN:**  Good afternoon, Your Honor.  Robert

Julian, Baker & Hostetler, for the Tort Committee.  And with me

is Kim Morris, from Baker & Hostetler, who will be handling

scheduling and discovery issues today.

**THE COURT:**  Okay.

**MR. MCCALLEN:**  Good morning, Your Honor.  Benjamin

McCallen, Willkie, Farr & Gallagher, on behalf of the Ad Hoc

Subrogation Group.

**MR. TOSDAL:**  Good afternoon, Your Honor.  Tom Tosdal

for Camp Fire claimants.

**MR. SINGLETON:**  Good afternoon, Your Honor.  Gerald

Singleton, Singleton Law Firm, appearing on behalf of the SLF

fire victim claims.

**MR. STONE:**  Your Honor, Good afternoon, Alan Stone, of

Milbank LLP, here on behalf of the Official Committee of

Unsecured Creditors.

**MS. CRAWFORD:**  Good afternoon, Your Honor.  Ashley

Crawford on behalf of the Ad Hoc Committee of Senior Unsecured

1   Noteholders.

2         **MR. PITRE:**   Good afternoon, Your Honor.   Frank Pitre

3   on behalf of the Tubbs victims.

4         **MR. JOHNSTON:**   Good afternoon, Your Honor.   Jim

5   Johnston, of Jones Day, on behalf of certain PG&E shareholders.

6         **MR. ORSINI:**   Good afternoon, Your Honor.   Kevin

7   Orsini, Cravath, Swaine & Moore, on behalf of PG&E.

8         **THE COURT:**   Okay.   Well, I had hoped you all would be

9   able to work something out, and I guess that didn't happen.   So

10  today we are going to jointly solve the who, where, what, when

11  and how questions for the hearing.

12        So who would like to take the lead on the Debtor's side?

13  Okay.

14        On the Claimants' side?

15        **MR. JULIAN:**   Robert Julian, Your Honor, on the issues

16  except for discovery --

17        **THE COURT:**   Yes.   Right now it's just the who, what,

18  where, when and how.   And part two, possibly after a brief

19  intermission, will be the discovery.   And by that I mean the

20  letter and any other outstanding discovery issues.

21        Okay.   Here's what I am thinking.   This is meant to be a

22  conversation.   So you know the case better than I do, and I

23  want to get the value of your input.   So make sure you're

24  not -- I hesitate to say this:   Don't be shy.   I don't need to

25  say that.   But that's also an informal way of saying I want to

1   make sure I hear your views, so express them.

2        Okay.  Let's start with who.  Who's going to be doing the

3   estimation proceedings when we get to that?

4        Clearly, the Debtor.

5        Clearly, the TCC.  That's you, Mr. Julian.

6        Now, what's not clear to me are the status of the

7   following parties in terms of appearing at the proceeding.

8   Let's start with the Ad Hoc Subrogation Group.

9        They are potentially on their way out; is that right?

10        **MR. MCCALLEN:**  Correct, Your Honor.

11        **THE COURT:**  Okay.  So we'll put you in the "likely

12   not" category for right now.

13        **MR. MCCALLEN:**  Correct.  Just to put a little context

14   on that, we have a settlement agreement.

15        **THE COURT:**  Just remind the reporter who you are too.

16        **MR. MCCALLEN:**  Correct.  Benjamin McCallen on behalf

17   of the Ad Hoc Subrogation Group.

18        Your Honor, we have a settlement agreement with the

19   debtors.  That has been filed with a motion for approval in

20   front of the bankruptcy court with a hearing set for

21   October 23rd, in front of Judge Montali.

22        Both we and, I think, the Debtors are confident that'll be

23   approved.  And if it is, then we won't be in front of Your

24   Honor any longer on this proceeding.

25        **THE COURT:**  All right.  So you're the likely out

1      category.

2          Next category is the group of Unsecured Creditors.

3          Who's here for Unsecured Creditors?  Oh, okay.

4          **MR. STONE:**  Your Honor, Alan Stone, Milbank LLP, here

5      on behalf of the Official Committee of Unsecured Creditors.

6          It's important for us to be participants in the estimation

7      proceeding.  We do represent $22 billion in claims, and there

8      certainly are scenarios where this company ends up not being a

9      solvent debtor, so we'd like a seat at the table.

10         That said, I will predict that we would be working closely

11     with the Debtors in the estimation proceeding and likely would

12     not have a whole lot more to say than they will.

13         **THE COURT:**  Well, my sense is, it was exactly that,

14     that substantively, in terms of the estimation, you're going to

15     be in the same space as the Debtor with really nothing to add.

16     Is that right?

17         **MR. STONE:**  Yes.

18         **THE COURT:**  Okay.  So you'll be here in spirit.

19     (Laughter)

20         **THE COURT:**  Okay.  Ad Hoc Senior Unsecured

21     Noteholders?  Oh, yes.

22         **MS. CRAWFORD:**  Ashley Crawford on behalf of the Senior

23     Unsecured Noteholders --

24         **THE COURT:**  Would you move that a little closer to

25     you, please.

1          **MS. CRAWFORD:**  Your Honor, as we explained in our

2     papers -- and you may know we were downstairs earlier this

3     morning in a hearing in the bankruptcy court -- my clients and

4     the TCC have proposed -- have filed a joint motion to terminate

5     exclusivity to propose our own plan of reorganization.

6          We don't have a ruling from the Court, Your Honor, on

7     that, but I do anticipate that my clients, who have an enormous

8     stake in the outcome of this estimation proceeding -- my

9     clients have roughly $10 billion in bonds of the company, Your

10    Honor -- will line up with the TCC in the estimate.

11         **THE COURT:**  All right.  You're in the same party space

12    as the Unsecured Creditors on the Debtor's side.  You'll be

13    here but largely overlapping with the TCC.

14         **MS. CRAWFORD:**  Exactly.

15         **THE COURT:**  All right.  Good.

16         **MS. CRAWFORD:**  Thank you.

17         **THE COURT:**  Okay.  And what's not clear to me is the

18    status of Camp Fire and what's been called the SLF claimants.

19    They seem to me to be all part of the TCC, but --

20         **MR. TOSDAL:**  Your Honor, Tom Tosdal for the Camp Fire

21    claimants.  I am working with the TCC on the estimation

22    process.  If there's any disagreement, which I doubt, then

23    we'll alert you later.

24         **THE COURT:**  Okay.  But, otherwise, you're with TCC in

25    terms of the hearing itself?

1          **MR. TOSDAL:**  Yes, sir.

2          **THE COURT:**  Okay.

3          **MR. SINGLETON:**  Gerald Singleton on behalf of the SLF

4    fire victims claimants.  And, Your Honor, we have roughly 6,000

5    people that we represent.  One of the things that

6    differentiates our clients a bit is that they are from

7    different fires for -- in many respects, in terms of where

8    their damages occurred as opposed to the TCC.

9          And so while we certainly will work very closely with the

10   TCC, and have been, our only concern is, in the event that

11   during the estimation procedures we believe, after having met

12   and conferred with the TCC and making every effort to agree on

13   what evidence should be presented, additional evidence should

14   be presented, we just want to make sure that we have the right

15   to do so in the event we believe it's absolutely necessary.

16         **THE COURT:**  Okay.  So, in other words, you'll let me

17   know in a couple of weeks about whether you need to have a

18   separate section of the estimation?  Is that fair?

19         **MR. SINGLETON:**  I think a couple weeks might be a

20   little bit early, Your Honor.

21         **THE COURT:**  A month or two?

22         **MR. SINGLETON:**  That should be fine.  Thank you, sir.

23         **THE COURT:**  Okay.  Perfect.

24      Okay.  I think that's it for who.  Is there anyone who's

25   missing?  Yes.

1          **MS. RIDDLE:**  Amanda Riddle.  I represent about 5,000

2     fire victims between the 2015, 2017, and 2018 fires.  And I

3     just wanted to clarify for the record that there are a number

4     of groups who represent large numbers of victims from many

5     fires.

6          And so if we are going to start giving every single group

7     who does that a seat at the table, we're going to get pretty

8     packed.  I think we should all be aligned with the TCC.

9          **THE COURT:**  Oh, all right.  Thank you.

10     Yes.

11          **MR. JOHNSTON:**  Your Honor, Jim Johnston again.  We

12     represent a very large proportion of the shareholders of PG&E.

13     Many of my clients are also commitment parties to the

14     $14 billion financing that's supporting PG&E's plan, which is

15     in a large degree contingent on what happens in this

16     proceeding.  We anticipate being here in a supportive role for

17     the Debtors.

18          **THE COURT:**  Okay.  Good.

19          **MR. JOHNSTON:**  Thank you.

20          **THE COURT:**  All right.  Anyone else?

21     All right.  That takes care of who.

22     Next category is what.  What are we going to be doing?

23     Let's start with the liability issue, liability for negligence.

24     I have to say, Mr. Orsini, I'm not going to require you to

25     say anything binding at this point, but how does the -- how

1   does your client admit causation but not liability?

2           **MR. ORSINI:**  Well, quite easily, Your Honor.  So

3   whether or not a particular branch hit a particular line and

4   started a particular fire, a causation question, actually says

5   nothing about legal liability.

6           Legal liability can give rise under two general theories.

7   Now, there are a lot of claims, but I'm going to lump it into

8   two buckets for simplicity.

9           Inverse condemnation, which is strict liability.  That

10  will be dealt with primarily through the briefing before Judge

11  Montali on the threshold issue of whether or not inverse

12  condemnation even applies to us.

13          There's an ambiguity as to another piece of that that we

14  should discuss at some point today, that came up this morning

15  with Judge Montali, which is, there's also a potential *Cantu*

16  argument.  I can get into the details, but --

17          **THE COURT:**  I saw it in the papers.

18          **MR. ORSINI:**  So, on the one hand, if we have conceded

19  for estimation purposes -- I'll pick the Redwood Fire as just

20  an example, Your Honor -- we've conceded for estimation

21  purposes that with respect to the Redwood Fire we will not

22  contest causation.

23          And for the Redwood Fire there is no *Cantu* argument.  So

24  for the Redwood Fire on inverse condemnation, if Judge Montali

25  agrees with the TCC and says that it applies to an IOU, there's

1    not much, if anything, for Your Honor to do with respect to

2    inverse condemnation.

3        Now, that doesn't answer the full liability question

4    because there are fundamental differences in the types of

5    damages available for inverse and negligence.  And we're

6    talking billions of dollars of potential differences in the

7    damages that are available.

8        So I'll stick with the Redwood example.  If it turns out

9    that Judge Montali rules against me and inverse applies and I

10   don't have a *Cantu* argument, we're done on Redwood with respect

11   to inverse liability.

12       But that doesn't answer the question as to probability of

13   negligence liability.  And the Redwood Fire is a good example.

14   It was a situation where there was a very large, healthy oak

15   tree that was 20-some-odd feet away from our power lines.  It

16   was actually leaning away from our power lines.  And the branch

17   that broke, according to Cal Fire, was a branch that was

18   growing away from the power line.

19       So you have power lines, 20-some-odd feet, tree leaning

20   away from the lines with a branch coming out in the direction

21   away from the lines.  In the extreme weather event of that

22   night, that branch broke, was propelled something like 30 feet

23   over the tree, into the power lines, and, according to Cal

24   Fire, started a fire.  No violation of state law.

25       And our position on that will be very clearly that no

1   vegetation management program -- ours, Southern California

2   Edison's, anywhere in the country -- would have trimmed that

3   branch; and, therefore, there can be no negligence liability

4   with respect to that fire.

