Pages 1 - 43

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE: PG&E CORPORATION and          )
PACIFIC GAS AND ELECTRIC             )
COMPANY,                             )
                                     )
            Debtors.                 )      NO. 19-05257 JD
                                     )
_____      )

                            San Francisco, California
                            Monday, October 21, 2019

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Creditor Committee Official Committee of Tort Claimants:
                    BAKER & HOSTETLER LLP
                    Levi's Plaza
                    1160 Battery Street East - Suite 100
                    San Francisco, California  94111
               BY:  **ROBERT A. JULIAN, ATTORNEY AT LAW**
                    **KIMBERLY S. MORRIS, ATTORNEY AT LAW**

For Ad Hoc Group of Subrogation Claim Holders :
                    WILLKIE, FARR & GALLAGHER LLP
                    878 Seventh Avenue
                    New York, New York  10019
               BY:  **BENJAMIN P. MCCALLEN, ATTORNEY AT LAW**

For Kevin Burnett and Plaintiffs-Creditors:

                    EDELSON PC
                    123 Townsend Street - Suite 100
                    San Francisco, California  94107
               BY:  **BRANDT SILVER-KORN, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ruth Levine Ekhaus, CSR No. 12219, RDR, FCRR
              Official Reporter

1   **APPEARANCES**:   (CONTINUED)

2

3   For Creditor California State Agencies:
                             FELDERSTEIN, FITZGERALD, WILLOUGHBY
                               PASCUZZI & RIOS LLP

4                             500 Capitol Mall - Suite 2250
                            Sacramento, California  95814

5                     BY:   **PAUL J. PASCUZZI, ATTORNEY AT LAW**

6

7   For 4000-Plus Fire Creditors:
                            COREY, LUZAICH, DE GHETALDI & RIDDLE LLP
                            700 El Camino Real

8                             P. O. Box 669
                            Millbrae, California  94030

9                     BY:   **AMANDA L. RIDDLE, ATTORNEY AT LAW**

10

11   For Creditor Committee Official Committee of Unsecured
  Creditors:

12                             MILBANK, TWEED, HADLEY & MCCLOY LLP
                            1850 K Street, N.W. Suite 100

13                             Washington, D.C.  20006
                    BY:   **ANDREW LEBLANC, ATTORNEY AT LAW**

14   For Fire Victims:
                            WALKUP, MELODIA, KELLY & SCHOENBERGER PC

15                             650 California Street - 26th Floor
                            San Francisco, California  94108

16                     BY:   **KHALDOUN BAGHDADI, ATTORNEY AT LAW**

17

18   For Ad Hoc Bondholder Committee:
                          AKIN, GUMP, STRAUSS, HAUER
                            & FELD LLP

19                           580 California Street
                            San Francisco, California  94104

20                     BY:   **ASHLEY VINSON CRAWFORD, ATTORNEY AT LAW**

21

22

23

24

25

**APPEARANCES**:   (CONTINUED)


For Creditor SLF Fire Victim Claimants:

                        SINGLETON LAW FIRM
                        450 A Street - 5th Floor
                        San Diego, California  92101
              BY:   **GERALD SINGLETON, ATTORNEY AT LAW**

For Debtor-in-Possession PG&E Corporation:
                        CRAVATH, SWAINE & MOORE LLP
                        825 Eighth Avenue
                        New York, New York  10019
              BY:   **KEVIN ORSINI, ATTORNEY AT LAW**
                    **PAUL H. ZUMBRO, ATTORNEY AT LAW**

1   <u>**Monday - October 21, 2019**</u>                    <u>**2:00 p.m.**</u>

2                         <u>P R O C E E D I N G S</u>

3                            ---o0o---

4       **THE CLERK:**  Please be seated.  Calling Civil 19-5257,

5   In Re: PG&E Corporation, and Pacific Gas and Eletric Company.

6       Counsel, state your appearances for the record.  Please

7   come forward and state your appearances for the record.

8       **MR. JULIAN:**  Good afternoon, Your Honor, Robert Julian

9   and Kimberly Morris of Baker Hostetler on behalf of the Tort

10  Committee.

11      **THE COURT:**  Good afternoon.

12      **MR. McCALLEN:**  Benjamin McCallen, Willkie, Farr &

13  Gallagher, on behalf of the Ad Hoc Subrogation Group.

14      **MR. SINGLETON:**  Good afternoon, Your Honor, Gerald

15  Singleton from the Singleton Law Firm, on behalf of the SLF

16  Fire victim claimants.

17      **MR. ORSINI:**  Good afternoon, Your Honor, Kevin Orsini,

18  Cravath, Swaine & Moore, on behalf of the debtor, along with

19  Paul Zumbro from Cravath, Swaine & Moore, also.

20      **THE COURT:**  Okay.  Anyone else?  All right.

21      Mr. Julian, Mr. Orsini, what's happening?

22      **MR. JULIAN:**  Your Honor, we have met and conferred

23  several times and I would like to give you a report.

24  Mr Orsini, I think, has some similar views.

25      First of all, on working on a discount, we have exchanged

different proposals.  I think we are apart right now.  We have

agreed to continue discussing them.  We may end up getting to

the point where we brief them.

　　　If I may tell you some of our thoughts --

　　　　　**THE COURT:**  Of course.

　　　　　**MR. JULIAN:**  -- what we're looking at.

　　　　　**THE COURT:**  Yeah.

　　　　　**MR. JULIAN:**  The committee believes that we should be

looking at discounts with respect to three different

classifications of damages because the discounts are handled

differently for each of them.

　　　First of all, for economic damages, where there is an

inverse claim -- which from our perspective is a pretty simple

claim to establish -- if Judge Montali in the inverse briefing

establishes that the California Appellate Court decision should

be applied in the Federal Court, we believe that we would

simply look at the Butte litigation and settlements to

establish whether the parties established discounts there.  And

we're going to -- we would propose to give evidence that shows

that, with similar defenses to what PG&E is asserting here, the

Court in Butte, in a similar circumstance -- which is disputed,

whether it's similar -- found that inverse applies on summary

judgment.

　　　　　**THE COURT:**  So would it be the case that you would do

that by taking settlement demands, versus actual compromise

1    amounts?

2          **MR. JULIAN:**  So let me address that.

3          So when discussing discounts on inverse economic damages

4    only -- let me address a couple of things.

5          First, both sides of experts are going to be, essentially,

6    building the economic damages from the ground up, looking at

7    individual homes, the numbers of homes, square-foot rebuild

8    cost, forestation, reforestation efforts, erosion control

9    efforts, business losses, and the like.

