Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE: PG&E CORPORATION and      )
PACIFIC GAS AND ELECTRIC         )
COMPANY,                         )
                                 )
            Debtors.             )      **NO. 19-05257 JD**
                                 )
_____  )

                        San Francisco, California
                        Monday, October 28, 2019

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Creditor Committee Official Committee of Tort Claimants:

                BAKER & HOSTETLER LLP
                Levi's Plaza
                1160 Battery Street East - Suite 100
                San Francisco, California  94111
            BY: **KIMBERLY S. MORRIS, ATTORNEY AT LAW**

For Ad Hoc Group of Subrogation Claim Holders:

                WILLKIE, FARR & GALLAGHER LLP
                878 Seventh Avenue
                New York, New York  10019
            BY: **BENJAMIN P. MCCALLEN, ATTORNEY AT LAW**

For JCCP Plaintiffs:
                SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
                One Sansome Street - Suite 2830
                San Francisco, California  94104
            BY: **STEVEN J. SKIKOS, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, RPR, CRR
              Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2

 3   For 4000-Plus Fire Creditors:

 4                         COREY, LUZAICH, DE GHETALDI & RIDDLE LLP
                           700 El Camino Real
 5                         P. O. Box 669
                           Millbrae, California  94030
 6              BY:  AMANDA L. RIDDLE, ATTORNEY AT LAW

 7

 8   For Creditor Committee Official Committee of Unsecured
     Creditors:

 9                         MILBANK, TWEED, HADLEY & MCCLOY LLP
                           1850 K Street, N.W. Suite 100
10                         Washington, D.C.  20006
                BY:  ANDREW LEBLANC, ATTORNEY AT LAW
11

12   For Fire Victims:
                           WALKUP, MELODIA, KELLY & SCHOENBERGER PC
13                         650 California Street - 26th Floor
                           San Francisco, California  94108
14              BY:  KHALDOUN BAGHDADI, ATTORNEY AT LAW

15

16   For Ad Hoc Bondholder Committee:

17                         AKIN, GUMP, STRAUSS, HAUER
                           & FELD LLP
18                         580 California Street
                           San Francisco, California  94104
19              BY:  ASHLEY VINSON CRAWFORD, ATTORNEY AT LAW

