Pages 1- 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE: PG&E CORPORATION and          )
PACIFIC GAS AND ELECTRIC COMPANY,    )
                                     )
              Debtors.               )      NO. 19-05257 JD
                                     )
_____)

                          San Francisco, California
                          Monday, November 4, 2019

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Creditor Committee Official Committee of Tort Claimants:
                    BAKER & HOSTETLER LLP
                    Levi's Plaza
                    1160 Battery Street East - Suite 100
                    San Francisco, California  94111
               BY:  **ROBERT A. JULIAN, ATTORNEY AT LAW**
                    **KIMBERLY S. MORRIS, ATTORNEY AT LAW**

For Ad Hoc Group of Subrogation Claim Holders :
                    WILLKIE, FARR & GALLAGHER LLP
                    878 Seventh Avenue
                    New York, New York  10019
               BY:  **BENJAMIN P. MCCALLEN, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Kelly L. Shainline, CSR No. 13476, CRR
              Certified Stenographic Reporter

1   **APPEARANCES**:   (CONTINUED)

2   For Kevin Burnett and Plaintiffs-Creditors:
                        LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
3                       275 Battery Street - 29th Floor
                        San Francisco, California  94111
4                 BY:   **ELIZABETH J. CABRASER, ATTORNEY AT LAW**

5


6   For Creditor California State Agencies:
                        FELDERSTEIN, FITZGERALD, WILLOUGHBY
7                         PASCUZZI & RIOS LLP
                        500 Capitol Mall - Suite 2250
8                       Sacramento, California  95814
                  BY:   **PAUL J. PASCUZZI, ATTORNEY AT LAW**
9


10  For Creditor Committee Official Committee of Unsecured
    Creditors:
11                      MILBANK, TWEED, HADLEY & MCCLOY LLP
                        1850 K Street, N.W. Suite 100
12                      Washington, D.C.  20006
                  BY:   **ANDREW LEBLANC, ATTORNEY AT LAW**
13


14  For Ad Hoc Bondholder Committee:
                        AKIN, GUMP, STRAUSS, HAUER
15                        & FELD LLP
                        580 California Street
16                      San Francisco, California  94104
                  BY:   **ASHLEY VINSON CRAWFORD, ATTORNEY AT LAW**
17

18  For Creditor SLF Fire Victim Claimants:
                        SINGLETON LAW FIRM
                        450 A Street - 5th Floor
19                      San Diego, California  92101
                  BY:   **GERALD SINGLETON, ATTORNEY AT LAW**
20

    For Plaintiff Liasion:
21                      SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
                        One Sansome Street, Suite 2830
22                      San Francisco, California  94104

23  For Debtor-in-Possession PG&E Corporation:
                        CRAVATH, SWAINE & MOORE LLP
24                      825 Eighth Avenue
                        New York, New York  10019
25                BY:   **TIMOTHY G. CAMERON, ATTORNEY AT LAW**
                        **PAUL H. ZUMBRO, ATTORNEY AT LAW**

| 1 | **<u>Monday - November 4, 2019</u>**                    <u>2:00 p.m.</u> |

1    **<u>Monday - November 4, 2019</u>**                    <u>2:00 p.m.</u>

2                    **P R O C E E D I N G S**

3                         ---o0o---

4         **THE CLERK:**  Calling civil 19-05257 In Re PG&E

5    Corporation, Pacific Gas & Electric Company.

6         Counsel.

7         **MR. JULIAN:**  Good afternoon, Your Honor.  Robert

8    Julian and Kimberly Morris of Baker Hostetler on behalf of the

9    Tort Committee.

10         **MR. McCALLEN:**  Good afternoon, Your Honor.  Benjamin

11    McCallen, Willkie Farr & Gallagher, on behalf of the Ad Hoc

12    Subrogation Group.

13         **MR. SINGLETON:**  Good afternoon, Your Honor.  Gerald

14    Singleton, Singleton Law Firm, on behalf of the SLF Fire Victim

15    Claimants.

16         **MR. SKIKOS:**  Good afternoon, Your Honor.  Steve

17    Skikos, plaintiffs' liaison for the State Court and TCC.

18         **MR. PASCUZZI:**  Good afternoon, Your Honor.  Paul

19    Pascuzzi.  My firm is cocounsel with the California Attorney

20    General's Office for certain California State Agencies with

21    fire-related claims.

