Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

| | | |
|---|---|---|
| IN RE PG&E CORPORATION AND | ) | |
| PACIFIC GAS AND ELECTRIC COMPANY, | ) | NO. C 19-05257 JD |
| | ) | |
| Debtors. | ) | San Francisco, California |
| | ) | Monday, November 18, 2019 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Creditor Committee, Official Committee of Tort Claimants:
                BAKER & HOSTETLER LLP
                1160 Battery Street East
                Suite 100
                San Francisco, California  94111
        **BY:  ROBERT A. JULIAN, ESQ.**
             **KIMBERLY S. MORRIS, ESQ.**

For Ad Hoc Group of Subrogation Claim Holders:
                WILLKIE FARR AND GALLAGHER LLP
                787 Seventh Avenue
                New York, New York  10019-6099
        **BY:  BENJAMIN P. MCCALLEN, ESQ.**

For Debtors-in-Possession PG&E Corporation and Pacific Gas and Electric Company:
                CRAVATH, SWAINE & MOORE, LLP
                825 Eighth Avenue
                New York, New York  10019-7475
        **BY:  KEVIN J. ORSINI, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
             Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED**:


For Creditor Kevin Burnett:
                     EDELSON PC
                     123 Townsend Street
                     Suite 100
                     San Francisco, California  94107
            **BY: TODD LOGAN, ESQ.**
            **RAFEY S. BALABANIAN, ESQ.**


For California State Agencies:
                     FELDERSTEIN FITZGERALD WILLOUGHBY
                       PASCUZZI & RIOS LLP
                     500 Capitol Mall
                     Suite 2250
                     Sacramento, California  95814
            **BY: PAUL J. PASCUZZI, ESQ.**


For SLF Fire Victim Claimants:
                     SINGLETON LAW FIRM
                     450 A Street
                     Fifth Floor
                     San Diego, California  92101
            **BY: GERALD SINGLETON, ESQ.**


For Creditor Committee, Official Committee of Unsecured
Creditors:
                     MILBANK LLP
                     1850 K Street, NW
                     Suite 1100
                     Washington, D.C.  20006
            **BY: ANDREW LEBLANC, ESQ.**


For Ad Hoc Committee of Senior Unsecured Noteholders of Pacific
Gas and Electric Company:
                     AKIN GUMP STRAUSS HAUER & FELD LLP
                     580 California Street
                     Suite 1500
                     San Francisco, California  94104-1036
            **BY: ASHLEY VINSON CRAWFORD, ESQ.**


        (Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Creditor Adventist Health System/West:
                        NORTON ROSE FULBRIGHT US LLP
                        555 South Flower Street
                        Forty-First Floor
                        Los Angeles, California  90071
                   BY:  **REBECCA WINTHROP, ESQ.**

```
 1    Monday - November 18, 2019                    2:02 p.m.

 2                    P R O C E E D I N G S

 3         THE CLERK:  Calling Civil 19-5257, In Re PG&E

 4    Corporation, and Pacific Gas and Electric Company.

 5      Counsel?

 6         MR. JULIAN:  Good afternoon, Your Honor.  Robert

 7    Julian and Kimberly Morris of Baker Hostetler, appearing on

 8    behalf of the tort committee.

 9         MR. MCCALLEN:  Good afternoon, Your Honor.  Benjamin

10    McCallen, Willkie Farr & Gallagher, on behalf of the ad hoc

11    subrogation group.

12         MR. ORSINI:  Good afternoon, Your Honor.  Kevin

13    Orsini, Cravath, Swaine & Moore, for PG&E.

14         THE COURT:  Okay.  Let's do the discovery issues.

15    Come on up.

16         MS. MORRIS:  Good afternoon, Your Honor.  Kimberly

17    Morris of Baker Hostetler for the tort claims committee.

18         THE COURT:  Okay.

19      Well, Mr. Orsini, how many people?  Is it 13 people, in

20    total, that you want to depose?

21         MR. ORSINI:  Well, I think there are two categories,

22    Your Honor.  So in terms of the depositions, there are 16 --

23         THE COURT:  Sixteen.  Oh.

24         MR. ORSINI:  -- potential witnesses that TCC has

25    identified.
```

 1              **THE COURT:**  Okay.

