Pages 1 - 42

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE: PG&E CORPORATION and      )
PACIFIC GAS AND ELECTRIC         )
COMPANY,                         )
                                 )
             Debtors.            )      NO. 19-05257 JD
                                 )
_____)
                                        San Francisco, California
                                        Thursday, May 21, 2020

**TRANSCRIPT OF ZOOM VIDEO CONFERENCING PROCEEDINGS**

**APPEARANCES** (via Zoom Video Conferencing):

For Creditor Committee Official Committee of Tort Claimants:
                        BAKER & HOSTETLER LLP
                        Levi's Plaza
                        1160 Battery Street East - Suite 100
                        San Francisco, California  94111
                   BY:  **ROBERT A. JULIAN, ESQ.**

For Ad Hoc Group of Subrogation Claim Holders :
                        WILLKIE, FARR & GALLAGHER LLP
                        878 Seventh Avenue
                        New York, New York  10019
                   BY:  **BENJAMIN P. MCCALLEN, ESQ.**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Official Reporter

1   **APPEARANCES**:   (CONTINUED)

2   For Numerous Fire Claimants:
                              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
3                             275 Battery Street, 29th Floor
                              San Francisco, CA 94111-3339
4                  BY:   **ELIZABETH J. CABRASER, ESQ.**

5   For Official Committee of Unsecured Creditors:
                              MILBANK LLP
6                             55 Hudson Yards
                              New York, New York  10001
7                  BY:   **ALAN J. STONE, ESQ.**

8   For PG&E Shareholders:
                              JONES DAY
9                             555 South Flower Street, 50th Floor
                              Los Angeles, California  90071
10                 **BY: BRUCE S. BENNETT, ESQ.**

11  For Creditor California State Agencies:
                              FELDERSTEIN, FITZGERALD, WILLOUGHBY
12                              PASCUZZI & RIOS LLP
                              500 Capitol Mall - Suite 2250
13                            Sacramento, California  95814
                   BY:   **PAUL J. PASCUZZI, ESQ.**
14
    For Creditor Federal Agencies FEMA, Department of Agriculture,
15  and Department of Interior:
                              U.S. DEPARTMENT OF JUSTICE
16                            Civil Division
                              P.O. Box 875
17                            Ben Franklin Station
                              Washington, D.C.  20044
18                 BY:   **MATTHEW J. TROY, ESQ.**

19  For Fire Victims:
                              WALKUP, MELODIA, KELLY & SCHOENBERGER PC
20                            650 California Street - 26th Floor
                              San Francisco, California  94108
21                 BY:   **KHALDOUN A. BAGHDADI, ESQ.**

22  For AT&T Corp.:
                              ARNOLD PORTER KAYE SCHOLER LLP
23                            250 West 55th Street
                              New York, New York  10019
24                 BY:   **BENJAMIN MINTZ, ESQ.**

25          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

1 | **APPEARANCES:**   (CONTINUED)

2 | For Creditors Adventist Health System/West, and Feather River
Hospital d/b/a Adventist Health Feather River:
3 |                          NORTON ROSE FULBRIGHT US LLP
                         555 South Flower Street, 41st Floor
4 |                          Los Angeles, California  90071
                    BY:  **REBECCA J. WINTHROP, ESQ.**
5 |
For Certain Fire Victim Creditors:
6 |                          REED SMITH LLP
                         101 Second Street, Suite 1800
7 |                          San Francisco, CA 94105-3659
                    BY:  **DAVID E. WEISS, ESQ.**
8 |
For Ad Hoc Committee of Senior Unsecured Noteholders:
9 |                          AKIN, GUMP, STRAUSS, HAUER
                           & FELD LLP
10 |                          One Bryant Park
                         New York, New York  10036
11 |                    BY:  **ABID QURESHI, ESQ.**

12 | For Creditor SLF Fire Victim Claimants:
                         SINGLETON LAW FIRM
13 |                          450 A Street - 5th Floor
                         San Diego, California  92101
14 |                    BY:  **GERALD SINGLETON, ESQ.**

15 | For Creditors Karen Roberds and Anita Freeman, for themselves
and on behalf of all others similarly, situated
16 |                          TRODELLA & LAPPING, LLP
                         540 Pacific Avenue
17 |                          San Francisco, California  94133-4608
                    BY:  **RICHARD A. LAPPING, ESQ.**
18 |
Pro Se Claimant:
19 |                    **MR. WILLIAM B. ABRAMS**
                         1519 Branch Owl Place
20 |                          Santa Rosa, California  95409

21 | For Debtor-in-Possession PG&E Corporation:
                         CRAVATH, SWAINE & MOORE LLP
22 |                          825 Eigth Avenue
                         New York, New York  10019
23 |                    BY:  **KEVIN ORSINI, ESQ.**

24 |                **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

25 |

```
 1   APPEARANCES:   (CONTINUED)

 2   For Debtor-in-Possession PG&E Corporation:
                         WEIL, GOTSHAL & MANGES LLP
 3                       767 Fith Avenue
                         New York, New York  10153
 4               BY:   STEPHEN KAROTKIN, ESQ.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Thursday - May 21, 2020                          10:03 a.m.

 2                          P R O C E E D I N G S

 3                              ---oOo---

 4        THE CLERK:  Calling civil 19-5257, In re PG&E

 5   Corporation and Pacific Gas & Electric Company.

 6        Will counsel for the defendants or debtors please state

 7   their appearances for the record.

 8        MR. ORSINI:  Good morning, Your Honor.  Kevin Orsini,

 9   Cravath, Swaine & Moore, on behalf of the debtors.

10        MR. KAROTKIN:  Good morning, Your Honor.  Stephen

11   Karotkin, Weil, Gotshal & Manges, on behalf of the debtor.

12        THE CLERK:  And plaintiffs also state their

13   appearances.

14        MR. JULIAN:  Yes, Your Honor.  Robert Julian, of Baker

15   Hostetler, on behalf of the Tort Committee, the TCC.

16        MR. MCCALLEN:  Good morning, Your Honor.  Benjamin

17   McCallen, Willkie, Farr & Gallagher, on behalf of the Ad Hoc

18   Subrogation Group.

19        MS. CABRASER:  Good morning, Your Honor.  Elizabeth

20   Cabraser appearing on behalf of numerous fire claimants.

21        MR. BAGHDADI:  Good morning, Your Honor.  Khaldoun

22   Baghdadi, liaison counsel in the California JCCP and on behalf

23   of certain fire plaintiffs, thank you.

24        MR. MINTZ:  Good morning, Your Honor.  Benjamin Mintz,

25   from Arnold and Porter, counsel for AT&T.
```

1          **MS. WINTHROP:**  Good morning, Your Honor.  Rebecca

2    Winthrop, of Norton Rose Fulbright US LLP, on behalf of a

3    Adventist Health System/West and Feather River Hospital, each a

4    nonprofit religious corporation.