5        Now, that will apply --

6            **THE COURT:**  So that is the sole cause of that fire?

7            **MR. ORSINI:**  Yes, Your Honor.

8            **THE COURT:**  In your view.

9            **MR. ORSINI:**  Yes, Your Honor.

10       And then there are other examples of this.  There's an

11  Atlas Fire.  Atlas Fire is one of the larger fires.   It

12  occurred in Napa, near the Silverado Resort.

13       That is one where Cal Fire has identified two ignition

14  points, although from everything we've seen, including a video

15  of the incident, it was one ignition point that appears to be

16  responsible for the large growth of fire.  And there, there is

17  a tree that fell and hit the line.

18       Again, there's no *Cantu* argument with respect to Atlas, so

19  if I lose before Judge Montali on threshold inverse --

20           **THE COURT:**  Let me ask you this.  How many -- of all

21  of the fires that are here before me, what's the total number

22  of ignition points, as you call them, that would be contested

23  for negligence purposes?

24           **MR. ORSINI:**  All of them, Your Honor.

25           **THE COURT:**  But how many?  What's the number?

1          **MR. ORSINI:**  There's give or take --

2          **THE COURT:**  Just an estimate.  Fifteen?  Twenty?

3          **MR. ORSINI:**  The total number is about 22.  But in

4     terms of the material fires, Your Honor, Tubbs is down in state

5     court.  That's going to get sorted out there.

6          I believe that the overwhelming majority of the damages

7     that will be asserted by the TCC relate to five or six fires;

8     you know, the Atlas Fire, the Nuns Fire.  These were the fires

9     we had proposed mini trials on.

10          **THE COURT:**  So how many ignition points would that be?

11          **MR. ORSINI:**  With respect to Atlas, there's

12     effectively one that's going to matter, Your Honor.

13          With respect to the Nuns Fire, there are actually five,

14     because it was five separate fires that merged into one.

15          With respect to the Redwood Fire, there's one.

16          With respect to the Camp Fire, there are two ignition

17     points identified by Cal Fire, one that we've agreed not to

18     contest.  That's the one where the equipment broke and the line

19     fell and started the fire.

20          Cal Fire also claims that there was a vegetation-started

21     fire that was then subsumed by the bigger fire.  Candidly, it's

22     not clear to me why that point's going to matter once we've --

23          **THE COURT:**  In your view, there are about 10 major

24     ignition point issues?

25          **MR. ORSINI:**  I think that's generally right, Your

1   Honor.

2            **THE COURT:**  All right.

3            **MR. ORSINI:**  And I heard Your Honor at the last

4   conference when you said you didn't want to do mini trials, you

5   didn't want to get into each specific tree.  So what we did is

6   modified our proposal so that we --

7            **THE COURT:**  Let me look at that a minute.

8            **MR. ORSINI:**  Sure.

9            **THE COURT:**  Okay.  Mr. Julian, what are your views?

10           **MR. JULIAN:**  On liability, three responses, Your

11  Honor.

12       First, what they're asking for is unprecedented in mass

13  tort bankruptcies.

14       Second, we're estimating not liability but their

15  settlement behavior on the basis of the Butte 2015 where they

16  make the same liability defenses.

17       And, third, they've admitted probable liability in their

18  SEC filings and in their motion to get subro out of here.

19       So let me address the first one.  What they're asking for

20  is unprecedented.  What we have dealt with in our mass tort

21  bankruptcies in the last 25 years are mass tort bankruptcies

22  involving a single product which manifested itself for

23  causation liability in a single way.

24       So when you see in some of the cases -- *Dow Corning* being

25  one of them, involving the breast implant -- the issue was

1   whether the product caused cancer.  It's a single issue to have

2   a so-called mini trial on.

3         Here, as you heard, we have a minimum of 10 mini trials on

4   causation.  And we simply can't prepare that type of case in

5   the limited amount of time.

6         **THE COURT:**  Oh, no, I don't disagree with that.

7         Look, let me just tell you what I'm thinking.  It may help

8   the discussion.

9         We've talked about we're finding the middle way.  That's

10  our mantra in this case is "the middle way."  What that means

11  is a reasonable estimate of probable liability.  Okay?  Key

12  words are "reasonable" and "probable."

13        This is not an occasion for fine-tune carving of the

14  turkey.  We're not doing that.  Okay.  This is reasonable and

15  probable.  Those are the touchstones.

16        So in my view, this is my thought, mini trials are far too

17  far down the line.  I think PG&E agrees with that.  So we're

18  all in agreement with that.

19        On the other hand, I am not comfortable just simply

20  assuming liability with no questions asked.  That also seems

21  inappropriate.

22        What I think is a possible middle way is just the

23  probability or estimate of success or defeat at trial.  Okay?

24  This is what you all do every day in settlement.  Plaintiff

25  comes in and says, if I rang the bell, I get a hundred million.

1   Of course, that's everything goes my way.  That never happens

2   in life.

3       Plaintiff and the defendant then negotiate what is a

4   reasonable discount for the litigation risks of going to trial;

5   30 percent, 50 percent, 10 percent, whatever it may be.

6       I think that is a potentially good way of addressing this.

7   Okay?  So we'll start with the premise that liability is more

8   likely than not.  There's no question in my mind that that's

9   true based on everything I've heard so far.

10      Then, to accommodate the Debtor's interests and to be fair

11  to both sides, I think a reasonable discount figure, if you two

12  can agree on one, would be the way to go.  And that's just

13  old-fashioned am I going to win at trial?  Here are the factors

14  that say I'm going to win, here are the factors that say I

15  might not.

16      Okay.  This is something that should be familiar to

17  everybody.  I'm sure it is.  It's old hat.  It's how we settle

18  every case, whether it's a mass tort or a breach of contract

19  between two parties.  You discount your odds.

20      All right.  So, Mr. Julian, how does that sound?

21          **MR. JULIAN:**  Your Honor, we have actually planned part

22  of our case on that basis, with one footnote.

23      I know you don't like footnotes, so let me put a

24  parenthetical.

25          **THE COURT:**  I'm not wild about those either, but go

ahead.  Just saying.

        **MR. JULIAN:**  The parenthetical is a lot has changed
since Butte 2015.  And in addition to there being potential
discounts for the variations between fires, there are actually
increases of two types.  And we have evidence for this.  So I
just -- I don't want to try it now, but I don't want to
surprise you.

    The first type is the devastation that occurred in Camp
Fire, plus the potential for punitive damages based on emails
that show they knew of the risk of people being killed.

    We will offer testimony to show that there should be an
increase in that type of case.

        **THE COURT:**  You mean on the probability of victory for
the claimants?

        **MR. JULIAN:**  Yes.

        **THE COURT:**  That's fine.

        **MR. JULIAN:**  And, secondly --

        **THE COURT:**  Really, all I want to do is just test the
concept now.

        **MR. JULIAN:**  You're fine.

        **THE COURT:**  You're both going to have arguments for
and against the actual probability number, but I think that
approach -- I think it makes sense.

    Mr. Julian seems to think it's theoretically, as a general
proposition, okay.

1      Mr. Orsini.

2          **MR. ORSINI:**  I think that's consistent with what we've

3    been proposing all along, Your Honor.  The precedence that

4    we've cited -- *Garlock*, *In Re Specialty Products*, Judge Montali

5    in the first *PG&E* case -- that was exactly the inquiry that was

6    done in each of those cases:  What is the probability of

7    success?

8          And it's -- you're calling it a discount.  That's another

9    way to look at it.  Is it a hundred percent probable you'll

10   win?  Never.  Is it zero percent probable you'll win?  Also

11   almost never.  So where are we in the middle of that range?

12         And so that's exactly the approach we've had in mind.  I

13   would love if we were able to agree on what those discounts

14   are.  Maybe things will change.  History tells us maybe not.

15   So what we're trying to establish is what's the framework for

16   us to give you, as the estimator --

17         **THE COURT:**  Listen, I agree.  We're not going to do

18   did the branch fly off in a high wind 15 times.  We don't

19   have -- that's not the spirit of the mandate that Congress has

20   set in Section 502(c), and it's just not timely either.

21         But, what we can do is -- you're all going to walk away

22   with homework.  One item is going to be starting discussions on

23   let's just call it the discount probability figure.

24         Even if you don't agree -- and I hope that you will, but

25   if you don't, you'll at least have a range, and I can work

 1   within the range.

 2            **MR. JULIAN:**  I do have one request on that.

 3            **THE COURT:**  Yes.

 4            **MR. JULIAN:**  So with this discount probability factor

 5   and the multiplier increase probability factor that I'm going

 6   to offer, it sounds like they're still going to have liability

 7   witnesses on vegetation to talk about the big picture.

 8        If that's true, then I have to narrow my preparation of

 9   looking at their 269 witnesses in depositions because their

10   experts will rely upon it.

11            **THE COURT:**  This is all funneling down to a case

12   management plan with discrete parameters.

13            **MR. JULIAN:**  Thank you, Your Honor.

14            **THE COURT:**  Right now we're just talking about

15   headliner issues.  This is how I would like to handle the issue

16   of -- call it proximate cause, legal causation, whatever you

17   want to call it for negligence.

18        Now, I'm not averse to having some evidence come in.

19   That's perfectly fine.  It gives me a more informed basis for a

20   reasonable estimate on both sides.

21        A branch, who knew?  The tree was in great shape, it was

22   20 feet away from the power line, it was a freak accident, no

23   one's responsible, or whatever the emails you were showing me,

24   they knew they had a problem and they hid it, and people

25   suffered as a result.  So that's fine.

1     But that's a far cry from slogging through 10 or 12

2 specific events to try to determine liability.  That's not even

3 an appropriate thing, in my view, for a 502(c) proceeding.

4          **MR. JULIAN:**  For the hearing, Your Honor, that's fine,

5 but I need to cut out those 269 witnesses.

6          **THE COURT:**  Well, we're going to get to that in a

7 moment.

8          **MR. JULIAN:**  All right.  Thank you.

9          **THE COURT:**  I think we're all in agreement on that.

10     Now, for damages --

11          **MR. ORSINI:**  Can I raise --

12          **THE COURT:**  Yes.

13          **MR. ORSINI:**  We can come back to this, but the issue I

14 alluded to a moment ago, just because it fits here before we

15 get further down the funnel, inverse condemnation, we had set

16 forth in our submission to Your Honor that we would like to

17 file summary judgment motions on this *Cantu* issue --

18          **THE COURT:**  Oh, yes.

19          **MR. ORSINI:**  -- which could knock out inverse

20 condemnation for a number of fires.

21     I think Judge Montali -- well, he asked us for

22 clarification as to whether or not that would go to him or to

23 you.  We discussed that with him this morning.  The Debtor said

24 we're open to either approach.  I believe the TCC's view is

25 that should be before Your Honor.  I think we just need to nail

1   it down.

2          **THE COURT:**  If you want me to read *Cantu*, and I'll

3   tell you what I think it means, that's fine.  But you all keep

4   saying summary judgment, and I just don't know how that makes

5   sense here because there's going to be fact disputes, I'm sure.