10         It's our view that if you look at the settlement figures

11   in Butte you have to look at the settlement demands and look at

12   the discounts rather than looking at what our experts come in,

13   in a neutral way, and explain what the numbers are.  Their

14   numbers are vastly different from what plaintiffs' lawyers

15   would be coming in addressing.

16         So what we're saying there is:  I need to get the final

17   set of documents on Butte settlements, which they are giving

18   us.  We don't have all the settlements demands or maybe they

19   came in today and I'm not aware of them, but I believe they are

20   coming in closely on the tail of today's hearing.

21         So after our review of the settlement documents and the

22   Court proceedings determining that inverse should apply in

23   cases like this, we would be in a position to discuss a

24   discount approach with PG&E.

25          **THE COURT:**  Okay.  But -- that's sounds fine, but the

1  way you would do that, if it's not, tell me.  Or, if you don't

2  want to tell me now, that's fine.  But you would do that by

3  comparing what was demanded and what was actually paid?

4       MR. JULIAN:  That's one way to do it.  Another way to

5  do it is to look at the inverse ruling, which said that it's

6  essentially -- in all these cases where they admit they caused

7  the fire -- I'll except the Redwood case here -- it's virtually

8  no discount or a minor discount.

9       THE COURT:  That's fine.

10      MR. JULIAN:  So we're looking at both --

11      THE COURT:  I mean, so the way I would envision this

12  is there would be demands.  That's the hundred percent.  There

13  will be checks that respond to the demand and the checks could

14  range from 0 to 100 percent.  And you will average those and,

15  maybe, at least, by category, houses of this size, you know,

16  outer structures of this type, you could have rough guidelines

17  and typically, you know, the average difference is either 0 or

18  10 or 20 percent, or whatever you come up with.

19      MR. JULIAN:  Yes.  Where we're not yet communicating I

20  think is that that's a settlement-only approach looking at

21  demands versus payments.

22      THE COURT:  No, I understand --

23      MR. JULIAN:  Our experts are building it from the

24  ground up.  Their numbers are going to be different from what

25  the plaintiffs' lawyers would come in.  So we're looking at

1    both ways for economic damages.

2           THE COURT:  There are multiple information streams.  I

3    get that.  But I think the ones where the claims were actually

4    compromised would be really very useful to see.

5           MR. JULIAN:  We plan to focus on those.

6       The second type of damages, which are wrongful death and

7    personal injury, emotional distress by fleeing the fire trauma,

8    and emotion distress caused by loss of the home.

9       We have good settlement data from Butte and San Bruno on

10   that, we believe.  And, Your Honor, it -- there we are using

11   the settlement data.  It's not experts telling you from the

12   ground up, looking at a victim in this case, what were their

13   damages because, you know, they haven't been calculated yet.

14   They haven't been proven in a deposition.

15          THE COURT:  Slow down without lowering with your

16   voice.  Speak up and slow down.

17          MR. JULIAN:  Yes.  With respect to Butte and San

18   Bruno --

19          THE COURT:  You have actual data.

20          MR. JULIAN:  There, Your Honor, obviously the discount

21   is already built in because it's settlement data.  We're not

22   building it from the ground up.

23          THE COURT:  How are you going to do that?  Is it going

24   to be --

25          MR. JULIAN:  I don't know until I get the document.

1          **THE COURT:**  You don't ask them.

2          **MR. JULIAN:**  We have a portion of them, not all of

3     them.

4          **THE COURT:**  Because we're thinking, among friends,

5     here, it can be -- data can be sliced and diced a million

6     different ways.  So might be sliced by age group.  You know,

7     you're going to have to put some fine tuning on it.

8          If you both agree, I'll work with it.  If you reach

9     consensus, the odds are pretty good I'll probably just go with

10    that.  But, if you don't, it's going to have to be not too

11    fine, but fine enough to make informed decisions.

12        Do you see what I'm saying?

13         **MR. JULIAN:**  Yes.

14         **THE COURT:**  Just one other question now.  What

15    about -- you mentioned wrongful death and emotional distress.

16    But aren't there physical injuries well?

17         **MR. JULIAN:**  Yes.

18         **THE COURT:**  Burns?

19         **MR. JULIAN:**  I put that into personal injury.  It's

20    wrongful death and personal injury.  Primarily the largest one

21    is emotional distress.  There are some burn cases.  In fact,

22    one of the witnesses you're going to hear from is a burn case.

23         **THE COURT:**  All right.  Go ahead.

24         **MR. JULIAN:**  The third class of damages is punitive

25    damages.  Perhaps, we disagree on the approach on this one.  At

1    this time, we can't say whether we're going to do a separate

2    punitive damages claim or bake it into the settlement process.

3              THE COURT:  I see.

4         MR. JULIAN:  Our approach is to take a look at

5    punitive damages that have been awarded in the form of PUC

6    fines of $1.6 billion for the San Bruno disaster and

7    record-keeping problems.

8         And there, the PUC set of fines was addressed sort of on a

9    per-violation number, but their press release looks at the PUC

10   fine in this way:  The amount of damages suffered by the

11   victims times the multiple.

12        So, at least from the PUC standpoint, in assessing -- this

13   is all going to be disputed, obviously, our approach -- the

14   PUC, in the press release, looks upon it as a multiple of

15   victim damages.  And they thought it was fair.

16        Similarly, in this case --

17             THE COURT:  So you're saying the PUC set the fines as

18   a multiple of actual damages?

19        MR. JULIAN:  Not in their decision.  Only in their

20   press release.

21        In their decision, they went violation by violation by

22   violation.

23        In my view, this is my interpretation, their cross-check

24   on reasonableness was to look at the multiplier times the total

25   fines.  And the fines there were varied.  Some of the fines

1   were based on rebates; some of the fines were based on water

2   usage; some of the fines were based on an outright fine.

3       All I'm saying is:  One data point that we'll submit to

4   you is the PUC set of fines and the analysis there.  And,

5   overall, with respect to all these numbers we believe that it's

6   appropriate for Your Honor as opposed to an expert witness, to

7   determine whether a multiplier or each of these classes of

8   damages should be applied based on the difference between Butte

9   and San Bruno and Camp, where -- let's face it -- the people

10  fleeing the fire there, some of them -- I interviewed one, just

11  two weeks ago up at the FEMA camp, which was the basis for our

12  motion to extend the bar date recently.

13      This woman underwent four hours of sitting in the fire

14  thinking she was dying.  You know, it was a much different type

15  of damage in San Bruno.