20

21

22

23

24

25
```

**APPEARANCES**:   (CONTINUED)


For Debtor-in-Possession PG&E Corporation:

                        CRAVATH, SWAINE & MOORE LLP
                        825 Eighth Avenue
                        New York, New York  10019
            BY:  **KEVIN ORSINI, ATTORNEY AT LAW**
                 **TIMOTHY G. CAMERON, ATTORNEY AT LAW**

<u>**Monday - October 28, 2019**</u>                              <u>**1:00 p.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---oOo---**

    **THE CLERK:**  Calling Civil 19-5257, In Re: PG&E
Corporation and Pacific Gas & Electric Company.

    Counsel, please state your appearances for the record.

    **MS. MORRIS:**  Kimberly Morris --

    **THE CLERK:**  Please come forward to the microphones,
thank you.

    **MS. MORRIS:**  Kimberly Morris of Baker Hostetler on
behalf of the Official Committee of Tort Claimants.

    **MR. McCALLEN:**  Good afternoon, Your Honor, Benjamin
McCallen, Willkie Farr & Gallagher on behalf of the Ad Hoc
Subrogation Group.

    **MR. BAGHDADI:**  Good afternoon, Your Honor, Khaldoun
Baghdadi, co-liaison counsel in the State court JCCP
proceedings.  And with me in court is also Mr. Steven Skikos,
also co-liaison in the same proceedings.

    **MR. ORSINI:**  Good afternoon, Your Honor, Kevin Orsini,
Cravath, Swaine & Moore, on behalf of debtors.  Also here with
me is my partner, Tim Cameron, who will handle a significant
portion of the argument today.

    **THE COURT:**  I'm sorry.

    **MR. ORSINI:**  He will handle a significant portion of
the discussion today.  I just have some preliminary remarks and

1   then I will cede the podium.

2           **THE COURT:**  Well, let's see.  Who is going to

3   represent the Plaintiffs' side?

4           **MS. MORRIS:**  I will, Your Honor.

5           **THE COURT:**  Ms. Morris, okay.  All right.  Go ahead.

6           **MR. ORSINI:**  So, Your Honor, I thought just at the

7   outset -- and then I will cede the podium -- I just wanted to

8   give the Court an update on a couple of the issues we discussed

9   when we were here last week, where we stand with respect to

10  claims coming in and the Bar Date because I do think it is

11  relevant to the question of sampling.

12      We have been pleased to see that there has been a

13  significant increase as we have processing -- been processing

14  the claims above the participation rates that we were initially

15  seeing.

16      Just to give the Court a sense as to where we are right

17  now, as of October 21st, which was the Bar Date, there were

18  approximately 45,000 claims related to the wildfires that have

19  been processed by the vendor who is taking all these in under

20  the Bankruptcy Court order.  There is approximately 20- to

21  25,000 claims that were submitted in paper that are still being

22  processed.  So we don't quite know what is in those yet.  We

23  just know they exist.  So our expectation is we will wind up

24  with somewhere in the range of 70,000 to 80,000 wildfire

25  claims.  Now, that --

             **THE COURT:**  Well, that sounds good but out of how

many --

             **MR. ORSINI:**  Well, that begs the question, right, what

percentage participation is that?  And there are different ways

to look at that because -- as I think Mr. Singleton was noting

when he was here last week -- there are some duplicates.  There

are also circumstances where -- let's say that I had owned a

piece of property in the Town of Paradise, and I had a house

that burned down and I lived there with my wife and my child,

in some instances we will have three claims associated with

that piece of property.

      So I think what all sides have been undertaking including

to prepare for estimation is to try and make heads or tails of

what we actually have in terms of participation.  One way to

look at it is to try to map all of the claims that have come in

to pieces of property that have structures that Cal Fire

identified as being damaged or destroyed during the fires.

      We still have 25,000 claims to process, but what we have

seen so far -- and these are rough numbers because it is a

rough analysis -- but what we have seen so far is there appear

in the Camp Fire, for example, to be claims associated with

roughly 70 percent of the addresses that Cal Fire identified as

having a damaged or destroyed property.

      Now, I expect that number will go up as we process the

rest of the claims.  I don't know by how much.  Another way to

1  look at it is people.  We have done an analysis of how many --

2          **THE COURT:**  That's just for the Camp Fire?

3          **MR. ORSINI:**  That was for Camp.  For Tubbs we are

4  seeing numbers that are roughly in the same range.  For the

5  non-Tubbs North Bay fires it can fluctuate based on the

6  individual fire from a low of roughly 50 percent to one I think

7  is closer to 80 percent.

8          In terms of people, we looked at the Town of Paradise by

9  way of example.  Prior to the fires, the census count was

10  roughly 26,000 residents.  Our rough analysis so far -- and we

11  still haven't processed those claims I talked about -- so far

12  we see claims by roughly 20,000 people who say they lived in

13  the Town of Paradise prior to the Camp Fire.  So high

14  70 percent.

15          With all that in mind, we do agree with the Court that we

16  would like as many Claimants who have valid claims in their

17  mind to submit claims in time.  So we considered the issue

18  further.  We notified the TCC this morning that we are amenable

19  to an extension of the Bar Date by two months to bring it from

20  October 21st to December 20th, which I think is the Friday.  We

21  considered going longer.

22          The reason, candidly, we stuck with December 20th as a

23  proposal is we think that will already challenge our ability to

24  incorporate all of the data into the estimation process given

25  our schedule, but we have a lot of professionals.  We can make

1    it happen.  Our concern is if you push it out too much further

2    than that, it will challenge our ability for the experts to get

3    that processed in time so that it can be included in rebuttal

4    reports, in depositions, so each side has an opportunity to

5    consider that.