22         **THE COURT:**  Thank you.

23         **MR. CAMERON:**  Good afternoon, Your Honor.  Tim

24    Cameron, Cravath Swaine & Moore, on behalf of PG&E.

25         And this is my partner, Paul Zumbro.

1        **THE COURT:**  Okay.  Let's do our discovery matter.  One

2    from each side, please.

3        All right.  Ms. Morris.

4        **MS. MORRIS:**  Good morning.

5        **THE COURT:**  Can you just cut down the head count a

6    little bit?  What is the two substation people?

7        **MS. MORRIS:**  This is our attempt to cut it down

8    significantly, Your Honor, and I believe we have.  If you'd

9    like to cut it down further, I think we can get it down to as

10   few as six.

11       **THE COURT:**  Six?

12       **MS. MORRIS:**  Yeah.

13       **THE COURT:**  Okay.  Six.  That's -- that's six.

14       **MR. CAMERON:**  I understand, Your Honor.  It would be

15   helpful to know who the six are.

16       The issue here, Your Honor, is that we are producing more

17   than 4 million pages of documents all related to the TC --

18       **THE COURT:**  Four?

19       **MR. CAMERON:**  Four million.

20       **THE COURT:**  It's doubled --

21       **MR. CAMERON:**  Well, it was 2.8 we referenced in the

22   letter, Your Honor.  There's going to be an additional

23   production of 300,000 --

24       **THE COURT:**  What is all of that?  How did all these

25   people have millions of documents?

1          **MR. CAMERON:**  These are very broad search terms,

2    Your Honor, over a period of about from 2010 to 2018.  So an

3    eight-year period.  We're running broad search terms over large

4    repositories, both for individuals and repositories of

5    documents.  It's an extremely large --

6          **THE COURT:**  All right.  There are 11 individuals.

7    That's going to be reduced to about six.

8          **MS. MORRIS:**  I can give you the six names now, yes.

9          **THE COURT:**  Oh, you've got the six names?

10         **MS. MORRIS:**  I can --

11         **THE COURT:**  Why don't you just share them with us and

12   you'll have them on the record.

13         **MS. MORRIS:**  Sure.

14      We can limit it to Carlos Gonzales, Alex Bingtan, Erick

15   Corona, Lorenzo Thompson, Kenneth How, and Raymond Trinh.

16         **THE COURT:**  Okay.  Now why is this going to generate

17   so many documents?

18         **MR. CAMERON:**  Well, Your Honor, it's still a

19   significant amount of processing to be done in order to respond

20   even for six additional custodians.  The documents for those

21   six, I have to check to see which ones are still active and

22   which ones are affected by background tapes.  But it takes

23   about two weeks to load and process the active files and an

24   even longer period of time to load and process the backup files

25   for these individuals.  And a lot of them are on backup tapes

1  given the length of the historical period.

2        THE COURT:  When do the backup tapes start, what time

3  period?

4        MR. CAMERON:  Well, I believe before 2010, Your Honor.

5  So we're taking that portion from 2010 onwards.  I would have

6  to verify that for each of the individuals.  But these are

7  active files and backup tapes.  And then they --

8        THE COURT:  So 2010 to 2018 is all on servers?

9        MR. CAMERON:  Obviously the more recent documents are

10 on servers, yes, Your Honor.  I don't know the precise cutoff

11 for those six.  Again, it's something that I could verify --

12       THE COURT:  You said 2010.  So that's what I'm asking.

13 When I ask when do the backup tapes start --

14       MR. CAMERON:  I believe --

15       THE COURT:  -- what I meant was when is the

16 information available on a server versus the backup tapes?

17       MR. CAMERON:  I don't know the precise cutoff as I

18 stand here today for those six individuals, Your Honor.  That's

19 something I would have to --

20       THE COURT:  What do you think?  You've been doing this

21 now for months.