 2              **MR. ORSINI:**  We have indicated that there are two of

 3    them for whom we're going to forego a deposition.  We're

 4    considering whether there are any others for whom we will

 5    similarly forego a deposition.

 6         I don't think there's any real dispute as to whether or

 7    not we will be entitled to depose them.  I think the question

 8    is really the subject matter.

 9              **THE COURT:**  So it's 14 people, total.

10              **MR. ORSINI:**  Currently 14, yes, Your Honor.

11              **THE COURT:**  And how many of those are testifying

12    witnesses?

13              **MR. ORSINI:**  Well, they've been identified -- all 14

14    have been identified by the TCC as potential testifying

15    witnesses at the estimation hearing.

16              **THE COURT:**  Okay.

17         **MS. MORRIS:**  I think that there's also two

18    non-testifying witnesses for which we've received deposition

19    notices as well.

20              **THE COURT:**  All right.  And who has the emerald?

21              **MS. MORRIS:**  That's one of the non-testifying.

22    Someone who is not on the TCC's initial disclosure list, and

23    who we do not intend to call at the estimation hearing.

24              **THE COURT:**  Okay.  There's something else I want to

25    talk about, so we'll just get through this quickly.

1          You can do whatever you want on the depositions.  Half-day

2    depositions, that's fine.  Whether it's usable or not at the

3    estimation, I will decide later.  But we will stick as much to

4    general federal practice as we can.  So if you want to ask

5    questions, that's fine.  So that resolves that.  Okay?  So you

6    do, you guys, you go ahead and do your thing.

7          Now, here's what I want to talk -- I should have thought

8    of this earlier, and I didn't.  I've been getting a lot of

9    communications from people who would like to see and hear

10   what's going on.  Most of those have been journalists.  A few

11   have been members of the public, just asking can they call in,

12   is there some way they can remote in, you know, things along

13   those lines.

14         The answer is no, we don't have adequate technology for

15   that.  However, we do have an answer.  I am part of the Cameras

16   in the Courtroom -- it's called a pilot project.  It's actually

17   been around for a long time.  But I am one of the Camera in the

18   Courtroom judges.  Okay?  So that allows us to put live feed

19   cameras that go into a YouTube presentation.

20         They're not live feed in the sense that you can just dial

21   it up at 2:00 p.m. and watch.  It will eventually be made into

22   a video that goes on to YouTube.  But it's available almost

23   immediately.

24         And I think that would be, at least, the best proxy to

25   allowing people to dial in real-time, which we can't quite do

1  yet.  There will be a day when we can.  That day hasn't

2  arrived.

3      But I think, given the interest in the case, the number of

4  people who would like to feel that they're participating, both

5  reporters and people who are just in California and are

6  interested and maybe even have a stake in the case, ought to

7  have that opportunity.

8      So under our national rules -- I ordinarily would just

9  order it.  However, under our national rules, I am required to

10  solicit your consent.  So.  I'm not going to put you on the

11  spot.  I would like to, but I'm not going to, because the other

12  part of this is I can't threaten or cajole people.  So my hands

13  are entirely tied.  However, I've made, I think, a good case

14  for why you ought to do it.

15      Just file a statement by tomorrow, individually, okay,

16  whether you agree or decline to participate in the Cameras in

17  the Courtroom project.  You can find it on our website, by the

18  way, if you want a fuller statement.  Just go to

19  cand.uscourts.gov/cameras.

20      And if you decline, just file -- these are both

21  one-liners:  We agree.  We decline.  And I will take it from

22  there.

23      Okay?  Are there any questions about that?

24          **MR. ORSINI:**  No, Your Honor.

25          **THE COURT:**  No.

1       **MS. MORRIS:**  Not about that, but about your prior

2  ruling, I just have one clarification.

3       **THE COURT:**  Yes, go ahead.

4       **MS. MORRIS:**  Is your ruling applying to both the

5  testifying witnesses, the ones that the TCC has put on its

6  initial disclosure list, as well as the non-testifying

7  witnesses that the TCC does not intend to call at the

8  estimation trial?