5          **MR. QURESHI:**  And, Your Honor, Abid Qureshi, Akin,

6    Gump, Strauss, Hauer, on behalf of the Ad Hoc Committee.

7          **MR. WEISS:**  Good morning, Your Honor.  David Weiss,

8    from Reed Smith LLP, on behalf of Paradise Irrigation District,

9    Paradise Unified School District, Northern Recycling, and Napa

10   Recycling.

11         **MR. STONE:**  Good morning, Your Honor.  This is Alan

12   Stone, from Milbank LLP, on behalf of the Official Committee of

13   Unsecured Creditors.

14         **MR. LAPPING:**  Good morning, Your Honor.  Richard

15   Lapping, Trodella & Lapping, LLP, on behalf of Karen Roberds

16   and other fire victims.

17         **MR. SINGLETON:**  And good morning, Your Honor.  Gerald

18   Singleton appearing on behalf of roughly 7,000 fire victim

19   plaintiffs.

20         **MR. BENNETT:**  Good morning, Your Honor.  Bruce Bennett

21   on behalf of certain equity shareholders.

22         **THE COURT:**  Okay.  Anyone else?  Is that it?

23         **MR. PASCUZZI:**  Good morning, Your Honor.  Paul

24   Pascuzzi for the California state agencies.

25         **THE COURT:**  Okay.  All right.  Thank you.

1          **THE CLERK:**  And Mr. Abrams is on the line.  He hasn't

2    stated his appearance, Your Honor.

3          **THE COURT:**  Okay.  Mr. Abrams, do you want to unmute

4    and just check in for us, please.

5          All right.  In our uncertain modern world things don't

6    always work right on the button, so we'll just assume he's

7    listening and will check in when he can.

8          Okay.  We are here in what may or may not be our last

9    proceeding in the estimation process.

10          I have some questions.  I'm going to start with Mr. Orsini

11    because it's the debtors' motion.  I'm happy to hear whatever

12    you would like to share, from anyone, but I do want to start

13    with a couple of things that I'd like to get answered before I

14    consider what my next step will be with respect to an order, if

15    any, from this proceeding.

16          So when we all convened, as you well remember, many months

17    ago, we were acting with speed and the highest degree of

18    certainty that we could, consistent with the mandates of

19    Section 502(c).  You all started down the road of discovery.

20          I can't remember whether it was you or I or both of us

21    collectively, all of us collectively, but we hit on the idea

22    that a good signpost, reliable signpost for evidence about the

23    fire victim claims and how they might be liquidated would be

24    found in prior settlements that the debtor had engaged in, in

25    similar situations in the past.

1     We started down the road or you started down the road of

2   discovery.  We had some hearings on that.  My understanding is

3   that a fairly substantial amount of evidence was available.

4     And, Mr. Orsini, that leads me to my first question.  I

5   would like a fuller description from the debtor about how the

6   $13.5 billion figure was arrived at in terms of evidence,

7   records, prior settlement values and other facts that were

8   taken into account.

9     What I really want is for you to tell me how that

10  $13.5 billion figure is grounded in the record.

11     MR. ORSINI:  Be happy to, Your Honor.  Good morning.

12     I was going to start where Your Honor did, which was at

13  the beginning.

14     As Your Honor noted, we embarked upon a process that was

15  going to lead to a 2- to 3-week bench trial where there were

16  going to be a slew of contested issues related to the 20-plus

17  wildfires we're dealing with.

18     We have in excess of 70,000 fire victim claims.  I think

19  that's one of the great successes of this entire Chapter 11.

20  You'll recall at the original bar date we were all disappointed

21  with how many claims came in.  We extended it, and through

22  great work of a lot of people on this phone we got, I think,

23  over 90 percent, close to a hundred percent of the fire victims

24  into this case.

25     The task before us was daunting, as you know, Your Honor.

1   We have 70,000 claims, none of which have a readily

2   ascertainable value associated with them.  So what we embarked

3   upon, as you described, was the process, discovery process to

4   begin looking at two issues: liability and potential value of

5   the claims in the event liability was established.

6        The TCC was incredibly active in litigating against the

7   debtor as were the subrogated insurance carrier group.  And a

8   lot of what occurred, in terms of the discovery record in these

9   estimation proceedings, picked up from a very well-developed

10  record that already existed from the state JCCPs.  Mr. Baghdadi

11  referenced those earlier today.

12       The North Bay Fire litigations were underway for well over

13  a year before the bankruptcy began.  We had had dozens of

14  depositions, we had gone through millions of pages of

15  discovery, and we just built on that for the estimation

16  proceedings.

17       Your Honor will recall that we ultimately announced the

18  settlement with the TCC, which is the statutorily required

19  committee that has a fiduciary duty to all of the fire victims.

20  Roughly a week before, we were hitting a critical milestone in

21  these estimation proceedings.  We were a week out from

22  exchanging all of our expert reports.

23       And as Your Honor will recall, the way we had set up the

24  bench trial, it was going to be heavily relying upon the

25  analysis of the value of the claims by a whole series of

experts.

I could tell you on our side we had close to a dozen who were going to submit reports.  I know the TCC had probably close to that amount, if not more.  Subros had their own experts to value their claims.  And each side had been working very hard on the data that was available to come up with what they viewed as a reasonable estimate of these wildfire claims.

There is no right answer here.  Our number would have been different than TCC's number, which would have been different from the subros' number.

But the analyses that were done looked at this, by that point, 50,000 claims that had come in, extrapolated based upon the information that was available from those claims to property values, looked at the number of tragic deaths that were associated with each of the fires, estimated the number of people who had been forced to flee their homes.  We were all working very hard on calculations of what it would cost to rebuild all of these communities that were devastated by the wildfires.

And to your earlier point, Your Honor, what I know with certainty was on our side, on the debtors' side, we were looking very hard at what we have always believed is the best touchstone in valuing these impossible-to-value cases, and that is what settled for historically, to try to project what they would settle for if they were actually being resolved claim by

claim by claim.