6          **MR. JULIAN:**  Correct.

7          **THE COURT:**  If there's no fact issue and you just want

8   me to construe *Cantu*, I'm happy to do that, but that's just a

9   matter of me reading it and I'll just tell you here's what I

10  think it means.

11         **MR. ORSINI:**  Well, it's a little more than that, Your

12  Honor.  We would like you to apply that law to the facts as

13  they exist for particular fires.  This has a huge impact on

14  this question of probability of liability.

15         There are -- the doctrine says quite clearly if the line

16  at issue was not developed for a public use and, instead, was

17  developed for a private use, inverse condemnation does not

18  apply.  That could have consequences to the billions of

19  dollars.

20         And while they're going to say there are facts in dispute,

21  the opponent of a summary judgment motion always says that.

22  Okay?  In fact, the question is, when was the line put in?  For

23  whom?  Was it eminent domain or not?  And is it serving a

24  public use or just a limited number of people, as was the case

25  in *Cantu*?

1      And so in our view, Your Honor, again, this was just a

2  matter of efficiencies.  If we can tee that issue up early and

3  take it off the table so that we know one way or another when

4  we go into the estimation hearing does inverse apply to these

5  fires, we think that will materially advance the cause.

6      Now, if there are disputed facts, then we can address that

7  during the hearing as well, but this is a fundamental critical

8  issue.  And motions like this on undisputed facts are part of

9  estimation hearings, claims objections all the time, including

10  in mass tort cases.

11          THE COURT:  Here's the problem.  Every defendant in

12  this court comes in and says the facts are not in dispute.

13          MR. ORSINI:  I'm sure, Your Honor.  And that's why --

14          THE COURT:  And they always are.

15      MR. ORSINI:  -- when we put the motion in, Your Honor

16  can decide whether or not there's a fact dispute.  That's what

17  you do with summary judgment.

18      Alternatively, we could brief it doing briefs going into

19  the main hearing.  Our proposal to do it in advance would be to

20  streamline issues.

21          THE COURT:  I want to hear from Mr. Julian, but why

22  can't we just use the same probability approach that I outlined

23  for liability?

24          MR. ORSINI:  Well, in order to do a probability

25  approach, you need to understand the facts that are driving

1   that probability and how the law is applied to those facts.

2        So it would be --

3        **THE COURT:**  Yes, I understand that, Counsel.

4        First of all, you two are going to work out some agreement

5   on what the probability discount should be.  And if you can't

6   do that, I will take it from there.

7        Obviously, I am not pulling it out of the Milky Way.  I am

8   doing it based on facts that are before me.  That goes without

9   saying, or should go without saying.

10       However, I do not need to go nor will I undertake the

11  arduous and burdensome task of looking at each and every power

12  line and deciding all those issues.  It's just not going to

13  happen.  Okay?

14       That is not realistic for a 502(c) proceeding, nor is it

15  within the spirit of what Congress mandated in that section.

16  That is not an efficiency way.  That is a slogging through the

17  mud way.

18       So you two approach the *Cantu* issue -- we'll just call it

19  that -- the same way.  If you can't reach a resolution, I will

20  do it.

21       I will strongly urge you to read my summary judgment

22  decision in *Federal Trade Commission versus D-Link* if you need

23  further illumination on my summary judgment policy, okay.

24       I have yet to see one, in six years of being on the bench,

25  that could be squarely granted.  And I take a very dim view of

1    all the time and expense that people accrue in these motions

2    knowing that there is a fundamental difference of material

3    fact.  And you will get a summary one-paragraph denial.

4        Just be aware of that now so that if this happens and you

5    go down this road and you give me 800 pages of material and you

6    get a one-paragraph response, I don't want there to be any

7    ambiguity on your client's end about what happened.  I'm just

8    telling you now that will be the outcome.

9        So Mr. Julian may say otherwise, and I'll be thrilled, but

10   it doesn't sound to me like you're going to reach agreement on

11   all those predicate facts for the application of the *Cantu*

12   case.

13           **MR. JULIAN:**  Correct.

14           **THE COURT:**  Is that right?

15           **MR. JULIAN:**  Correct.

16           **THE COURT:**  Okay.  I mean --

17           **MR. JULIAN:**  We're not going to reach agreement.

18           **THE COURT:**  Yeah.

19           **MR. JULIAN:**  I view it as the legal issues they raised

20   in Butte.  They ended up denying everything.  These speeches

21   were given and they paid 900 million.  We're modeling

22   settlement behavior.  They deny everything.

23           **THE COURT:**  Well, okay.  We are modeling settlement

24   behavior.  That means we're going to do it in an informed

25   fashion but in a way that is within the spirit of 502(c), okay.

1          Now, with respect to damages, so I just want to make

2     sure -- I am going to estimate, subject to possible *Cantu*

3     application, property damages for all the fires; is that right?

4               **MR. ORSINI:**  That's our understanding, Your Honor.

5               **THE COURT:**  Okay.  And also the personal injury

6     claims, which include emotional distress.  Anything else?

7               **MR. JULIAN:**  Wrongful death.

8               **THE COURT:**  Wrongful death.

9               **MR. ORSINI:**  The only clarification I will put on your

10    first question, Your Honor, to the extent I do convince Judge

11    Montali inverse doesn't apply, then, obviously, the property

12    damages still need to be estimated by this court but under a

13    different legal standard.

14              **THE COURT:**  That's fine.

15         When is that happening, by the way?

16              **MR. ORSINI:**  I believe we have arguments scheduled for

17    December 11th.

18              **THE COURT:**  December.  That late?

19              **MR. ORSINI:**  It's getting briefed.  Our brief goes in

20    in about two and a half weeks.  There was an issue with

21    briefing it before the bar date.  We proposed to do it earlier,

22    but there was concern on the TCC's side about doing it before

23    the bar date.

24              **THE COURT:**  So we're not going to know until

25    December 11th.

1          **MR. ORSINI:**  Or later.

2          **THE COURT:**  Or later.  It's kind of late.

3     Are you able to move that up, Mr. Julian?

4          **MR. JULIAN:**  Able to meet what, Your Honor?

5          **THE COURT:**  Are you able to move that up a little bit

6     with Judge Montali maybe?

7          **MR. JULIAN:**  We would be happy to -- there are, I

8     think, five people putting their input into our briefs.

9          **THE COURT:**  Okay.  You can talk to them.

10          **MR. JULIAN:**  I'll talk to them.

11          **THE COURT:**  If you can get that done earlier, I think

12     that would be helpful.

13          **MR. JULIAN:**  I think that would be helpful.

14          **THE COURT:**  Okay.  Also enhanced damages, punitive

15     damages.  That's going to be also part of the estimation;

16     right?

17          **MR. JULIAN:**  Yes, sir.

18          **THE COURT:**  Mr. Orsini?

19          **MR. ORSINI:**  (Nods head.)

20          **THE COURT:**  Yes, Mr. Julian?  Okay.

21     So I think that's the what at a high level.  Obviously,

22     things will develop over time, but that's the what.

23     Now let's get to -- Yes.

24          **MR. MCCALLEN:**  Sorry to interrupt.  Just to clarify

25     the record -- again, Benjamin McCallen on behalf of the Ad Hoc

1   Subrogation Group.

2        We have settled, we anticipate settling.  In the unlikely

3   event something were to happen and we were to be back in the

4   estimation proceedings, for purposes of the damages case we

5   actually have different damages than the TCC does.

6        The TCC's damages are the ones Your Honor described,

7   including property damages, emotional distress, things of that

8   nature.  We actually -- our claims are comprised of monies that

9   have been paid out by our clients on -- to insureds or will be

10  paid out.  They might be reserved right now.

11       And so the damages case, in the event we were back in the

12  case, would be different as to us; whereas, the liability case,

13  I think, there would be, if not complete overlap, substantial

14  overlap with the TCC.

15           THE COURT:  I mean, yours are figured out.  You know

16  what you paid; right?

17           MR. MCCALLEN:  We know what we paid, which is why,

18  frankly, I think it would be our -- our case on estimation

19  should be simple.

20           THE COURT:  We'll see how it goes, but it could be as

21  simple as you just file a statement of claims paid, and that

22  would be the numbers I would use.

23           MR. MCCALLEN:  Well, if we're back in front of Your

24  Honor, we'd be fine with that.

25           THE COURT:  Okay.

1          **MR. ORSINI:**  And, Your Honor, I think I'd be remiss in

2      saying that that would not be fine with us if we were back

3      here.  I don't think it's that simple.  They stand in the shoes

4      of the underlying insureds.

5          Just because they paid something out doesn't mean they are

6      entitled to get it back from us.  So there would be issues as

7      to whether or not the claims that they paid could be, in fact,

8      recovered from us.

9          **THE COURT:**  Well, yes.  You'll have your full

10     opportunity to contest everything one step at a time.  At least

11     the input from the claimant would be relatively discreet.  Then

12     you can do whatever you'd like.

13         **MR. ORSINI:**  I just knew if I left that unsaid, I'd

14     have to do some explaining later on today, Your Honor.

15         **THE COURT:**  It's okay.

16         All right.  Now, the how part.  So it looks like you've

17     all coalesced around two weeks for a hearing time.  It seems

18     fine with me.

19         **MR. ORSINI:**  I think our view, Your Honor, was it

20     might take a little bit longer, but subject to the Court's

21     preference, of course.

22         **THE COURT:**  Okay.  Well, I'm happy to set two weeks

23     firmly, and if we need to add a week, I can accommodate that.

24         Despite what I said or thought last time, I think January

25     is too soon.  I think you have a lot of work to do to get up to

```
 1   the point where it's going to be useful for everyone, including
 2   me.
 3         So I would like to have this start on March 16.  I think
 4   that will give you enough time, barely, to get everything done.
 5   In order to meet that June state legislative deadline, I don't
 6   think I can go any later than that, but I just think January is
 7   a little too early.
 8         So March 16th, and bank on two weeks and possibly a week
 9   more if we need it.
10         You all had a lot of heat on who's going to say what when.
11   It's a very simple issue.  We're just going to go -- I'd like
12   to go -- this is what I would like to do, and you tell me what
13   you think.
14         We'll just go damages type by damages type.  Claimants
15   will say here's what we think we're owed, PG&E will say here's
16   what we think is the value of your claim, and we'll just do it
17   that way.  Okay?
18         MR. JULIAN:  Your Honor, that's fine.  We're the
19   claimants; we're happy to go first.  Our comment was about
20   disclosure.  As long as we know what their case is going in,
21   we're happy to go first.
22         THE COURT:  Yes.  I know I keep saying this, but we're
23   going to get to discovery punchline in just a moment.
24         MR. ORSINI:  Your Honor, if I may?
25         THE COURT:  Yes.
```

1          **MR. ORSINI:**  So I spend a lot more time in this type

2     of court than I do in Judge Montali's court.  I'm being told by

3     those who spend their lives the other way around that

4     March 16th might not give us enough time to dot all the Is and

5     cross all the Ts that need to be dotted and crossed to actually

6     get confirmation by June 30th.

7          Once we have the number that comes out of estimation,

8     there are a whole series of processes that have to be

9     undertaken, including sending out potential disclosure

10    statements, getting votes, potentially additional financing

11    work that needs to be done, getting a confirmation trial with

12    all the attendant issues associated with that.