16      So our only point is, when we present the evidence with

17  these live testimony from victims, we will be asking probably

18  for a multiplier.  And that's our view today.

19      It's very preliminary.  Obviously, we have to work it out

20  with Mr. Orsini, and I don't think he agrees with anything I

21  said.  So that's the approach.

22          **THE COURT:**  Okay.  I'm going to get back to the bar

23  date in a moment.

24      So, Mr. Orsini?

25          **MR. ORSINI:**  Yes, your Honor.

 1          For the reporter, Kevin Orsini for the debtors.

 2          Let me work my way backwards through those three

 3     categories, because I think there will be disagreements that,

 4     obviously, we're not going to sort out today.

 5          But, just to give Your Honor a little bit of sense as to

 6     how we're thinking about this.

 7          On the punitive damages, I think Your Honor remarked at

 8     the last conference when we were here, there are no benchmarks

 9     for this.  I think you're right.  There haven't been awards of

10     punitive damages in a case like this in California or,

11     candidly, anywhere else to our knowledge.

12          We don't believe the PUC fine has anything to do with

13     punitive damages.  In fact, if anything, the existence of a

14     regulatory scheme that includes fines suggests that punitive

15     damages are not necessary.  But, putting that argument aside,

16     the standard for imposing a regulatory fine is obviously

17     fundamentally different than the standard that's in place for

18     punitive damages.

19          These are issues Your Honor is going to have to sort

20     through because we have disagreements about whether or not it

21     is a relevant benchmark.

22          I think as it relates to punitives, as Your Honor said

23     last time we were here, we're going to have to present some

24     evidence to you.  They have e-mails they want to show you.

25     We'll have some witnesses we want to present to you that are,

in particular, relevant on the punitive damages fees, so the
Court can understand what circumstances did lead, in
particular, to the Camp Fire; what sort of work was being done
by PG&E leading up to that; how did it match up with industry
standard, which it did; all relevant to that.  So we'll have
some disputes and we will sort through that later.

On the non-economic damages -- the personal injury, the
pain and suffering, the wrongful death -- I think we are in
general alignment that one of the more interesting data sets
that will be presented to the Court on that issue is Butte
settlement values.

We obviously have a disagreement whether or not San Bruno
is a relevant benchmark.  We'll present on that.  Your Honor
will have to make a decision on that once you see the
differences between that case and this case, or not.

But, particularly with respect to Butte, what I heard
Mr. Julian say today and what I have heard him say during our
meet-and-confers is that they do think that the awards -- wrong
word, but the amount of money that was set aside in the
settlements for pain and suffering, personal injury in Butte
is, obviously, informative of the value of those claims here.

We agree with that.  There will need to be some
adjustments.  Those adjustments can be based upon likelihood of
liability in that case versus this one, because those will be
the damages that are available only for negligence, but also I

1    think in terms of, to Mr. Julian's point, the types of

2    experiences that were at issue.  Right?

3        There are a whole lot of different types of experiences

4    that people suffered through in these tragedies.  The same was

5    true with respect to Butte.  There were some on one end of the

6    spectrum and some on the other.  So what we would expect to do

7    is present to Your Honor, based on the settlement data, what

8    our experience was in Butte and how you value, in a settlement

9    context, these types of soft damages, non-economic damages

10   claims.

11       There may also be other information that could be useful

12   to the Court that we would present.  There are whole industries

13   built around trying to value wrongful death claims -- for

14   example, for cases that have nothing to with wild fires -- in

15   the State of California.  So there may be some comparables that

16   experts can bring to bear for Your Honor --

17       **THE COURT:**  That's fine.  You should do whatever you

18   want to do, but there is a lot of data here to work with.

19       **MR. ORSINI:**  I agree.  I think that would be the

20   primary mechanism.  There just might be generally understood

21   trends as to what a personal death claim is worth for someone

22   in this age cohort, versus that age cohort, as the Court noted.

23   That was the point I was making there.

24       On economic losses, again, we certainly agree with

25   Mr. Julian that the starting point has to be an expert analysis

1   built up from the bottom on what were the actual homes that

2   were lost here; what were the values of those homes; what other

3   types of damages were incurred by those who lost their property

4   in these fires; what does it looks like in terms of rebuilding;

5   what does it look like in terms of diminution of value.

6       Ultimately, I would expect we will present those rolled up

7   to Your Honor in one primary expert, as we have discussed at

8   prior conferences, so Your Honor is not parsing through

9   property by property.

10      But what will become clear quickly is that there are --

11  and don't hold me to the number -- but there is probably five

12  or six key variables that go into the spreadsheet on how you

13  calculate from the bottom up the actual damages.

14      We will know how many houses were lost.  We will know how

15  many of those have claims associated with them.  Then the

16  question becomes:  How do you value different pieces of those

17  damages?

18      And I think we both have the same view that we'll build

19  that up for you.  And then the question becomes:  How do you

20  look at the settlements in the Butte case and what, if

21  anything, might that tell the Court as to how to deal with

22  that?

23      I do think you have to look at what was demanded, and what

24  was accepted.  Very significant discounts in that case between

25  what was demanded and what was accepted, even in a scenario

1    where the Court, as Mr. Julian noted, had already held on

2    summary judgment that PG&E was liable on the inverse.  So the

3    liability question was not at issue effectively on economic

4    damages when the settlements were reached, subject, of course,

5    to appeals.

6         **THE COURT:**  Why were there such substantial discounts,

7    in your view?

8         **MR. ORSINI:**  Well, I think there was some concern

9    about an appeal risk on the inverse, if it actually made it's

10   way up to the California Supreme Court and whether that applies

11   here.

12        But, I think it's also a question of overstatement of

13   actual damages.  I think we have seen some of that already in

14   this case, and we will continue to see it.  So it's not, in

15   itself, dispositive but, as Your Honor has noted, it will be a

16   relevant data point.

17        I do agree with Mr. Julian; I think we have had at least

18   two meet-and-confers on this issue.  We exchanged

19   correspondence.  I think more data will help both of us

20   identify areas of agreement and areas of disagreement.

21        **THE COURT:**  All right.  What happened to the bar date?

22   That's right now?

23        **MR. ORSINI:**  It's today.

24        **MR. JULIAN:**  The claims bar date is today.  The TCC

25   filed, last Friday night, a motion to extend the bar date to

either December 5 or January 31.

If it's December 5, we recommended that if the Court did not want to accept our evidence, the Court could appoint an independent expert to go up to Paradise and Gridley, like I did, and interview people to determine whether they are impaired from filing, either through lack of knowledge, lack of education, confusion, misrepresentation, or simply impairment that I found from the trauma of living day-to-day in FEMA trailer camps or tents.