6         Of course, if claims come in after December 20th Bar

7    Date -- just like if claims have come in since October 21st --

8    we will consider those, and I can represent to the Court that

9    from the Debtors' perspective, we will be very open to allowing

10   those untimely claims.  We don't intend to use the Bar Date

11   and --

12        THE COURT:  Let me just pause.  So, Ms. Morris, 12/20,

13   does that sound better?  Is everybody happy with that on

14   Plaintiffs' side?

15        MS. MORRIS:  Your Honor, we just received this

16   position of the Debtors just before this hearing today.  And so

17   we are still processing it internally.  We are happy to hear

18   that they are open to some extension, but we will discuss it on

19   our side; and I believe we are meeting and conferring on this

20   right after this hearing today.

21        MR. ORSINI:  Including to work out the logistics, Your

22   Honor.

23        THE COURT:  It is good news, right?

24        MS. MORRIS:  Yes, it is good news that they are

25   agreeing to an extension.  Our Bar Date motion had sought two

1    alternative dates for a Bar Date, and I think we are going to

2    discuss all of the issues including --

3          THE COURT:  Which dates did you propose?

4          MS. MORRIS:  I believe the date was an alternative

5    date was the December 20th date, which they have agreed to, and

6    I believe the first date that we had asked for was a January

7    date; but I would have to go back and look at that.

8          THE COURT:  And there -- if you two agree, then

9    bankruptcy court is not going to have a problem with that as

10   far as you know.

11         MR. ORSINI:  We wouldn't expect the Court would have a

12   problem with that.  That is part of the reason we will meet and

13   confer.  We have a motion that is calendared up for a hearing

14   in mid-November, I believe; but hopefully we can stipulate to

15   this.

16         THE COURT:  It sounds like at a minimum it would be

17   December 20th.  You all may ask for something longer.  I take

18   it your next date is down the road from December 20th.  But

19   that's good news.  Okay.  I'm happy to hear that.  I hope the

20   percentage rate is as high as 70 as a base and will only go up.

21   Time will tell.

22         I understand, Mr. Orsini, what you are saying; but I think

23   we ought to be able to do 90 percent or more.  That should be

24   realistic in a case like this.  So I hope we get to that point,

25   and I think the extension of the deadline is going to help with

1   that.

2      Now, what about the new fires?  What are we thinking about

3   in terms of estimation impact, Ms. Morris?

4         **MR. ORSINI:**  So with respect to --

5         **THE COURT:**  Let me start with Ms. Morris.

6         **MS. MORRIS:**  Your Honor, the treatment of the claims

7   that have arisen in connection with the Kincade and the other

8   fires from this weekend, claims that have already arisen or

9   that may arise in connection with those fires, their treatment

10   of the bankruptcy process, we need to confer with the various

11   constituents in the bankruptcy on that; the debtors, the UCC,

12   all the constituents in the case.  And so we intend to do that

13   and report back to Your Honor as to its effect on estimation

14   after we have had a chance to do that.

15         **THE COURT:**  But the more -- the baseline proposition

16   is that -- are you going to ask for that to be included in the

17   estimation?

18         **MS. MORRIS:**  I think there are a number of issues that

19   affect the bankruptcy case as a whole.  We are not prepared to

20   address that issue today.  It is under consideration, and we

21   will address it with all the parties and then come back to

22   Your Honor when we are prepared to address it after we have a

23   chance to consider it.

24         **THE COURT:**  Mr. Orsini?

25         **MR. ORSINI:**  We too are in the process of assessing

1  how that might play into the bankruptcy proceedings.

2      The Kincade fire as well as the others are still under

3  investigation in terms of actual causation; but even putting

4  that aside, the question is to how that interplays with the

5  estimation proceedings is something we are still discussing on

6  our side too if it does turn out to be --

7                  **THE COURT:**  When are you --

8                  **MS. MORRIS:**  We are looking at the issue now, and we

9  hope to be back before Your Honor with the recommendation as to

10  how to do that as soon as possible; possibly even by the next

11  hearing.  We do need to confer with the other constituents in

12  the bankruptcy.

13                  **THE COURT:**  That sounds fine, okay.

14      Okay.  Let's talk about the questionnaire.

15                  **MR. ORSINI:**  At this point I will cede the podium to

16  Mr. Cameron.

17                  **MR. CAMERON:**  Afternoon, Your Honor.

18                  **THE COURT:**  Afternoon.  So I still like the idea in

19  concept.  I just think we are about a million miles away from

20  making this work.

21      Let me just tell you what my concerns are, okay.  I know

22  you have put work into this.  This is not meant to be -- this

23  is observational, not critical.  But as I said on several

24  occasions, this is informed in part by my long experience in

25  Rule 23 class action cases, which are roughly analogous, not

perfect but they do offer some good guidelines.  So this will
sound more critical than it is.

Here are my observations:  The form is just not workable.
It is legalese.  It is intimidating.  It is confusing.  I can
barely get through it.  Some of the definitions look like --
some of the questions look like they were definitions of
elements pulled out of a case or out of a statute.  It was not
at all user-friendly.  It was nothing that I would even be
tempted to fill out if I were a victim.  I mean, there are just
a number -- just the whole thing is just unreadable and
unfriendly to start with.

Second thing is if I got this in the mail, I would have no
idea what I was supposed to do with it.  I just filed a claim
form, hypothetically.  Now I'm getting this.  There is no
explanation about what this thing is.  Did I not file my claim
form properly?  Is this part of the claim process?  If I fill