22       MR. CAMERON:  I understand.  My guess would be

23 somewhere in the middle of that period.  Obviously the backup

24 tapes are probably more than the active files, I believe,

25 Your Honor.

1      **THE COURT:**  So about 2014.

2        Ms. Morris, you've seen the output.  What's your

3  understanding?

4      **MS. MORRIS:**  We've been asking the same questions that

5  you've been asking since the beginning of October, Your Honor.

6  And I believe that we need to go a little bit beyond 2014 given

7  what we've seen in just what we have to date.  They scored that

8  line, Caribou-Palermo line, it was risk scored in 2014.  So I

9  believe that we need to go beyond 2014.

10       I think we can cut it off at 2010, if that's the date by

11  which they have the backup tapes.  But we did ask them to start

12  processing these custodians because we knew we'd be bringing

13  this issue to Your Honor if they wouldn't be producing the

14  witnesses.

15      **THE COURT:**  Well, how about just two years before

16  2014?

17      **MS. MORRIS:**  To 2012?

18      **THE COURT:**  Yeah, why not -- well, why do you want to

19  be able to go four years back?

20      **MR. CAMERON:**  I think we could limit it to 2012,

21  Your Honor.

22      **THE COURT:**  All right.  So six individuals starting

23  2012.  There's plenty of time to get it done so --

24      **MR. CAMERON:**  Well, Your Honor, and we will make every

25  effort if that's the Judge's order.  We'll make every effort to

1  do it.  It is a significant amount of work.  It's still six

2  years as opposed to eight.

3       **THE COURT:**  Rounding up tapes and getting them

4  produced over the space of two weeks is just not that

5  burdensome.

6       **MR. CAMERON:**  Your Honor, it will take -- it's not

7  human time.  We could throw as many resources as we could at

8  it.  It's machine time.  It's the time that it takes to

9  actually physically upload and process these documents.

10      **THE COURT:**  I understand it, but you said two weeks.

11      **MR. CAMERON:**  I think two weeks to load the documents.

12  And for the backup tapes longer.  And then, of course, they

13  actually need to be reviewed for privilege, processed and

14  produced.

15      **THE COURT:**  You're doing electronic searching, aren't

16  you?

17      **MS. MORRIS:**  Yeah.  We're providing search terms to

18  them.  But we're happy to agree to a clawback protocol so that

19  we can get them without advanced review if that's what the

20  concern is.

21      **THE COURT:**  You're not reviewing each and every

22  document?

23      **MR. CAMERON:**  No.  We're doing technology-assisted

24  review for a number of these that would be affected by this as

25  well.  But we are reviewing for privilege.  That's important

1    here, Your Honor.

2              **THE COURT:**  I don't disagree with that.  Just don't

3    get hung up on privilege.  Produce everything else first.  And

4    then take the pool of possibly might be privileged because you

5    have received an indicator and save that for later.

6         But as you get them, it's very easy to carve off the

7    presumptively non-privileged materials and then just produce

8    those.  If anything inadvertent happens, you return them

9    without circulating and reading them and copying them or doing

10   anything else with them.  Just give them back.

11             **MS. MORRIS:**  Sure.

12             **THE COURT:**  And you can save the privilege things for

13   later.  And just do that as you need to.  But in 2019 this

14   really should not be that time-consuming.  Okay?

15             **MS. MORRIS:**  Thank you.

16             **THE COURT:**  Anything else for today?

17             **MS. MORRIS:**  Not on this issue, no.

18             **THE COURT:**  Okay.  Six people.  You named them.  2012

19   to 2018.  Privilege comes second.  In terms of the production,

20   roll everything out ahead of time.

21        And does that conclude our business for today?

22        Yes, Mr. Julian.

23             **MR. JULIAN:**  Thank you.

24        Your Honor, one issue has come up.  We would propose that

25   the Court request the parties to identify the three liability

1    experts that they told you on October 7th each side would call

2    at trial.