9       **THE COURT:**  Any witness at all.  So you can depose

10  your witnesses.  You have a limit of 10, so we haven't -- we

11  haven't altered the number of deposition rules.  If you want to

12  do the testifying witnesses plus a certain number -- and it

13  seems like you both agreed on that -- that's fine.  If you have

14  any more, you should work that out.  That's why I asked.  I

15  guess you're already up to 14, so you're technically four over.

16  But that's fine; you've worked it all out.  But, everybody.

17  Okay?

18    So some evidence -- they're certainly entitled to factor

19  in evidence or present evidence at the estimation hearing about

20  overstated claims, just as you are entitled to present your

21  evidence, as well.

22    So, now, whether three depositions is enough to generalize

23  to a large number of people is a different issue, but that's up

24  to the debtor and its counsel to decide.

25       **MR. ORSINI:**  Understood.

1          THE COURT:  Anything else for today?

2          MR. ORSINI:  Well, just one update, Your Honor.

3          THE COURT:  Yes.

4          MR. ORSINI:  Not an issue for resolution; just wanted

5    to update the Court on where we are with a bar date.  And some

6    general cooperation going on between the parties, to try and

7    streamline the disputes that will have an estimation.

8          I think the last time I gave you an update on where we are

9    with claims that came in by the original bar date, October 21,

10   I said roughly 70 percent participation rate, but there was

11   still a large number of claims left to process.

12         We've now gotten through all of those claims; we've

13   processed them.  And our calculations say to us that currently,

14   the number of claims that came in by the original bar date puts

15   us much closer to, and in fact, above an 80 percent

16   participation rate for the Camp Fire as well as the Tubbs Fire.

17         The other fires, which are smaller, obviously have bigger

18   swings based on how many people come in, they're a little bit

19   lower.  But we've viewed it as positive news that we were up

20   over 80 percent.

21         But as Your Honor knows, we've agreed to extend the bar

22   date until December 31st.  Claims are still coming in.  There's

23   a process in place to get the boots on the ground, so we all

24   expect and hope that those numbers will be significantly higher

25   than even 80 percent by the time we come to estimation.

1        **THE COURT:**  All right, that's good.  I still think we

2   should be close to 95, but that's progress.

3      Any reason to disagree with that?

4        **MS. MORRIS:**  No.

5        **THE COURT:**  Okay.

6        **MR. ORSINI:**  And the only other update, Your Honor,

7   is how you count participation rate, I think I've explained to

8   you, is a bit of a complicated question.  We have 72,000

9   wildfire claims that have come in so far.  Many of those are

10  duplicates.  A number of those will relate to the same

11  household, but they're filing separate claims.

12      So I think both sides have undertaken pretty significant

13  efforts with their own experts to try to come up with what the

14  universe is of actual claims.  Which bankruptcy claims apply to

15  which human beings, and which pieces of property.

16      And from our perspective, and I think theirs as well,

17  that's not something we should be asking Your Honor to figure

18  out during estimation.  We should have a common understanding

19  as to what claims are actually in, with respect to what

20  properties.  And so the parties have negotiated a data-sharing

21  agreement that will allow for us to exchange that information.

22      You've heard in previous conferences about the Brown Greer

23  database, I believe.  Mr. Skikos, who is one of the plaintiffs'

24  lawyers who is here, I think, has been managing that database

25  for a long time, which was good for basic information sharing.

1    We've expanded on that with a stipulation that's now been

2    filed, I believe with Judge Montali, that will permit this data

3    sharing, and shield both sides from any argument that in doing

4    so, we're waiving privilege more broadly as to the work that's

5    being undertaken, but all in the spirit of trying to narrow in

6    on the key questions that have to be answered by the Court.

7         **THE COURT:**  So this would effectively de-duplicate

8    overlapping claims.

9         **MR. ORSINI:**  De-dupe and map, right.  De-dupe and try

10   and figure out which houses are actually in the bankruptcy,

11   which ones aren't.  That will then allow us all to have, I

12   think, a far more robust basis for the actual conversations we

13   have to have about how much those claims are worth.