So the analyses we were going to put forward would have included very sophisticated regression analyses based upon the existing previous settlements, trying to match that up against the circumstances of the various claimants here to provide value to those claims that are the most difficult to value. What we refer to as the soft damages; the emotional distress, the pain and suffering, the annoyance and inconvenience.

And I know -- I don't want to get into the details because it wouldn't be appropriate, but I know, based upon the mediation conversations that we had with both the Tort Claimants Committee and the lawyers representing in excess of 70 percent of the actual victims that they were doing the same thing.

So when we ultimately were able to get --

**THE COURT:**  Let me just jump in.  And "the same thing" is crunching this vast trove of real-world data from prior settlements.  Is what you mean?

**MR. ORSINI:**  That's right, Your Honor.

**THE COURT:**  Go ahead.

**MR. ORSINI:**  That's right.  That's right.

And we also had, from the debtors' perspective, we had -- the company itself had done a tremendous amount of work looking at similar issues, in order to take the accounting charges that it was required to take for these fires under SEC reporting

1    rules.

2         Now, those were low ends of the range.  Your Honor is

3    familiar with the securities law, I know, from both your

4    practice and your time on the bench.  We had to disclose the

5    low end of the range because we had concluded that losses were

6    probable for many of the fires.  So we also had that data

7    available to us.

8         And so when we got down to brass tacks, which was a very

9    hard-fought set of mediations that lasted months on end, that

10   started with two very well-known and very respected mediators,

11   Judge Danny Weinstein and Robert Meyer, both of them associated

12   with JAMS, they got us started with months of mediation where

13   we were talking about, among other things, these very questions

14   of settlement value from previous cases.

15        In late summer/early fall of last year, Judge Montali

16   appointed retired Bankruptcy Judge Newsome as a mediator.  And

17   Judge Newsome got us all into a series of conference rooms and,

18   figuratively and almost literally sometimes, beat our heads

19   together and had the -- had the warring factions here talk to

20   him about how we valued these claims, talk to each other about

21   how we valued these claims, dived into specific issues like the

22   property damage, like the pain and suffering.  I don't think

23   it's appropriate for me to get into specifics, but this is the

24   process because it was mediation.

25        And it was through this incredibly hard-fought mediation

1  with the debtors, the company's equity holders, the TCC, which

2  has the statutory fiduciary duty, and, ultimately, the lawyers

3  representing in excess of 70 percent of the wildfire claimants,

4  along with part of this process represented the California

5  state agencies, the federal government, Mr. Careshi (phonetic)

6  and his partners on behalf of the bondholders, through the

7  course of these weeks of mediations, arrived at the settlement

8  that's before you right now.

9       And it was, I think everyone who was part it can attest

10  to, one of if not the most complicated things we've been

11  involved in, in our careers, because of the complexity of the

12  number of company claims, because of the stakes we were facing

13  here because of the horrific circumstances.

14       And all of it was informed by reviewing the massive

15  discovery record and, in particular, the data from previous

16  settlements to find a number that we could all agree was a

17  reasonable estimate of the wildfire claims here, and a number

18  that now, we're pleased to be able to report, has been adopted

19  by an overwhelming majority of the victims themselves through

20  the bankruptcy voting process.

21       **THE COURT:**  What was the final percentage on that, the

22  approval vote?

23       **MR. ORSINI:**  We have not yet released that specific

24  percentage, Your Honor, because that percentage is not final

25  yet.  I don't think it would be appropriate for me to give the

1  specific number.

2       What I can tell you is -- because it's still being

3  certified, the final vote tabulations.  It is well in excess,

4  well in excess of both of the statutory minimums, which are

5  50 percent for the votes cast by number and two-thirds of the

6  votes cast by value.

7       And, again, the specific number will be certified, but the

8  reason we were comfortable disclosing the general results is

9  because the numbers so far exceed that threshold.

10       **THE COURT:**  Well, somebody at PG&E used the word

11  "overwhelming" in press stories, so --

12       **MR. ORSINI:**  Yes, Your Honor.

13       **THE COURT:**  Is that what you mean by overwhelming,

14  it's just over 50 percent?

15       **MR. ORSINI:**  It's not just over 50 percent, Your

16  Honor.  It is substantially over 50 percent.  It is closer to

17  100 percent than it is 50 percent.

18       **THE COURT:**  When is this going to be certified?

19       **MR. ORSINI:**  I believe on May 22nd, the end of this

20  week, tomorrow.

21       **THE COURT:**  Tomorrow.

22       **MR. ORSINI:**  Tomorrow.

23       **THE COURT:**  All right.  Okay.  I'm going to have some

24  follow-up questions.

25       Mr. Julian, so your colleague has given a very vivid

1    description of the adversarial aspects of the mediation and the

2    process that led up to the 13.5 billion.  Are you in agreement

3    with all that?

4         **MR. JULIAN:**  In general, yes.  And I would only

5    supplement Mr. Orsini's description with two points.  And that

6    is that both sides also accessed a substantial body of data

7    with respect to square foot rebuild costs in the various fire

8    zones as well as expert testimony on what it will take to

9    remediate the land, the soil, the trees.

10        We had good data on that.  A lot of this was shared in

11   mediation, which is confidential and we can't repeat here today

12   because we signed the confidentiality orders respecting our

13   use, but there was a good exchange of information in the

14   mediation with the parties on that.

15        And the second point I would like to make is that the

16   parties, in negotiating the settlements, both the -- the

17   aggregate fire victim consideration amounts, including the

18   assigned rights and causes of action, as well as the plan

19   construct with equity, were guided by an overriding principle

20   of practicalities, Your Honor.  And it comes down to this:

21        If you fight this out forever, and each side tries to get

22   the higher dollar amount or the lower dollar amount, you end up

23   with, potentially, an illiquid case, you end up with a loss of

24   time and value.  And these fire victims are suffering now and

25   need their money now.

1          So, really, what the parties additionally did in that

2     mediation was look at the practicalities of this case and say

3     we have to settle now, earlier is better, and that guided a lot

4     of our construct for the plan and for the settlement itself.

5          **THE COURT:**  Well, 502(c) is wide open, as you know,

6     but the one word that is never used is "forever."  That's the

7     apposite of what we're supposed to be doing here.  So I'm not

8     in any danger of that.

9          Mr. Orsini, here are my follow-up questions.  I have

10    called explicitly, for this conference and prior communications

11    on other status conference occasions, for someone, if they are

12    unhappy with the 13.5 billion estimation, to tell me what is

13    left to be liquidated.  In other words, what portion, if any,

14    of the fire victim claims will not be estimated with the number

15    that you all are proposing for me to consider.