13         That's about as far as my expertise goes.  I can have my

14    co-counsel come up if that would be useful, Your Honor, but I

15    think there's serious concern on our part that March 16th might

16    be too late.  I don't disagree that January is fast, but we're

17    concerned that March 16th might not give us as well as the PUC

18    adequate time.

19         **THE COURT:**  Mr. Julian.

20         **MR. JULIAN:**  I'm sensitive to their issue.  If you

21    had -- I know it's a wish list, but if you had the last week of

22    February, I think that would work.

23         **THE COURT:**  I have a giant MDL trial scheduled for

24    February 3rd, which I was hoping to preserve.  How about -- so

25    I happen to know February 3rd is a Monday.

1      How about February 17th?

2            **MR. ORSINI:**  I think that would give us --

3            **THE COURT:**  30 days earlier.

4            **MR. ORSINI:**  That would give us a lot more breathing

5      room, Your Honor.

6            **THE COURT:**  Is that okay?

7            **MR. ORSINI:**  Thank you.  Yes.

8            **THE COURT:**  Mr. Julian?

9            **MR. JULIAN:**  Yes, Your Honor.  That's fine.

10      February 17th?

11            **THE COURT:**  February -- oh, it's Presidents Day.  So

12      February 18.  We'll start on 2/18.  Thank you.

13            **MR. ORSINI:**  Thank you, Your Honor.

14            **THE COURT:**  Okay.  All right.  Now, and as I said,

15      you'll just go back and forth.

16      I would like to -- in terms of witnesses -- and this is

17      all developing, it's a live show.  We're going to put more

18      details on it as we get closer.

19      But I proposed and I think you've all accepted the idea

20      there will be some good expert testimony, will be very useful

21      benchmark approach.  Be focusing on that.

22      I still would very much like to hear -- and I'll leave it

23      to your discretion on how to do this.  I would very much like

24      to hear from some of the victims about their personal losses

25      and experiences.  I think it's going to be important for me to

1  hear directly from the people who have been affected by the

2  fire.

3            MR. JULIAN:  Yes.

4        THE COURT:  I don't think I need 20 or even a dozen,

5  but I need a good -- I would like to hear a good cross-section

6  of people to the extent you can do that.

7            MR. JULIAN:  We will, Your Honor.

8        THE COURT:  I would value that.  And I would like to

9  hear from some PG&E witnesses directly about their views on the

10  case.

11       I do not want this just to be a matter of dry forms and

12  distant expert testimony.  I want to hear from the people who

13  are actually involved.  So that would be important to me.  So I

14  think you can make that happen.

15       With respect to experts, I am not going to be buried in

16  expert testimony.  I'm not going to do that.  So I want every

17  expert live.  Or, in the alternative, I will let you have two

18  experts submitted on the testimony.

19       I have done this before and I got hornswoggled by the

20  lawyers because they had one person come in for an hour and

21  then they submitted thousands of pages of declaration.  I'm not

22  going to do that.

23       I don't have the time or the resources, and it's just a

24  trap for the judge, because then you go on and tell someone,

25  oh, the judge missed something on page 802, footnote 68.  We're

1   not going to do that.  Okay?

2        So I leave it up to you.  You can have one live witness

3   and two on papers, or all the live witnesses you want, but no

4   deluge of declarations and written testimony.  Okay?

5             **MR. ORSINI:**  Understood, Your Honor.

6             **THE COURT:**  All right.

7             **MR. JULIAN:**  Understood, Your Honor.

8        I do have a question about experts.

9             **THE COURT:**  Yes.

10             **MR. JULIAN:**  Given the compressed timetable --

11             **THE COURT:**  Yes.

12             **MR. JULIAN:**  -- we believe it's better for us if we do

13   not present full expert reports but we present an expert

14   outline so that all this evidence that we're going to be

15   getting can be developed over the next series of months.

16        They won't be prejudiced because they'll have an outline

17   for their deposition.  They'll take the deposition.  But

18   getting an expert report prepared in such a short amount of

19   time, we're going to need every single week.  So, I think, like

20   the state court system, the outline would be best for us.

21             **THE COURT:**  Mr. Orsini?

22             **MR. ORSINI:**  Respectfully, Your Honor, I think we

23   disagree with that proposition.  We have a lot of very

24   significant issues that are going to come through expert

25   testimony.

 1        I think avoiding expert reports only maximizes

 2    inefficiency during the actual testimony phase.  I think it's

 3    in everybody's interest to know precisely what the basis for

 4    the experts' report and the experts' conclusions are,

 5    including, in particular, what facts they're relying on.

 6        There will be a lot of modeling done here.  That's not the

 7    type of thing that should be done on the fly at a deposition.

 8        I understand we have limited time here.  I try

 9    limited-time cases all the time, as I know Your Honor tries

10    limited-time cases all the time.  We can get expert reports

11    done.

12        I think it would be fundamentally prejudicial,

13    particularly to the Debtor who's responding to claims that are

14    being asserted, to avoid expert reports as permitted by the

15    federal rules.

16        **MR. JULIAN:**  As to modeling, I would agree with them.

17    So as to the modeling, they need the models and the charts and

18    the Excel spreadsheets.  As for other expert witnesses who are

19    going to come in and talk to you about, you know, what happened

20    in Camp Fire, you know, sort of give a talking-through of all

21    these experts --

22        **THE COURT:**  Well, just generally, you mentioned, for

23    example, PTSD experts.  I think you mentioned that.

24        **MR. JULIAN:**  So we have a PTSD expert, and that's not

25    my concern.  We have an economics modeling expert, and they

1   certainly will have the charts and everything.

2       But we will also have experts who will come in and talk

3   about vegetation in response to their high-level liability case

4   only, because I don't want to do this, remember.  Vegetation,

5   management, electrical system, operations management and

6   de-energizing, to talk about how San Diego Gas de-energized and

7   PG&E did not.

8       And that's a lot of summary of PUC reports and things like

9   that.  And if they see the summary of the documents that

10  they're relying upon -- Judge Alsup's findings and things like

11  that -- without having a 25-page expert report due in, their

12  proposal, a month or two months even, that's simply a burden

13  that we can't live with in this case.

14      THE COURT:  Well, I think that's -- first of all, it's

15  not our federal practice, as you know.  And there's good reason

16  for why that's not our federal practice.  It creates a

17  minefield of, is the expert going beyond her initial

18  disclosures?  Was this ever discussed earlier?

19      It's a huge amount of effort to say, well, what is this

20  based on?  You normally would have it right there in the

21  report.  In other words, you know, the report says --

22      MR. JULIAN:  Well, if we had a year to do it --

23      (Unreportable simultaneous colloquy.)

24      THE COURT:  -- metes and bounds around testimony that

25  I will be called on to enforce.

1          An interesting side issue, which we don't need to get into

2     here, is the extent with which the vigor of the federal rules

3     of evidence will be applied.  I haven't answered that question

4     yet.

5          I think there's some room for informality, like, for

6     example, in preliminary injunction proceedings.  I think the

7     emphasis on 502(c) for speed and efficiency suggests that we

8     shouldn't get too hung up on evidentiary issues.

9          Nevertheless, there are requirements, and one of them is

10    the other side knows your case.  And I'm afraid that a summary

11    thing would invite too much confusion about that.  But

12    here's -- let's just footnote this because I think it will go

13    into the discovery schedule that I'm going to propose.

14         But, in any event, I'm just trying to get a sense of how

15    many experts you're going to have.  So you're going to have one

16    damages expert, one or two what you might call liability

17    experts, and then --

18              **MR. JULIAN:**  We would have six.

19              **THE COURT:**  Six total?

20              **MR. JULIAN:**  Well, no, no.  Six total, Your Honor.

21              **THE COURT:**  Six total, yeah.

22              **MR. JULIAN:**  Two types of damage, one PTSD.  And if

23    the liability case comes in, we would have two or three of the

24    others.

25              **THE COURT:**  All right.  So about six.

1        And how about for the Debtor?

2        **MR. ORSINI:**  I expect on liability issues, similarly,

3    three experts.  On damages, I think three is a little too

4    narrow, especially given Your Honor's admonition a few moments

5    ago that you don't want the written testimony coming in.  I

6    think it's probably closer to six to seven expert witnesses.

7        There are very different categories of damages here --

8        **THE COURT:**  In total.

9        **MR. ORSINI:**  Six to seven in total, plus the three

10   liability experts, Your Honor.

11       **THE COURT:**  That's a lot of expert reports.

12       **MR. ORSINI:**  Understood, Your Honor.

13       **THE COURT:**  Okay.  Well, let's get back to that in a

14   moment.

15       **MR. JULIAN:**  Well, Your Honor, we -- let me clarify

16   one thing.  Our economics expert is relying upon other experts

17   who have given us testimony, who would not testify, but those

18   experts talk about what's the square footage in Camp Fire to

19   rebuild?  What's the cost to replace trees in the Atlas Fire?

20       We had not planned on calling those experts as witnesses.

21   We planned on our two major damages witnesses to rely upon

22   sub-expert data.

23       **THE COURT:**  Of course.  Experts do that every day.

24       **MR. JULIAN:**  I think that's maybe where the difference

25   is in the approach.

1          **THE COURT:**  That sounds fine.  Experts rely on things

2     all day.

3          **MR. JULIAN:**  Exactly.

4          **MR. ORSINI:**  So in that scenario, I just want to make

5     sure we're very clear, because that's actually not too

6     dissimilar from what we were expecting, so I want to make sure

7     I'm not misinterpreting what Your Honor said a few moments ago.

8          So if, for example, we have a primary economic modeling

9     expert who's going to bring together six different categories

10     of damages, and for category one, one of the key assumptions

11     is, to use Mr. Julian's example, price per square foot to

12     rebuild in Paradise, they will have an expert on that, we'll

13     have an expert on that, there may be a document here or there

14     on that.

15          Is the idea that that -- we'll call him a

16     price-per-square-footage expert -- that expert's conclusions

17     would be exchanged in expert reports subject to deposition, but

18     the live expert who's called as the economist can rely upon

19     that underlying expert's opinion when they testify here in

20     front of the Court?

21          **MR. JULIAN:**  In concept, I had anticipated our

22     sub-experts doing formal -- that's a lot of expert reports in

23     such a truncated time.  502(c) does not anticipate that if we

24     had a year.

25          What I'm saying is we're going to focus on our main case

1   on our six.  Our sub-experts will have data that they hand over

2   to the economics modeling expert, not a full report.

3          **THE COURT:**  So you both are federal court people.   I

4   know that.  That's typically how it works.  You get the

5   economist who comes in, and the economist has generally scores

6   if not hundreds of footnotes of the sources that she has relied

7   on.  And you cross-examine the economist.  And if you want to

8   go to the next level, I suppose you guys can work that out.

9   But --

10         **MR. JULIAN:**  No.

11         **THE COURT:**  -- that's not what I had in mind.

12         **MR. ORSINI:**  Well, I think there's a difference

13  between a footnote that relies upon a model that was put

14  together by one of the expert's consultants, or some particular

15  document, versus what I think is being contemplated here, which

16  there are critical, critical underlying sets of assumptions

17  that are then going to get rolled up into the overall

18  estimation of the damages.