**THE COURT:**  Who is helping them file claims; is there anyone up there?

**MR. JULIAN:**  There is no fiduciary.  So we asked -- the lawyers are attempting to get additional clients up there.

**THE COURT:**  Do you all have teams up there going around --

**MR. JULIAN:**  We don't, but several firms do.  But, in my view -- in my investigation, I found that renters, who may not have claims high enough for certain law firms, are most at risk.  We think there are anywhere from 15- to 20,000 renters displaced, for which there is no forwarding address, or are simply confused.

**THE COURT:**  I'm not following this.

So someone here ought to be having the functional equivalent of a claims center where people can show up and, like our self-help desk here in court, people without lawyers

1  can walk in and get some guidance on how to do it.

2      You're telling me no one is doing that?

3          MR. JULIAN:  The -- Prime Clerk is the agent that does

4  it for the debtor.  We actually proposed it to the judge to

5  have something akin to that.  He denied our motion.

6      So my motion last night, or Friday night, asked for the

7  appointment of a fiduciary to do precisely what you asked.  A

8  fiduciary to go out and assist claimants who do not have a

9  lawyer to actually file the claim on the basis they lack the

10  skills to actually do it, which is what I found.

11          THE COURT:  Why isn't PG&E doing that?

12          MR. ORSINI:  Your Honor, there is an extensive notice

13  program put out.  There are hotlines to call and assist with

14  questions about claims.  There are customer centers available

15  for questions about claims.

16          THE COURT:  What kind of customer centers?

17          MR. ORSINI:  The PG&E customer centers.

18          THE COURT:  Where are they?

19          MR. ORSINI:  They are in the local community, sir.

20          THE COURT:  They are advertised, "You can come here

21  for help with the claim"?

22          MR. ORSINI:  I believe it was in the notice program

23  that went out.  There is an extensive notice -- this is

24  actually the most extensive notice program that the bankruptcy

25  petitioners in this case have ever seen.  It was something that

1    was discussed at length with Judge Montali in terms of getting

2    the appropriate amount of notice out there, satisfying due

3    process, making sure people understood what their rights were,

4    what they want.

5         There were millions of dollars spent on this --

6         **THE COURT:**  Let me just chime in.  Look, we all know

7    from class actions that, no matter how good the settlement and

8    notice are, the claims rates are abysmal.  People just get

9    confused.  They get overwhelmed.  They are baffled.  They throw

10   them away.  They get something that says "in re," they have no

11   idea what it means.

12        So I am concerned that there aren't teams of people

13   scouring these areas to get these claims filed.  Today is the

14   day.  There is no guarantee the judge is going to lift the bar.

15        **MR. ORSINI:**  Understood, Your Honor.

16        **THE COURT:**  I have seen some evidence anecdotally in

17   newspapers saying that a tremendously high number of people who

18   are eligible aren't filing claims.  And I don't understand why

19   PG&E isn't actively soliciting applications.  It's something

20   you ought to be doing, not just with an e-mail and not just

21   with US mail.

22        **MR. ORSINI:**  No, Your Honor, it hasn't just been with

23   an e-mail or US mail.  There have been multiple rounds of

24   mailings.  There have been social media campaigns.  There have

25   been advertisements.  The response rate that we are seeing is

 1 | well beyond what you would typically see in a class action

 2 | context.

 3 |         THE COURT:  What's the response rate?

 4 |        MR. ORSINI:  We're still processing the date.  It

 5 | looks like, so far, the response rate could be in the

 6 | neighborhood of 40 to 50 percent of actual parcels that were

 7 | destroyed have a claim associated with them.  The other

 8 | piece --

 9 |         THE COURT:  That's better than the typical class, but

10 | that still means 50 to 60 percent of victims aren't going to

11 | get a dime.  That's just not right.

12 |        MR. ORSINI:  I wouldn't say that that means 50 to

13 | 60 percent aren't going to get a dime.  Part of what's going on

14 | is there has also been $16 billion of insurance paid out.  So I

15 | think there are a lot of people who may very well be deciding

16 | that their insurance was sufficient to cover their losses.  And

17 | there are certainly, if there are situations involving specific

18 | hardship, there are provisions for that in the bankruptcy code.

19 |     The other thing I would note --

20 |         THE COURT:  Let's just pause on that.  It concerns me.

21 |     Let's say someone doesn't get their claim in today because

22 | they are suffering from some disability; they just couldn't do

23 | it; they are overwhelmed; they don't understand.

24 |     How do they apply to get out of that and get their claim

25 | heard?

1          **MR. ORSINI:**  They can bring that claim to the

2     bankruptcy court.  That's something bankruptcy court deals with

3     all the time.

4          **THE COURT:**  How are they going to know to do that?

5          **MR. ORSINI:**  They can bring it to us.  They can bring

6     it to Prime Clerk.

7          There is actually -- Mr. Julian said the fiduciary.  There

8     is a fiduciary to the wild fire claimants.  It's Mr. Julian and

9     his law firm, who has been working on this case for six months.

10    And they also have the obligation to be out there helping bring

11    these claims in.  So I think the statement that there is not a

12    fiduciary is misleading.

13         And the other point that I would make on that front, Your

14    Honor, is that there has been a tremendous amount -- tremendous

15    amount -- of advertising by the tort lawyers, the state court

16    lawyers, in these areas, walking in the FEMA camps, going out

17    there, that is on top of all the work that has already been

18    done with respect to the noticing program.

19         And these are the types of issues that Judge Montali is

20    going to have to face with respect to that motion.

21         But, we believe, based on what we have seen, that the

22    notice program far exceeds anything that's ever been required

23    before.  And that was Judge Montali's determination when he

24    approved --

25         **THE COURT:**  Is that your view, Mr. Julian?

1          **MR. JULIAN:**  Pardon me?

2          **THE COURT:**  Is that your view as well?

3          **MR. JULIAN:**  No.

4      What I would like to, do since you have asked questions,

5  is deliver to chambers a copy of our motion with the 10 or so

6  declarations filed about victims who were educated, but tell

7  the story of their impairment and lack of notice.

8          **THE COURT:**  Give me one example, just a short example.

9          **MR. JULIAN:**  I'll give you the one I did, because

10 that's -- my investigator filed the declaration himself.

11     So I -- when the victim's lawyers informed Judge Montali

12 that there was a problem with participation, it was a day in

13 the hearing where Bruce Bennett, the lawyer for the equity

14 shareholders, which we contend are controlling the debtor now,

15 stood up and said, "The day of reckoning is coming because the

16 claims aren't there."