this out, do I get money?  I mean, there are just a whole host
of questions that an average fire victim is going to need
answers to before they pick up their pen or pick up their
keyboard and start answering any of this.

The return process is a mystery to me.  I don't know who
BrownGreer or Green, whatever that company is.  But, you know,
you all came in last week, the last time I saw you, and said
Prime Clerk -- is that that bank?

MR. CAMERON:  That's right, Judge.

1          **THE COURT:**  Prime Clerk was a disaster on wheels and

2    now Prime Clerk is being offered as the baseline for processing

3    of all these applications.  So I don't get that either.  There

4    is a big disconnect there.

5          I didn't see any basic information like are you going to

6    send this out with a self-addressed stamped envelope for people

7    over a certain age who don't use computers, and how is it going

8    to get back in, e-mail.

9          This is a very long-winded way of saying I'm not sure it

10   is worth the effort anymore.  I think you are all going to

11   spend too much time and money.  Too much time and money has

12   already been spent arguably but even more running this thing

13   down.

14         Here is my proposal:  Just drop all of this, and let's

15   just take the claim forms and use that and harvest as much

16   information you can get from the claim forms.  I have what I

17   think is a copy of the claim form, and it is -- you know, first

18   of all, it is one page, which is what it should be for the

19   questionnaire or a page and a half at the most -- but it says

20   in very simple terms "here is what I lost," okay.

21         Why don't we just build off of that?  That is all I need.

22   This is just an estimation.  I don't need anything else.  I

23   don't need doctor's opinions.  I don't need the names of the

24   kids and all the other stuff that the questionnaire proposed to

25   answer.  Is there any reason we can't just -- you-all just take

 1   this questionnaire; have at it in terms of data extraction and

 2   put together some reasonable numbers.  How about that,

 3   Ms. Morris?

 4       **MS. MORRIS:**  We are fine with that process,

 5   Your Honor.  And just for the Court's information, I would like

 6   to let you know that there is -- the BrownGreer database that

 7   you just referenced, that is a database that was jointly built

 8   by the Debtors and the North Bay fire victims counsel in the

 9   underlying North Bay proceeding before PG&E filed for

10   bankruptcy.  The Plaintiffs' lawyers were populating that --

11       **THE COURT:**  BrownGreer is a database?

12       **MS. MORRIS:**  It is a database of claims related

13   information relating to the various constituents.  It has over

14   200 data points, and there are roughly 50,000 wildfire claims

15   associated with that database; and the lawyers for the victims

16   have been populating that database with a significant amount of

17   information.

18       Mr. Skikos is here because he was the appointed person in

19   the JCC proceeding, the appointed lawyer, to oversee the

20   administration of that database with BrownGreer.  It offers a

21   significant amount of additional information for the Debtors.

22   I just wanted to make you aware of that database, and the

23   Debtors now have access to that database or the information in

24   that database by virtue of an agreement we reached with them in

25   the bankruptcy case.

1          **THE COURT:**  They have free roaming to the database?

2          **MS. MORRIS:**  To the data in the database, yes.

3          **THE COURT:**  But the -- my initial proposal is at least

4     start with the claim form.  Plaintiffs are okay with that?

5     Claimants are okay with that?

6          **MS. MORRIS:**  We are fine with that, Your Honor.

7          **THE COURT:**  Mr. Cameron.

8          **MR. CAMERON:**  Your Honor, I would like to try to

9     persuade the Court for us to consider this issue of a

10    questionnaire again.

11         When the proof of claim was originally designed, it was

12    not -- we knew at that time that additional information would

13    be required for estimation.  It doesn't have, for example, a

14    breakdown or any additional information on particularly the

15    important categories of damages such as things like emotional

16    distress and what people experienced.  Those are going to be

17    very significant categories of damages that we try to estimate.

18    And the proof of claim form does not enable us to do that.

19         I completely hear, Your Honor, when you say that the --

20    your concerns regarding the questionnaire.  I think we can fix

21    those.

22         **THE COURT:**  The claim forms says:  Were you injured,

23    yes or no.  If yes, please describe.  Why wouldn't someone put

24    down there, I haven't been able to sleep or I have been

25    depressed or --

 1          **MR. CAMERON:**  And that is exactly what we would be

 2  asking for in the questionnaire.  The proof of claims form

 3  doesn't have that information.

 4          **THE COURT:**  It does.  It is the claim form I am

 5  reading from.  It is right under total amount claim, the next

 6  question is:  Were you injured, yes or no.  If yes, please

 7  describe.

 8          **MR. CAMERON:**  My understanding, Your Honor, is that we

 9  don't -- and this is my understanding on what we have seen so

10  far -- is that it does not have the type of information that

11  will help us for estimation purposes.

12          **THE COURT:**  I don't understand that.  I'm looking --

13  look, this is -- I'm looking at something called the claim

14  form.  Do you see that?

15          **MR. CAMERON:**  I see that.

16          **THE COURT:**  Right, Mr. Cameron?

17          **MR. CAMERON:**  Yes.

18          **THE COURT:**  It says:  Description of incident,

19  property damage, food spoilage, were you injured, other losses.

20  What more do we need?

21          **MR. CAMERON:**  I understand --

22          **THE COURT:**  Total amount claimed.  What is missing for

23  estimation --

24          **MR. CAMERON:**  Your Honor, what I was trying to say is

25  that very few of those forms have that information completed.