3        In this context, in the disclosures that the parties

4    recently filed the PG&E identified 27 experts, 15 damage and 12

5    liability.  My firm identified seven damage and seven

6    liability.  And on October 7, we both said we would be calling

7    three lead liability experts at trial.  We don't know about the

8    others.

9        We propose both sides identify experts to testify at

10   trial.  They, of course, legitimately said it's too early, but

11   with respect to the three liability experts that we both told

12   you on October 7th we would be calling, we think it's best if

13   both sides simply exchange the identity of those three that we

14   already told you on October 7th we certainly would be calling

15   as witnesses.

16       **THE COURT:**  Okay.  I'm not quite following the issue.

17   Did you ask and they said no?

18       **MR. JULIAN:**  Yeah.  Yeah.  Well, we said it's the

19   27th, they said no, and so now I've narrowed it to at least the

20   three that we told Judge Donato we definitely were calling as

21   expert witnesses.

22       **THE COURT:**  Do you have the three names?

23       **MR. JULIAN:**  I have three and he has three.  And I'd

24   like to know their three and I'll give them my three.

25       **THE COURT:**  So you want the names?

1            **MR. JULIAN:**  Yeah.

2            **THE COURT:**  Okay.

3            **MR. CAMERON:**  So, Your Honor, Mr. Julian raised this

4      with me just outside the courtroom.  The proposal was initially

5      made was that we would do some more extensive disclosure now.

6      I think it's worth just taking a brief step back.

7            The schedule the Court put in place required us to

8      exchange initial witness lists.  We all know, you know, what we

9      have to do to get to the estimation hearing at the time that

10     Your Honor has made available and what we're going to be able

11     to do in that time.

12           The initial witness list, of course, had people, you know,

13     on that list who either may not be called, who may not be asked

14     to prepare a report, or may prepare a report that other experts

15     use and rely upon.

16           We have a deadline of December 13 to exchange expert

17     reports under the current schedule.  That will certainly define

18     at that point the universe of experts who will or may be

19     called.

20           And then we have a deadline of January 15th for final

21     witnesses who will actually appear at the estimation hearing.

22           We are going through the process now of determining

23     exactly which witnesses we would use at estimation.  There's no

24     prejudice to the TCC or anyone else.  They're going through

25     exactly the same process.

1          And so we're doing exactly what we discussed with the

2     Court previously and what the Court actually discussed with us,

3     which was an initial disclosure, moving into expert reports by

4     December 13, and then a final witness list in January.

5          **THE COURT:**  All right.  So you're not quite ready yet?

6     That's basically --

7          **MR. CAMERON:**  Exactly, Your Honor.  We're still

8     working our way through this process.  We're all doing this

9     very quickly.  And we are doing exactly what we discussed with

10    the Court in terms of disclosing witnesses in a timely manner

11    in a way that the Court set forth in its initial schedule.

12         **THE COURT:**  All right.  Mr. Julian, they're not quite

13    ready yet.

14         **MR. JULIAN:**  Got you.

15         **THE COURT:**  When they're ready, they're ready.  If you

16    can do it earlier, you know, these are all end dates.  And I'll

17    put this on the order, but they -- effectively each day should

18    be read separate hearing dates as last days to disclose.  It

19    just says "disclose."  But any time beforehand.

20         So if you all need some more time and you both have a

21    mutual interest in that, then you can exchange them whenever

22    you're ready.  But if you're not ready, you're not ready.

23         **MR. JULIAN:**  Okay.  That's all we have for today, Your

24    Honor.

25         **MR. CAMERON:**  Thank you, Your Honor.

1    **MR. McCALLEN:**  Just one more issue, Your Honor.  Just

2    to clarify.

3    **THE COURT:**  I have one question just before -- what

4    happened with the filing deadline?

5    **MR. JULIAN:**  Oh, that didn't -- we asked the judge to

6    move it up.  PG&E did eventually speak on a date.  The new

7    hearing date on inverse is November 19th.

8    **THE COURT:**  Oh, no, no, no.  The claim filing

9    deadline.

10   **MR. JULIAN:**  Oh, I know what happened, but I don't

11   know if I'm authorized to say.