14        **THE COURT:**  That's good.

15        **MS. MORRIS:**  From the TCC's perspective, we agree

16   that we shouldn't be disputing issues as to who has actually

17   filed claims.  And so we agree to the stipulation, and hope

18   that Judge Montali so orders it very soon.

19        **THE COURT:**  I think that's ideal.  I hesitate even to

20   mention this, because I think you're doing the right thing.

21   But you could also -- there are just margins of error that you

22   could calculate as well.  I mean, you could --

23        **MR. ORSINI:**  I suspect, Your Honor, we -- we got past

24   the first hurdle, which was agreeing to share the information.

25   I suspect once we now share the information and sit down in a

1  room together and try to figure out what it actually means,

2  we'll confront those issues.

3      But my sense so far has been there's a good spirit of

4  cooperation on these issues, so that we can take those off

5  Your Honor's plate.

6          **THE COURT:**  All right.  So we're getting into holiday

7  issues.  The end of the year is going to be here before you

8  know it, and February is right around the corner.  So what am I

9  -- what should I anticipate in terms of any motions or

10  anything?

11      Ms. Morris?

12          **MS. MORRIS:**  Well, at this time, I have one other

13  discovery dispute that may guide that -- I hope not -- but, as

14  far as other motion practice, I believe that we have been able

15  to resolve most items consensually.  At this point, I don't

16  have any motions that I know are going to be filed.

17      But I think when we're back before Your Honor in two

18  weeks, we should have a good sense of what will need to be

19  filed, going into the end of discovery.

20          **THE COURT:**  All right.

21      Mr. Orsini?

22          **MR. ORSINI:**  I say the same, Your Honor.  There may

23  be discovery issue here and there.  I think we heard Your Honor

24  loud and clear on summary judgment dispositive motions, so we

25  have no intent of filing any such motions.  So if it's

1    anything, it will be in the form of discovery disputes.

2          THE COURT:  And where is the Bankruptcy Court on the

3    inverse condemnation issues?

4          MR. ORSINI:  10:00 a.m. tomorrow morning, Your Honor.

5          THE COURT:  Oh, tomorrow morning, okay.  Is -- ruling

6    from the bench?  Or --

7          MR. ORSINI:  That, I can't promise.

8          THE COURT:  -- a little thereafter?

9          MR. JULIAN:  I think the Judge won't rule from the

10   bench, because he issued a docket entry last night, stating --

11   ordering PG&E and the creditors' committee and the shareholders

12   to explain why they have not addressed the case that we believe

13   is on point from the Supreme Court that says the Bankruptcy

14   Judge is mandated to follow the California Supreme Court's

15   denial of review of the California appellate decisions on

16   inverse.

17       And he bolded and capitalized the words "must dismiss."

18   That the issue is that he must dismiss it.  So we view it as an

19   issue of law that he is going to rule on very quickly, Your

20   Honor.

21          THE COURT:  Okay.

22          MR. ORSINI:  As you might imagine, we have a

23   different view on that, but Judge Montali will decide that

24   quickly, I'm sure.

25          THE COURT:  Who's here for the insurance -- yes.  So,

1  are you settling or not?

2          MR. MCCALLEN:  That's an excellent question,

3  Your Honor.  We --

4          THE COURT:  I thought it was locked in, but there are

5  indications that I may have been wrong.

6          MR. MCCALLEN:  We have settled.  There have been

7  parties that have filed objections to the settlement.  And the

8  Court has adjourned the hearing now until December 10th.  I

9  believe, December 10th.

10          THE COURT:  All right.

11          MR. MCCALLEN:  So our status is the same as it was

12  before, Your Honor.  We have an agreement with the debtors.

13  The debtors have moved under Bankruptcy Rule 9019, saying that

14  they've satisfied their business judgment in entering into the

15  settlement, and that's before the Court.

16      But the Court has not yet issued a decision on it.  But he

17  will take up the hearing again on the --

18          THE COURT:  Okay.  But for me, is it fair, if it

19  doesn't work out for whatever reason, you just have -- you have

20  an entirely liquidated number, right?  You're just going to

21  tell me a number.