16         Now, is there anything left on that from the debtors'

17    point of view?

18         **MR. ORSINI:**  No, Your Honor.  And this is actually a

19    very important point and, I think, is one of the

20    misunderstandings reflected in some of the filings that have

21    come in, including last night.

22         So the task before us is and always has been to come up

23    with an estimate of the aggregate fire victim claims.  There

24    were two main constituents, when we started this, on the other

25    side of the D from me.  There were the subros and then there

1  were the fire victims, which is basically everybody else;

2  individuals, corporations, businesses, what have you.

3      The aggregate fire victim consideration, which is made up

4  of $6.75 billion in cash, $6.75 billion in equity, of the

5  fire-equity value, and the assigned claims that Mr. Julian

6  referenced, that amount is the amount that is being set aside

7  to resolve every single claim from the 2015, 2017, and 2018

8  wildfires that is not part of either the subrogation settlement

9  or a series of settlements we entered into with some local

10  municipalities that actually never even got before the Court.

11      So the most direct answer to your question, Your Honor, is

12  no, there are zero claims left that need to be estimated, that

13  need to be liquidated after we get this plan confirmed, after

14  we get the estimation order we're seeking, and after we fund

15  the Fire Victim Trust.

16      Now, what will happen after the plan goes effective and

17  the Trust is funded is there are trustees that have been

18  established; Judges Trotter and Yanni.  Very well-respected.

19  They do this all the time.  They are going to go through the

20  mechanism of figuring out how much each specific claimant to

21  that trust will receive as a payment.  Because, as we sit here

22  right now, there has been no finding that any claims, with

23  respect to any of the victims that are in this class, the fire

24  victim class, have a liquidated claim amount.

25      I could talk more about that if you like, but the reality

1    is we're asking for an aggregate estimate of all of the claims

2    in this class.  And once Your Honor enters this order, if Your

3    Honor enters this order, there is nothing left to do in this

4    case because you really had two tasks: estimate the subros --

5           **THE COURT:**  Let me just jump in.  I am going to enter

6    an order.  I do not know if I'm going to take the proposed

7    order you submitted --

8           **MR. ORSINI:**  I understand that.

9           **THE COURT:**  -- but something will be entered.

10   Something will be entered.

11       We've always appreciated that the granularity of exact

12   claims is not part of this process.  We're looking at the

13   big-picture pool, estimate pool, from which all those claims

14   will be paid.  It will be, of course, well beyond the scope of

15   502(c) and the realities of the case to try to do anything more

16   granular than that.

17       Mr. Julian, yes, go ahead.  I was about to ask you your

18   views.

19          **MR. JULIAN:**  Yes, Your Honor.  I understand that you

20   may enter your own order, not the one we proposed.  It's very

21   important for me to address what we believe the minimum that

22   order should state.

23       And your estimate should be pursuant to the bankruptcy

24   court-approved settlement, which states that the consideration

25   being paid into the Fire Victim Trust is made up of several

1    items, four principally.

2        First, the cash.  Second, the PG&E stock.  Third, the

3    assigned rights and causes of action against third parties,

4    which will be pursued by the Fire Victim Trust standing in the

5    shoes of PG&E to recover more money into the Trust for the fire

6    victims.  That's very important to us.  And last, but not

7    least, certain rights and causes -- and insurance policies.  So

8    contracts of indemnity, insurance policies.

9        Your Honor, these extra rights contained in the claims and

10   the policies and the contracts are additional consideration to

11   the $13.5 billion.  And so that --

12       **THE COURT:**  I want to jump in because I'm concerned

13   about something.  I am not a settlement judge, all right.  This

14   is not a class action, a Rule 23 class.  I'm not giving

15   preliminary or final approval.  I am entering an estimate

16   number.  All right.

17       Now, you all have done a huge amount of work on the RSA

18   and proceedings in the bankruptcy court, and that's great.

19   That doesn't, in my view -- I'm not in a position to say yes or

20   no to any of that.

21       I'm doing one thing, and one thing only, discharging what

22   Congress tasked me to do under Section 502(c), which is give a

23   best-case estimate, in the circumstances, on the aggregate

24   value of the fire victim claims.  That's it.

25       So I am not going to make any findings about conditions

1    precedent or anything else.  That's for you all to do.  But I

2    just want to be clear, this is not -- I am not adopting.  That

3    is not the right word.  I'm not adopting anything.  I am making

4    my estimate, and that will be based on the inputs that I have

5    received.  I'm not approving anything.  I'm going to enter an

6    estimate figure.

7        So I understand you all have structured this thing like a,

8    you know, very complicated puzzle for good reason.  But just be

9    aware that this is going to be an estimation order under

10   Section 502(c), and that's it.  No more, no less.  All right?

11           MR. JULIAN:  Yes, Your Honor.  My main point is, when

12   the Trust goes and sues these defendants, we don't want any

13   defendants to say, "Oh, no, Judge Donato said the victims are

14   only owed 13.5; you can't collect anymore money on the assigned

15   rights and causes of action."

16       So I would just request Your Honor --

17           THE COURT:  I understand what you're saying.  Won't be

18   the first time someone has taken a judge's order and said this

19   is what it means.  And you all can duke that out in the right

20   forum.

21       But I just want to be clear, I'm not -- I do not believe

22   it is consistent with 502(c) to present this as a settlement

23   for approval.  That's just not what I consider the proper scope

24   of my task under 502(c) to be.

25       So you may be reading -- we both may be reading more into

1    this than we need to, at this point, but that's my perspective

2    on where we're coming from.

3        All right.  So we've heard from the two main players,

4    which is just about most of the case.  Anybody have anything

5    else to add either on the process or whether there are

6    unliquidated damages?

7        I have not received anything, from anyone, indicating to

8    me at any point from December through today that anything is

9    going to be left unliquidated.

10       Now, I understand -- let me just preface this.  I

11   understand a few parties think the amount is not sufficient.

12   But, you know, the magnitude of the estimate is going -- why

13   that's not the case is what I was asking.  You need to show me

14   something is being left out, and I have not seen any evidence

15   of that.

16       And the second issue is, you know, you individual claims,

17   you know, one of the hospitals, I think, said, "Well, we're

18   owed 500 million."  That seems to me to be something that's

19   going to be worked out in the more granular claims process, not

20   something I need to do here.  That's just not -- that's

21   starting to ask me to adjudicate what the amount of the check

22   should be, and that is not what 502(c) contemplates or what I

23   contemplated when we kicked this thing off in the fall.