19         And we have to have the opportunity to test the basis for

20  that critical underlying assumption, including not just asking

21  the economist about it, but asking the price-per-square-footage

22  expert, What'd you look at?  How'd you come up with this?  Did

23  you consider this piece of evidence?  Did you consider that?

24  And we're not going to do that on every single little issue,

25  but there are -- there are going to be material drivers here.

 1        Look, we also have to try the Tubbs Fire.  I'm actually

 2   doing both that and this.  I have no interest in taking 50

 3   extra expert depositions.  But we have to have the right to

 4   test, in particular, the material assumptions that some uber

 5   expert is relying upon.

 6        **THE COURT:**  I'm not foreclosing that.  You all will

 7   see how it goes.  I mean, it can be overly ambitious or it can

 8   be reasonable.  We'll have to see how it plays out.  I'm not

 9   foreclosing that.

10        I do want to have you back every two weeks.  We do not

11   have any excess time in this schedule.  I do this in my MDL and

12   other large nonMDL cases, I have people come in every two

13   weeks.

14        We vet discovery.  We talk about any road bumps you're

15   hitting, speed bumps you're hitting in the road, and I can get

16   it done quickly and not get things delayed.

17        This is not a typical case where I can, if I need to, push

18   the trial off by six months.  So if it turns out every two

19   weeks is too much, we'll cancel it, but let's start planning.

20   I will see you every two weeks.

21        **MR. JULIAN:**  The 21st?

22        **THE COURT:**  This time good?  Two o'clock Monday?  Is

23   that workable for everybody?

24        **MR. JULIAN:**  Yes.

25        **MR. ORSINI:**  That's good, Your Honor.

 1          **THE COURT:**  So I'll see you back in two weeks.  That

 2     will be the 21st.

 3          All right.  Now let's turn to case management.  I think

 4     this is a lot easier, in my view.  Maybe it needs to be

 5     revised, but I just want you to pick some dates.  All right?

 6          By the way, so the bar date is October 21st?

 7          **MR. JULIAN:**  Yes.

 8          **THE COURT:**  Now, if you don't submit a claim you are

 9     out of the estimation, and there's no placeholder for -- you

10     know, like in asbestos claims, people get cancer ten years

11     after they're exposed to a toxin.  And that's true for fires as

12     well.  There's no provision for that in the estimation?

13          **MR. JULIAN:**  There are four answers to that.  The easy

14     one is it's a firm bar date.  Judge Montali has said that.  He

15     has also said there's a little standard for filing late claims.

16          Some of the plaintiffs' lawyers, who believe the Camp Fire

17     victims suffering from PTSD have not been able to come forward

18     because they're paralyzed, are planning a motion to extend the

19     bar date.

20          And last, but not least, Elizabeth Cabraser, Lieff,

21     Cabraser, has announced her intention to file a motion for a

22     class, which could be a placeholder.  I have no position on

23     that until I see the actual evidence and the documents.  I'm

24     just informing you of what's out there.

25          **THE COURT:**  All right.  So I'm just concerned about

the after -- I'll call it after-arising claims.  And there's no

answer.

         **MR. ORSINI:**  Well, there were four.

         **THE COURT:**  There's no concrete answer.

         **MR. ORSINI:**  Well, the concrete bankruptcy answer is

the bar date is the bar date is the bar date; right?  I think

the types of --

         **THE COURT:**  That's not true.  I read this in the

asbestos cases where --

         **MR. ORSINI:**  But in the asbestos cases, the difference

there is you often had future manifestation of disease claims.

People who had been exposed to asbestos had not yet developed

mesothelioma, for example.

         **THE COURT:**  Yes.

         **MR. ORSINI:**  And in that scenario, what the courts

would typically do, the bankruptcy courts would appoint a

future claims representative to address exactly those type of

latent claims that could arise in the future.

    No such future claims representative has been appointed in

these bankruptcies.  There's no suggestion or motion by anyone

that there should be.  So I think -- I think Your Honor's right

that that's what happened there.

    I think it's slightly -- well, not slightly.  It's a

different context.  I think the bigger question here is and

what Mr. Julian just raised is different.  Someone who's

1    already suffered the injury and the injury has already

2    manifested itself, they lost the house, they've suffered the

3    emotional distress, but they don't submit a claim by

4    October 21st, what does that mean in terms of the total

5    universe of claims?

6         I think a lot of that's going to be answered by Judge

7    Montali in the next couple weeks based on the motions that are

8    being described in his court, that Mr. Julian just referenced.

9         **THE COURT:**  Well, I have seen informally, in the wake

10   of the 9/11 incidents, late-arising cancer claims from the

11   inhalation of toxic materials.  And seems to me that, given

12   where there's smoke there's always that possibility, it may not

13   manifest itself until after October 21st.

14        All I'm asking is, do I need to account for that in the

15   estimation?  That's all that I'm asking.

16        **MR. JULIAN:**  And my answer is, I can give you an

17   answer after October 21.  I need to see the bar date and need

18   to see the evidence and the motions that people have said they

19   are brining in front of Judge Montali.  And he has said if

20   you're going to do that, you better do it soon.

21        **THE COURT:**  All right.  So you want to do it after the

22   bar date.

23        **MR. JULIAN:**  I want to hear the folks out and I want

24   to see what the claims filing rate is.

25        **MR. ORSINI:**  I think that's sensible, Your Honor.

1          **THE COURT:**  That will actually be an interesting --

2     it's all interesting, but I think that one would be

3     particularly interesting.

4          Okay.  All right.  Now, so let's just get back and do -- I

5     want you to do a schedule.  I know you can do it.  I have

6     confidence in your ability to do it.

7          Do a traditional District Court schedule.  All right?  So

8     do the simultaneous exchange of expert reports.  If you two

9     negotiate some streamlined report form, I'm fine with that.  If

10    you don't, we're going to do it the old way.  You're just going

11    to do full report.  All right?

12         But you two work that out.  Just simultaneous exchange.

13    Do your simultaneous rebuttals, whatever you want, three weeks,

14    four weeks.  After that, you set a period for expert

15    deposition.

16         I want you to propose a fact discovery cutoff date and

17    then propose -- let's see, given a February 18th, 2020, hearing

18    start, just schedule exchange of witness lists and do an

19    exhibit list and do the things you would typically do for a

20    United States District Court trial.  Okay?

21         And get that to me.  What is -- today is Monday.  Can you

22    get that to me by Wednesday?  Get me a proposed schedule by

23    Wednesday.  I'll do it if you can't do it.  You won't be happy.

24         **MR. JULIAN:**  I understand, Your Honor.

25         **THE COURT:**  Make yourself happy.  Otherwise, I'll just

```
 1    pick dates.  And once I pick them, they will not change.  You
 2    really should try hard to get this done.
 3            MR. ORSINI:  Understood, Your Honor.
 4            THE COURT:  Yes.
 5            MR. ORSINI:  What's your preference with respect to
 6    pretrial briefs or -- you know, prehearing briefs, argument --
 7            THE COURT:  Whatever you would like to do.  Not
 8    argument, but if you want to submit pretrial briefs, that's
 9    fine.  And by that, what I mean is a detailed overview, a
10    roadmap to your case.
11            MR. ORSINI:  Right.
12            THE COURT:  Here's what we're going to show you.
13    Okay?  And both sides can do that.
14        The argument is not valuable to me at that stage.  It will
15    help me if I have what is effectively a very detailed set of
16    notes on what you plan to show me at the estimation.  That
17    would be the best pretrial statement you can do.  Okay?
18            MR. JULIAN:  Sure.
19            MR. ORSINI:  Yes.
20            THE COURT:  Now, so get that to me by Wednesday by
21    5:00 p.m.  If you can't reach agreement, just tell me you can't
22    agree.  Don't submit proposed schedules.  I'll just make one
23    up.  Okay?
24            MR. JULIAN:  Wednesday, 5:00 p.m. next week?
25            THE COURT:  No.  This week.
```

1          **MR. JULIAN:**  This week.  All right.

2          **THE COURT:**  Yes.  Time is growing short.  It's already

3     October 7th.

4          **MR. JULIAN:**  It is.

5          **THE COURT:**  Okay.  Are we settled now on everything

6     we've talked about so far?  This is going to evolve with time.

7     Are you okay with all that, Mr. Julian?

8          **MR. JULIAN:**  Yes.  Yes.

9          **THE COURT:**  Mr. Orsini?

10         **MR. ORSINI:**  Yes, Your Honor.

11         **THE COURT:**  Okay.  Now let's talk about discovery.  I

12    received a letter.

13    Who is going to --

14         **MR. JULIAN:**  Your Honor, may I turn the podium over to

15    Ms. Morris?

16         **THE COURT:**  Ms. Morris, yes.

17         **MS. MORRIS:**  Good morning, Your Honor.  Kimberly

18    Morris, of Baker Hostetler, on behalf of the Official Committee

19    of Tort Creditors.

20         **THE COURT:**  Okay.  All right.  What is it that you're

21    missing for San Bruno?  This is docket number 87.

22         **MS. MORRIS:**  That's right.

23    And Your Honor issued an order two weeks ago saying that

24    you believed that the summaries of the San Bruno settlements,

25    the 500 or so settlements as a result of the San Bruno

1   explosion, were relevant to this estimation proceeding, and the

2   only issue was the form and content of those summaries.

3        In connection with that order, the very next day we sent a

4   proposed stipulation to the Debtors.  It was almost a mirror

5   copy of what we had agreed to and what Judge Montali ordered in

6   the bankruptcy proceeding relating to the Butte summaries.

7        And what's important about those summaries is that it

8   included PG&E's allocations of the different categories of

9   damages, which are the same categories we have here; personal

10  injury, wrongful death, property damage, and which we believe

11  would be important to estimation.  And we believe Your Honor

12  agreed as well.

13       They responded saying that they didn't have any

14  non-privileged summaries that they were willing to turn over.

15  And they agreed to turn over the settlements and agreements

16  themselves but not the summaries with the allocations that I

17  just referenced.  And so that prompted the letter that we sent

18  to Your Honor today.

19       We believe that they should be ordered to turn over -- or

20  they should be ordered to comply with your order to turn over

21  the summaries, which we know they have.

22       They had to file SEC documents in connection with those

23  settlements which occurred over the course of three different

24  years.  They had to account for their insurance.  And so

25  there's undoubtedly summaries in the same fashion that they had

1   them for Butte.

2       So we would ask that they be ordered to comply with your

3   order to turn those over as well as the agreements and demands.

4   Which, by the way, we don't even have those for Butte yet even

5   though they were ordered to be turned over a month ago, so we'd

6   ask that you order those be turned over expeditiously as well.

7           **THE COURT:**  Okay.  I'm just doing San Bruno.

8           **MS. MORRIS:**  Okay.

9           **THE COURT:**  Isn't Judge Montali doing Butte?

10          **MS. MORRIS:**  He did issue the order with respect to

11  Butte, Your Honor, but we were making the request to you to

12  order that they comply with that order as well.  I can take it

13  to Judge Montali if you prefer.

14          **THE COURT:**  Let's just hold that for a moment.

15      Mr. Orsini.

16          **MR. ORSINI:**  I can dispense with this pretty quickly,

17  Your Honor, which would have been true if we'd met and

18  conferred on this issue.

19      The tracker that Ms. Morris said we definitely have, we

20  don't.  Doesn't exist.  In the Butte scenario, there were

21  thousands of claims that were settled over the course of many

22  years.