17     Mr. Skikos, one of the lawyers who has appeared in this

18 Court, stated to the judge he was going to file a motion to

19 extend the bar date.  And he had 10 or 12 declarations.  He

20 brought them to us.  I looked at them.  For the first time I

21 recognized there was an impairment problem.

22     So I took an investigator up with me to Gridley, which is

23 the FEMA trailer, camp about 30 minutes from Paradise, and

24 interviewed five victims randomly, knocking on the doors.  And

25 two said they filed claims.  Three said they had not.  And one

was so overwhelmed with problems with her cat, couldn't get around to it.

The woman I spent about 30 minutes with was, I think, 89 years old.  She told a harrowing story about being thrown into a car from the Feather River Hospital on the day of the fire, with the flames all around, and looking through the flames and thinking she was going to die, for four hours.

And now, every time she gets up in the morning, she -- if she hears a fire engine or sees a candle, she is in trauma and shakes.  She told me she thought she could only file if she was insured, and she did not own the home; she was a renter.

The next woman I went to, essentially, told me the same story.  The first woman I interviewed on the phone, she was right next to the trailer, said it was just too much getting out of bed and dealing with everything to do it.

And what I learned from that was, I corroborated the 10 declarations that had been given to us by Mr. Skikos, the declarations there, essentially, established the same story, that a lot of these people many of whom were renters -- I won't say all of them, but appears to be a lot of them -- simply don't have forwarding addresses.  There is no way that PG&E could have sent them direct notice.

And they are so impaired from getting up in the morning and living with this, not having any of their belongings that they used to have in Paradise, that -- they explained that they

```
 1   don't know what to do.

 2        And most of them don't have the education that they can

 3   file a claim.  And by "education" I don't mean grade-wise.  I

 4   mean, they don't have the knowledge in this case.  And so

 5   that's why I asked in my motion that I filed Friday, there be a

 6   fiduciary appointed to go out and do what I did, and find the

 7   people, educate them, and set up a table in Paradise and the

 8   like.

 9             THE COURT:  How many fire victims are in Gridley right

10   now, the FEMA camp?

11             MR. JULIAN:  Actually, at that camp there are 350

12   trailers.  One or two or three people per trailer.  The ones I

13   saw were one in four trailers in each of the four and two in

14   one of the trailers.

15             THE COURT:  And are there other FEMA camps?

16             MR. JULIAN:  I think -- Kevin, I think there are two

17   others?

18             MR. ORSINI:  I think that's right.

19             MR. JULIAN:  Yeah, but a lot of these people are

20   living --

21             THE COURT:  Maybe PG&E should have gone to each of the

22   trailers and knocked on the door said, "How do we help you fill

23   out your form?"

24        Did PG&E do that?

25             MR. ORSINI:  We did not, Your Honor, including because
```

```
 1   we have -- had we have had extensive allegations from the
 2   plaintiffs' lawyers that are representing the fire victims
 3   about improper contact to potential victims.  Even in scenarios
 4   where PG&E was talking to people who lived in Paradise to try
 5   and get an understanding as to whether or not they intended to
 6   rebuild their house so that PG&E could decide whether or not
 7   they were going to actually run service back to the location,
 8   we were accused of all sorts of ethical violations for
 9   communicating with people that were potentially represented.
10           THE COURT:  Is that right, Mr. Julian?
11           MR. JULIAN:  I did not make that -- two points.  First
12   of all, I did not make that -- one of lawyers did -- presented
13   to me e-mails and phone calls whereby the PG&E person asked the
14   question, "Are you going to rebuild?"
15       And the "Are you going to rebuild" question, the
16   plaintiffs' lawyer say, is a trap, because if the person says
17   yes, he gets his costs to rebuild.  If he says no, he gets
18   diminution of value, which is why some of these claim numbers
19   come down.
20       Secondly, what I'm referring to has no ethical problem.
21   Renters.  Renters aren't not going to rebuild.  They didn't own
22   anything, Your Honor.
23       What I'm saying is I found a bunch of renters --
24           THE COURT:  All these folks are going to get the short
25   end of the stick because the litigation gamesmanship is really
```

 1  unacceptable.

 2      Now, I am -- strictly speaking, this matter is before the

 3  bankruptcy judge, so I'm going to let that court handle it.

 4      But it obviously affects the estimation if less than

 5  40 percent of the people who are entitled to claims file and

 6  60 percent don't.  That's going to affect the estimation.  So

 7  that's why I'm asking.

 8      Now, I will just tell you, I find that, were I doing it

 9  from scratch -- and I'm not -- things would have been done

10  differently.  That strikes me as a lot of posturing that's

11  being balanced on the backs of people who have suffered

12  tremendous tragedies.  Both sides, plaintiffs and defendants.

13      I cannot imagine a lawyer ever telling someone "Don't go

14  and fill out a claim form.  It's a trap."

15      I also cannot imagine PG&E not going to each and every

16  victim saying, "Here is the claim form.  Make sure you get this

17  done, because if you don't, the bar is going to drop," which is

18  going to happen today, unless the judge extends it in

19  three hours or less.

20      **MR. JULIAN:**  Let me clarify:  I don't know any

21  plaintiffs' lawyers who said, "Don't fill out a claim form."

22      **THE COURT:**  Someone on the plaintiffs' side said,

23  "Don't talk to the lawyers because it's a trap."

24      You just told me that.

25      **MR. JULIAN:**  I understood that a plaintiffs' lawyer

said to his client, "Don't answer the question if a PG&E representative asks, 'Are you rebuilding or not?'"

All the plaintiffs' lawyers have told everyone they know to file claims.

Your Honor, there are two other ways you are involved in the motion before the Court on the bar date.

**THE COURT:**  Well, let me just get back to what -- so when are you expecting to hear from Judge Montali?

**MR. JULIAN:**  On the motion to extend the bar date?

**THE COURT:**  Yes.

**MR. JULIAN:**  The hearing is November 13th.  And we put in our brief that there are two ways Judge Donato would be involved.

First of all, he has asked how we are addressing future claims.  And a future claim in an asbestos case is where the exposure to asbestos occurred before the bankruptcy case, but injury could occur after confirmation later.  That's a future claim.

In this case, we don't believe we have exposure to the fire with an injury later.  What we have is exposure to the fire and an impairment to file that tolls the statute or tolls a bar date.  That's a type of future claim.  Whether that is a type of future claim that should be estimated in this case, I don't know yet.