```
 1   That was one of the things that made us realize that a
 2   questionnaire was necessary in order to help flush out this
 3   information.  The claims --
 4           THE COURT:  Say that again.
 5           MR. CAMERON:  A number of the proof of claims forms do
 6   not have that filled in.  People have not filled in that
 7   information to help us understand more --
 8           THE COURT:  How does that work if someone just put
 9   their name and address on a claim form?
10           MR. CAMERON:  People have checked boxes but not
11   necessarily explained what happened to them or explained the
12   type of emotional distress that they are suffering.
13       Your Honor, I believe that we can make this questionnaire
14   work.  It is an opportunity for Claimants to have their voice
15   heard in this proceeding beyond the claim forms.  I think we
16   can make it plain and simple English.  We can try to do this
17   within 24 hours so that we don't lose time.  The current
18   timetable suggests that we would send this out by October 30,
19   and we have proposed -- again, to give more people time to
20   respond -- that the response date be December 6th.
21       This is five weeks of time, Your Honor, that we have and I
22   think we can use; and it is a chance for Claimants to give us
23   more information about what happened to them in these wildfires
24   that will help us estimate losses as part of the estimation
25   hearing in February.  The proof of claim forms respectfully,
```

Your Honor, are not themselves sufficient in terms of estimating some of these categories of damages that we have tried to address in the questionnaire.

**THE COURT:**  I guess I'm not following something.  If somebody submits this claim form to the bankruptcy court, and says, I'm claiming $5,000, they are only eligible for a claim of being paid between zero and $5,000; right?

**MR. CAMERON:**  That's the proof of claim, absolutely.

**THE COURT:**  Okay.  So then they are locked in.  So they can't come back and say, Oh, I had $10,000 of mental health counseling.  I just didn't put it on the form.  They have blown that; right?

**MR. CAMERON:**  I understand.  What we are trying to actually understand is what is behind that number.  Is -- you know, is -- what informs that estimate they have made for something like emotional distress.  That's a very important part of this process as we seek to actually estimate what really is the value of these individual claims.

**THE COURT:**  I'm sorry.  I'm not really understanding as -- I am estimating what PG&E may have to account for through the bankruptcy process; right?

**MR. CAMERON:**  Yes, Your Honor.

**THE COURT:**  Not the Tubbs process.  Whatever happens in State court happens in State court.  I'm not -- that is carved out.  I have nothing to do with that.  That is in the

 1   hands of my State court colleagues as it should be.

 2        So now, I'm trying to estimate what the total amount of

 3   money would be that should be allocated or might be allocated

 4   as an estimate in the bankruptcy proceedings.  We had this

 5   wonderful set of claims where people put down an actual dollar

 6   figure.

 7              MR. CAMERON:  And --

 8              THE COURT:  And what difference does it make if they

 9   say it is because I lost my car or I have been depressed?  They

10   have a dollar figure.  Why isn't that enough?

11              MR. CAMERON:  Your Honor, they often don't and that is

12   the problem.  I have an example of a form right here.

13              THE COURT:  What happens in bankruptcy if you submit a

14   form without a dollar figure?

15              MR. CAMERON:  The proof of claim form says you have to

16   indicate the categories of damages you are claiming, and then

17   it says how much of the claim, dollar sign optional or unknown

18   to be determined at a later date.  So that's part of the

19   estimation process for people that haven't given us this

20   information or haven't broken it down.  That's what we are

21   trying to estimate, and that's what the questionnaire will help

22   us answer.

23              THE COURT:  Ms. Morris?

24              MS. MORRIS:  Your Honor, we had a number of the same

25   concerns that you had with the timeframe in which we are

1  allowed to accomplish this.  Especially in light of recent

2  events -- I know we are putting off the impact of Kincade on

3  the bankruptcy process off to a later date -- but as least with

4  respect to the questionnaire, it is a significant issue.  Up

5  until just yesterday afternoon the Debtors weren't pushing back

6  the response date.  They have gone from three and a half weeks

7  to five weeks.  Unfortunately, a number of the people that

8  would respond to this questionnaire are in the dark without

9  access to their computer or evacuated from their homes which

10 poses additional complications.

11     We understood that Your Honor thought this might be a

12 helpful data point.  We tried to work with the Debtors to come

13 up with a claim form.

14     I want to raise one issue for, Your Honor.  The Debtors