12   **MR. CAMERON:**  I'm not sure what you're talking about

13   so I'm not sure.  Should we try again?

14   **MR. ZUMBRO:**  I think it's the bar date we're talking

15   about.

16   **MR. JULIAN:**  Yeah, it's the bar date.

17   **MR. ZUMBRO:**  I think I can take this one.  Paul Zumbro

18   from Cravath for the debtor.

19   I think we, when we were last before you, Mr. Orsini had

20   mentioned December 20th date and I think subsequently the TCC

21   had requested that we extend it to December 31st, through the

22   end of the year which we were amenable to.  So we're now in the

23   process of preparing a stipulation as to the procedures that we

24   will be entailed with that, but I expect that will be resolved

25   in TCC's motion.

1          **THE COURT:**  It's 12/31 now?

2          **MR. JULIAN:**  Yes, it is, Your Honor.  With special

3     procedures to ensure that we get more participation than we

4     have today.

5          **THE COURT:**  I still think someone should be going door

6     to door.  I will leave that up to you.

7          **MR. ZUMBRO:**  That is part of the -- boots on the

8     ground is part of it.

9          **MR. JULIAN:**  Boots on the ground is part of the

10    procedures, plus your idea of the claims center actually in

11    Paradise, Chico, et cetera.

12         **THE COURT:**  Is that set up?

13         **MR. JULIAN:**  We're discussing how to set it up.

14         **THE COURT:**  Okay.  Now I don't know this because I

15    don't do bankruptcy.  But does Judge Montali need to approve

16    this or --

17         **MR. JULIAN:**  Yes, he does.

18         **MR. ZUMBRO:**  The motion is before him, but this will

19    resolve on a stipulated agreement basis the motion.  And so I

20    don't expect him --

21         **THE COURT:**  Well, while you're both here, what is the

22    potential impact of the mediator that was named?

23      Mr. Julian or --

24         **MR. JULIAN:**  A good impact.

25         **THE COURT:**  What does that mean for this proceeding?

1          **MR. JULIAN:**  The goal of the mediation is to resolve

2    the case.  Whether or not the -- an overall global settlement

3    would involve a fairness hearing that would involve this Court

4    or Judge Montali is something that the parties will look at, in

5    my view.

6          **THE COURT:**  Well, I don't think it would be me.  But

7    I'm just estimating.

8        Fairness with respect to a plan --

9          **MR. JULIAN:**  No.  No.  We'll come back to you on that.

10          **THE COURT:**  Settlement, class-wide settlement.

11          **MR. JULIAN:**  Your Honor, the parties are discussing

12    it.

13          **THE COURT:**  Well, okay.  You will keep me advised --

14          **MR. JULIAN:**  Yes.

15          **THE COURT:**  -- of any documents.

16          **MR. ZUMBRO:**  Of course.  I think we have had -- there

17    have not been any formal mediation sessions to date, but I

18    believe the mediator has met with the parties.  And we'll

19    obviously keep the Court apprized.

20          **THE COURT:**  And now I'm going to assign the case

21    challenging the constitutionality of AB 1054 as well.  So I

22    don't think any of you are directly involved in that, but it

23    will have an impact.  I'm going to be having those parties in

24    relatively soon.  But I am planning on probably getting that on

25    a similar time track, for obvious reasons.  So that's just

1  something to keep in mind.  Okay?

2          **MR. JULIAN:**  Yes, Your Honor.

3          **THE COURT:**  All right.  Okay.  Someone else had

4  something else?

5          **MR. ZUMBRO:**  Thank you, Your Honor.

6          **MR. JULIAN:**  Thank you, Your Honor.

7          **MR. McCALLEN:**  Your Honor, Benjamin McCallen, the Ad

8  Hoc Subrogation Group.

9      Two brief points.  The first is just to update Your Honor.

10  I was here before two weeks ago and told you, if you recall, we

11  had settled but that had to be approved by Judge Montali.  We

12  had an initial hearing on that and we had oral argument, but

13  the judge continued the hearing until November 13th.