22          MR. MCCALLEN:  We are certainly intending to keep our

23  presentation as streamlined as possible.  I do think that it --

24  so let me back up for a second.

25      There's a lot --

1          **THE COURT:**  But you know exactly what you paid.

2          **MR. MCCALLEN:**  Exactly.  So there's a liability side

3  of the case, and a damages side of the case.  On the liability

4  side of the case, I think our case lines up, if not perfectly

5  with the TCCs, nearly perfectly.  We're both trying to prove

6  liability with respect to the 22 fires at issue.

7          On the damages side, however, they're entirely different

8  cases.  And you're absolutely right, Your Honor, to your point,

9  the evidence that we will present we believe can be very

10  streamlined and direct because these are claims that have

11  either been paid, or been reserved, or otherwise anticipate

12  being paid.

13          **THE COURT:**  Okay.  So you don't expect, if you are

14  here, to -- your being here is not going to significantly

15  extend the proceedings.

16          **MR. MCCALLEN:**  I don't believe so, Your Honor.  I

17  think what -- the only caveat I would say is that obviously, we

18  haven't seen the debtors' expert reports, and they haven't seen

19  ours.

20          Without knowing exactly what might be argued by -- whether

21  it's the debtors or any other party who comes in, I can't say

22  for sure on that, but I do anticipate that our -- that the

23  portion of the case that would be solely related to our damages

24  I think would be a small portion of what's in front of

25  Your Honor.

1        **MR. ORSINI:**  So if I may, briefly, Your Honor, I

2   agree with where Mr. McCallen landed, which is that if we don't

3   end up having a settlement, their piece of the estimation will

4   be smaller relative to the individuals.

5        The one thing I will flag is I don't think it's quite as

6   simple as they've paid the amount out, and therefore they're

7   entitled to it, regardless of liability.  I mean even, if there

8   is liability, on the damages piece, they're only entitled to

9   recover that which the underlying insured would have been

10  entitled to recover from us.

11       And there will be a lot of circumstances in which they've

12  paid out well above that, for a variety of reasons, including

13  potentially poor adjusting or other insurance regulations.  So

14  there will be some dispute.  And it's not going to be a small

15  dispute as to how much of what they paid they're actually

16  entitled to.

17       And I suspect there will also be disputes about the

18  billions of dollars that haven't been paid, but that are in

19  reserves or what's called "IBNR," which is in essence the claim

20  hasn't come in yet, but they expect it will.  I'm sure there

21  will be disputes between the experts as to the rate at which

22  those billions of dollars of potential claims will convert into

23  actual claims.

24       So there will be some issues to be decided, not just based

25  on how much they've paid.  But the upshot and I think what

1   Your Honor is getting at, if there's no settlement, does that

2   mean we need another week of estimation?  No.  I think it's a

3   day, day and a half, max.

4           MR. MCCALLEN:  And I think in our initial

5   projections, we put in two or three days for our damages case.

6   He's saying a day, day and a half; we're saying two or three.

7   I think the takeaway from both is it's a much smaller portion

8   of the case than the TCC damages case.

9           THE COURT:  You expect to know by the end of the year

10  whether your settlement is approved or not?

11          MR. MCCALLEN:  I think that would be a reasonable

12  conclusion, based on where we stand today.  However, obviously,

13  we settled a month and a half ago, and I was hopeful that I

14  would already be sitting on the other side of the bar at this

15  point (Indicating), and I'm not doing that.

16      So I think that -- I think it's reasonable to think that

17  we will have a decision by the end of the year, although,

18  obviously, that's up to Judge Montali.

19          THE COURT:  All right.  Anything else?

20          MR. ORSINI:  Not from us, Your Honor.

21          THE COURT:  Claimants?

22      Yes.

23          MS. MORRIS:  One other discovery issue, Your Honor.

24      When we were before you two weeks ago, we had requested a

25  certain number of custodial data.  And we had limited our

1    request to only six custodians.

2        We have been recently told by the debtors that they won't

3    be in a position to produce those documents until after the

4    close of discovery on December 23rd, which is, I believe,

5    almost eight weeks after you ordered it.