24       So with that, is there anyone who has something about --

25   yes, Mr. Mintz.  You have to unmute.

1          **MR. MINTZ:**   Your Honor, thank you.

2      I want to be clear as to what's being asked for and the

3  issue that we have.   I am counsel for AT&T.   We filed an

4  objection and we've been conferring with counsel for Adventist

5  and the Paradise entities as well.   We're similarly situated in

6  the sense that we hold substantial liquidated claims.

7      And I think it's important to focus on the request that's

8  being made here and how it fits into 502(c).   The debtors have

9  told you that they're asking for an estimation of all fire

10  victim claims, and that's what was requested of you with

11  respect to the withdrawal of the reference.   But that's not

12  right.

13      Your Honor, the withdrawal of the reference was limited to

14  the estimation of the unliquidated -- of the unliquidated and

15  contingent claims, and that is all that 502(c) permits you to

16  do under that statute.

17      Our point is, we're not asking you to fix the amount of

18  our claims, and we recognize that's beyond the scope of what's

19  here.   Our point, though, is that we have substantial claims in

20  excess of a billion dollars, a substantial portion of which are

21  liquidated, noncontingent claims and which, therefore, cannot

22  be the subject of an estimation by Your Honor either within the

23  scope of the jurisdiction in the withdrawal of the reference or

24  under 502(c).

25      Those claims -- any claims that are liquidated and

1    noncontingent have to be outside the scope of the estimation.

2    It's just not within the statutory authority that Your Honor

3    has.

4          **THE COURT:**  Well, that may be right.  I don't know.

5    But why -- why do I have to worry about -- I'm not trying to

6    sound glib, but why is this a problem for me now?

7          I'm just going to enter an estimation.  Whether you think

8    you're in it or not, that's not something I need to decide, is

9    it?

10         **MR. MINTZ:**  Your Honor, if the order is limited to the

11   estimation of unliquidated and contingent claims as set forth

12   in 502(c), that addresses that specific concern.

13         The request that the debtors have made is that it's an

14   estimation of all fire victim claims.  So on this particular

15   issue the point is, is that the estimation should be tied to

16   the statute and should be limited to those claims which are

17   unliquidated and contingent.

18         **THE COURT:**  All right.  Anybody want to respond to

19   that on debtor or TCC?  Mr. Orsini.

20         **MR. ORSINI:**  Yes, I would, Your Honor.  Thank you.

21         So a couple of things.  First of all, just because

22   Mr. Mintz says they're liquidated does not make it so.

23         What his client has claimed, what Adventist has claimed,

24   which is the hospital, has claimed are losses associated with

25   rebuilding, a lot of which has not been done yet.

1       Your Honor, I don't know if you've every done a

2   construction project.  I've suffered through it.  Two things

3   are guaranteed: it's not going to be done on time and it's not

4   going to be done for what it was estimated.  Could be more;

5   could be less.

6       So the simple fact that these claimants say, "Well, ours

7   is liquidated because we put a number down" doesn't make it so.

8   There are still open issues as to which categories of damages

9   they will be entitled to.  There are open issues with respect

10  to what the amount is.  All the things that will have to be

11  addressed by the trustee.  So saying they're liquidated doesn't

12  make it so, is my first point.

13      Second point is, and this is the critical one, what's

14  really going on here is Mr. Mintz and others who have submitted

15  these briefs are trying to get themselves out of the number,

16  out of the amount that's being set aside to satisfy all five

17  victim claims, right.

18      The evidence that's before the Court, in terms of what the

19  parties stipulate the value of the claims is -- and I totally

20  understand and take your point that you're not approving a

21  settlement.  We're not asking you to, right.  But what we've

22  given you --

23          THE COURT:  Well, you know, your papers actually do.

24  You keep saying I should adopt a settlement.  I just want to be

25  clear, that's not the way the order is going to read, all

 1    right.  So don't be surprised when you see that.  I don't think

 2    that's right under --

 3              **MR. ORSINI:**  That's not -- apologize, Your Honor.

 4              **THE COURT:**  The reason I brought it up is because the

 5    language in the papers provoked it.  I didn't come up with it

 6    on my own.  So you may not have intended it.  And if not, then

 7    we've clarified it.  But I just want to be clear, this is not

 8    me looking over a Rule 23 preliminary approval paper and saying

 9    this looks fine.  I'm not doing that.

10              **MR. ORSINI:**  I understand that, Your Honor.  And if

11    that's the impression we left, that was not our intent.  So I'm

12    glad we've clarified that.

13         Our -- our position is that we're asking you to do exactly

14    what you said, which is estimate the claims.  And what we've

15    given you --

16              **THE COURT:**  Mr. Mintz's point is well-taken.  I'm

17    estimating the unliquidated claims.

18              **MR. ORSINI:**  Well, yes, Your Honor, but --

19              **THE COURT:**  Let me just say, there's clearly going to

20    be some fights.  How much are people going to get?  How is the

21    pot going to be divided up?  Who's subject to the pot?

22         That's not 502(c) the way I understand it.  I am tasked

23    with entering the -- I don't have the exact language here, but

24    it's plain as day under the 502(c) language, the unliquidated

25    and contingent claims.

1        **MR. ORSINI:** Yes.

2        **THE COURT:** If you all want to fight later about

3 whether, you know, company A or hospital A's claim is

4 unliquidated and contingent, that's a bankruptcy issue, I

5 think, for the trustee, as you say, or maybe the bankruptcy

6 judge.

7      But I am going to put a dollar value on the unliquidated

8 and contingent claims. Now, what that means for an individual

9 claimant is something that I don't think is within the scope of

10 502(c).

11      Do you agree with that, Mr. Orsini?

12        **MR. ORSINI:** Well, to the -- to the extent that

13 there's a liquidated claim -- for these purposes none exists,

14 right, but if there were one, what we're asking for here is an

15 estimation of the total value of the fire victim claims.

16      So if it were hypothetically the case, for example, that

17 there was a fire victim claim that had been found to be

18 liquidated, that was worth, say, $500 million, okay, the

19 debtors, the TCC, and the others who have put in their

20 stipulated estimation amount would not be agreeing that the

21 total value of the unliquidated claims is 13.5 and then that

22 500 sits on top of it. It would, in that scenario, be 13,

23 okay.

24      And that's the critical point here. We have to make sure

25 that this isn't set up such that there's some pool of claims

1  outside of the 13-and-a-half billion dollars that's being set

2  up.  The 13-and-a-half is the value that we've all agreed

3  exists for all of the fire victim claims.  We don't believe any

4  of those are liquidated.  But to the extent they are, again,

5  they're getting that amount of money in the Trust.  And, as you

6  said, they go put into the Trust for that amount, and they're

7  going to fight over whatever they do or don't get.