23      As part of the SEC accrual process, Ms. Morris is

24  absolutely right that the company had to prepare a spreadsheet

25  that they used to break out the settlement amounts between

1    different categories of damages so they could begin making

2    decisions as to, okay, what's our likely liability that we have

3    to accrue for each such claim that hasn't been settled yet.

4              **THE COURT:**  That's for Butte?

5              **MR. ORSINI:**  That was for Butte.  That was created.

6    That's been produced.

7         No such document was every created, no such document

8    exists with respect to San Bruno, period, full stop.

9         What we're producing with respect to San Bruno are the

10   settlement agreements, any of the negotiation back-and-forths

11   that identify the bids, the asks, those sort of things.

12        That is a process because we have to redact all the

13   personally identifiable information because of the mediation

14   privilege.  So we have to take out the names, we have to take

15   out the addresses, we have take out anything else that will

16   tell you who it is because of the state mediation privilege.

17             **THE COURT:**  How many settlements are there?

18             **MR. ORSINI:**  There are about 200 households in

19   San Bruno.  So that's underway right now.

20        What we also have to do so that any of this is useful --

21   you'll have a settlement agreement, you may have an opening

22   demand, you may have a response.  Your Honor knows how

23   mediations work.

24        Once we redact all the personally identifiable

25   information, we can't just dump it on the TCC because you'll

1    have no idea which document corresponds with which settlement.

2    So we've had to group them together first, give them unique

3    identifiers, and redact them.  First wave is coming out this

4    Friday.  They'll all be done in the next several weeks.

5         But on the spreadsheet -- and there may have been some

6    ambiguity in the letter my colleague sent -- the spreadsheet

7    they're asking for doesn't exist.

8         Are there documents within the general --

9              THE COURT:  Let me jump in.  I think I introduced the

10   idea of a summary, and it was really for defendants'

11   opportunity to just produce a summary.

12             MR. ORSINI:  Or to create one.

13             THE COURT:  Yeah.  I intended that to be a proxy for

14   having to produce thousands or tens of thousands of pages of

15   documents.  I was giving the Debtor the opportunity to prepare

16   one.

17             MR. ORSINI:  Now I'm definitely going to get yelled at

18   later today, Your Honor.

19             THE COURT:  You don't want to do that?

20             MR. ORSINI:  I'm more than happy to explore that

21   possibility.  I'd have to confer with the team that's closer to

22   it to figure out how feasible that is.

23             THE COURT:  Well, bring them up.  Who's the team?

24             MR. ORSINI:  I actually don't know that they're in the

25   courtroom today.

1              THE COURT:  Somebody in this room must be on the team

2    for discovery.

3              MR. ORSINI:  Not with respect to the San Bruno

4    documents, Your Honor, candidly.

5              THE COURT:  Well --

6              MS. MORRIS:  Your Honor?

7              THE COURT:  Yes.

8              MS. MORRIS:  I would just ask Mr. Orsini whether or

9    not they've conferred with counsel.  They were represented by

10   Latham Watkins, Clarence Dyer, Sedgwick, amazing law firms

11   that, undoubtedly, had tracked their settlements.

12        And there were, I believe, approximately 500 settlements

13   over the course of three years that were being -- that forced

14   PG&E to draw down from their insurance policies, that were

15   recorded in their SEC filings, that were estimated --

16             THE COURT:  So 500 for San Bruno?

17             MS. MORRIS:  My understanding is that there were 500

18   settlements in San Bruno.

19             THE COURT:  Okay.

20             MS. MORRIS:  I went back, in preparation for this

21   hearing today, Your Honor, looking at their SEC filings from

22   2013, 2014, 2015, in which they were estimating their remaining

23   liability with respect to those civil cases.

24        And so I find it hard to believe that there's no such

25   summary document, with the quality of those law firms involved,

1   that currently exists that can't be turned over while we wait

2   for the additional documentation.

3            THE COURT:  Well, and it would be work product, I

4   imagine.

5        Here's your choice:  Produce all copies of however many

6   settlements there are.  You can redact the names.  Or do a

7   summary chart.

8            MR. ORSINI:  Understood, Your Honor.

9            THE COURT:  Is that okay, Ms. Morris?

10           MS. MORRIS:  That's fine, Your Honor.  But I would

11  also ask that we give a deadline.

12           THE COURT:  Oh, yes.  That's part two.

13       So how much time do you need for that, Mr. Orsini?

14           MR. ORSINI:  Our current expectation is that if we go

15  Route A, produce the documents, that the first wave is going to

16  go out by this Friday.  We should have it all done no later

17  than November 1st.

18           THE COURT:  November 1st?

19           MR. ORSINI:  It's the redaction process, Your Honor.

20  It takes a lot of time.  And we're doing the same thing for

21  Butte.

22           THE COURT:  500 settlement agreements?

23           MR. ORSINI:  Yeah, but there are also thousands of

24  emails back and forth.  If we're not going to that level, we

25  can get it done much faster.  What we were anticipating --

1          **THE COURT:**  Ms. Morris, I was assuming you just want

2     the actual settlement agreement.

3          **MS. MORRIS:**  I'd like the demands and I'd the

4     settlement agreements.

5          **THE COURT:**  So you want the demands?

6          **MS. MORRIS:**  The demands as well, yes.  The reason

7     why, Your Honor, the demands are important is settlement

8     agreements give you one number; this case settles for X number

9     of dollars.

10     What the demands give you are how the plaintiffs' lawyers,

11     who analyzed those cases, broke out the numbers that went into

12     that settlement.  This is how much we're claiming for the

13     destruction of the house by the fire caused by the explosion.

14     This is how much we're demanding for the wrongful death claim.

15          **THE COURT:**  Oh, no, I agree, and I think it would be

16     interesting to me because I'd like to see if there's a

17     consistent discounting number between demands and payment.

18          **MR. ORSINI:**  And that's why, Your Honor, we were

19     assuming we had to produce all that, and that's just why

20     it's -- if it were 200 documents, I would look at me like you

21     just did if I said it would take me until November 1st, but

22     it's --

23          **THE COURT:**  So that number could be the proxy number.

24     Okay?  I mean, this is what I'm saying about liability.  I

25     don't necessarily need to look at all the trees and everything

1   else.

2        As I said -- I'm not going to repeat everything I said

3   about that, but if it turns out that's actually an interesting

4   issue, the demands are consistently X and the settlements were

5   consistently X minus 20 percent, that's a good roadmap for

6   estimation purposes.

7        So I agree you should see all that.  But, you know --

8            **MS. MORRIS:**  Your Honor, we can take the demands and

9   the agreements first with the remainder of the documents which

10  I believe may be useful at a later date.

11       But Cravath has over a hundred lawyers working on this

12  case.  I see no reason we need to wait a month for that.

13           **THE COURT:**  Are you with Cravath?

14           **MR. ORSINI:**  I am, Your Honor.

15           **THE COURT:**  Okay.  I was thinking something else.

16  Okay.  Do you have a hundred lawyers?

17           **MR. ORSINI:**  I'm not sure how to take that.

18           **THE COURT:**  No, no, no.  Do you have a hundred lawyers

19  on the case?

20           **MR. ORSINI:**  We do not have a hundred lawyers on the

21  case, Your Honor.  We have a lot of contract attorneys, we have

22  a lot of other associates on the case.  There are also a few

23  other things going on, so --

24           **THE COURT:**  Let me just jump back.

25       So on these two-week conferences -- I'm glad you raised

 1   this as a prompt for me -- we do not need to have huge teams

 2   coming out.  Just send the point people.  All right?  All of

 3   this money is being paid out of the Debtor's estate.  It's a

 4   lot of money.  We don't need to do that.

 5        In all my class action cases, I tell people I want one

 6   person from the plaintiff and one person from the defendant.

 7   And I do not approve fee applications where that is not held to

 8   be the case.

 9        Now, I don't think I'm doing fees, at least it's my

10   understanding at this point, but I want to see the same spirit

11   here.  Lean and mean.  Keep the costs down.

12        This is money that can be spent in other ways that may be

13   of higher social utility.  So keep that in mind for the status

14   conferences.

15        All right.  Two weeks.  Okay?

16           MS. MORRIS:  Your Honor, can I request that --

17           THE COURT:  You can get a protective order.  You don't

18   have to, you know, redact everybody's name.  I mean, just make

19   some arrangements.  People do "attorneys' eyes only" protective

20   orders all the time in situations like this.

21           MR. ORSINI:  Well --

22           MS. MORRIS:  Can we also include the Butte settlement

23   agreements in that, because we still don't have the agreements

24   or the demands?  Would Your Honor like to extend his order to

25   cover those which were --

1           **THE COURT:**  No, I don't really want to step on Judge

2     Montali's -- whatever he's doing.

3         So did you all raise this?  Didn't you see him this

4     morning?

5           **MS. MORRIS:**  We did see him this mourning.  This issue

6     did not come up.  There were a number of other things on the

7     document.

8           **THE COURT:**  When is Butte coming up again?  When will

9     it come up?

10          **MS. MORRIS:**  When we bring it up with Judge Montali,

11    because we've been waiting for this information, and it's only

12    in an email as of late last week that we were informed that it

13    was still going to take a number of additional weeks before we

14    would get those agreements.

15          **THE COURT:**  Well, I think it would be useful, so I

16    will add Butte.

17        You already have the chart for Butte, Mr. Orsini.  Is that

18    right?

19          **MR. ORSINI:**  They already have the chart for Butte.

20          **MS. MORRIS:**  We have the chart.  We don't have the

21    agreements and the demands.

22          **THE COURT:**  How many agreements were there?

23          **MR. ORSINI:**  There were 460,000 documents to review.

24    460,000 documents to review in connection with the Butte

25    settlement, because Judge Montali ordered us to produce all the

1  underlying settlement material.  That's what they requested.

2  That takes time.

3       They've had the chart that has the breakdown for quite

4  some time now, I believe over a month.

5            THE COURT:  That's the actual payments?

6            MR. ORSINI:  It designates the total amount paid in

7  various categories of damages in connection with the Butte

8  settlement, yes, Your Honor.

9            MS. MORRIS:  It doesn't have the demands with respect

10  to each of those categories, Your Honor.

11            MR. ORSINI:  No, it doesn't.  That's what we have in

12  the 460,000 documents we're reviewing, Your Honor.

13            MR. SINGLETON:  Gerald Singleton.

14       Your Honor, myself and many of the other attorneys present

15  in the court represented victims in the Butte fire.  For

16  example, my firm and the people we worked with resolved 697

17  cases.

18       We can provide those if the Court gives us permission.  We

19  can provide those settlement agreements and the demands

20  immediately to the TCC.

21       And I know that Mr. Pitre, Ms. Riddle, several other

22  people did as well.  Perhaps that would be a way of moving the

23  process forward.  As long as we get the Court's permission so

24  we're not violating mediation confidentiality, we're happy to

25  do so.

1          **MR. ORSINI:**  Your Honor, PG&E would have no objection

2     to that.  We actually proposed that in July and were rebuffed.

3          **MS. MORRIS:**  And it would work if that covered all of

4     them.  But, unfortunately, Mr. Singleton, Mr. Pitre, Ms. Riddle

5     do not represent all of them.  There were a number of law

6     firms, I think over a dozen law firms representing victims, and

7     we don't have access to all of those lawyers to be able to --

8          **THE COURT:**  Well, 697, that's 700 out of 800.  What's

9     wrong --

10         **MS. MORRIS:**  Your Honor, there were over 1500

11    settlements in Butte.