And what I have said to Mr. Orsini is that we would like

 1   to see how Judge Montali handles the extension of the bar

 2   date --

 3           THE COURT:  We have plenty of time.  So I will know

 4   with a high degree of certainty at that point.

 5       All I'm saying, is it would be a heartbreaking shame if

 6   even 10 percent of the eligible victims don't file claims for

 7   whatever reason.  If we're talking about 50 percent not filing,

 8   that's -- that's intolerable.

 9           MR. JULIAN:  That's what we're looking at.  That's why

10   we filed the motion.  And that's why we're asking for a

11   fiduciary to be appointed.

12           THE COURT:  Okay.

13           MR. JULIAN:  Your Honor, there is one more aspect you

14   may be involved with Judge Montali's motion.

15           THE COURT:  Yes.

16           MR. JULIAN:  And that is:  Judge Montali may ask

17   whether or not, if he extends the bar date and new claims come

18   in between now and December 5, the first trigger -- or

19   January 31, the potential second trigger -- whether this Court

20   can estimate claims that are brought in after October 21.

21       And we have simply briefed to him that that is a question

22   that should be directed to you.

23       From the TCC's standpoint, we believe we can come up with

24   a process to bring those claims into estimation.  And he may

25   want to know your view, or may want to know PG&E's view.  All

1    we know now from the correspondence this weekend, PG&E will

2    oppose our motion for the short extension to December 5, as

3    well as the longer extension to January 31.

4         **THE COURT:**  Well, if we have a working database of

5    50 percent, which I hope is much higher, it's an easy matter to

6    extrapolate larger groups of people.  I'm not terribly worried

7    about that.

8         **MR. JULIAN:**  Thank you, Your Honor.

9         **THE COURT:**  Okay.  What else for today?

10   San Bruno documents get produced?

11        **MR. ORSINI:**  Yes, Your Honor.  We have produced or

12   will have produced by the end of today all of the demand and

13   settlement packets, in the sense of the initial demand, the

14   counter, the settlement agreement.

15        There are additional documents related San Bruno, sort of

16   the broader set that we had talked, about that are still in

17   process.

18        I think Ms. Morris has points on that.  But, we're in the

19   process.

20        **MS. MORRIS:**  Good afternoon, Your Honor, Kimberly

21   Morris, Baker Hostetler, for the Official Committee of Tort

22   Claimants.

23        Mr. Orsini has said that with respect to San Bruno we

24   should have all of agreements and demands by the end of the day

25   today, but there is still the outstanding issue of the Butte

1   settlement agreement and demands.   And right now we have less

2   than 50 percent of the agreements and none of the demands.

3        And I believe, in my discussions with Mr. Orsini, that the

4   hold up is the redactions that they're doing to protect

5   themselves against violation of a mediation confidentiality

6   privilege.

7        What I would request from you, Your Honor -- which I think

8   may help resolve this -- is an order directing that they

9   produce those documents without the redactions without

10  violating the mediation confidentiality, so we can get those

11  documents in a lot quicker and start utilizing them to come

12  back to with what we intend to do with them during the

13  estimation trial.

14       **THE COURT:**  Whatever happened -- I think it was

15  Mr. Singleton who offered to provide a big tranche of Butte

16  documents?

17       **MS. MORRIS:**  He did.  And I have spoken with

18  Mr. Singleton about getting his spreadsheets of his data.  But

19  again, he only has a portion of those and --

20       **THE COURT:**  Is that right, roughly 700?

21       **MR. SINGLETON:**  Yeah, 697.

22       **THE COURT:**  Okay.

23       **MS. MORRIS:**  We would like to be on equal footing with

24  the debtors and have everything they have so we have a full

25  picture of the types of claims and the types of settlements.

1    And I think if Your Honor would order them to produce that

2    information without redactions, that could assist the process.

3         **MR. ORSINI:**  I think, by the end of today, we will

4    have produced all of the Butte settlement agreements in

5    redacted form.  We will have produced roughly, I believe, half

6    of the demand packets in redacted form.  There is still a

7    tremendous amount of redaction to do.

8         Candidly, I think it's in the best interests of that group

9    if we don't have to do those redactions.

10        **THE COURT:**  Just make it outside counsel's eyes only,

11   or whatever you would like to do.

12        **MR. ORSINI:**  If that's Your Honor's directive, we will

13   absolutely abide by that.

14        **THE COURT:**  Have you all done a protective order yet?

15        **MS. MORRIS:**  We do have a protective order, but I

16   don't think it covers the state court confidentiality mediation

17   privileges of which Mr. Orsini is concerned.  And also --

18        **THE COURT:**  It should be fine.

19        You can just designate it outside counsel only and --

20        **MR. ORSINI:**  So our concern was just making sure we

21   didn't violate some state law confidentiality.  I think -- the

22   Court has just directed us to produce it subject to protective

23   order --

24        **THE COURT:**  Blame the Court.

25        **MR. ORSINI:**  That gives us the comfort that we will

1    proceed as we need to.

2              MS. MORRIS:  One clarification.

3              THE COURT:  Did you all do an order?

4              MS. MORRIS:  We do have a protective order.

5              THE COURT:  Did I enter it?

6              MR. ORSINI:  No, Judge Montali.

7              THE COURT:  Okay.  Fine.  Use that then as a screen.

8    Confidentiality is usually, "Attorneys' Eyes Only."

9              MS. MORRIS:  Could we do "Professional Eyes Only," so

10   we can utilize our experts?

11             THE COURT:  Yes.

12        So that resolves that.  You'll get them all today.

13             MR. ORSINI:  Maybe not today.  We need to put Bates

14   numbers on them.  But you will get them quickly.

15             MR. JULIAN:  Two housekeeping matters, Your Honor.

16             THE COURT:  Yes, please.

17             MR. JULIAN:  First, you asked us if the inverse

18   briefing could be moved up.  We are submitting our letters

19   tomorrow to Judge Montali on that.  It may be possible to move

20   it two weeks up.  Mr. Orsini and I are still talking about

21   that.  We'll submit the letter to Judge Montali on that

22   tomorrow.

23             THE COURT:  When would that be, if it moved up?

24             MR. JULIAN:  Well, our proposal is that the matter be

25   deemed submitted on November 15, if there is no reply brief.

1    If there is a reply brief, on November 22, that it will be

2    deemed submitted on November 22, and that there be no hearing

3    on December 11, because we think it's a rather straightforward

4    legal issue.

5              **THE COURT:**  Okay.