15 are saying that they are most focused on emotional distress;

16 yet, the very questions that we added into the claim -- the

17 form are the ones that they are not agreeing to, about whether

18 or not you have lost sleep, about whether or not you are having

19 nightmares, about whether or not you are experiencing the

20 symptoms of emotional distress.  Those are the questions they

21 have not agreed to include in the form that we suggested be

22 part of the form because they are the same questions asked by

23 the Center For Disease Control or the same questions that are

24 asked by the National Institute For Post-Traumatic Stress

25 Disorder.  Those are the questions they don't want to include

 1    in the claim form.

 2        So, Your Honor, if we had an additional amount of time,

 3    then I think that this would be -- could be a helpful process.

 4    But given the timeframe that we have, we tried to create a form

 5    with them that we thought was workable and a process, more

 6    importantly, that we thought was workable.  And in order to

 7    accomplish this claim form or any sort -- I'm sorry -- this

 8    questionnaire or any sort of questionnaire in the timeframe

 9    that we have here -- a timeframe that is usually months if not

10    years in mass tort bankruptcies -- we need to involve the

11    Plaintiffs' counsel.  And I have conferred extensively with

12    Plaintiffs' counsel on a process by which we could get that

13    done.

14        Unfortunately, as you mentioned, we are miles apart on

15    portions of that process.  One, just by way of example, is

16    whether or not this questionnaire can be used as a basis for a

17    claims objection in the bankruptcy process or used against them

18    in a subsequent litigation.  We propose that it be limited for

19    purposes of estimation, and the Debtors have not agreed to

20    that.  Another is whether it can be sent to unrepresented

21    Claimants, and they have not agreed to that.  So,

22    unfortunately, we are far apart on process.

23        THE COURT:  Well, let's go back to first principles.

24    I'm charged with estimating the potential liability.  That's

25    it.  Not putting the finest possible engineering or scientific

1   point on that.

2       This questionnaire is useful to me only if the following

3   goals are achieved:  One, a statistically significant number of

4   people respond.  All right.  First of all, I don't think 500 is

5   going to be nearly enough.  Whether 5,000 is, I don't know.

6   My -- as I said earlier, the way the form currently stands, I

7   think you are going to get zero.  Nobody is going to fill this

8   out.  It is not a liveable/workable form for most people.

9       So I need to get a statistically significant response, and

10  it has to be useful to me.  It sounds to me like the only thing

11  that you-all are worried about -- and I have an interest in it

12  as well -- is people putting some value, to the extent that

13  they can, on the non-physical injuries, mental health and

14  emotional distress as a data point.  That's about it.  I mean,

15  I think property damage -- claim form is more than enough for

16  that.

17      I also -- I am sympathetic to the idea that this form --

18  I'm not saying who might do it -- but this form is not going to

19  be a sword against the people who are filling it out.  It is

20  just not going to be.  This is not a confession.  This is an

21  information point.

22      So if you-all want to pursue this, you can certainly do

23  that.  I'm not going to stop you from doing that.  In my view,

24  you ought to be basing your analysis, first, on this giant

25  database that the bankruptcy court has put together called

Prime Clerk; then if there is a supplement that the Plaintiffs have, that ought to be used as well.  If you want to do a supplement to that in terms of a very straightforward claims form, that is fine with me as long as you-all agree on it.

It is going to have to go out soon, and it is going to have to be plain and simple; and I am very sympathetic to the idea that it is to be used purely for the Court's assistance in the estimation process and not in any other capacity.  I don't want this to be a litigation dispute point between Counsel.  I don't want this to be in any way used against any of the Claimants.

So to that end, I think that has a couple of ramifications.  One, it is usable only here and here only and two, it goes to everybody, not filtered by lawyers, all right. There is no need for any lawyer filtering.  You just send it out to every potential person you can reach by e-mail, by U.S. mail, by depositories on-site with written copies at the FEMA housing centers, at community support centers.  You have hard copies.  You have electronic copies.  You have mail copies and anything else you can come up with and you get the word out.

I would also imagine that people with clients would make sure that their clients had a copy of it and could fill it out, all right.

       **MS. MORRIS:**  Your Honor, if I may address that point.

       **THE COURT:**  Yes.