14      So as of now obviously I'm still here, but we're still

15  hopeful that on the 13th, as of that time we no longer will be.

16      And then a second point was just a clarification on the

17  disclosure issue.

18      So we disclosed six potential expert witnesses.  The TCC I

19  think had seven and the debtors had 27.

20      There's obviously a date for rebuttal reports in the

21  schedule as well.  And something I just want to clarify from

22  our perspective is obviously six expert witnesses is a much

23  narrower subject matter than 27.  And so to the extent that

24  they end up putting in reports on issues that our six witnesses

25  aren't experts in, that that's what the rebuttal reports are

for.

In essence, we're not going to be foreclosed from putting forward experts at that point on issues that the debtors put in play with their initial reports.

**THE COURT:**  I'm not understanding what you're saying. You have a deadline to disclose your experts and --

**MR. McCALLEN:**  So I'll give you an example, Your Honor.

**THE COURT:**  You're probably not even going to be here but --

**MR. McCALLEN:**  I'm hoping this is just an academic discussion.

(Simultaneous colloquy.)

**MR. McCALLEN:**  -- sure, an advisory ruling.

**THE COURT:**  Yes.

**MR. McCALLEN:**  And I think this could affect other parties too, Your Honor.  So I'll give you an example.

So on the issue of liability, we have three different witnesses.  We've got a vegetation management person, we've got a metallurgist, and an electrical engineer.

The debtors have those same kind of people, but they also have, for instance, an arborist, somebody who's an expert in issues related to trees and can speak to what's, you know, a lot of these cases are caused because of, we claim, damaged trees that come in contact with PG&E's equipment.

1      So for our case, we did not intend to put an arborist

2    forward because we took to heart, you know, the conversations

3    we've had with Your Honor talking about this is an estimation,

4    this isn't a -- we're not doing a fire-by-fire adjudication.

5    And so those were the witnesses we intended to put on.

6          But to the extent, Your Honor, that they intend to put on

7    evidence broader in scope than we or the TCC intended to put

8    on, I just want to clarify that on rebuttal we would have the

9    opportunity to put forward those expert witnesses because, you

10   know, as you heard today, they have 27 witnesses.  They might

11   end up not calling their arborist.

12         THE COURT:  But you say on rebuttal.  Do you mean

13   during the hearing?

14         MR. McCALLEN:  No, Your Honor.  So I'm looking at the

15   schedule.  So we have a December 13th date for exchange of

16   expert reports.  And then a month later, on January 13th, we

17   exchange rebuttal expert reports.

18         So that would be the opportunity at which we would put

19   forward experts who would opine on the issues that their

20   experts talked about that might be different than the issues

21   that our experts talk about.

22         THE COURT:  And this is driven by an uncertainty over

23   27?

24         MR. McCALLEN:  Yeah, well, I think -- I think what's

25   going on here, Your Honor, in part is because of the speed with

1  which we're moving.  In a typical litigation, the parties have

2  full discovery and an opportunity to narrow the issues.  So by

3  the time you get to the point where you're going to expert

4  discovery, everybody knows exactly what the issues are in the

5  case.

6          **THE COURT:**  Yes, I understand.

7      **MR. McCALLEN:**  But in this case, we don't have that

8  luxury and so it might be a little bit ships passing in the

9  night.  So we intend to talk about these things, they intend to

10  talk about other things.  But we want to have an opportunity,

11  of course, to be able to address something that they put in

12  front of Your Honor that we didn't, you know -- in terms of

13  putting together our list of experts, from our perspective we

14  may not think they're relevant, but if they're going to put

15  something different in front of Your Honor and claim, oh, yeah,

16  in fact, Your Honor, some issue related to damages or some

17  issue related to liability is relevant, we need to consider it.

18      We just want to make sure that we have the opportunity to

19  put somebody in front of Your Honor as a rebuttal expert

20  witness on that same topic.

21          **THE COURT:**  Mr. Cameron.

22      **MR. CAMERON:**  Your Honor, I think all the parties,

23  when they filed their initial disclosures, reserved the rights

24  to potentially put in something in addition for rebuttal if

25  necessary.  Again it's --

1     **THE COURT:**  You both want to do this.