6        And so my understanding from --

7              **THE COURT:**  Just -- for the six we talked about?

8              **MS. MORRIS:**  For the six that we talked about, as

9    well as a couple of others that they had agreed to produce

10   before we came to Your Honor.

11       And my understanding from what Mr. Cameron had represented

12   to the Court when we were here two weeks ago is that it would

13   take about two to three weeks to process those custodians.  So

14   that would lead me to believe that the remaining five or so

15   weeks is with review of those documents.

16       We, the TCC, will agree to a clawback protocol so that

17   they don't have to be pre-reviewed, so that we can get those

18   documents, and depose those witnesses, before the close of

19   discovery.

20             **MR. ORSINI:**  So Your Honor, we have millions of pages

21   of documents that are being produced more generally.  The

22   documents from these custodians are in excess of a million that

23   have to be reviewed.

24       Your Honor ordered them to be collected and produced.

25   We've moved as quickly as we can.  Simple physics --

```
 1              THE COURT:  In excess of a million pages?  Or a
 2   million documents?
 3              MR. ORSINI:  Documents.
 4              THE COURT:  From six people?
 5              MR. ORSINI:  The search terms are incredibly broad.
 6   We're talking about a six- to seven-year period of time.
 7   There's a tremendous amount of volume here.  Just, it just is
 8   what it is.  So we're getting through it as quickly as we can,
 9   particularly with all the other discovery obligations that we
10   have on us.
11        I don't think it would be appropriate -- we have clawback
12   provisions in existing protective orders, but we certainly
13   would object to any requirement that we just produce these
14   documents, sight unseen.  I don't think that's appropriate at
15   all.
16              THE COURT:  Are you going to beat December 23rd?
17   When are you going to get it done?
18              MR. ORSINI:  Very soon thereafter.  I'll keep
19   updating the Court.  But as soon as we conclude --
20              THE COURT:  No.  I thought the 23rd was the day you
21   agreed to produce everything.
22              MR. ORSINI:  December 23rd was the day that was set
23   for the deadline of fact discovery.  Right?  They subsequently
24   asked for this additional discovery which Your Honor has
25   ordered.
```

1        The simple physics of how much we're dealing with has led

2  us to conclude we can't get these documents produced by that

3  date.

4              THE COURT:  Well, when will you have it done?

5              MR. ORSINI:  When will we have it done?  We expect

6  within a week or two of that.  Certainly in enough time --

7  these are four, frankly, third-order witnesses.  We will have

8  it done in time for those witnesses to be deposed well in

9  advance of the estimation hearing.

10       As Your Honor said, this is -- we have to treat this like

11  an expedited bench trial.  And these sorts of things happen

12  sometimes in expedited bench trials.

13             THE COURT:  Well, you can't just drop a million

14  documents on the claimants on January 10th.  That's just not

15  going to work.

16             MR. ORSINI:  Well, Your Honor -- well, but they're

17  the ones who asked for these custodians, late.  They're the

18  ones who asked for extraordinarily expansive search terms.  The

19  number of documents that are getting produced are a function of

20  the over-broad discovery they've sought.

21       And so we're going to get it done as quickly as we can,

22  but we just can't alter the physics of how long it's going to

23  take for that production to be completed.

24             THE COURT:  It's not a matter of physics.  How are

25  you reviewing these documents?  Are you doing electronic word

1   searches?

2           **MR. ORSINI:**  We are running electronic word searches

3   against them.  We're then using a sophisticated privilege

4   review tool, a sort of artificial intelligence tool that's been

5   used for all these productions that weeds out all of the

6   documents that are plainly not privileged.  And those get

7   produced, and I think a number of those will get produced in

8   advance of December 23rd.

9       But the ones that are identified as potentially privileged

10  then have to undergo an actual review by attorneys to see if

11  the document is a privileged document before it's produced.

12          **THE COURT:**  Well, how many of the million are

13  potentially privileged?

14          **MR. ORSINI:**  I don't have that number off the top of

15  my head, Your Honor, because I think we're still in the process

16  of running that.