8          **THE COURT:**  Mr. Mintz.

9          **MR. MINTZ:**  Your Honor, the notion that there are no

10 liquidated claims within the scope of fire victim claims is

11 patently absurd.

12      We've incurred and spent money repairing the damages.  I'm

13 not here to say that every single dollar of our claims are

14 liquidated, but a substantial portion of our claims are

15 liquidated, and that's never been disputed.  And it's patently

16 false to suggest otherwise, Your Honor.

17      Our problem here, and the reason we're raising these

18 issues, is that we don't know what this estimation is to be

19 used for.  The debtor has not articulated an explanation that

20 tells us how it's going to be used in connection with

21 confirmation or the distribution of -- of recoveries by the

22 Trust on a go-forward basis.  Because of that opaqueness, we're

23 here today raising these issues.

24      The debtors told us -- has told Your Honor what the

25 purpose is not.  It's not for [audio distortion] 1054; it's not

1   for confirmation; it's not for distribution purposes.  But

2   they've never explained why they need this estimation and what

3   the purpose of it is.

4      So because of that, I'm here challenging this because I

5   really don't know why they need it and why they're intending

6   to -- why they think this is important.

7      I don't think they need it for confirmation.  I think if

8   Your Honor didn't give them this order they would go forward

9   with confirmation next week without a beat, without missing a

10   beat.  But Your Honor is constrained by the statute and the

11   jurisdiction.

12      There are liquidated claims.  And I don't have a problem

13   if the estimation is 13-and-a-half billion less the amount of

14   liquidated claims.  I'm not trying to change the fundamentals

15   of what's been agreed to here, but I don't think it's

16   appropriate for the estimation to include those claims which

17   are, indeed, liquidated.

18          **MR. KAROTKIN:**  Your Honor, may I say something?

19          **THE COURT:**  Yes.

20          **MR. KAROTKIN:**  Stephen Karotkin for the debtors.

21      First of all, Mr. Mintz has acknowledged that his claim is

22   not fully liquidated.  He stated that.  And I can confirm, Your

23   Honor, that the debtors are engaged in discussions with AT&T as

24   to what is the amount of their claim.  So it's not liquidated.

25   It's contingent.

1   Under the Bankruptcy Code, the debtors have the full right

2 to object to any claims that are filed.  That right has not

3 expired.  And if you look at the claim filed by the Adventist

4 group, it says only -- the claim is at least approximately

5 $500 million plus punitive damages in a -- in a similar amount.

6 That's not a liquidated, noncontingent claim.  It just is not

7 the way the bankruptcy code works.

8   Just because -- what they're telling you, Your Honor, is,

9 "Just because we filed a claim in a dollar amount, that makes

10 it liquidated and not contingent," and that just is not the

11 fact.  That is not how it works.

12   Any party can file a claim, a proof of claim in the

13 bankruptcy court for any amount of dollars.  That does not mean

14 it is a liquidated, allowable, noncontingent claim.

15   And I would ask Mr. Mintz to -- he cannot possibly

16 contradict that.

17   **THE COURT:**  All right.  Yes, last word on that,

18 Mr. Mintz, and I want to move on.  Go ahead.

19   **MR. MINTZ:**  Your Honor, I will contradict it just

20 briefly.  I think Mr. Karotkin is boring the concepts of

21 liquidation, contingent, and allowance.

22   I agree my claim is not allowed, but it is certainly

23 liquidated to the extent that I've spent monies doing repairs.

24 That is the definition of liquidating.  The fact that the

25 debtor may have --

1          **THE COURT:**  Let me just -- I can't re- -- I mean, I'm

2     not sure I would -- I'm not going to resolve this.  Let me just

3     be clear.  You all are going to fight about whether someone is

4     in or out of liquidated.  I'm not the right forum for that.

5     It's not within 502(c).

6          But having said that, Mr. Mintz, I mean, you know, if you

7     look at an insurance context, if you have an auto accident and

8     you, on your own, go and get everything replaced with

9     hand-built parts and customized repairs, just because you have

10    a huge bill in your hand does not mean that that is the

11    liquidated amount.  That may be unreasonable.  It may have been

12    precipitous.  It may have been, you know, attackable in a

13    variety of ways.  So just having a number is not enough for the

14    concept of something being liquidated.

15         This is all dicta.  It has nothing to do with anything

16    we're talking about.  That's just my view.

17         Ms. Winthrop, you've had your hand up for a long time.

18    Please.

19         **MS. WINTHROP:**  Thank you, Your Honor, appreciate that.

20    Rebecca Winthrop on behalf of the Adventist claimants, since

21    they always like to talk about my claim, my clients' claim.

22         So, first of all, to correct a couple of misstatements,

23    this matter has been fully briefed, and not once did any of the

24    briefs focus on the amount of the claim.

25         Just because the -- the focus of the briefs, as set forth

1   in our opposition to this motion, was the idea that the debtor

2   disputed liability.  That does not render a claim un- -- pardon

3   me, does not render a claim unliquidated.  That issue has now

4   been settled because the debtors has plead guilty to a number

5   of felonies.  So the debtor cannot sit there and dispute

6   liability any further.  Regardless, that is not before this

7   court.

8        The issue is what is within this Court's power, and that

9   is to estimate only unliquidated and contingent claims.  That's

10  it.  That's all we're asking, is that the Court be -- the

11  Court's ruling be limited to what is before us.

12          **THE COURT:**  Sounds perfectly fine to me.

13       All right.  Any last words -- oh, yes, Mr. Abrams, you've

14  joined us.  Okay.  Yeah.  I can't hear you.  Are you on mute?

15  I can see you, but I can't hear you.  No.  Why don't you fiddle

16  around a little bit, and I'll make sure we come back to you

17  before we sign off, okay.

18       Yes, Mr. Weiss.

19          **MR. WEISS:**  Thank you, Your Honor.

20       I wanted to address and thank the Court, first, for asking

21  the question at the beginning, of the debtors' counsel, about

22  how the 13.5 billion was derived.

23       And the debtors' counsel went through a long explanation

24  of that and the process and the experts and all the information

25  that went into it as input, but none of that was put before the

1   Court on the debtors' motion.

2       And that was one of the principal objections that we made,

3   that there was no evidence before the Court that you would

4   traditionally see in an estimation proceeding to allow the

5   Court to have their information, to be able to make an

6   estimation.