12         **THE COURT:**  I heard 697.

13         **MS. MORRIS:**  I believe that was Mr. Singleton's

14    clients.

15         **THE COURT:**  Eight hundred settlements?

16         **MR. ORSINI:**  No, Your Honor.  In Butte, Your Honor,

17    Ms. Morris is actually right.  It was 1,537 plaintiff cases.

18         **THE COURT:**  Let's start with 50 percent.  That's a

19    good benchmark.  I'm perfectly fine with that.  Thank you for

20    suggesting it.

21       Have you all done a stipulated protective order yet?

22         **MR. ORSINI:**  We have one in bankruptcy court, which I

23    presume applies --

24         **THE COURT:**  Oh, that's fine with me.  If you're happy

25    with it, that's certainly fine with me.  So, thank you.

 1        And let's have that produced to the TCC, please.  And then

 2   you can churn through the 460,000 documents.  It shouldn't take

 3   more than four weeks.

 4        **MR. ORSINI:**  I think, our current expectations, we'll

 5   be done this month, Your Honor.

 6        **THE COURT:**  Okay.  Then we'll do that.

 7        So at least you have 50 percent to start with, probably

 8   Friday or Thursday, something like that.

 9        **MS. MORRIS:**  Okay.  Thanks, Your Honor.

10        And then we have three other areas of discovery.  You said

11   that you wanted the parties to be prepared to discuss other

12   discovery disputes?

13        **THE COURT:**  Yes.  Three.  Okay.

14        **MS. MORRIS:**  The San Bruno had to deal with the

15   damages.  These all deal with liability issues.

16        **THE COURT:**  Before I forget, so end date for San Bruno

17   is two weeks from today.

18        Yes.  Go ahead.

19        **MS. MORRIS:**  Thank you.

20        The first of the three discovery disputes relates to very

21   targeted and specific discovery requests that the TCC served on

22   the Debtors back on August 26th.

23        The discovery requests were focused on topical categories

24   like de-energization and vegetation management, and then

25   specific document requests with respect to each of the fires

that would go to the individual fire causation issues, but it would also go to vegetation management generally.

Also, it was targeted document requests for the Camp Fire because there was no litigation involved in the Camp Fire, so there had been no discovery whatsoever exchanged with respect to that fire at that time.

The PG&E's response to our targeted discovery request was to tell us to:  Go back and look at the 2,000 RFPs that were served in connection with the North Bay Fire discovery and you'll find documents there.  We haven't finished producing them, but you can go find them there.

Your Honor --

**THE COURT:**  Two thousand RFPs?

**MS. MORRIS:**  That's right.

**THE COURT:**  Is this in state court?

**MS. MORRIS:**  It's state court, yes.

**THE COURT:**  Okay.

**MS. MORRIS:**  I propose, Your Honor, that PG&E be ordered to respond to our document request in this proceeding and that they shouldn't be allowed to point to document requests in another proceeding.

If they would like to point to the documents produced in that proceeding, we are fine with that.  They just need to give us the Bates numbers so we don't have to play Go Fish and find them.

1      But we've spent an enormous amount of time doing this

2  elaborate matching game trying to figure it out ourselves and,

3  quite frankly, it's impossible.

4      And so I would ask that Your Honor order for them to

5  produce responses to our requests that include the Bates

6  numbers that they respond to.  And this would apply to any

7  future requests that we do serve.

8      Then there's one category of documents --

9          **THE COURT:**  Let's pause there.

10         **MS. MORRIS:**  Sure.

11         **THE COURT:**  Mr. Orsini?

12         **MR. ORSINI:**  So I think what counsel is asking me to

13  do is rereview millions of pages of documents that have already

14  been produced and line them up request by request.  That's just

15  not feasible.

16     It's also not necessary because, as a general matter, in

17  our response to the letters they provided us we told them with

18  respect to each of their requests which state court RFPs we

19  believed we could satisfy, to satisfy the new request that was

20  provided.

21         **THE COURT:**  You gave specific cites?

22         **MR. ORSINI:**  We gave -- well, not to pages and

23  productions, Your Honor.  I want to be very clear.  They asked

24  for -- let's just say they gave me 10 document requests.  I

25  said, for document request 1, if you go back to the state court

1    requests 27, 36, and 49 should satisfy 1.  We're either done

2    with those three or we will be soon.  Right?

3        We also produced in the state court system, because this

4    is required in California, a spreadsheet that we updated, I

5    think, every week -- might have been biweekly; don't hold me to

6    that -- where we would explain Bates ranges by Bates ranges

7    what we had actually produced and which RFP it correlated to.

8        Now, there was one exception, and it's a big exception.

9    We engaged in TAR, technology-assisted review, under a state

10   court stipulation that was negotiated by the parties, entered

11   by the state court judge, that made it very clear that because

12   you're using TAR you're not looking at each document.

13       So you can't possibly be going back and lining up this

14   document applies to this request.  It just doesn't work.  So

15   for that group, they're right, they don't have specific

16   requests by document approach.

17            THE COURT:  Let me jump in.  Have you two had a

18   meet-and-confer about this?

19            MS. MORRIS:  We've had many, yes.

20            THE COURT:  All right.

21            MS. MORRIS:  And the TAR issue is a separate issue.

22            THE COURT:  I want you to do it again.  Do it over the

23   next few days.  And if you can't resolve it, send me letter and

24   I'll have you back promptly.  I think you two can solve this.

25       So by Wednesday -- can you do it by Wednesday?

```
 1              MS. MORRIS:  Meet and confer by Wednesday?

 2              THE COURT:  Yes.

 3              MS. MORRIS:  Sure.

 4              MR. ORSINI:  Sure.

 5              THE COURT:  Do that in person, you two.

 6         Anybody else you want, but you two in person.  I always

 7    like the principals to do it.  And let me know by Thursday,

 8    just send me a short letter and outline sufficiently what the

 9    areas of dispute are, and I'll have you in very promptly.

10              MS. MORRIS:  Sure.  There's one --

11              THE COURT:  Before I forget, I forgot to raise the

12    issue of questionnaires when we were talking earlier.  I like

13    the idea.  I think it can be fine.  But you all need to work on

14    that.

15         I think TCC felt they hadn't had enough time to think

16    about the specific questions, but, obviously, it's going to

17    have to be a representative sample.  There are going to be some

18    issues with that.

19         But as a concept, if you all can work out a questionnaire

20    that you agree on the contents, it shouldn't be that

21    controversial, but maybe it is.  You know, here are my losses.

22         They're going to say what they say.  We're not fighting

23    about their answers.  We're just getting the questions down.

24    Seems like you should be able to work that out.  And then

25    somehow figure out a method for making sure it's a good, you
```

 1  know, reliable sample.

 2          MR. ORSINI:  And, Your Honor, we agree --

 3          THE COURT:  It does not have to be with statistical

 4  perfection.  A good sample, it just needs to cover I'm getting

 5  a fair picture.

 6          MR. ORSINI:  We've also been looking at the

 7  questionnaire to see if there are ways to streamline it as

 8  well.  We did not intend to get a ruling on that today --

 9          THE COURT:  I know you didn't.

10          MR. ORSINI:  -- so we can absolutely confer on that.

11          THE COURT:  I'm embracing the concept.

12          MR. JULIAN:  Can I tell you -- so I said we would

13  check.  We are still checking with the experts, but let me give

14  you the background.

15      The Debtor asked to use questionnaires, quote, in a manner

16  consistent with the approach taken in other large mass tort

17  bankruptcies.

18      And in the other mass tort bankruptcies, the key ones --

19  *A.H. Robins*, *Garlock*, *GI Holdings*, *Specialty Products* -- the

20  time between the questionnaire and the use at the estimation

21  hearing was 12 to 16 months.  That gives time for the victims

22  to answer the questionnaire and for the experts then to analyze

23  them.

24      Frankly, we don't have time to do that unless their

25  15-whatever-page questionnaire is truncated down to a couple

1    pages.

2          **THE COURT:**  I understand.  You two, I want you to work

3    on that.  If it doesn't work out, it doesn't work out.  I mean,

4    if there's not enough time, if five people respond, you know,

5    whatever.

6          **MR. JULIAN:**  Again, if this were a year until

7    estimation, I wouldn't have a problem with anything --

8          **THE COURT:**  I think we can still do it, but it's going

9    be to have to be short and clear.

10         **MR. JULIAN:**  Okay.

11         **THE COURT:**  One other thing.  If we do do this -- we

12   don't have to get into the details now, but I'm going to need a

13   digest summarizing the responses.  Okay?  I'm not going

14   through, if you get lucky, 500 questionnaires.

15       I need a roadmap of what the content is.  And I want to

16   see the questionnaire responses, but you're going to have to

17   give me some kind of an overview of what the answers are.

18   Okay?

19         **MR. JULIAN:**  Sure.

20         **MR. ORSINI:**  Okay.

21         **THE COURT:**  Then the other thing I wanted to -- we are

22   all on board with the concept that emotional damages are going

23   to be part of the estimation?

24         **MR. JULIAN:**  Yes.

25         **THE COURT:**  Is that right, Mr. Julian?

1          **MR. JULIAN:**  Yes.

2          **MR. ORSINI:**  I'm sorry, I was talking.  What was the

3   question?

4          **THE COURT:**  We're all on board with the proposition

5   that emotional damages are going to be part of the estimation?

6          **MR. ORSINI:**  Yes.

7          **THE COURT:**  All right.  Let's go back to the

8   discovery.

9          Thank you.

10          **MS. MORRIS:**  We'll certainly meet and confer with

11   Mr. Orsini on the electronic records and the RFPs, but there is

12   one request for production that we made that we've already met

13   and conferred about, and they made their position clear that

14   they don't intend to respond to that request, and they objected

15   to it.

16          The request was for all the documents on vegetation

17   management that they've produced to the federal court monitor

18   in Judge Alsup's courtroom.

19          Their federal court monitor in that courtroom is looking

20   at PG&E's compliance with its enhanced vegetation management

21   program.  As part of what the federal court monitor has already

22   released from his review of that, it's clear from the report

23   that he released that he's looked at past vegetation management

24   practices as well as current vegetation management practices.

25          We've all agreed that's going to be an issue that's going

1    to be before the Court in the estimation of liability here, and

2    that information would be incredibly helpful for all parties to

3    see.  Obviously, they have access to it.  We'd like to have

4    access to it.

5         The information that the federal court monitor has relates

6    to recordkeeping over the course of a number of years on the

7    vegetation management program, and it also -- it also looks at

8    their --

9              THE COURT:  What am I going to do with all that?  What

10   is the judge going to do with all that?

11             MS. MORRIS:  Well, Your Honor, it goes to the entire

12   liability case as to whether or not PG&E's vegetation

13   management program is sufficient or whether or not they were

14   negligent --

15             THE COURT:  But I started off today saying -- that was

16   not in my understanding of what Section 502(c) stands for.  It

17   would take me months, months of hearings, to make a

18   determination on whether or not the vegetation management

19   program was sound.  That is antithetical to 502(c).  If you

20   reason backward from that, getting warehouses' worth of

21   documents doesn't make any sense to me.