6              **MR. ORSINI:**  From our perspective, Your Honor, we had

7    proposed to have the whole inverse issue decided months ago.

8    TCC opposed that, which is what led us to having the December

9    date.

10         We're willing to speak to Judge Montali on Wednesday --

11   we're before him on other matters -- about whether he can move

12   the hearing up.  We're not willing to forego the hearing at

13   this point.

14             **THE COURT:**  And I am certain you appreciate he has

15   quite a bit to do, as do you.  And if anything can be made to

16   do it earlier, it will make your trial prep a lot easier.

17             **MR. ORSINI:**  Understood.

18             **THE COURT:**  And the second matter?

19             **MR. JULIAN:**  The second matter is the District Court's

20   order withdrawing the reference stating that the case was -- or

21   the estimation was assigned to you provisionally, and that the

22   withdrawal would become permanent, when you ordered it

23   permanent.  I think, by implication, you have, but I wanted to

24   draw that to your attention.

25             **THE COURT:**  Okay.  Consider it permanently withdrawn.

1          **MR. JULIAN:**  Thank you, Your Honor.

2          **THE COURT:**  Anything else?

3          **MR. ORSINI:**  From your perspective, Your Honor, there

4    is the question of the damages questionnaire.  We have

5    discussed this before.  So let me just give you an update as to

6    where we are.

7          We had provided them our extent of damages questionnaire

8    in advance of the hearing on October 6th or 7th, whatever date

9    that was.

10         We have -- we last week gave them a shorter one, trying to

11   reduce the burden.  I believe we cut it in, at least, half.  We

12   have not yet heard back.  I believe Mr. Julian has said they

13   would be prepared to meet and confer on that later this week,

14   which is fine, and we'll have that meet and confer.

15         I do think it's important, however, we get that out so

16   that we have enough time for people to actually respond to it,

17   so that we have enough time to process the data.

18         I'm a little concerned that --

19         **THE COURT:**  How are you going to distribute that?

20         **MR. ORSINI:**  I would expect that a significant amount

21   of it can be distributed through the counsel for the actual

22   victims.  Because many, many of the victims in these cases are

23   represented by lawyers.  Not the TCC, but folks like

24   Mr. Singleton.  There may be some mailing or e-mail involved as

25   well, so we get a representative sample of cross-section here.

1      But it's going to be a process --

2          THE COURT:  It probably should go through counsel.

3  Because this is a tool that's being used for litigation, and a

4  little bit different from -- significantly different, in my

5  mind, from the claims form.

6          MR. ORSINI:  I agree with that.  My only point was, if

7  there are thousands of victims not represented by counsel, we

8  may not want to exclude them from --

9          THE COURT:  There are thousands?

10          MR. ORSINI:  I say "if."  We are still processing the

11  data.  There very well may be.  What we have seen so far, that

12  could be where we end up.

13      But these are obviously the questions we have to tackle:

14  Who do we send it to and how?  I don't know if we're going to

15  have disputes as to what.

16      And, just given the timing, I'm concerned about waiting

17  another two weeks to get those things ironed out.  So, subject

18  to Your Honor's preference and availability, I would ask we set

19  aside some time next week.

20          THE COURT:  I'm starting to think a little bit out

21  loud.

22      How are we going to get people to fill those things out?

23          MR. ORSINI:  Well, I think the Court has to set a

24  deadline.

25      I think, in particular, where they are going out through

lawyers who have duties to this Court, there will be the
ability for the Court to enforce that order and to enforce the
assurance that they are filled out completely and accurately.

There have been, in other bankruptcies, orders that have
been entered that include sanctions for failure to fill out.  I
don't expect we're going to ask for that.  That, obviously,
increases the likelihood that we get them.  But, as I said, I
don't think we're going to ask for that.  But I think it's
going to be a matter of the Court entering a very clear
deadline and holding the lawyers who represent --

THE COURT:  You're expecting plaintiffs' counsel to be
the driver on the questionnaires?

MR. ORSINI:  I'm expecting the plaintiffs' counsel to
work with their clients and actually get them filled out and
get us back what we need to estimate the claims they are
asserting, yes.

THE COURT:  What do you think about that?

MR. JULIAN:  We think that's a good approach, if we do
it.  Again, this is usually a 12 to 16-month process when there
is one injury.  Here we have 22 fires, 22 different types of
injuries within each fire.

So we know they can be helpful, and so we are meeting with
the plaintiffs' lawyers and economist later this week to see if
we can pare it down.  Because, obviously, if it's one page,
something could be done in two months, which is what they want.

1    Actually, they want it in done in a month so the experts

2 can have it in a month.  Your Honor, one month to fill it out

3 and one month for expert review is unheard of in these cases.

4    We're going to work with Mr. Orsini, we're going to work

5 with the plaintiffs' lawyers to try to pare that down to

6 something that's reasonable, and talk about the process to get

7 it out.

8         THE COURT:  Well, we're obviously not dealing with the

9 strictest standard of proof.  This is an estimation.  We have

10 talked about that many times.  Nevertheless, I need to feel

11 comfortable that I have a representative set of survey

12 responses.  So it has to be more than, you know, 100 folks.

13 It's going to have to be a critical mass that gives me the

14 assurance that they, more or less -- more or less, not exactly,

15 but more or less -- represent the world as it is.  Okay?  So

16 that's going to be the task.

17         MR. ORSINI:  We agree with that, Your Honor.

18         THE COURT:  That's going to be a lot of work to do.

19    Now, Mr. Orsini, would like to finish the questionnaire.

20 When can you get that done?

21         MR. JULIAN:  We think we can get back to him this

22 Friday.

23         THE COURT:  By Friday?

24         MR. JULIAN:  Yeah.

25         THE COURT:  Okay.  Is that good?

1          **MR. ORSINI:**  That's good, Your Honor.

2      I would ask, if Your Honor is available, whether we can

3  set some time aside next week to come in if we have disputes,

4  just because I think, if we wait another two weeks, and then

5  Your Honor is going to have to parse through them.  Then we're

6  going to have to go through the process of getting them out.

7  Time does matter here.

8          **THE COURT:**  Well, why don't we tentatively plan for

9  2:00 on Monday.  Okay?  Is that enough time?  Do you want to do

10  it Tuesday?

11          **MR. JULIAN:**  I'm not here, but we have partners who

12  can appear for us.

13          **THE COURT:**  We have a lot of people in the courtroom.

14          **MR. JULIAN:**  Yes, we do.