1          **MS. MORRIS:**  Sending out a mass questionnaire like

2    this to all of the wildfire Claimants and asking that it be

3    responded to within five weeks and then expecting that the

4    parties can even use whatever comes back in a one-week

5    timeframe before the submission of expert reports, I think is

6    going to create a tremendous and most likely unworkable burden

7    for the Plaintiffs' lawyers.

8          We proposed a process by which we thought we could get a

9    usable set of data working with the Plaintiffs' lawyers.  But

10   sending it out to a vast number of people and everyone at this

11   point will inundate the Plaintiffs' lawyers with the concerning

12   phone calls that you, yourself, mentioned just a moment ago by

13   clients who have no idea why they are getting this form --

14          **THE COURT:**  Obviously this has to be accompanied by --

15   in every class settlement, there are FAQs.  Why am I getting

16   this form?  They are literally labeled that way.  Why am I

17   getting this form?  How does this relate to the claim form?

18   Why should I fill this out?  Who do I call if I have any

19   questions?  That is going to have to be there.

20          In fact, the claim form itself had -- it looks like it had

21   a back page that had similar information on it.  So, look, if

22   it doesn't work, it doesn't work.  It is entirely up to you.

23   If you do this and you get twenty people responding, I'm not

24   going to use it.  It is just non-usable to me.  If you get 200,

25   that is probably also not going to be enough.  We will see.  I

1   don't know.  Once you get in triple and quadruple digits, my

2   interest will go up.

3        If you get a lot of responses and you need some more time

4   to process them, we will accommodate that.  We are going to

5   change dates.  Nothing is carved in stone.  This is -- we are

6   all moving together in a fast car.  So that's just the way it

7   is going to have to be.  We will have to play it by ear and see

8   how it goes.  Don't get hung up on one week here or one week

9   there.  I have complete control to alter that if it needs to be

10  longer.

11          MS. MORRIS:  Your Honor, if I may address two points.

12          THE COURT:  Yes.

13          MS. MORRIS:  One is I would like to defer to

14  Mr. Baghdadi, who is co-liaison counsel for the JCC process,

15  who can explain to Your Honor the impact of sending out a mass

16  questionnaire such as this to a number of the Claimants or all

17  the Claimants, a number of whom have only recently submitted

18  their claim and who --

19          THE COURT:  Let me just cut to the chase.  If you

20  don't want to do it on the Plaintiffs' side, that's fine.  We

21  won't do it.  You have got to make a call.  Yes, we are going

22  to do or no, we don't want to do it.  Don't tell me:  Oh, there

23  are 15,000 reasons not to do it; but we are kind of on the loop

24  with doing it.  You need to take a position.  Ms. Morris, if

25  you don't want to do it, you don't have to do it.  We are fine.

 1   We don't have to do it.

 2          **MS. MORRIS:**  The position is that we attempted to

 3   create a process that was workable; but unfortunately, we don't

 4   think we are there with the process.  I don't think we can do

 5   that.

 6          **THE COURT:**  No questionnaire will be filed.

 7          **MR. CAMERON:**  I just want to respond to -- obviously,

 8   it was never anyone's intentions to use the responses against

 9   anybody.

10          **THE COURT:**  I prefaced that by saying -- I understand

11   that.

12          **MR. CAMERON:**  We were asked to --

13          **THE COURT:**  Computations arise at various times -- I

14   can rule at times -- wrong branch.

15          **MR. CAMERON:**  It's important --

16          **THE COURT:**  I can order against it, okay.

17          **MR. CAMERON:**  I understand, but that was never

18   anyone's intention.

19          **THE COURT:**  I'm not suggesting it was.  Plaintiffs

20   don't want to do it so I can't -- right now it is total ground

21   zero.  The form I got is, in my view, completely unworkable.

22   So unless there is two to tango, there won't be a dance, okay.

23        So if there is not enough information for me to ballpark

24   emotional distress, then there is just not and that will be the

25   consequence.  So I will work with the data you-all tender; and

1    if there is just not one way or another, I'm not going to

2    guess, okay.

3        So if it turns out that I only have enough data to

4    estimate property damage, then that will be the estimate.   If

5    there is enough data to do something else, then we will work

6    with it.   But that's just the way it is going to come down.

7    You-all control the information stream.   Okay.   All right.

8    Anything else I can help you with today?

9            MS. MORRIS:   I just have one discovery issue.   I know

10   we are back before Your Honor next Monday.

11           THE COURT:   Yes.

12           MS. MORRIS:   We have reached a number of concessions