2     **MR. CAMERON:**  No, I'm not saying we're contemplating

3     that at this point.  We tried to make our disclosures as robust

4     as we possibly could.

5     Frankly, I think this is something for us to address

6     together and decide when that time comes and should there be a

7     need and to work out where we all are, you know, and how we're

8     going to make this work for estimation and how many experts

9     we're going to have.  There's a lot of discussions for the

10    parties to have, you know, to ensure that we make this work for

11    the Court.

12    And so frankly I'm not sure we need to deal with it now.

13    I think we can obviously deal with it down the stream.

14    **THE COURT:**  I think that's probably right.

15    I won't close the door to completely -- or I should say

16    solely responsive testimony.  I'm not going to foreclose that.

17    But January date is not a chance to fill in gaps.

18    So if, to use your example, the debtor sponsors an

19    arborist and there are a couple of points you want to respond

20    to, that's fine.  But it would be -- consider it to be an

21    application of the scope of cross-examination rule.  All right?

22    You cannot raise any new material.  You can be responsive only

23    to the opinion that you wish to challenge of the debtor-related

24    witness.  Okay.

25    **MR. McCALLEN:**  Understood, Your Honor.  And it wasn't

1    intended --

2            **THE COURT:**  And vice versa.  You can both do the same

3    thing.

4            **MR. McCALLEN:**  I think it's appropriate.  We will

5    start having a conversation with the debtors about this.

6            **THE COURT:**  You all should be talking, you know, two

7    times a day between now and the end of the year to get this

8    thing shaped up.  So don't wait on me.

9        I'm only going to see you every two weeks.  So, you know,

10   be on the phone, be in meetings, whatever you need to do, but

11   you should be working every day, it seems to me at least once a

12   day, to get things streamlined.

13           **MR. McCALLEN:**  Sure, Your Honor.  And just to clarify,

14   part of this is driven by the fact that on some of these issues

15   prior to the disclosure date and even till today, we don't have

16   a real understanding as to what the debtors are going to be

17   putting forward against us on, for instance, the issue of

18   damages.  We've talked in front of Your Honor before about the

19   damages issues.

20       And, you know, from our perspective, my clients are

21   insurance carriers and people that purchase insurance claims,

22   so what we've paid out of pocket is known and knowable.  We can

23   put forward evidence as to the money that went out of pocket.

24       So one of the questions we've had is:  Well, what are you

25   going to be arguing against us for damages?  And we don't have

1  a good idea about that.

2      But I think I understand Your Honor correct today to be

3  telling us have that conversation, and if we're not getting

4  those answers, perhaps we can come back to Your Honor and try

5  to get somewhere.

6          **THE COURT:**  Well, if your settlement is approved, it

7  resolves all of that.

8          **MR. McCALLEN:**  If it's approved, then you never have

9  to hear from me again.

10         **MR. CAMERON:**  Your Honor, the other point I want to

11 make is we take your instruction very seriously.  We had a call

12 as recently as last Friday with certain representatives of the

13 plaintiffs, including Mr. Skikos, to see if we can, you know,

14 agree upon how the claims with Prime Clerk and BrownGreer and,

15 you know, some of that data is being sort of synthesized

16 sequential to make sure we're on the same page and how it's

17 being correlated and things like --

18                  (Simultaneous colloquy.)

19         **THE COURT:**  Well, I would suggest to call every day,

20 2:00 o'clock California time, call.  I've done this in one

21 other case, and it turned out to be very productive.  I did it

22 for different reasons in that case, but sort of each case has

23 its own factors.  If you don't want to do it every day, just do

24 Monday, Wednesday, and Friday at 2:00 o'clock.  I'm not going

25 to order that now.  If somebody wants to ask me for that, I

1    will consider making it an order.

2        But let me just propose to have a regularly scheduled

3    time.  If it takes five minutes, you're done.  If it takes an

4    hour, then you've got an hour's worth of issues to work out.