17          **THE COURT:**  Running it should be at the speed of

18  electrons, right?

19          **MR. ORSINI:**  It's not that fast, Your Honor.  With

20  the size of data we are dealing with, with the quality of the

21  data we are dealing with, these processes takes weeks.  It's

22  what we've experienced throughout these --

23          **THE COURT:**  Weeks for automated privilege review?

24          **MR. ORSINI:**  Weeks to collect the documents, process

25  them, run the search terms, train the privilege system, get the

1    privilege system running against the documents after they've

2    been processed with the search terms.

3          THE COURT:  For privilege searching, all you need is

4    the name of every possible lawyer.  And then you just search

5    for the 20 names that show up, or 40 names.

6          MR. ORSINI:  We're going back over the course of

7    seven years, Your Honor.  It's not as simple as every possibly

8    lawyer, because there could have been dozens if not more

9    lawyers involved for a moment in time, and then moving on.  So

10   that's why we use this sophisticated artificial intelligence.

11         I'm trying to get them done as quickly as we can.  We have

12   no interest --

13         THE COURT:  You may be over-thinking it.  You just

14   run the names -- you get every PG&E in-house lawyer and law

15   firm, and you just run the names.  I mean, it's not that hard.

16         MR. ORSINI:  That's part of the process, Your Honor.

17   But there could be -- there could be --

18         THE COURT:  You had one privilege.  It's an attorney

19   privilege.

20         MR. ORSINI:  But there could be lawyers who we don't

21   have yet identified.  Because these are documents from --

22         THE COURT:  Then you can't search them, anyway.

23         MR. ORSINI:  But the artificial intelligence

24   mechanism goes through the documents with algorithms to try and

25   identify discussions that may be likely to be privileged

1     discussions.

2         Just like if we had human beings reviewing each document,

3     if there was a lawyer who wasn't on the list but they see the

4     document and it has a clearly legal discussion, that one would

5     get pulled out.  The AI system is used to replicate that in a

6     far more efficient manner.  And to carve out the ones that are

7     obviously not privileged off the top --

8         **THE COURT:**  What I hear you saying is all this time

9     is devoted to the speculative possibility that an unnamed

10    lawyer may be a communicant in an email or a document.

11        **MR. ORSINI:**  Or their advice might --

12        **THE COURT:**  Strikes me that anyone at PG&E is likely

13    to put the lawyer's name somewhere in the document.  I can't

14    imagine there would be that much ambiguity over a communication

15    involving an attorney.  So I think you are holding this up

16    unnecessarily, for a very small percentage of documents.  So,

17    you need to work on that.  Okay?

18        I don't think this is right.  It's very easy to do a

19    peremptory or at least a first-cut privilege review.  Put all

20    the lawyers' names in, and you match them.  Put all the law

21    firms in, and you match them.  All right?

22        Now, if you want to show me some evidence that you're

23    missing five or ten or twenty percent of legal documents, I'll

24    look at it.  But this is -- this is a triple-conservative

25    approach that I don't think has any grounding in fact as a

1    necessity.

2        And at best, as the claimants suggest, you may be ending

3    up producing one or two oddly-mislabeled documents where you

4    cannot tell on their face that an attorney was involved.  In my

5    experience, that's never happened.  I've never seen a mystery

6    attorney/client privilege.

7            **MR. ORSINI:**  Your Honor --

8            **THE COURT:**  The name of the lawyer is somewhere

9    there.  Or the email or the -- the address of the law firm is

10   somewhere there.  Or an in-house designation for department

11   routing is somewhere there.

12       I just -- we don't have time for that triple-check.

13           **MR. ORSINI:**  We're not talking about a mystery

14   lawyer, Your Honor; we are talking about circumstances where it

15   could be an email that says "Matt told me the following."

16   Right?

17       I see this all the time in documents and emails.  And it

18   turns out that Matt is a lawyer.  We can't just search for

19   "Matt."  You have to look at the context of the document and

20   the statement that's made, which is what human beings do when

21   they're actually reviewing the documents for privilege, which

22   is what the AI system is meant to replicate as opposed to just

23   running the search terms of known names, full names of lawyers

24   or law firms.