7       And so I would just submit that there's still no evidence

8   that has been put before the Court in a proper way through

9   declarations, no evidence of these experts or any information

10  for -- to support the 13.5 billion.

11      And it may very well be that the 13.5 billion is well

12  supported and the evidence that would be put forth would show

13  that, but we just don't have that in front of us and had no

14  ability, until today, to hear what Mr. Orsini described to you

15  as to the process and what went into it.

16      So I just wanted to put that on the record, Your Honor.

17          **THE COURT:**  Okay.

18      Any other comments?

19      Oh, yes, Mr. Lapping.  Lapping, yes.

20          **MR. LAPPING:**  Good afternoon.  Good morning.  Yes.

21      We initially objected to the estimation motion based on

22  concerns that tying it to the support agreement and the

23  consideration that was in there, that there were weaknesses,

24  and events had transpired since the deal was cut that

25  potentially made a lot of that consideration somewhat

1  questionable in terms of its actual value.  So I endorse the

2  notion that Your Honor should come up with a number here, not

3  adopt this convoluted definition that was proposed.

4       And then, secondly, we filed a supplemental objection, and

5  I guess I would, essentially, join in Mr. Weiss's comments.

6  There's no evidence that counsel has described a process, but,

7  obviously, there are expert reports.  In addition, there were

8  settlements in the Tubbs Fire cases that we understand that, I

9  guess, are now liquidated but would be part of this pool.

10      So our view is, consistent with Mr. Weiss's, that there

11 should be some substantial evidence in the record for Your

12 Honor to make this decision.

13      **THE COURT:**  All right.  Mr. Abrams, do you want to try

14 again?

15      It's not working.  I'm sorry to say, there's no audio, at

16 least on my end.  I see you pointing, but not hearing.

17      Okay.  Mr. Orsini, you had your hand up.

18      **MR. ORSINI:**  Yes, Your Honor.  Just two final points.

19      On the points that were just raised about the sufficiency

20 of the evidence, Your Honor noted to me, I think the first time

21 we were together, how broad your discretion is and how there

22 are no hard and fast rules here.

23      And I don't think any judge, in any estimation proceeding,

24 has had better evidence than you have in the sense of it's not

25 just us saying the number or the consideration is what it is,

1   it's not just statutory fiduciary, but it's now the

2   overwhelming majority of the wildfire victims.  So the notion

3   that you don't have sufficient evidence is specious given all

4   that.  Point number one.

5            **THE COURT:**  Well, I think that's an interesting point.

6   The actual claimants are what is being represented to be, to

7   use PG&E's word, an overwhelming number of the actual

8   claimants, who presumably know how much they're out of pocket,

9   have expressed comfort that they'll be made as whole as they

10  can be made, realistically, with the settlement value.  I mean,

11  that is -- that is not a trivial factor.

12           Now, there's a lot of fighting about who's covered and so

13  on.  That's really more institutional players than the

14  individuals who have been put out of their homes and suffered

15  tremendous losses as a result of that.

16           One thing I would like, though, you're quite right to

17  point out what I said at the beginning, which is, there are no

18  rules.  This is not a bench trial.  I was going to have one,

19  but it's not by any means required or maybe even contemplated.

20  But given the size of this case, that might be a good idea.

21  There's no evidentiary standard or requirement of any sort.

22           Nevertheless, Mr. Orsini, I asked that question

23  specifically this morning because I did want to get some

24  assurances that this was more than a mediation number.  I'm not

25  saying that in a disparaging way, but I think you understand

1    what I'm saying.

2              **MR. ORSINI:**  I do.

3              **THE COURT:**  You've given me those, but I would like --

4    I think it would be good for the record and good for me and

5    good for you, all of you, to put what you just said into a

6    filing.

7              Mr. Julian, I would like to have you make that a joint

8    filing to the extent you two can work that out.  And that would

9    be a description in as much detail as you can.

10             I'm not asking, at this point, certainly not compelling

11   any mediation privilege waivers.  We're not at that point.  And

12   I don't think it's necessary for my purposes.  But how much

13   time would you need for that?  Can you get that to me by, say,

14   Tuesday next week?

15             **MR. ORSINI:**  I think we have to, Your Honor.

16             **THE COURT:**  Mr. Julian.

17             **MR. JULIAN:**  Yes, that would be fine.

18             And I might add, Your Honor, Mr. Orsini and I actually

19   discussed the evidence concept, and we were guided by your

20   comment that you made when we both informed you of the

21   settlement, that when you have two warring parties who finally

22   settle, you've got the gold standard of the best settlement

23   possible.  And so we used that as a guide in deciding what we

24   would and would not present, but we'd be happy to supplement

25   the record.

1          **THE COURT:**  I stand by those comments.  I still think

2    that's the right way to see it.  Let's just put it down on

3    paper, and that way we don't have to fish through the

4    transcript.  If nothing else, we won't have to fish through the

5    transcript.

6          I think I have everything I need.

7          **MR. ORSINI:**  Can I make my second point, Your Honor?

8    I had two points.

9          **THE COURT:**  Mr. Orsini, yes.

10          **MR. ORSINI:**  Sorry, Your Honor.  I made my first.

11          My second point, going back to the debate with Mr. Mintz

12    and Ms. Winthrop, you're a hundred percent right, Your Honor.

13    This is not the place to decide what is or is not liquidated or

14    unliquidated.

15          The only critical point that I'd ask the Court to keep in

16    mind as the Court crafts its order is the point with which

17    Mr. Mintz also agreed, which is that to the extent there are

18    any fire victim claims that are liquidated, what that would do

19    is reduce the estimate, not sit on top of the nominal 13 and a

20    half --

21          **THE COURT:**  Listen, everybody can have -- I'm almost

22    certainly -- I'll think about it, but I'm almost certainly not

23    taking a position on any of that, all right.

24          So don't go back and point to this record and say I did

25    something on that issue.  I am not.  I am only discharging my

1   502(c) duties.

2        Ms. Cabraser has been the only person so far to raise the

3   hand.  Makes it easy for me.  Go ahead, yes.

4        **MS. CABRASER:**  Thank you, Your Honor.  Elizabeth

5   Cabraser.  We appreciate greatly -- can you hear me?

6        **THE COURT:**  Yes.

7        **MS. CABRASER:**  Thank you.

8        We greatly appreciate Your Honor's observation under

9   502(c) that your estimation order will be an estimated number.