22             MS. MORRIS:  I don't believe it's warehouses' worth of

23   documents, Your Honor, but there are documents that go to the

24   negligence of the company.  And we've all agreed that

25   vegetation management is one of the key issues that are going

1   to be part of the liability trial here.

2        **THE COURT:**  Well, no, we haven't.  The point I was

3   making earlier is I'm hoping we can get to a reliable estimate

4   of the likelihood of success on trial on the negligence claim.

5   That is my charge.

6        My charge is not going to the third level and then

7   figuring out whether they actually will win or lose based on

8   vegetation management.

9        This all informs the scope of discovery.  It goes to the

10  point your colleague raised about am I going to have 269

11  witnesses or 26.  All right?

12       If you start doing this, you're going to have 269

13  witnesses, and it doesn't make any sense to me.  So I'm just

14  not understanding why you need everything produced on

15  vegetation management in another case.

16       **MS. MORRIS:**  Your Honor, it's the vegetation

17  management program in general.  And Mr. Orsini has already told

18  the Court today that he would like to produce or put evidence

19  on the likelihood of liability going up or down based upon

20  whether certain trees should have been trimmed or not.

21       And these documents go to the vegetation management

22  program of the company and whether it's sufficient.  And the

23  vegetation management of the company, we would argue, is -- has

24  showed extreme negligence.  The monitor found that they have

25  been negligent.  And so I believe that it does go to the

```
 1  ultimate issue as to --

 2          THE COURT:  Well, let me just jump in.  Okay.

 3      So that may be a fact I'd like to see, if a federal

 4  monitor has said your vegetation management program was

 5  negligent.  But those are all inputs into estimating what I

 6  call the discount factor.

 7      Why do you need the next step?  You have a monitor saying

 8  they did a terrible job.  I'm just hypothesizing.  Why do you

 9  need the documents behind what?  And I don't -- I'm not

10  going -- we don't have the capacity or time to get into that.

11      I'm not going to -- I'm not going to try the monitor's

12  decision.  If the monitor has said they're the gang that

13  couldn't shoot straight when it came to managing trees, then

14  you should be running with that.  Why do we need to go beyond

15  this?

16          MS. MORRIS:  Well, if we're relying upon just the

17  monitor's report, then I would submit that you don't need to

18  rely upon anything --

19          THE COURT:  It's a reasonable estimate of

20  probabilities.  That's all I'm doing.  I really -- think of it

21  as this is -- that's the star that we're all following.  I

22  just -- we have to manage this case this way or the entire

23  purpose of 502(c) is eviscerated.

24      So I'm going to deny it for now, but if there's something

25  comes up, you can come back and tell me in a more discrete
```

1  fashion why, but just wholesale production of vegetation

2  management seems far beyond the scope of today's proceedings.

3  Okay?

4      **MS. MORRIS:**  Thank you, Your Honor.

5      **THE COURT:**  Anything else on discovery?

6      **MS. MORRIS:**  Nothing that we don't have for a

7  meet-and-confer.

8      **THE COURT:**  Do you have everything you want from the

9  claimants?

10      **MR. ORSINI:**  Nothing for today, Your Honor.

11      The big issue is right now we have no information about

12  the actual claims that are being asserted here, other than

13  names, but that's --

14      **THE COURT:**  Questionnaires.

15      **MR. ORSINI:**  Exactly.  Which is why I don't think

16  that's an issue for today.

17      **THE COURT:**  Okay.  All right.  Anything else from

18  anyone?  I always dread asking that.

19      I'm sorry, I don't mean you personally.

20      **MR. STONE:**  Alan Stone, again here on behalf of the

21  Official Committee of Unsecured Creditors.

22      Simple request:  We would like the ability to send one

23  lawyer live to the depositions in the Tubbs case.  The Tubbs

24  case, of course, is a very important data point for estimation.

25  We have been denied that right.

1          We were recently given telephonic access for those

2     depositions.   I suppose we could --

3               THE COURT:   That's the state court case.

4               MR. STONE:   That's the state course case, exactly.

5               THE COURT:   That's not my case.

6               MR. STONE:   I understand that, Your Honor, but it is

7     something that is important for estimation.   And I suppose, as

8     an interested party, we could notice the depositions of all of

9     the same people --

10              THE COURT:   I have a very strong and firm view of

11    federalism, and I am not going to order anything happening in a

12    state court case that is not in my court.   So I'm not going to

13    take that up.

14              MR. STONE:   Okay.

15              THE COURT:   That's between you and the state court

16    judge.

17              MR. STONE:   Well, you do have jurisdiction over the

18    Debtor, and I suppose you could order them --

19              THE COURT:   No, no, no.   That's a side game.   I'm not

20    going to play side games with comity of state and federal

21    courts.

22              MR. STONE:   Okay.   We'll apply to the state court

23    then.   Thank you, Your Honor.

24              THE COURT:   Okay.   Yes.

25              MS. CRAWFORD:   Your Honor, I had the same issue.

```
 1   Ashley Crawford on behalf of --
 2           THE COURT:  You need to see a state judge.  The long
 3   arm of the federal government does not reach into the state
 4   court.  I am adamantly opposed to anything that would suggest
 5   that.
 6           MS. CRAWFORD:  I understand that, Your Honor, and,
 7   frankly, said that in the pleading that we made today.
 8       My question is whether Your Honor will allow us to take
 9   the same discovery in this estimation proceeding that is
10   proceeding in the Tubbs action, if we feel it's necessary,
11   because we are not being potentially allowed to attend those
12   depositions.
13           THE COURT:  Well, when you have something concrete,
14   I'll take it up.  That's a little abstract right now.
15           MS. CRAWFORD:  Sure.
16           THE COURT:  So if something comes up that you think is
17   a problem for your presentation, I'd be happy to hear it, but
18   let's wait until it's a little more specific.  Okay?
19           MS. CRAWFORD:  Thank you, Your Honor.  Appreciate it.
20           THE COURT:  Yes.
21           MR. TOSDAL:  Thank you, Your Honor.  Tom Tosdal for
22   some Camp Fire claimants.  I have a question about the what and
23   a question about the how.
24       The claim for punitive damages for causing the Camp Fire
25   is a very serious one, and my question for Your Honor is
```

1  whether the standard that you have articulated as -- and I

2  understand it, to assume probable liability subject to discount

3  also applies to the predicate for punitive damages under 3294

4  of the Civil Code.

5          THE COURT:  Well, would you like to do?

6          MR. TOSDAL:  I would go with that.  I would assume

7  probable liability subject to discount.  Not that -- not that

8  PG&E could get any discount, but...

9          THE COURT:  Well, I would like to see the evidence.  I

10 think -- I can't remember -- I'm sorry, it may have been you

11 but it may have been someone else said that they had the

12 impression that there were a number of emails that would show

13 intentional -- something that would warrant enhanced damages.

14 I would like to see that.

15         MR. TOSDAL:  Oh, we'll show you.

16         THE COURT:  Yes.

17         MR. TOSDAL:  But in terms of approaching the standard,

18 is the standard that you articulated for liability going to be

19 one that applies to the predicate under 3294?

20         THE COURT:  Okay.  Mr. Orsini, you're standing up.

21         MR. ORSINI:  Well, I can understand why they would

22 want to presume punitive damages.  We think that would be

23 completely inappropriate.

24         Punitive damages are an incredibly heightened standard.

25 We think Your Honor should see the evidence and, based upon

1   that evidence, which is not a full-blown trial, make a

2   determination as to a reasonable probability of liability.

3           THE COURT:  Well, here's an issue:  There's no

4   benchmark for punitive damages, is there?

5           MR. TOSDAL:  No, sir.

6           MR. ORSINI:  No, Your Honor.

7           THE COURT:  There have only been settlements.  So

8   there's been no court adjudication of enhanced damages.

9           MR. TOSDAL:  Correct.

10          THE COURT:  So I think the probability method makes a

11  lot of sense to me in the context of track records of results,

12  settlements, and so on.

13      In the absence of any record for punitive damages, I would

14  like to just see the evidence.  And sounds like you'll be the

15  person responsible for that.

16      But I would like to maybe just set aside some of the

17  estimation time for that.  I'd like to see why you think

18  enhanced damages are appropriate and what do you think the

19  evidence is.

20      I am also -- just thinking about it, I'm not sure how to

21  ballpark enhanced damages.  You'll have to give me some

22  guidance on that as well.

23          MR. TOSDAL:  We'd be glad to offer that, your Honor.

24          THE COURT:  That would be useful too.

25      I think for property damage and personal injury, it seems

1   to me it might be easier to do that.  But maybe the same is

2   true for enhanced damages.  So you should probably plan on

3   that, and I'll make sure you have time at the estimation.

4          MR. TOSDAL:  Sure.  Thank you, Your Honor.

5      And just to alert you that there is a Cal Fire report with

6   regard to every one of the wildfires except for Camp.

7          THE COURT:  Oh.

8          MR. TOSDAL:  So we're going to have to develop

9   everything from ground zero since there hasn't been any civil

10  discovery as well.  So just alerting you.  Hopefully, the

11  parties can work together to get this hammered out.

12         THE COURT:  Yes, try that.  If it doesn't work out,

13  come back.  But that sounds like a good plan.

14         MR. TOSDAL:  Thank you, sir.

15     The second question has to do with how.  We've talked

16  about a hearing lasting two or more weeks.  But if Your Honor

17  is amenable or would Your Honor consider a visit to the town of

18  Paradise to inform you about what it is that PG&E hath wrought

19  in reality?

20         THE COURT:  That's an interesting concept that I've

21  actually been thinking about.  I'll just think out loud here.

22  I may be wrong about this, but I think a colleague in another

23  district got thrown off a case because he did that.

24         MR. TOSDAL:  Oh, okay.

25         THE COURT:  But that was a different context.  It's

1   not -- it's not per se wrong, but some complications arose that

2   resulted in the judge being removed, I think.  But, in any

3   event, I'm not sure, but I'm not going to foreclose the idea.

4         **MR. TOSDAL:**  Thank you, sir.

5         **THE COURT:**  If there's something else, I would also be

6   happy to see video evidence, you know, anything that would be

7   kind of a virtual experience as well.  So that -- look, I want

8   to see the facts.

9         Despite what I said earlier, I don't want just papers,

10  charts, and experts.  I want to hear from the victims.  I want

11  to hear from the company, you know, the people who were on the

12  other end of these claims.  I'd like to see visual evidence of

13  what happened.  I'd like to hear from the people directly.

14        So if you have something that's short of a visit, which

15  I'm not ruling out, but if you have something short of a visit,

16  you should -- I'm talking to the TCC and everybody now on that

17  side, including you -- I'm more than willing to see it.  Okay?

18        **MR. TOSDAL:**  Thank you, sir.

19        **THE COURT:**  All right.  Anything else?

20        **MR. ORSINI:**  Nothing else from me, Your Honor.

21        **THE COURT:**  Anything else from anyone else?

22        All right.  I'll see you all on October 21st.  Okay.

23  Thanks for coming in.

24        (At 3:29 p.m. the proceedings were adjourned.)

25                          - - - - -

1    **<u>CERTIFICATE OF REPORTER</u>**

2            I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4    DATE: Monday, October 7, 2019

5

6

7

8    _____

9        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25