15          **THE COURT:**  Okay.  Let's do it at 1:00 on Monday.  I

16  have a pretrial conference at 2.  If you don't need it, just

17  drop me a line.  All right?  Just tell me we don't need to come

18  in.  Otherwise, I will see you here for the questionnaire.

19  Okay.

20          **MR. ORSINI:**  Thank you, Your Honor.

21          **THE COURT:**  Now, it seems to me, this is productive.

22  This is an experiment.  I do this in my MDLs and other cases,

23  as I mentioned.  And I'll do this until you all agree you don't

24  want to do it anymore.  We can keep on two weeks, next week

25  being the interim exception.

1       Anything else?  Any discovery issues?

2            **MR. JULIAN:**  May I file a copy of our motion to extend

3    the bar date with the Court so you may see it?

4            **THE COURT:**  Sure.  Yes.

5       Yes?

6            **MR. SINGLETON:**  Thank you, Your Honor.  Gerald

7    Singleton.

8       Very brief issue I want to raise with the Court and ask

9    for the Court's guidance.

10      We're having an issue with Prime Clerk.

11           **THE COURT:**  What?

12           **MR. SINGLETON:**  We're having an issue with

13   Prime Clerk, which is the mechanism through which we file the

14   proofs of claim.  And because it relates to numbers of

15   estimation, I wanted to ask the Court if the Court want us to

16   address it with Your Honor or take it to Judge Montali.

17      In a nutshell, here is the issue:  When you file a proof

18   of claim on behalf of a claimant, there are problems with

19   either withdrawing it, in the event someone changes their minds

20   and wants it withdrawn, or, two -- and this is, by far, more

21   common -- things are filed duplicatively.

22      And there are a lot of reasons for that.  It has to do

23   with the system through which this data is processed and --

24   but, in our assessment, over the weekend, when we were filing

25   and looking at it, we found a number of duplicative claims.  A

1    significant number.

2          **THE COURT:**  More than one claim for one person?

3          **MR. SINGLETON:**  Yes, sir.

4          **THE COURT:**  They accidentally hit the file button --

5          **MR. SINGLETON:**  Not so much hitting "file" but

6    sometimes things are submitted as a part of the subrogation

7    insurance data and sometimes individually --

8          **THE COURT:**  I see.

9          **MR. SINGLETON:**  So the concern we have is, we asked

10   Prime Clerk about consolidating these so there was only one,

11   and we were not able to get a responsive answer.

12         **THE COURT:**  So sounds like a bankruptcy thing.  I have

13   no idea what Prime Clerk is, but this is a third-party vendor?

14         **MR. SINGLETON:**  It is.  I just want to know if Your

15   Honor wants to --

16         **THE COURT:**  Why do they refuse to fix it?

17         **MR. SINGLETON:**  My understanding is they have a system

18   in place and they are not generally used to filings of this

19   size.  So I think this might be an unusual circumstance for

20   them.

21      Plus, they are getting inundated.  There have been tens of

22   thousands filed within the last two weeks.  So I completely

23   understand Prime Clerk's issue.

24      We're just concerned because what we don't want is to have

25   duplicative claims presenting the parties and the Court with an

1   inaccurate report of the total number of claimants.

2        THE COURT:  You all just can't de-dupe?  In class

3   actions, the class administrators do this all the time.  It's

4   all automated.  I'm sure you both know, probably.

5        So they can't do the same thing?

6        MR. SINGLETON:  We have been told no.  And that's

7   something that we're trying to work out.  But I wanted to raise

8   this issue with the Court.  And we can raise it with

9   Judge Montali if it continues.

10       I just wanted to know:  Does the Court want us to bring

11  this to Your Honor, or something we should address with

12  Judge Montali.

13       THE COURT:  Sounds to me, in the first instance, it's

14  going to be the bankruptcy court.  But if anything changes it's

15  something else -- I hear what you're saying and we're going to

16  have to -- if it turns out that it's raising the claims rate by

17  a significant margin, we'll have to address it.  If it's

18  plus-or-minus 3 or 5 percent, I'm not going to get terribly

19  hung up on it.  If it's plus-or-minus 30 percent, we're going

20  to have to take a look at it.

21       MR. ORSINI:  I think -- Kevin Orsini for the debtor.

22       I think it's more complicated because we plainly agree

23  with Mr. Singleton.  None of us want duplicative claims.  There

24  is a lot of manual work that has to be done to aggregate claims

25  that are not duplicative.  So if I was living in a home with my

wife, we lost the home, both fled the fire, sometimes that
comes in as one claim associated with the address, sometimes it
comes in as two.  That contributes to something that looks like
duplication, and may not be.

I'm going to get so far over my skis here I will
immediately fall if I start talking about what Prime Clerk can
and can't do.  But we are attuned to the fact there is noise in
the data in terms of duplicates and those --

**THE COURT:**  One thought -- and it's going to be
expensive and I don't necessarily recommend it -- but one
thought, and I'm sure you have had it too.  If you just got --
it's probably a SQL database.  If you got that and gave it to
someone who knows how to do it, you can get it automated.  It's
not an insurmountable problem.

Maybe there is something about Prime Clerk I'm not
appreciating.  But this happens all the time in, admittedly,
less complicated domains, but happens all the time in class
cases.  And you can do it electronically.

You may have to do something to get the database all set.

**MR. ORSINI:**  There has been the lot of work done over
the last few days.  You have heard Mr. Skikos' name mentioned.
He is one of the plaintiffs' lawyers who has been managing a
database they created that was being ported over to
Prime Clerk.  And there have been multiple, you know,
multi-daily conversations about how to make that work, so --

1    **THE COURT:**  What I would do, and it's totally up to

2    you, but I would get some sense of magnitude.  As I said,

3    frankly, just you pick an arbitrary number.  If it's less than

4    10 percent, I'm not going to be bothered by it.  If it looks

5    like it's larger and skewing things one way or the other, we're

6    going to have to deal with it.  It may be simple as you just

7    give me a number and say, "We have 100,000 claims.  We believe

8    20 percent of those are probably duplicative and so we'll work

9    with a set of 80."

10    **MR. ORSINI:**  I think we'll be able to do better than

11    that for Your Honor, but understood.

12    **THE COURT:**  Is that good?

13    **MR. SINGLETON:**  Thank you, Your Honor.

14    **THE COURT:**  Anything else on behalf of anyone?

15    **MR. JULIAN:**  No, Your Honor.

16    **THE COURT:**  I'll see you Monday at 1:00.

17    (Proceedings adjourned at 2:47 p.m.)

18    ---o0o---

19

20

21

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Tuesday, October 22nd, 2019

_____

Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court