13   with PG&E on discovery, and the only remaining issue

14   outstanding, I believe, at this point related to outstanding

15   discovery is some e-mail requests that we had made.

16       We initially had sent an e-mail request for Camp Fire

17   related electronically stored information to the Debtors.   We

18   requested a number of custodians.   We reduced that amount

19   significantly, and we have only requested just a handful.

20           THE COURT:   I don't really -- I'm not following.   What

21   is it you want?

22           MS. MORRIS:   What I am asking Your Honor to do is --

23   we have requested that the Debtors at least process those

24   custodians -- it is only a dozen custodians -- while we

25   continue to work through the search terms over those

1   custodians.

2            **THE COURT:**  PG&E?

3            **MS. MORRIS:**  Yes, PG&E.

4            **THE COURT:**  What is it -- you want to search 12

5   people's e-mails at PG&E?

6            **MS. MORRIS:**  That's right.  And they have refused to

7   even process those so we can run the search terms over them to

8   see what kind of data we are asking for and come to an

9   agreement on the search terms.

10           **THE COURT:**  Mr. Orsini.

11           **MR. ORSINI:**  We have had extensive negotiations over

12  the scope of discovery for the summary estimation hearing.  We

13  have already produced millions of pages of e-mails.  We have

14  agreed as it relates to the Camp Fire, which is what these

15  custodians are about, we initially agreed to 34 custodians, 34

16  people.  And it takes you from literally the CEO of the company

17  at the time down to the individual who walked underneath the

18  tower at issue to inspect it, right.  You go from bottom to top

19  in these 34 custodians.

20       We have agreed during these meet-and-confers to give them

21  three additional custodians.  With those three additional

22  custodians, we have run search terms.  Just for three people,

23  the hits, Your Honor, are well over a million documents to run

24  and review and produce these documents.

25       The twelve people who are left, we don't think there is

1    any basis whatsoever in a summary estimation proceeding to

2    incur all of the burden of collecting and producing documents

3    for people who slot in somewhere in that hierarchy and were

4    pulled --

5              THE COURT:  I don't know who we are talking about or

6    what you want or anything else.  So if you want to raise this,

7    send in a letter brief and I will take it up next Monday.

8         Now, this is something for me, not for Judge Montali; is

9    that right?

10             MS. MORRIS:  That's right, Your Honor.

11             THE COURT:  Just send it in by -- what is today,

12   Monday?  Send it in by Thursday morning, okay, before noon.

13   Now, let me be clear --

14             MR. ORSINI:  Joint letter, Your Honor?

15             THE COURT:  Separate letters.  You can do just -- you

16   can do -- if you want to do a joint letter, that's fine.  If

17   you can't pull it together, send in your three pages each.  It

18   sounds like you both know what you are talking about.  I'm the

19   only one in the dark.  Just let me know what is happening.

20        Let me be clear:  If you-all don't want to do the

21   questionnaire, it just restricts my information.  Restricted

22   information means there will probably be a restricted estimate,

23   all right.  So that's how it comes out.  Now, if you want to

24   pull it together and get something done, that's fine.  It

25   doesn't have to be -- you know, in my view the claims form in

1    Prime Clerk and whatever databases are a wealth of information.

2    They may be enough.  They may not be.

3         I'm not going to -- just so you-all know, I'm not going to

4    get zero information and then be pressed for a number.  That is

5    just not going to happen, nor am I going to come in and say you

6    have zero information and I think you should just add

7    15 percent just because.  That is also not going to happen.

8    That is guessing.  This is not a court of guessing.  This is a

9    court of estimation.  I work with data to the best extent

10   possible, and I can make reasoned and reasonable inferences

11   from that data.  I'm not going to make cosmic leaps and jumps

12   and acts of faith.  That is just not going to happen, okay.

13            **MR. ORSINI:**  Understood.

14            **MS. MORRIS:**  Okay.

15            **THE COURT:**  You give me the input, and I will give you

16   the output.  That's the way it will work.  Thanks a lot.

17                 (Proceedings adjourned at 1:39 p.m.)

18                          ---oOo---

19

20

21

22

23

24

25

1

2

3                    **<u>CERTIFICATE OF REPORTER</u>**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Monday, October 28, 2019

8

9

10                           *Marla Knox*

11   _____

12                    Marla F. Knox, RPR, CRR
                       U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25