5        But give serious thought to Monday, Wednesday, Friday

6    regular call, just a standing time when you know that you two

7    and TCC and debtor will be talking -- and when they're talking,

8    I'm looking at you.  You can certainly participate.

9                   (Simultaneous colloquy.)

10           MR. McCALLEN:  Thank you.

11           MR. CAMERON:  Your Honor, one more point.

12           THE COURT:  Yes.

13           MR. ZUMBRO:  Paul Zumbro.

14        And one other thing, Your Honor, Mr. Julian alluded to,

15    and I did want to alert the Court.  You had previously asked

16    what the schedule for the first condemnation briefing.

17           THE COURT:  Oh, yes.

18           MR. ZUMBRO:  And I just want to let you know that

19    Judge Montali did enter a scheduling order on October 31st, and

20    the schedule for inverse is we -- the debtors put in their

21    opening brief on October 25th, which we've done.  The reply

22    brief is November 15th.  And then the oral argument is set on

23    the inverse condemnation issue for November 19th.

24           THE COURT:  When is that going to resolve?

25           MR. ZUMBRO:  Well, as soon as --

1      **THE COURT:**  What issues are going to be resolved?

2      **MR. ZUMBRO:**  That's the issue of whether inverse

3  condemnation applies to publicly -- privately owned utilities

4  like PG&E.  And so that goes to whether there's a strict

5  liability standard or whether it's a negligence standard.

6      **THE COURT:**  Then you come back to me and tell me this

7  how to divide the damages.

8      **MR. ZUMBRO:**  Correct.  I just wanted to make sure

9  you're aware.

10     **THE COURT:**  Yes.

11     **MR. PASCUZZI:**  Your Honor, Paul Pascuzzi, cocounsel

12  with the Attorney General's Office for California State

13  Agencies.

14     One other scheduling issue, Your Honor, that Judge Montali

15  entered.  If you recall, the first time that we were here, we

16  mentioned -- I was here with the federal government lawyer --

17  about our issue about our claims, our fire-related claims being

18  liquidated and not subject to estimation, and that was going to

19  be briefed by the Bankruptcy Court and decided by the

20  Bankruptcy Court.

21     The court entered its briefing schedule last week as well

22  on that.  So our brief is due November 15th, the debtors

23  December 5th, our reply December 12th, and then the hearing

24  will be December 17th.

25     And I think, Your Honor, the discussion at the September

1   hearing was that that may put us on a subsequent track with our

2   different types of fire-related claims because we're not really

3   fire victims in the sense that the Tort Committee is talking

4   about governmental units with disaster aid, fire suppression

5   costs, and things like that.

6       So I just wanted to inform the Court that the Bankruptcy

7   Court --

8                     (Simultaneous colloquy.)

9         **THE COURT:**  Are you working with the mediator as well?

10         **MR. PASCUZZI:**  I believe so, Your Honor.  We've spoken

11   with the debtors' lawyer, and Judge Montali's order wasn't

12   precise on who's principal party.  But the debtors seem to be

13   okay with us participating and I believe the Tort Committee as

14   well so it will be --

15         **THE COURT:**  To me -- and you know better -- but to me

16   it seems like could be possibly easier settlement discussion.

17         **MR. PASCUZZI:**  Understood, Your Honor.  We're looking

18   forward to participating.

19         **THE COURT:**  Okay.  Good.

20       Okay.  Anyone else?  Nope.  All right.  Next time is two

21   weeks from today unless something comes up and you can let me

22   know.  Okay.

23       All right.  Thank you.

24         **ALL:**  Thank you.

25            (Proceedings adjourned at 2:30 p.m.)

**CERTIFICATE OF REPORTER**

I, KELLY SHAINLINE, Court Reporter for the United States District Court, Northern District of California, hereby certify that the foregoing proceedings in 19-05257 JD, IN RE: PG&E CORPORATION and PACIFIC GAS AND ELECTRIC COMPANY, were reported by me, a shorthand reporter, and were thereafter transcribed under my direction into text; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_Kelly Shainline_

Kelly Shainline, Court Reporter

Monday, November 4, 2019