25       Most of the documents we're talking about here are emails.

1   And it's very common for legal advice to be reflected in an

2   email where the lawyer is not actually on the email.  And those

3   are the types of issues we're trying to catch here.

4          **THE COURT:**  Who are these six people that are getting

5   this torrent of legal advice that they're sharing with each

6   other?

7          **MR. ORSINI:**  Your Honor, it's not a torrent of legal

8   advice.  But --

9          **THE COURT:**  So what's the issue?  Maybe a hundred

10  emails will get produced that shouldn't be produced.  You're

11  just going to give them back.  There's no questions asked.

12  They cannot be used, they can't be copied, can't be saved,

13  can't be referenced, they can't be -- anything at all, can't

14  happen with them.  Okay?

15     I mean, if someone -- if you're right, and two of these

16  six people said: Oh, Bob and -- Bob told me X, they're not

17  probably going to even know what that means, anyway.  How would

18  they know that Bob was a lawyer?

19         **MR. ORSINI:**  Because you can often tell from the

20  context of the email when you review it.  I've seen cases where

21  emails like that are critically important, Your Honor.  And so

22  the process we've put in place is a process to make sure those

23  things get culled.

24         **THE COURT:**  I don't think that's right.  You two need

25  to meet and confer on a plan to improve this.  That is a

1    needle-in-a-haystack risk, in my view, that you're -- that

2    you're trying to shoot with -- I'm mixing too many metaphors.

3        This is a minor risk that you are overreacting to, to put

4    it directly.  So, you two work this out.

5        **MS. MORRIS:**  We are happy to, Your Honor.

6        **THE COURT:**  All right?  Now, I want to be clear that

7    any inadvertent productions are immediately unusable, and

8    returnable.  No questions asked.

9        **MS. MORRIS:**  Absolutely.  And --

10       **THE COURT:**  And if I see any misuse of that

11   information, I will react appropriately.  And it will not be

12   something that you will enjoy.  I want to be clear about that.

13       **MS. MORRIS:**  We understand.

14       **THE COURT:**  So this is the bargain.  All right?  So

15   you want speed; you have to play on the other end of that and

16   be cooperative of any mistakes that the other side might make.

17   And vice-versa.

18       But we're not going to do this.  This is too much work for

19   too little output.  So you two work out something.

20       When do you want to report back to me?  Wednesday?

21   Thursday?

22       **MR. ORSINI:**  If we could have one more day,

23   Your Honor, just because most of us are in court today.

24       **MS. MORRIS:**  Thursday's fine with us.

25       **THE COURT:**  All right.  You file a stipulation -- you

1   stipulate on a protocol for Thursday.  If you can't do that,

2   you tell me what the problem is, and I'll probably have you

3   back in on Monday.  But we can't -- that's way too late.  It's

4   just too late.

5        There are too many -- this train is moving too quickly for

6   a million documents or more to get produced on January 10th.

7   Particularly after a review that I don't think is warranted by

8   a realistic fear that attorney/client materials are going to be

9   produced in wholesale.  I just don't see it.

10       Okay?

11            **MS. MORRIS:**  Thank you.

12            **THE COURT:**  All right.  Anything else for today?

13            **MS. MORRIS:**  No.

14            **THE COURT:**  Mr. Orsini?

15            **MR. ORSINI:**  Not from us Your Honor.

16            **THE COURT:**  Okay, good.  Thank you.

17            **THE CLERK:**  All rise, Court's in recess.

18       (Proceedings concluded)

19

20

21

22

23

24

25

1

2

3

4                         **CERTIFICATE OF REPORTER**

5          I, BELLE BALL, Official Reporter for the United States

6     Court, Northern District of California, hereby certify that the

7     foregoing is a correct transcript from the record of

8     proceedings in the above-entitled matter.

9

10                         *Belle Ball*

11                    _____/s/ Belle Ball_____

12              Belle Ball, CSR 8785, CRR, RDR

13              Monday, November 18, 2019

14

15

16

17

18

19

20

21

22

23

24

25