10  As you can see, everyone has been tempted to import other

11  unresolved issues into this hearing and perhaps into a plea for

12  an order.

13       My understanding is no one is waiving or withdrawing their

14  positions on any of those unresolved matters which will be

15  before the bankruptcy court in connection with the confirmation

16  hearing on the proposed plan and perhaps on an ongoing basis as

17  we move into the Trust.

18       Whatever the estimated number, this will be the

19  quintessential limited fund.  Perhaps the largest one ever for

20  tort claimants, but a limited fund nonetheless.  And so there

21  will be a premium --

22       **THE COURT:**  Is that right?  In your experience, is

23  this, your knowledge, the largest tort settlement fund ever?

24       **MS. CABRASER:**  Perhaps, Your Honor.  Depends on the

25  definition.  But in terms of a Trust to be set aside under a

1  plan for tort claimants, lost lives, livelihoods, properties,

2  businesses, I believe it is.

3       Nonetheless, as you know, it is a limited fund.  And so

4  there will be a premium, on an ongoing basis, to making sure

5  that it's administered and allocated fairly and efficiently and

6  with conservation of those limited assets.

7       And I think that is the source of a lot of the arguments

8  and presentations that have been brought to you.  I think it is

9  a shared concern and a shared interest, and will be subject to

10 a number of motions, objections, suggestions to the bankruptcy

11 court, and perhaps to this court, I don't know, on an ongoing

12 basis.

13      But for today, the essence of the 502(c) request is the

14 estimation number.  That's the linchpin for all of those other

15 arguments.

16      **THE COURT:**  Well, I think those are all very fair

17 statements.

18      And let me just say, for clarity, what Ms. Cabraser said

19 so eloquently.  Obviously, all of these issues are for another

20 day.  No one is losing anything from whatever I enter into the

21 estimation proceeding.  You can take that up with whoever is

22 next in line.

23      I have to admit, I have a little bit of judicial envy.

24 These are great issues.  I wish I could stay involved.  I

25 can't.  It's going to be someone else.  It's either going to be

1    the bankruptcy judge or whoever handles the appeal.

2        But I think in some ways some of the more interesting

3    things and some of the things that are going to give real value

4    to the fire victims are yet to come.  And I wish I could be

5    involved, but I probably won't be.

6        Okay.  Last comments, Mr. Karotkin?

7        **MR. KAROTKIN:**  Your Honor, tomorrow we will be, I'm

8    told, filing the final certification of the votes on the

9    plan --

10       **THE COURT:**  Tomorrow.

11       **MR. KAROTKIN:**  -- tomorrow, which I believe will

12   confirm overwhelming acceptance by the fire victim class.

13       **THE COURT:**  Okay.  All right, everyone.  That's it.

14   So thanks very much.

15       Oh, yes.  One last shot, Mr. Abrams.  I can't hear you,

16   I'm sorry to say.

17       Well, maybe six months from now technology --

18       **MR. ABRAMS:**  Can you hear me?

19       **THE COURT:**  Yes, go ahead.  Something happened.

20       **MR. ABRAMS:**  All right.  Thank you, Your Honor.  And I

21   apologize for my technical issues.

22       **THE COURT:**  Oh, don't worry about it.

23       **MR. ABRAMS:**  I apologize for that.  I did want to

24   bring to the Court's attention, really, the focus on 105(a).

25   So that is also part of the debtors' motion.

And part of what 105(a) states is that this process needs to prevent an abuse of process.  And I've been very concerned about that as a wildfire survivor and as someone who has been on the receiving end of this process and heavily involved with other wildfire survivors regarding this settlement.

This 13.5 amount has been sold to wildfire survivors as "come and get your 13.5," with very little information about what goes into that.

The process associated with developing that, I know, may not be in front of this court, but the process that comes out of this is very important to understand.

So the debtors have stated through a number of different means, including through the C2C that their expectations are that upon exit from bankruptcy that the hedge funds will exit the stock.  And they're leveraging the Victims Trust to be able to do that.

And once the hedge funds and other investors exit the stock, the victims are going to be very greatly exposed.  The exact date for when the cash portion of the settlement is going to be put in the Trust, as I understand it, is yet to be determined and yet to be guaranteed.  And the stock portion of this is also very much up in the air.

And so they're asking us to hold our stock portion while the other investors are able to sell.  And so they are using our 21 percent shareholder status to be able to benefit the

1  other investors.  That, I believe, is an abuse of process under

2  105(a), and I would ask you to consider it.

3          **THE COURT:**  All right.

4       **MR. ABRAMS:**  This has great --

5          **THE COURT:**  Go ahead, yes.  Sorry.

6       **MR. ABRAMS:**  Sorry.

7       And, Your Honor, there's two reasons why I think this is

8  critical for this court to decide.  One is for victims who have

9  been told through robo calls and through text message campaigns

10 and other media that this 13.5 is their only way to salvation.

11 And they have not been given much of a choice at all.  They

12 haven't been given much information at all.  And it has all

13 been to advantage others, other parties in this case.

14      And so the fact that this settlement amount will

15 revictimize victims is important for the Court to understand,

16 and what it will mean in terms of the safety of our

17 communities.

18      So what it means that this settlement is set up this way

19 is that the only investors that will be left holding the bag

20 this summer, during wildfire season, are the victims.

21      By every expert's estimation this wildfire season is going

22 to be very, very risky, which is why they have set it up this

23 way, so that other investors have securitized their investment

24 and are positioned for the exit doors.

25      Again, under 105(a) I believe this sets up an abusive

1  process for the victims and should not be allowed.

2          **THE COURT:**  All right.  Well, I appreciate all that.

3  Those are interesting points.  And I think they may be

4  something you can follow up with in another forum, maybe

5  bankruptcy court, or on appeal if it gets to that.  But I think

6  most of that, probably all of it, to be honest, Mr. Abrams, is

7  just outside the scope of what I'm doing in the estimation.

8      Okay.  Thanks very much, everyone.  I'll wait for the TCC

9  and the debtors to file the proffer that we discussed, the

10  statement, I should say, and I'll take it from there.

11      All right.  We're adjourned.  Thank you.

12          **MR. ORSINI:**  Thank you, Your Honor.

13      (Counsel thank the Court.)

14      (At 10:57 a.m. the proceedings were adjourned.)

15                           - - - - -

16                  <u>**CERTIFICATE OF REPORTER**</u>

17          I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19  DATE: Thursday, May 21, 2020

20

21

22          *Katherine Sullivan*

23  _____

24      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                   U.S. Court Reporter

25